## *Section A – Introduction and Summary*

In March 2001, Roxco submitted a Request for Equitable Adjustment (REA) to the Air Force contracting officer in accordance with the Contract Disputes Act. Roxco's REA requested an adjustment in the amount of $7,840,497, citing significant financial losses due to defective documents, differing site conditions, changes, extra work, excessively strict inspections, active interference by the Government, and abusive Government conduct. Roxco's REA is divided into five volumes. Volume 1 is a Technical Entitlement narrative which describes each issue and the evidence of Roxco's entitlement to compensation. Volume 2 is the Cost section and shows the costs and delays resulting from each of the issues discussed in Volume 1. The issues discussed in Volumes 1 and 2 are divided into 11 categories, separated by tabs. Generally, the cost and delay impacts associated with the issues in each tab of Volume 1 are shown in the corresponding tab of Volume 2. An exception is the impacts associated with several issues discussed in Tabs 5 and 6 of Volume 1 which are included in Tab 7 of the Volume 2. The remaining three volumes of the REA include 153 exhibits referenced by the Technical Entitlement narrative in Volume 1.

In 2002, Roxco's counsel, Young Williams P.A. of Jackson, Mississippi, retained Pearson Management Group, Inc. (Pearson) to analyze Roxco's entitlement. We were released to commence work in June 2004, shortly after the United States Court of Federal Claims ruled against the Government's August 22, 2003 motion to dismiss Roxco's claim. Since then, Pearson has reviewed many project documents, including documents obtained from the Government through discovery. We have conducted many studies of those documents and held interviews with Roxco personnel involved in the project. We have also attended several depositions.

As evidenced by the text, tables, graphics and other documents included in this report, Pearson has undertaken its own independent analysis of Roxco's claim. We did not follow the Roxco REA format or rely on statements made in Roxco's REA; we conducted our own analyses and reached our opinions based on our findings, which are sometimes different than stated in Roxco's REA. Based upon our study of the record thus far, Pearson concluded that Roxco is entitled to recover from the Government its remaining contract balance of $816,767 and additional

compensation in the amount of $5,415,776, bringing the total to $6,232,543. Roxco may also be entitled to interest on those amounts. In addition, we find that the Government is not entitled to recover any liquidated damages from Roxco. Pearson reserves the right to amend our findings based on new facts that may become available to us in the future.

In summary, Roxco's entitlement arises from the following issues:

1. Deficient contract documents
2. The impact of voluminous changes
3. The Government's refusal to update the contract documents during the course of work to incorporate the voluminous changes made by the Government
4. Differing site conditions
5. The Government's failure to timely and properly compensate Roxco for changes
6. Flawed inspection processes
7. Unreasonable delays in building acceptance
8. Extensive compensable delays

The following text provides a project background and a summary of our findings.

The Air Force retained the architectural firm of Armstrong, Inc. (Armstrong) of San Antonio, Texas to prepare the design of the Wherry housing project at Barksdale (hereinafter the Project). The design contract was apparently administered by the Air Force Center for Environmental Excellence (AFCEE) at Brooks Air Force Base in San Antonio. Armstrong's work included the development of design drawings, project specifications, and a construction cost estimate. The design drawings and specifications were completed on December 12, 1994, and the construction cost estimate was completed on December 22, 1994. Other than performing an evaluation of construction progress in early 1996, it does not appear that Armstrong had any other involvement with the project after December 1994.

Bids for the work were solicited in December 1994. On March 3, 1995 Roxco Ltd. of Brandon, Mississippi (Roxco) submitted its bid to the Air Force to construct the Wherry housing development at Barksdale Air Force Base in Shreveport, Louisiana. Only two contractors bid this project, Roxco and Brown Builders of Bossier City, Louisiana. Roxco's price for all of the alternates accepted by the Government totaled $18,898,565. Brown Builders submitted a price of $20,404,178 for the same work. Roxco's bid was therefore 7% less than the only other bidder.

The Air Force analyzed the bids over a two week period in March 1995. On March 17, 1995 the Air Force contracting officer awarded the contract to Roxco as the low bidder. Air Force funding for the project was split between two fiscal years, and as a result the project was awarded in two phases. The contract awarded to Roxco on March 17, 1995 was for what was referred to as "Phase II" of the project. Phase II was described in the contract as the "Base Bid" plus Options 1 through 4 and included the construction of 41 duplexes and 24 garages, along with associated site improvements. The contract value of the Phase II work was $8,854,587.

On June 27, 1995, the Air Force added "Phase I" to the contract through Contract Modification P00001. Phase I was described in the contract as Option 5 and included the construction of 45 duplex units, 25 garages, and associated site improvements. The value of the Phase I work was $10,043,978. Roxco's total contract, including Phase I and II was $18,898,565.

The total scope of work awarded to Roxco included construction of 86 stand-alone duplexes (172 housing units), 49 garages, new site utilities, and site improvements such as sidewalks, alleys and playgrounds. The contract duration, including all alternates and Phase I was 495 calendar days. The Government issued Notice to Proceed on March 28, 1995, yielding an original contract completion date of August 5, 1996. The Government administered Roxco's construction contract utilizing the Contracting squadron of the 2nd Bomb Wing at Barksdale with technical assistance from the Civil Engineering squadron. An aerial photograph of the completed project appears at **Exhibit 1.**

*Section A – Introduction and Summary*

In 1995 Roxco was a thriving general contractor with a backlog of approximately $50 million. While constructing this project Roxco was working on four other Federal housing projects, including a Wherry housing project at Warner Robins Air Force Base in Georgia which had strong similarities to the Barksdale project but was successfully completed with Roxco making a profit. Roxco contends that the damages caused by the Government at Barksdale depleted Roxco's capital to the extent that they were forced to discontinue business.

Immediately after mobilizing to the site Roxco experienced problems laying out the buildings. Roxco discovered that the coordinates shown on the contract documents were wrong. Roxco and the Government quickly solved that problem and work resumed. Next, Roxco began excavation at the locations of the new foundation/building slabs. The contract documents stated that all debris from a previously existing but recently demolished housing area had been removed. It had not. The Government orally directed Roxco to remove the debris, dubbed "hidden concrete" by project participants. Roxco removed the hidden concrete. The Government never questioned its obligation to pay Roxco for removing the hidden concrete. However, to this day, a full decade after the work was completed; the Government has never paid Roxco for that work. Furthermore, Government documents obtained in discovery indicate that the Government collected enough money from the demolition contractor that should have removed the debris to pay the amount that the Government states they owe Roxco.

When enough of the hidden concrete was removed to allow Roxco to commence installation of the engineered fill (approximately 2 to 3-foot thick specialized compacted earth) upon which Roxco would later construct the concrete foundation/slab system of each building, Roxco encountered a flawed engineered fill material requirement; the first of a virtually endless stream of flawed contract documents and Government misinterpretations. There is only one engineered fill material on this project but there are three different specifications describing the engineered fill. All three specifications are different. At least one of those three specifications states that a low-cohesive soil could be used in the engineered fill. Roxco's earthwork subcontractor found such a soil a short

distance away from the site, had it tested, submitted it to the Government and the Government approved it. As will be described below, under the proper circumstances, a low-cohesive fill material was acceptable for this foundation/slab system design. That opinion is also shared by Steve Carmichael, P.E., a soils engineer employed by Pearson to review this data. Mr. Carmichael's report is included herein behind Appendix Tab B. Additionally, the Government interpreted the contract documents to require the engineered fill to be placed in 6-inch lifts, when a reasonable interpretation was 8-inch lifts. As directed, Roxco installed the engineered fill in 6-inch lifts. Finally, although the Government argued otherwise, Roxco performed compaction tests on the engineered fill more often than the specifications required. After all of the engineered fill was installed, the Government demanded that Roxco provide a credit for using low-cohesive soil, which as previously stated was specified by the Government and approved for use on this project. Eventually, the Government dropped their demand for that credit because they decided that their approval of the material was inconsistent with their demand. The Government also requested a credit for soil compaction testing that it contended Roxco was obligated to perform but did not. The Government did not drop that demand. Project records confirm that Roxco actually performed more soil tests than the Government argued Roxco was obligated to perform.

When Roxco began to construct the building foundation/slab system the Government would not allow Roxco to pour concrete in the grade beam trenches immediately after excavation. The Government erroneously determined that the contract documents required the grade beams and slabs to be poured monolithically. This caused multiple problems. The Government designed the grade beams deep and narrow. When Roxco excavated them, and had to leave them open for several days in order to pour the grade beams monolithically with the slabs, the sides of the trenches would slough off, requiring Roxco to remove the loose material, sometimes by hand with Dixie cups while working around previously installed reinforcing steel and underground plumbing. The low-cohesive engineered fill material would not hold perimeter formwork in place during the pour, causing the edge of the slabs to be out of alignment.

For a while, the Government even required Roxco to pour the porches monolithically with the duplex slabs. The contract documents relating to the issue of a monolithic pour are conflicting. One specification stated that the foundation/slab had to be poured monolithically; another specification requirement could not be met if the foundations and slabs were poured monolithically. There were sound engineering reasons to pour the grade beams immediately after excavation, which the Government disregarded. There was no sound engineering reason to require the grade beams and slabs to be poured monolithically. Nonetheless, the Government directed Roxco to pour the slabs monolithically, even though doing so made it nearly impossible for Roxco to maintain quality lines and appearance. Roxco tried but could not pour the foundation and slab monolithically and maintain quality lines and appearance. Roxco asked the Government to allow them to pour the foundations, then the slabs but the Government refused. After battling this problem for three months, Roxco hired an engineer to help them find a solution. The engineer developed a solution and Roxco submitted it to the Government in the form of a VE and included a proposed $30,680 credit. The Government was slow to respond but eventually accepted Roxco's proposal only at the garages, not on the duplexes, where Roxco was encountering the most severe problems.

Roxco initially blamed its foundation/slab subcontractor for the quality problems that it was experiencing and terminated him. Thereafter, Roxco employed three more subcontractors and even tried to place the foundation/slabs themselves. A couple of the subcontractors walked away. None of the several experienced tradesmen who tried could accomplish the work satisfactorily utilizing the Government's deficient design. Roxco spent hundreds of thousands of dollars trying to satisfy the Government. As stated in the expert report of structural engineer Gordon Davis, P.E., there was no engineering reason to require the foundation/slabs to be constructed monolithically. Mr. Davis' report is included herein behind Appendix Tab A. Most of Roxco's difficulties constructing the foundation/slabs arise from the combined effect of the Government's flawed design; that is, specifying a low-cohesive engineered fill material, requiring that the foundation/slabs be poured monolithically and refusing to accept Roxco's reasonable solutions. It should be noted again that Roxco submitted a reasonable and acceptable solution to these problems during the course of work

but the Government wrongfully refused to accept it. Thereafter, Roxco continued pouring the foundation/slabs in the best fashion possible under those difficult circumstances. The last foundation/slab was poured on March 22, 1996.

Next, Roxco started wood framing. As discussed in Section F of this report, the Government's contract documents relating to wood framing are seriously flawed. First, the contract documents state that No. 3 Southern Yellow Pine (SYP) may be used to frame these buildings. No. 3 SYP is used for pallets and orange crates, not house framing. The grading requirements, that is, how much warp, wane, bow, twist, etc. is allowed in No. 3 SYP, far exceed what is required to accomplish generally accepted industry tolerances for the straightness of walls and ceilings. The Government inspectors were, for most of the contract duration, not interested in just achieving substantial compliance with wall tolerances. They wanted Roxco to achieve the exact wall, ceiling and floor tolerances stated in other sections of the contract documents. Roxco quickly realized that it could not purchase the low-grade No. 3 SYP that the Government specified and achieve straightness tolerances listed elsewhere in the contract documents so they began to buy industry standard No. 2 SYP instead of No. 3. They did so without requesting additional compensation from the Government, even though Roxco was probably entitled to additional compensation for that change. A year later, in 1996, the Government asked its designer, Armstrong, about the use of No. 3 SYP material in these houses. Armstrong stated that No. 3 met the structural requirements of its design but made no statement about its unacceptable high tolerances, which was an extremely significant problem with No. 3 SYP lumber.

There were many other problems in the contract documents related to wood framing. After the bid documents were circulated to the bidders but before bids were accepted, the Government issued four amendments, which taken together were voluminous. Those amendments corrected many, but not nearly all, of the flaws that existed in the wood framing specifications and drawings. The Government did not issue new contract documents that incorporated those amendments; instead Roxco had to tape or staple them onto the existing documents. That process works for a

while but as the volume of "pasted" revisions grows, the need for a new set of contract documents increases. That is true because it becomes increasingly more difficult to ensure that the foremen who are directing work in the field are working with the right documents. When Roxco installed the wood framing, it encountered many omissions and discrepancies in the contract documents that were not corrected in the four pre-bid amendments. In most instances, the Government either issued an oral direction, some text, or a sketch. As those modifications mounted, it became increasingly more difficult to paste them onto the existing documents and be sure that Roxco and the subcontractors were working with the right documents. On July 8, 1996 Roxco wrote the Government a 14 page letter that, among other things, stated that Roxco had from the beginning of the project requested that the Government prepare for Roxco's use an updated set of contract documents that incorporated all of the changes that the Government had authorized to date. **(Exhibit 2)** The Government never responded to that letter and never updated the contract documents. In other words, although the Government demanded excellence from Roxco they refused to perform their most basic obligation – providing the tools Roxco needed to achieve excellence.

When Roxco began installing roofing and sheet metal, it was probably no surprise to them that the contract documents were again vague and conflicting. Sheet metal details on the contract documents were wholly insufficient. Most owners confronted with this problem would have directed their design architect to issue large scale details clearly setting forth what the designer intended. The Government directed Roxco to install the sheet metal in accordance with the reference standards included in the boilerplate language of the sheet metal specification. If that was a reasonable solution, there would never be a need to have an architect design sheet metal for any particular application, including this one. The Government must have known that they needed a customized design for this particular project because they commissioned Armstrong to do just that. However, the design was too vague to utilize. For months and months Roxco and the Government discussed sheet metal details. For months Roxco installed roofing and sheet metal, believing all the while that their installation was acceptable. In fact, the Government paid Roxco 100% for the roof

installations in February 1997. However, on April 28, 1997, two months after the Government paid Roxco in full for the roofing and sheet metal the Government forwarded to Roxco a 47-item checklist that it planned to use to inspect the roofing. To say that such actions by the Government were untimely would be an understatement. Clearly, if such a list was necessary, the time to issue it was at the outset of work, not after all of the roofing had been installed. The Government did in fact use that 47-item punchlist to inspect the roofs and they used it with zeal. After receiving the 47-item checklist Roxco worked for <u>16 months</u> demolishing the new roofs, replacing sheet metal and reinstalling roofs. Roxco expended about $325,000 installing the roofs, about $100,000 more than its budget. After the Government paid Roxco in full for the roofs Roxco expended about $270,000 attempting to comply with the Government's untimely 47-item inspection checklist.

Disputes arose on this project virtually from the outset. Between April 1995 and August 1998 Roxco wrote many letters to the Government about those disputed issues. The Government did not respond to most of them. If the Government did respond it was usually too late. As previously stated, on July 8, 1996 Roxco's Vice President, Mr. Pat Leech, wrote a sixteen-page letter to the Government setting forth the many problems that the Government's flawed contract documents and unreasonable inspection procedures had been causing Roxco since Roxco started work, and the conversations that Roxco and the Government had about those issues. Mr. Leech's letter was clearly a plea for help. The Government never responded to that letter. In fact, based on the record thus far it appears that the Government did not respond to the majority of the issues raised by Roxco. The same issues were raised by Roxco time and again. Roxco complained about hidden concrete, conflicting and improper issuance of verbal directives, additional testing frequency and costs, and harassment and over-inspection on the part of the Government.

The original contract duration of this project was 495 days, or 16¼ months. The original completion date was August 5, 1996. As of October 1996, three months after the original contract completion date, Roxco billed, and the Government paid Roxco, for installing 82% of the work. Under standard measures, Roxco should have had three to four months of work remaining. Such

was not the case on this project. There was an enormous end-of-job delay caused by the Government's flawed inspection methods, flawed inspection criteria and intentional acceptance deferrals to investigate design issues that had nothing to do with construction. Sixteen months later, in February 1998, Roxco had been paid for 96% of the work. Roxco would never receive another payment. Nonetheless, they continued to work on the project for another 8½ months. Roxco left the project in November, 1998. The Government accepted the last building on August 20, 1999, nine months after Roxco left the project and a year and a half after the Government's last payment to Roxco. We refer to this period, October 1996 through August 1999, as the building turnover period. Section K of this report provides the details of that period.

Although in October 1996, 82% of the contract amount had been billed and paid, less than 37% of the actual construction duration had been expended. In October 1996, Roxco was in its 19th month of construction. Unbeknownst to Roxco, this project would not be completed for another 34 months, or until August 20, 1999. Roxco was not on site when the Government accepted the last building. For financial reasons Roxco voluntarily left the project in November 1998. Roxco's bonding company, AIG, worked the last 288 days, until the last building was accepted. These statistics are highly unusual.

Roxco's original schedule did not include a specific activity entitled "building turnover." Working with Roxco personnel Pearson added that activity to their schedule. Our building turnover activity begins on April 15, 1996 and ends on the contract completion date, August 5, 1996. That duration assumes that the Government would accept 6 buildings per week for 14 weeks. In actuality, building turnover took 149 weeks, 135 more weeks than would have been completed under a reasonable schedule. That is a time overrun of a critical path activity of over 1,000%. As previously stated, Section K of this report describes in detail the flaws in the Government's building turnover process that caused most, if not all, of that delay. As one would expect, Roxco spent millions in unanticipated costs contending with such delays.

The Government refused to timely pay, and in some instances refused to ever pay Roxco for legitimate changes. In unilateral modification P00011 the Government finally issued a modification to Roxco to pay for the removal of hidden concrete that had been discovered almost two years earlier. However, in modification P00011 the Government also included so many illegitimate and overpriced credits that instead of paying Roxco for added work, the Government demanded that Roxco pay the Government $54,974. Section B of this report includes over twenty pages of text and several exhibits explaining Modification P00011. Section B also discusses evidence that exists in the Government's files to support a conclusion that the Government had insufficient funding for this project. The Contracting Officer knew it and modified payments due Roxco so as to not exceed those funding limits.

The Government has benefited from the use of this project for the past 7 to 8 years. During those same 7 to 8 years the Government has benefited from the use of over $800,000 of Roxco's remaining contract balance and, in our opinion, millions that the Government owes Roxco for added construction costs that the Government caused. The Government did not withhold liquidated damages during the course of work. However, three years after the project was completed and two years after Roxco submitted its REA, the Government stated in 2003 that it was entitled to recover over $900,000 in liquidated damages from Roxco. Based on our review of the record we concluded that the Government personnel managing this project were not concerned about construction delays, at least while the project was being constructed. Until Roxco last submitted a pay application in early 1998, the Government issued a time extension every time that contract time was about to expire, whether or not there was a valid reason to do so. In addition, the record also contains documents demonstrating that the Government was intentionally deferring building acceptance to investigate a design issue, unrelated to construction, at the same time that the Government now states Roxco owes liquidated damages. A full discussion of this issue is provided in Section C – Schedule Analysis.



ROXCOREPORT0015

Not surprisingly, during the three and one half years that Roxco worked on this project Roxco lost $7.9 million. That amounts to about a 45% cost overrun. A comparison of Roxco's total job costs of $23,822,451 to its revised budget of $15,946,449 yields a cost overrun of $7,876,002.

One of the matters that we investigated on this project relates to Roxco's construction company, its managers and its experience with multi-family housing. As previously stated, in 1995 Roxco was a thriving general contractor with an ample backlog of work, including several Federal housing projects. Roxco's top managers on this project, Mr. Ron Robbins, President and Mr. Pat Leech, Vice President, were at that time skilled and experienced. In the eight years since leaving this project, Mr. Robbins and Mr. Leech have enjoyed successful careers. We were also interested in the "Measured Mile" section of Roxco's REA, which compared Roxco's performance and experiences at a similar Government housing project at Warner Robins AFB in central Georgia to Roxco's experience at Barksdale. There are far more important similarities to those two projects than there are differences. We think this particular comparison is worthy of consideration. A copy of the Measured Mile section of Roxco's REA is included herein at **Exhibit 3**. There were 172 units at Warner Robins and 172 units at Barksdale. Some of the subcontractors and suppliers that Roxco used at Warner Robins were also used at Barksdale. Roxco served the same client at both projects, the Federal Government. Roxco finished the Warner Robins project on time, made a profit and had a satisfied client. The Barksdale project finished three years late and Roxco lost nearly $8 million.

The preceding text provides a summary of the reasons that the Government is responsible for most, but not all, of Roxco's losses. The eleven sections of this report that follow, Sections B through K, provide further detail of the issues discussed above and explain other problems that did not have a critical path impact but resulted in additional costs for which the Government is responsible, such as many sitework design errors and unforeseen underground obstructions other than "hidden concrete."

Section L - Claim Pricing provides Pearson's calculations of the amounts due Roxco.

David E. Pearson

Jeffrey J. Montroy

*Section C – Schedule Analysis*

This project experienced unusually long delays. It was originally scheduled to complete on August 5, 1996, 495 days after Notice to Proceed. Construction actually took 1,606 days, a delay of over 300%. The Government issued beneficial occupancy of the last building on August 20, 1999, 1,111 days late. (3.04 years late) During the past 25 years, Pearson has evaluated delays on some 500 to 600 projects for both contractors and owners. Of that total, we may have provided consulting services on one or two projects that experienced delays of this magnitude. Certainly, the extent of delay on this project puts it in a very small and unfortunate group.

Part of the criteria that one uses to evaluate the cause of such extremes is the skill and experience of the contractor. We found that Roxco was an experienced contractor that employed skilled and experienced managers. Mr. Robbins and Mr. Leech, Roxco's top managers of this project, were experienced when they worked on this project and have enjoyed successful construction careers after this project. Also important is Roxco's success with another very similar Government housing project constructed at Warner Robins at about the same time Roxco was constructing the Barksdale project. Roxco included a discussion of the Warner Robins project in its REA and Pearson included herein in Section A - Introduction and Summary, Exhibit 3. Not only was Roxco skilled and experienced, they constructed a very similar project for the same client at another location on time and within budget.

As is common on most projects that are delayed by such extremes, Roxco and several of the subcontractors that started this project did not see it through to the end. Roxco left the project on November 5, 1998, about 9.5 months before the Government issued beneficial occupancy of the last building. Roxco's bonding company, AIG, completed the project during the final 9½ months. Roxco worked on this project for 1,318 days, March 28, 1995 through November 5, 1998. Thereafter, AIG worked on the project for another 288 days (November 5, 1998 through August 20, 1999).

*Section C – Schedule Analysis*

The purpose of this schedule analysis is to determine the actual cause of the total 1,111-day delay (August 5, 1996 through August 20, 1999) and the actual cause of the 823-day delay that Roxco incurred during its tenure on the project (March 28, 1995 through November 5, 1998.)

The following text provides a discussion about Roxco's schedules and the schedule analysis that Pearson performed to evaluate the various causes of delay.

*Roxco's Approved Schedule & Progress Reporting*

As previously stated, for funding reasons this project was awarded in two parts. The Government awarded Phase II first. The contract duration for Phase II was 360 days. When Phase I was added through modification P00001, another 135 days were added to the contract duration, bringing the total contract duration to 495 days.

Roxco submitted its proposed construction schedule to the Government in the form of a "Construction Progress Chart," as required by the contract documents. **(Exhibit 1)** Roxco's schedule shows that it planned to start construction on April 1, 1995 and complete on July 31, 1996, a performance period of 487 days, approximately the same duration as its 495-day contract duration. Roxco's schedule lists each line item that appears in Roxco's monthly pay applications and it shows the planned rate of progress for each item as a bi-weekly percentage of the contract value of the item.

Pearson prepared a summary of Roxco's as-planned schedule, which appears at **Exhibit 2.** Roxco's original schedule did not include a specific activity entitled "building turnover." Working with Roxco personnel, Pearson added that activity to their schedule. Our building turnover activity begins on April 15, 1996 and ends on the contract completion date, August 5, 1996. That duration assumes that the Government would accept 6 buildings per week for 14 weeks.

Roxco submitted construction progress reports to the Government on Air Force Form 3065 on a biweekly basis throughout the project. Those reports showed actual progress on each of the

items included in the construction progress chart. Actual progress was also shown in Roxco's pay applications submitted to the Government monthly.

***As-Built Schedule***

Using the project documents, including daily diaries, certified payroll reports, pay requests, test reports, and correspondence, Pearson prepared a detailed as-built schedule of the project. A copy of Pearson's detailed as-built schedule is included herein at **Exhibit 3**. A summary as-planned and as-built schedule showing the as-built critical path of construction appears at **Exhibit 4**. Observations include:

- The critical path of the project includes the sitework, building foundations/slabs, framing, MEP rough-ins, drywall, interior finishes, and building turnover.
- All activities along the critical path experienced delays. By far, the longest delay occurred in the building turnover. Building turnover took 149 weeks, 135 more weeks than would have been completed under a reasonable schedule. That is a time overrun of a critical path activity of over 1,000%. As previously stated, Section K of this report describes in detail the flaws in the Government's building turnover process that caused most, if not all, of that delay. As one would expect, Roxco spent millions in unanticipated costs contending with such delays.

***Calculation of Critical Path Delay***

Pearson prepared a spreadsheet entitled Reconciliation of Delays along the Critical Path. (**Exhibit 5**) That spreadsheet lists the seven construction activities that are on the planned and as-built schedule. It also shows the start and end date of the critical portion of each of the seven critical construction activities and the planned and actual duration of each. The spreadsheet calculates the duration variance of each critical activity and the cumulative delay along the critical path. The last column of that spreadsheet lists the causes of delay to each activity. The facts surrounding each of the causes listed therein are discussed in Sections D through K of this report.

The spreadsheet at **Exhibit 5** separates the last critical path activity, building turnover, into two sections, Roxco's tenure and the bonding company (AIG) tenure. As shown on the spreadsheet, Roxco was on the project for 745 days of the building turnover period and AIG completed the last 288 days. After Roxco left the project on November 5, 1998, Roxco was no longer involved in the project. It did not pay the continuing cost of construction and it was not involved in the management of the work. Therefore, Roxco's claim for relief is based on the period of its 1,318 days of performance, March 28, 1995 through November 5, 1998.

***Responsibility for the 823 days of Delay Incurred During Roxco's Tenure***

Government-caused delays on this project were pervasive. As stated earlier, details of these delays are discussed in Sections D through K of this report. Government-caused delays started on virtually the first day of work and continued in an uninterrupted fashion for the entire 3.6 years of Roxco's tenure on the project. Delays for which the Government bears responsibility include, but are not limited to, the following:

1. The Government's refusal to provide updated contract documents that incorporated all of their changes.
2. Building coordinate errors that delayed initial layout.
3. Hidden concrete.
4. Flawed engineering fill specifications, including vague and confusing requirements and the Government's approval of a non-cohesive soil material for the engineered fill.
5. Requiring the engineered fill to be installed in 6-inch lifts in lieu of 8-inch lifts.
6. Requiring more compaction tests than required by the contract documents.

7. Numerous variances between the sitework elevations shown on the contract documents and actual conditions.

8. Flawed and conflicting contract documents related to the foundation/slabs.

9. The Government's insistence that Roxco pour the building slabs monolithically.

10. The Government's wrongful refusal to approve Roxco's suggested solutions to the foundation/slab problems experienced by Roxco and its various foundation/slab subcontractors.

11. Flawed lumber specifications.

12. Numerous errors in the wood framing contract documents.

13. Flawed and untimely wood framing inspection criteria.

14. Flawed vapor barrier specifications.

15. Vague sheet metal details in the contract documents.

16. Flawed sheet metal specifications.

17. Flawed and untimely roofing and sheet metal inspection criteria.

18. The Government's late delivery of permanent power to the project.

19. Flawed and untimely final inspection criteria, including incomplete and misleading punchlists.

20. The Government's demand that Roxco provide written warranties prior to acceptance of the buildings.

21. The Government's intentional deferral of building acceptance to investigate EIFS design issues.

22. The Government's intentional deferral of building acceptance to perform destructive testing of the EIFS.

23. The Government's wrongful withholding of funds for alleged defective work.

24. The Government's wrongful withholding of funds to pay lower tier suppliers with whom Roxco had no direct contract.

25. The Government's unreasonable floor levelness criteria utilized during the final inspection process.
26. Voluminous, expensive and time consuming removal and replacement of completed work throughout construction caused by the Government's flawed and untimely inspections.
27. The Government's refusal to timely pay Roxco for changes.
28. Changes in the work authorized by the Government.

In addition to delays caused by the Government, the evidence also leads us to conclude that Roxco was responsible for delays in some activities, most notably, delays caused by Roxco's framing subcontractor, Chaneyworth, and to a lesser extent Roxco's EIFS contractor, Interior Exterior, Inc. Roxco filed claims against both of those subcontractors. Roxco's claim against Chaneyworth was arbitrated. In that matter Roxco acknowledged that the Government was responsible for over $1 million of Roxco's framing losses and stated that Chaneyworth was responsible for about $580,000 of their framing losses. The arbitrator ruled in favor of Chaneyworth and required Roxco to pay Chaneyworth $91,807. Roxco collected $1,050,000 from Interior/Exterior.

In our opinion, the Chaneyworth delays, Interior/Exterior delays and the Government's delays were equally critical during the framing, insulation & drywall and interior finishes performance periods. As illustrated on **Exhibit 5**, 135 days of critical path delay was incurred during installation of framing, insulation & drywall and interior finishes. Also, as illustrated on **Exhibit 5**, Roxco incurred 823 days of delay during its tenure. After allowing for the concurrent delays caused principally by Chaneyworth, 688 days remain.

To be conservative, we further adjusted the remaining 688 calendar days of delay incurred during Roxco's tenure by 15% to allow for other contractor-caused delays that are concurrent with Government delays, leaving 585 days of critical path delay for which we believe that the Government should be held solely responsible. (688 x .15 = 103. 688 – 103 = 585)

*Section C – Schedule Analysis*

In summary, we conclude that Roxco should be found not solely responsible for any critical path delays and the Government is solely responsible for 585 days of delay. Roxco should owe no liquidated damages and the Government should pay Roxco's extended general conditions for 585 days.

***Time Extension Granted by the Government***

During construction, the Government added 569 days to the contract duration through 23 contract Modifications, 400 days for additional work and 169 days for abnormal weather. Together those time extensions extended the contract completion date to February 25, 1998. Roxco left the project on November 5, 1998, 254 days after the revised February 25, 1998 completion date. The Government accepted the last building on August 20, 1999, 541 days after the February 25, 1998 revised contract completion date. An illustration of the time extensions granted by the Government appears at **Exhibit 6.**

Roxco contends that several of the time extensions granted by the Government were not requested by Roxco and were not justified. They contend that the Government issued non-compensable time extensions under the threat of liquidated damages and to cover up the real reason that the project was being delayed; i.e., compensable delays attributable to the Government. Based on studies conducted to date, we agree with Roxco's finding.

First, it appears that the voluminous delays incurred on this project did not seriously concern the Government personnel in charge of managing this project. It also appears that the Government was not interested in identifying the true cause of project delays. The Government was, however, keenly motivated to issue time extensions for virtually any reason warranted or not, so long as those time extensions provided no compensation to Roxco. The most notable of such time extensions include the 115-day non-compensable weather time extension issued unilaterally in modification P00011 and the additional 54 days of abnormal weather time extensions granted in modifications P00014 through 21. In total

the Government granted 169 days of abnormal weather time extensions, much of which was granted for alleged weather delays occurring after the roofs had been installed on the buildings. Pearson reviewed the records and concluded that there was no valid weather-related reason for the Government to grant weather-based time extensions in any period of construction.

The first weather-related time extension granted to Roxco was granted in unilateral modification P00011, issued on February 14, 1997, almost two years after work commenced. In modification P00011 the Government extended the contract by 115 days for alleged "cold weather." We found no letters from Roxco to the Government requesting weather-related time extensions prior to February 11, 1997. We also found no Government document explaining how the Government determined that the critical path of work had been delayed 115 days by weather. Roxco did not accept P00011. Pearson analyzed weather delays from March 28, 1995 through January 1997 to determine how much time extension Roxco may have been entitled to receive. As previously stated, we concluded that Roxco was not entitled to any weather-related time extensions. Our study is included herein at **Exhibit 7.**

From mid-February 1997 through November 5, 1998, the date that Roxco left the project, the Government issued 54 additional weather days in five contract modifications issued after P00011. In each case Roxco requested weather days because they knew that without a non-compensable time extension, the Government would not pay Roxco's pay applications. And in each case, the effective date of the modification was on or just before the current contract completion date. **(Exhibit 8)** It appears that from the issuance of P00011 in February 1997 to Roxco's departure from the project, weather days were used primarily to extend the contract performance period in order to prevent the assessment of liquidated damages and allow Roxco to be paid.

It also appears that the Government used the threat of liquidated damages to induce Roxco to sign other time extensions that had no basis. The time extensions issued in modifications P00015 and P00016 appear to have been issued under the threat of liquidated damages and in exchange for Roxco waiving their right to seek additional money for the changes involved. **(Exhibit 9)** In contract modification P00015, the Government issued a 75-day time extension for the installation of approximately 34,000 square feet of additional sod. In contract modification P00016, the Government issued a 30-day time extension for the removal and replacement of sidewalks as identified by the Government. The work that was added in these modifications was clearly additive work for which Roxco incurred additional costs. In both cases, the modifications described the work as a no-cost change issued with the understanding that Roxco would not seek any additional compensation for the work. Since the additional sod installation and the sidewalk rework would certainly have cost Roxco additional money to accomplish, they were clearly trading time for money by accepting P00015 and P00016. As with all but one of the modifications issued for weather-related delays, the effective dates of P00015 and P00016 were the same as the contract end dates at the time the modifications were issued. In other words, if Roxco had not accepted the modifications when issued, the assessment of liquidated damages would have commenced immediately. This strongly suggests that the Government was using the threat of liquidated damages to pressure Roxco to accept non-compensable time extensions for non-critical work, thus avoiding liquidated damages and attempting to insulate the Government from paying additional funds.

The Government's claim for liquidated damages from February 25, 1998 through August 20, 1999 is highly suspect. First, as discussed above and as will be discussed in detail in the following sections, in Pearson's opinion the Government is not entitled to recover liquidated damages because the Government was either solely responsible or jointly responsible for all delays on this project. Second, during the course of work the Government was willing to issue time extensions for virtually any reason, provided the time

extensions provided no compensation to Roxco. Third, the Government issued time extensions for the entire period that Roxco submitted pay applications. The last pay application that Roxco submitted was in February 1998. It is not just a coincidence that the Government's final time extension was also in February 1998. When Roxco stopped submitting pay applications, the Government stopped issuing time extensions; strong evidence that the time extensions were not related to what was truly delaying the project. Fourth, 288 days of the Government's liquidated damage claim occurred after Roxco left the project. Roxco's bonding company, AIG, completed the project. If the Government intended to collect liquidated damages for that period, it should have pursued AIG. It did not. Fifth, the Government made no claim for liquidated damages until after Roxco filed its Request for Equitable Adjustment. Finally, as discussed in Section K - Building Turnover, Government documents obtained during discovery indicate that in mid-1998, the Government was intentionally delaying acceptance of the buildings to investigate EIFS design issues, a period of delay for which the Government now alleges Roxco bears sole responsibility.

In summary, from our review of the records we conclude that Roxco is entitled to receive compensation for 585 days of the 823 delays incurred during their tenure and we conclude that the Government is not entitled to any liquidated damages.

# RECONCILIATION OF DELAYS ALONG THE CRITICAL PATH

| ACTIVITY | ROXCO'S PLANNED SCHEDULE Start | End | Duration | ROXCO'S AS-BUILT SCHEDULE Start | End | Duration | DURATION VARIANCE Activity | Cumulative | CAUSES |
|---|---|---|---|---|---|---|---|---|---|
| Sitework | 3/28/1995 | 4/30/1995 | 33 | 3/28/1995 | 4/27/1995 | 30 | -3 | -3 | None |
| Foundations | 5/1/1995 | 5/31/1995 | 31 | 4/28/1995 | 7/25/1995 | 89 | 58 | 55 | Layout errors, hidden concrete, Installing fill in 6-inch lifts |
| Framing | 6/1/1995 | 7/14/1995 | 44 | 7/26/1995 | 9/10/1995 | 47 | 3 | 58 | Cheneyworth performance problems |
| Exterior Skin | | | | | | | | | Not Critical |
| MEP Rough-ins | 7/15/1995 | 8/31/1995 | 48 | 9/11/1995 | 10/27/1995 | 47 | -1 | 57 | none |
| Insulation & Drywall | 9/1/1995 | 9/30/1995 | 30 | 10/28/1995 | 1/10/1996 | 75 | 45 | 102 | Insulation and drywall work was paced by the speed of framing work, which was delayed by flawed contract documents, including the lumber spec, slab levelness and edge condition issues related to flawed contract documents, flawed government inspection criteria, vapor barrier specifications, Cheneyworth performance problems. |
| Interior Finishes | 10/1/1995 | 4/14/1996 | 197 | 1/11/1996 | 10/21/1996 | 285 | 88 | 190 | Interior Finishes were delayed by the same issues that are listed under insulation and drywall plus the government's requirement to sand out the naturally occuring grain in the trim lumber. |
| Building Turnover Roxco's Tenure | 4/15/1996 | 8/5/1996 | 112 | 10/22/1996 | 11/5/1998 | 745 | 633 | 823 | Building turnover was delayed by the Government's flawed inspection process, the Government's requirement that written warranties be provided before turnover, intentional deferral of acceptance to investigate EIFS design issues, destructive testing of EIFS, and unreasonable floor levelness requirements. |
| Roxco's Duration | | | 495 | | | 1,318 | 823 | | |
| Building Turnover Bonding Company (AIG) | | | | 11/6/1998 | 8/20/1999 | 288 | 288 | 1,111 | Roxco was not on the project during this period. Documentation memorializing what transpired during this period is sketchy. However, it appears that AIG continued to be delayed by the same issues that delayed Roxco. |
| Total Duration | | | 495 | | | 1,606 | 1,111 | | |

ROXCOREPORT0143

*Section F – Wood Framing*

The contract documents related to wood framing are flawed. The Government's contract documents state that No.3 southern yellow pine lumber is acceptable for use in this project. We have never seen that low grade lumber specified for house framing. No. 3 southern yellow pine (SYP) is sometimes used for some parts of prefabricated trusses and blocking, not significant framing members. The specifications also state that stud grade SYP may be used, which is a very low grade of stud. There were more serious problems.

Another part of the contract documents require the highest degree of "straightness" perfection, a tolerance of ¼" in 8 feet. If zealously checked, few framing jobs would ever substantially comply with that specification, even where No. 1 and No. 2 southern yellow pine framing lumber is used. There is no chance of complying with that specification when using No. 3 material. If we are wrong about that statement, it is only because someone threw away 90% of the No. 3 material and utilized 10%, or less, to construct the house. Roxco initially purchased two truckloads of No. 3 material but soon changed their order to No. 2. Even with that quantum improvement in materials, Roxco had to cull (throw away or cut up for other use in non-structural and non-aesthetic locations) thousands of pieces of lumber all in an effort to comply with the Government's flawed contract documents and zealous adherence to specified tolerances.

As discussed in previous sections, the Government's contract documents relating to the engineered fill and foundations/slabs were also flawed, causing quality problems in the concrete slabs that translated into the framing. That coupled with flawed framing specifications and stringent framing tolerance criteria that were zealously checked by the inspectors caused huge problems for Roxco and its framing subcontractor.

Roxco subcontracted the wood framing work to Chaneyworth Construction (Chaneyworth). The framing work started on time, one month after the first building foundation was poured. The Government immediately began to identify framing work that they considered to be unacceptable.