Chaneyworth blamed the problems on the concrete slabs. Roxco agreed that the slabs were partially to blame but blamed some of the framing quality problems on Chaneyworth.

Roxco's approved schedule called for wood framing work to start on May 31, 1995 and be completed in one year, by May 31, 1996. Framing work began on schedule, May 30, 1995. However, framing was not installed in all the buildings until February 1996, some 8 months late. Thereafter, remedial work continued consistently through September 1997, and sporadically thereafter.

As discussed in the Section E, most housing project subcontractors are thinly capitalized and not capable of maintaining a prolonged presence on projects when they are losing money. That was true for the foundation/slab contractors and it was true for Chaneyworth. With the passage of time, Chaneyworth lost more and more money and reached the point that he was not properly manning the project. That shortfall caught Roxco's attention and in June 1996, Roxco terminated Chaneyworth. Termination of Chaneyworth occurred about three weeks after Chaneyworth was supposed to have completed their scope of work and 16 months before the majority of the remedial work was completed.

***Uneven Building Slabs***

As discussed in Sections D and E, the Government's soil specifications and foundation design were both flawed, and the Government imposed on Roxco unreasonable and unnecessary foundation/slab construction means and methods. The result was poor quality slabs on which to frame the buildings. Unlevel slabs were a significant contributor to framing quality problems.

***Flawed Framing Lumber Specification***

Achieving the framing tolerances specified in the contract documents and demanded by the Government inspectors was a costly and time-consuming challenge for Roxco throughout the

project. There was certainly a conflict between what the Government demanded in terms of framing tolerances and what could be achieved using the lumber grade specified in the contract documents.

***Framing Lumber Specification Discrepancies***

The specification for the lumber to be used to frame the duplexes and garages is covered under specification Section 06100 – Rough Carpentry. **(Figure 1)** However, a specification was also provided on drawing S-9 (Sheet 86 of 94). **(Figure 2)** The two specifications contradicted each other, and neither specified a grade of lumber appropriate for the framing tolerances required by the Government.

Table of Grades for Framing and Board Lumber

| Grading Rules | Species | Framing | Board Lumber |
|---|---|---|---|
| WWPA WLGR standard grading rules | Aspen<br>Douglas Fir-Larch<br>Douglas Fir South<br>Engelmann Spruce<br>Engelmann Spruce<br>Hem-Fir<br>Mountain Hemlock<br>Subalpine Fir<br>White Woods<br>Western Woods<br>Western Hemlock | All Species: Standard Light Framing or No. 3 Structural (Stud Grade for 2 x 4 size, 10 | All Species: No. 3 Common |
| WCLIB 17 standard grading rules | Douglas Fir-Larch<br>Hem-Fir<br>Mountain Hemlock<br>Sitka Spruce<br>Western Hemlock | All Species: Standard Light Framing or No. 3 Structural (Stud Grade for 2 x 4 size, 10 feet and shorter) | All Species: Standard |
| SPIB SPIBGR standard grading rules | Southern Pine | Standard Light Framing or No. 3 Structural Light Framing (Stud Grade for 2 x 4 size, 10 feet and shorter) | No. 2 Boards |

Figure 1 - Wood Framing Grades from Specification Section 06100

WOOD FRAMING

1. All lumber and its fastenings shall conform to the National Design Specification for Wood Construction, latest edition, by the National Forest Products Association.

2. All wood framing shall be Southern Yellow Pine, Grade 2, or approved equivalent. Design properties: Fb=1200 PSI (1400 PSI for repetitive members); Ft=625 PSI; Fc (perpendicular) = 565 PSI; Fc=1000 PSI; Fv=90 PSI; E=1,600,000 PSI.

3. Provide solid wood blocking at supports, halfway between supports, at ends of cantilevers, and at 8'-0" on center maximum for all joists and rafters.

4. Micro-Lam beams shall be solid rectangular sections constructed of high strength laminated veneer as manufactured by Trus-Joist Corporation. Design properties: Fb=2800 PSI multiplied by (12/d)1/9 for member depths greater than 12"; Ft=1850 PSI; Fc (perpendicular) = 500 PSI; Fc=2700 PSI; Fv=285 PSI; E=2,000,000 PSI.

Figure 2 - Wood Framing Grade from Drawing S-9

The lumber used at Barksdale was Southern Yellow Pine. Specification Section 06100 stated that the minimum grade of Southern Yellow Pine framing lumber was to be No. 3 Structural, Standard Light Framing, or Stud grade. Drawing S-9, on the other hand, required that all Southern Yellow Pine framing lumber be No. 2.

Typically, specifications take precedence over drawings. Thus the specification requirement for No. 3 Structural, Standard Light Framing, or Stud grade in specification Section 06100 was to be followed for the framing lumber.

It appears that there was uncertainty within the Government about the lumber specifications. As previously noted, Armstrong answered several questions from the Air Force Center for Environmental Excellence as part of their April 18, 1996 construction evaluation of the project. **(Exhibit 1)** One was a question about the difference between No. 2 and No. 3 grades for Southern pine studs. Another question mentioned the

discrepancy between the lumber grades required by the drawings and specifications and asked whether the specified lumber met "requisite codes."

Armstrong's answer to the first question (on page III-1 of the report) dealt only with the structural characteristics of the two grades, and they stated that the "Stud" grade specified for 2x4 lumber under 10' in length was roughly equivalent to No.3 structural. Their answer makes no reference to differences in the tolerances for warp between stud grade and No. 3 structural.

Their answer to the second question (also on page III-1 of the report) was that the specifications called for all "framing" to be No. 3 or stud grade, while joists, rafters, headers trusses, beams and columns were to be No. 2. They stated that the note on drawing S-9 that required "all" lumber to be No. 2 Structural should have read "all structural" lumber was to be No. 2 Structural.

Armstrong stated in their report that all of the lumber observed on the site met the specifications. In fact, the lumber on the site met their interpretation of the specifications only because Roxco had elected to substitute No.2 Structural for some of the No. 3 Structural that was clearly called for in the specifications.

Armstrong's explanation of the specification discrepancy was flawed. They stated that specification Section 06100 allowed No. 3 Structural lumber only for studs, and that all other framing lumber was to be No. 2. This was incorrect. The table of grades in Section 06100 clearly indicated that <u>all</u> framing lumber could be No. 3 Structural (**Figure 1 again**). Only "board" lumber was to be No. 2 Structural, and as defined by the Southern Pine Inspection Bureau, board lumber is not framing lumber.

Although the Government had asked Armstrong for clarification of the specifications for the framing lumber, it does not appear that the Government ever passed

those comments on to Roxco. It is not clear why the Government did not clarify the lumber specifications with Roxco or its subcontractors.

*Discrepancy Between Lumber Grade Specification and Framing Tolerances*

Specification Section 06100 also provided the installation tolerances for wood framing members. The tolerances exceeded what could reasonably be achieved with the substandard grade of lumber specified.

Paragraph 3.3 of Section 06100 provided the tolerances for framing members to be covered with certain types of finishes (**Figure 3**).

3.3 ERECTION TOLERANCES

a. Framing members which will be covered by finishes such as wallboard, plaster, or ceramic tile set in a mortar setting bed, shall be within the following limits:

1. Layout of walls and partitions: 1/4 inch from intended position;
2. Plates and runners: 1/4 inch in 8 feet from a straight line;
3. Studs: 1/4 inch in 8 feet out of plumb, not cumulative; and
4. Face of framing members: 1/4 inch in 8 feet from a true plane.

b. Framing members which will be covered by ceramic tile set in dry-set mortar, latex-portland cement mortar, or organic adhesive shall be within the following limits:

1. Layout of walls and partitions: 1/4 inch from intended position;
2. Plates and runners: 1/8 inch in 8 feet from a straight line;
3. Studs: 1/8 inch in 8 feet out of plumb, not cumulative; and
4. Face of framing members: 1/8 in 8 feet from a true plane.

-- End of Section --

**Figure 3 - Framing Tolerances from Specification Section 06100**

The specification did not address floor or roof framing, but only those framing members to be covered by certain wall and ceiling finishes. Nevertheless, Paragraph 3.3 is the only reference to framing tolerances included in the contract documents.

The framing tolerances required by Section 06100 were at odds with the lumber grades specified in the same section. According to the 1991 Southern Pine Inspection Bureau Grading Rules (SPIBGR), which was referenced by the project specifications, the following amount of warp was allowed in No. 3 Structural, Standard Light Framing, or Stud grade:

| Grade | Warp Allowed | 1991 SPIGBR Page Reference |
|---|---|---|
| No. 3 Structural | Medium | 77 |
| Standard Light Framing | Light | 79 |
| Stud | ½ Medium | 82 |

The actual amount of warp in a framing member depends on the width and length of the member. As explained in the REA, the allowed warp for each of the three lumber grades translated to the following permissible deviations from "a true or plane surface" for a 2 x 4 framing member 10 feet long, as described in Chapter 7 of the 1991 SPIGB:

| Grade | Crook | Twist | Bow | 1991 SPIGBR Page Reference |
|---|---|---|---|---|
| No. 3 Structural | ¾" | ⅞" | 2 ¾" | 127 - 130 |
| Standard Light Framing | ½" | ⅝" | 1 ½" | 127 - 130 |
| Stud | ⅜" | 7/16" | 1 ⅜" | 127 -130 |

The framing tolerances in Paragraph 3.3 of Section 06100 required Roxco to install framing members to within ¼ inch of their planned locations and allowed no more than a ¼ inch deviation from a true plane at walls and ceilings. But clearly, the warp allowed in the lumber specified by Section 06100 did not allow such tolerances to be achieved.

Residential and commercial construction specifications typically specify No. 2 and No. 1 lumber for framing. Armstrong's response to the Government's question regarding the difference between No. 2 and No. 3 lumber only addresses the structural properties of each. Armstrong's answer said nothing about the true problem with No. 3 lumber, its gross dimensional tolerances and its impact on other architectural specifications. It appears that Armstrong chose No. 3 lumber based solely on its structural properties and price. The result was a flawed lumber specification which was at odds with the framing tolerances Armstrong and the Government zealously demanded. Project documents confirm that the Government's inspectors and technical representative used surveying instruments to check the framing for conformance to the specifications. None of the demanded quality perfections could be met with the specified lumber.

The framing tolerances set forth in Paragraph 3.3 of specification Section 06100 apply only to framed surfaces to be covered with certain types of finishes. The tolerances were not based on any structural requirements, and there is no mention in the specification of surfaces covered with such finishes as EIFS, resilient flooring, or roofing. Yet the Government's inspectors and technical representative insisted that Roxco maintain the tolerances set forth in the specifications for all of the framing.

In their April 18, 1996 report, Armstrong blamed a lack of quality control for the extensive "warping, barking and excessive knotting" observed in the framing. Armstrong believed that the problem was caused by Roxco not culling enough lumber from their orders to achieve the tolerances set forth in the specifications. But Armstrong also stated that the grades of lumber observed on the site met the specification requirements. The Government

and Armstrong apparently saw nothing wrong with specifying substandard lumber, expecting the contractor to purchase what was specified, and then expecting the contractor to reject much of what was purchased in order to comply with specified tolerances. Much of the better grade lumber was also culled to achieve the Government's perceived tolerances.

Roxco culled a lot of lumber all in an attempt to comply with flawed specifications and zealous inspection criteria. The degree to which Roxco culled lumber is memorialized in an exchange between the Government's inspectors and a Roxco superintendent. In an April 18, 1996 two-way memo, the Government's inspectors accused Roxco of not selecting studs for straightness. **(Exhibit 2)** Roxco's superintendent responded on April 23, 1996 by noting in his daily diary that approximately 4000 studs had been culled and restacked for return to Roxco's lumber supplier.

The Barksdale Project was competitively bid, and Roxco was selected as the low bidder. As such, Roxco was entitled to use the most cost effective means allowed by the contract documents to construct the Project. Roxco used the minimum grade of lumber specified (and sometimes paid a premium for better-than-specified lumber) but were then held to framing tolerances that were questionably applied and in excess of what could be achieved with the specified lumber.

***Defective Design Drawings***

After the bid documents were circulated to the bidding contractors but before bids were received, the Government issued four voluminous amendments, most of which corrected inconsistencies in the bid documents. The Government's amendments effectively rendered the drawings and specifications out-of-date even before the work began. Although many discrepancies were corrected in those four amendments, they did not remotely correct all of the discrepancies that existed in those documents. After work got underway Roxco found that the architectural design drawings and specifications contained errors and omissions almost too numerous to recount.

***Duct Chase at Mechanical Rooms***

The architectural floor plans such as those on drawing A-1 (Sheet 61 of 94) show a duct chase on the second floor above the mechanical rooms (**Figure** 4).




**Figure 4 - Duct Chase Detail from Drawing A1/2**

The purpose of this duct chase was to enclose the supply and return air ducts running from the mechanical rooms to the second floors. The dimensions on the floors plans resulted in a duct chase that was less than 12" wide. The width of the ducts to be installed was 12". Roxco submitted RFI 37 on August 16, 1995 to inform the Government of the discrepancy. **(Exhibit 3)** The Government responded by changing the dimensions of the ducts. The contract documents were never updated to reflect the changes.

***Threshold Details***

A discrepancy clearly exists between the structural drawings showing the foundation slabs and the architectural wall sections showing the installation of the thresholds at the exterior doors. The architectural wall sections such as those on drawing A-11 (Sheet 71 of 94) clearly show the exterior wall and door set back away from the edge of the concrete foundation slab. **(Figure 5)**




**Figure 5 - Exterior Door Detail at Front Porch from Drawing A-11/2**

However, the dimensions of the foundation slabs provided on the structural drawings and the dimensions to the outer edges of the wall framing provided on the architectural floor plans are the same. So the outer edges of the exterior walls and doors were actually flush with the outer edges of the foundation slabs. In order to install the thresholds as shown in the architectural drawings, a block-out would have been needed in the foundation slab at the locations of the exterior doors. No such block-out was provided on the foundation plans such as those shown on drawing S-2 (Sheet 79 of 94). **(Figure 6)** Without the block-outs, the thresholds would have only partial support, which would have made it difficult or impossible to adequately secure the thresholds to the concrete foundation slabs.



**Figure 6 - Foundation Detail at Front Porch from Drawing S-2/1**

The Government never recognized the blocking drawing discrepancy. They required Roxco to design and install blocking to fit under the outer edge of the thresholds to provide adequate support. They would not agree to pay Roxco for this work.

Roxco's concrete subcontractor bid on the work in specification section 03300 only, and the subcontractor would only have been concerned with the information provided in the structural drawings. It is not standard practice to show dimensional or other information regarding structural components on architectural drawings, and it is not standard practice for structural concrete contractors to reference architectural drawings for structural information. Roxco's subcontractor correctly fulfilled his contractual obligation by constructing the slabs according to the structural drawings only.

The reaction of the Government's personnel to this problem reveals a lack of understanding with regard to contract drawings. Daily reports by the Government inspectors on October 12, 1995 and November 8, 1995 indicate that the Government personnel were aware that the thresholds were not installed according to the architectural drawings. **(Exhibit 4)** They state that the drawings show the door frames and thresholds

set back from the edge of the slab. On November 13, 1995, the inspector's daily report indicates that the Government thought Roxco should have installed block-outs at the doors, even though no such block-outs are shown on the structural slab drawings. **(Exhibit 5)**

Memos written by Civil Engineering to Contracting on November 14 and 20, 1995 reveal a complete misunderstanding of the problem. **(Exhibit 6)** The memos contend that the thresholds were not properly installed and both memos state that it is up to Roxco and their subcontractors to propose a solution. Both memos suggest the problem is due to uneven floor slabs, which in fact had nothing to do with the problem.

On May 21, 1996, Roxco sent a letter to the Contracting Officer regarding the threshold problem. **(Exhibit 7)** The Government responded on May 22, 1996 with a sketch from Civil Engineering showing wood blocking under the threshold to provide support at its outer edge. **(Exhibit 8)** The sketch includes the contention that the modifications at the thresholds were a no cost change.

Roxco incurred additional costs associated with the changes made to the exterior thresholds. The problems were entirely due to the discrepancy between the structural and architectural drawings. The Government's contention that the problems were due to Roxco's failure to install block-outs not shown on the drawings or due to uneven building slabs is erroneous. The Government apparently never admitted that a discrepancy existed in the drawings, even though one clearly did.

***Kitchen Knee Walls***

The architectural floor plans such as those on drawing A-1 (Sheet 61 of 94) show a countertop extended out between the kitchens and the family rooms. **(Figure 7)**




Figure 7 - Kitchen Floor Plan from Drawing A-1/1

The only details provided for these cabinets are shown on the interior elevations on drawing A-15 (Sheet 75 of 94). **(Figure 8)**




Figure 8 - Kitchen Elevations from Drawing A-15

The countertop and cabinets that extended out between the kitchens and dining rooms required a half-height "knee" wall behind the cabinets, but this was not called out or clearly shown in the drawings. Roxco's subcontractor did not include such a wall in his bid, since

there were no details of the wall (dimensions or other information) on the drawings. The Government never recognized this omission and would not reimburse Roxco for additional costs incurred by their subcontractor.

Roxco's contention in their REA that the knee wall was not shown on the architectural floor plans on drawings is correct. The plans do show a full-height wall ending at the dishwasher and elevations 2 and 3 on drawing A-15 shows this dimension to be 4'-2". There is no clear indication on the drawings that a half-height wall is to extend to the end of the cabinet behind the dishwasher and the under cabinet storage. The backing for the cabinets could have been either a framed wall or simply a finished back on the cabinets.

On December 21, 1995 Roxco confirmed with their framing subcontractor, Chaneyworth, that the "changes in framing the kitchen knee walls" would be included in Change Order #3 to their contract. For reasons not determined, Chaneyworth later submitted their cost for this change totaling $11,745 on January 8, 1996. **(Exhibit 9)**

Chaneyworth's January 8, 1996 letter containing their proposal for the knee wall construction eventually made its way to the Civil Engineering Squadron. On May 16, 1996, the technical representative responded to the Contracting Officer regarding Chaneyworth's letter, advising that the issue had been addressed when the prototype house was being constructed and it was pointed out to Roxco and Chaneyworth that the wall was required "where it was shown on the drawings after they requested information on the counter." **(Exhibit 10)** The only written record of such a conversation is RFI 23 dated August 8, 1995 which addresses the width of the counter top in relation to the cabinets below but makes no reference to the knee wall. **(Exhibit 11)**

The knee wall was not shown on the contract documents. The Government required Roxco to install the knee wall, thus it was a change to Roxco's contract.

***Hall Walls at Stairs***

The stair sections on drawing A-14 (Sheet 74 of 94) showed an open, triangular space at the stairs in the living room. **(Figure 9)**




**Figure 9 - Section at Stair from Drawing A-14/2**

After the framing of the buildings had started, it was clear that the upper floors required additional structural support at the stairs. The Government directed Roxco to frame in the open space to the double 2 x 10 header at the upper floor and to finish the wall in the same manner as the other walls in the room. Roxco was given verbal directions to make the change but was never given a drawing or sketch depicting the new configuration. The design drawings were never updated to reflect the change.

In unilateral contract modification P00011 issued on February 14, 1997, the Government reduced Roxco's contract amount by $11,165 for this change due to the fact that it eliminated a rail cap and Roxco used pine instead of red oak on the stair riser. Roxco rejected the unilateral modification, and so this item has not been resolved.

***Eave Overhang***

Amendment 0001 to Roxco's contract included a revised drawing of the typical eave detail. The most significant changes to the original detail in the design drawings was an increase in the overhang from 8" to 9 ½", and the addition of a metal cover over the 2 x 10 fascia boards. **(Figure 10)**




**Figure 10 - Eave Detail from Drawing R-6**

On August 7, 1995 Roxco submitted RFI 21 which suggested that air flow through the vent holes to be drilled into the 2 x 10 wood fascia would be severely constricted by the gutter assembly. **(Exhibit 12)** There was also some concern that the vent holes would be visible beneath the higher end of the sloped gutter.

As a result of Roxco's concerns, the Government approved a major redesign of the eaves. The 9½" overhang was increased to 11½", the 2 x 2 framing to which the soffit boards were attached was replaced with a 2 x 4 framing system, and a 2" wide continuous vent was installed at the outer edge of the soffit to replace the vent holes in the fascia. On

the buildings with trusses already delivered or installed, the changes required extending the rafter tails, adding 2 x 4 framing at the soffit to support the vent, and installing the vent. On subsequent buildings, the change consisted of the additional soffit framing and vent installation only.

In an August 18, 1995 letter, Roxco suggested that the Government provide a sketch confirming the changes that had been discussed. **(Exhibit 13)** There is no indication in the documents that the Government ever provided a sketch, and a modification was never issued to change the contract documents.

The extension of the overhang resulted in a soffit height about 2" lower than originally planned and shown on the contract documents, which in turn made it necessary to lower all of the second floor windows, including those that had already been installed. Roxco gave their framing subcontractor, Chaneyworth, a change order for lowering the second floor windows and several other changes. The Government apparently never provided Roxco with written directive to lower the windows.

The Government considered the changes to the eaves to be at no cost, and they would not approve change proposals from Roxco for any of the work. No sketches or other drawings were ever provided by the Government, and the contract documents were never updated. Roxco and their subcontractors were left to frame the eaves using only verbal instructions from the Government.

***Mechanical Room Platforms***

Insufficient information was provided about the platforms needed in the mechanical rooms to support the furnaces and water heaters. The only information provided was in the details of the mechanical room layout on drawing M-2 (Sheet 88 of 94). **(Figure 11)**




TYPICAL MECHANICAL ROOM SECTION
M-2 N.T.S.

Figure 11 - Mechanical Platform from Drawing M-2/2

On August 8, 1995 Roxco requested information about these platforms in RFI 24. **(Exhibit 14)** The Government responded two weeks later with a description of the platform construction and a comment suggesting that Roxco should have somehow been able to determine what the platforms were made of when they prepared their bid.

The platforms were inadequately represented in the contract documents, and Roxco is entitled to compensation for constructing the platforms in accordance with the Government's response to RFI 24.

***Change to Door #6 Caused Conflicts with Vanities, Toilets***

Amendment 0001 to Roxco's contract changed the size of the bathroom doors from 2'-0" wide to 2'-4" wide. The drawings were not updated to reflect this change. The increased door width caused conflicts with the bathroom toilets and vanities. **(Figure 12)**




**Figure 12 - Door 6 Detail from Drawing A-1/1**

Such conflicts might have been avoided had the increased door width been shown on the drawings.

On December 7, 1995 Roxco notified the Contracting Officer that there were problems with the wider door interfering with the toilets, door casings and vanity tops. **(Exhibit 15)** The Government's technical representative verbally provided guidelines for all buildings where the wider door was or was not to be installed. This was summarized in a Roxco letter to the Contracting Officer on December 12, 1995. **(Exhibit 16)** Roxco advised the Contracting Officer there would be additional costs associated with this change.

*Joist Spacing Change*

The structural framing plans such as those on drawing S-1 (Sheet 78 of 94) show the second floor framing joists spaced at 24" on center. **(Figure 13)**




**Figure 13 - Second Floor Framing Plan from Drawing S-1/2**

The framing of the duplex units began on May 30, 1995, and about seven weeks later, on July 8, 1995, Roxco was directed by the Civil Engineering squadron to change the spacing of the 2x10 floor joists from 24" on center to 16" on center. The change was directed in the field by the Government's technical representative. No revised drawing or specification was ever issued by the Government to reflect the change.

On July 8, 1995, Roxco sent the Government a letter confirming the joist spacing change and advising the Government that additional costs would be involved. **(Exhibit 17)** The Government's files include a memo from the Civil Engineering squadron to the Contracting squadron which addresses one of several proposals submitted by Roxco for the costs associated with the change. **(Exhibit 18)** Paragraph 2 of the Civil Engineering memo refutes a statement made by Roxco that the design drawings were deficient, and then goes on to state that the "only deficiency is contractor's failure to accept drawings as drawn." It is

not clear how a field change made by the Government's technical representative represents Roxco's failure to accept the drawings as shown.

On July 19, 1996 the Government added 30 days to Roxco's contract for the joist change through contract modification P00007, and on July 29, 1996, the Government added $62,047 to the contract and extended the contract completion date by 18 days though contract modification P00008. **(Exhibit 19)** A "Contractor's Statement of Release" in contract modification P00008 includes a note that Roxco reserved its right to seek additional compensation for the joist spacing issue. The price negotiation memorandum associated with P00008 explained that Roxco did not agree to the amount offered by the Government but was willing to sign the modification in order to receive at least partial payment for the work.

No other contract modifications for this work were issued, and it appears that Roxco billed for and received all of the money included in P00008. Based on the Contractor's Statement of Release included in P00008, Roxco never waived their right to seek additional compensation for the floor joist change.

***Subfloor and Underlayment Attachment Specifications***

The requirements for attaching plywood subflooring and underlayment to the second floor joists are covered in both the specifications and the design drawings. The specifications and drawings were in agreement regarding the attachment of subflooring, but not underlayment.

Specification Section 06100 – Rough Carpentry included specific requirements for the attachment of subflooring and underlayment. The requirements included screwing the underlayment through the subflooring and into the floor joists. **(Figure 14)** Section 06100 also included a reference to an American Plywood Association (APA) standard for installing plywood. **(Figure 15)**

3.1.5.1 Plywood

Apply best side up with the grain of outer plies or the long dimension at right angles to joists. Stagger end joints and locate over the centerline of joists. Panels shall be continuous over two or more spans. Glue and nail panels 6-inches o.c. at supported edges and 10 inches o.c. over intermediate bearing. Nails shall be 8-penny common or 6-penny threaded, glue shall be construction adhesive recommended for the proposed application. Underlayment shall be laid perpendicular to the subfloor with joints staggered. Underlayment shall be screwed to the joists through the subfloor using type W power driven screws. Screw heads shall be driven flush with top of plywood. Lightly sand all joints to receive resilient flooring.

**Figure 14 - Plywood Installation Requirements from Specification Section 06100**

AMERICAN PLYWOOD ASSOCIATION (APA)

| | |
|---|---|
| APA E30-L | 1990 Design/Construction Guide, Residential and Commercial |
| APA E445-P | 1991 Structural-Use Panels (APA PRP-108) |
| APA F405-H | 1990 Performance Rated Panels |

**Figure 15 - APA Reference from Specification Section 06100**

Drawing S-9 (Sheet 86 of 94) also included requirements for the attachment of plywood subflooring and underlayment. **(Figure 16)** Like specification section 06100, the drawing notes reference the American Plywood Association, and state that "Installation of plywood panels shall be in strict accordance with APA recommendations."

PLYWOOD DECK

1. Floor plywood subfloor shall be 23/32" or 3/4" thick APA RATED PLYWOOD SHEATHING EXP 1, EXP 2 or EXTERIOR with a Panel Span Rating of 48/24. Floor underlayment shall be 1/2" thick APA underlayment.

2. Roof plywood shall be 5/8" APA RATED PLYWOOD SHEATHING EXP 1, EXP 2 or EXTERIOR with a Panel Span Rating of 32/16.

3. Plywood panels shall be glued and nailed to supports in accordance with American Plywood Association recommendations. Glue shall conform to Performance Specification AFG-01 developed by APA. Installation of panels shall be in strict accordance with APA recommendations.

4. Install plywood panels with the long dimension of the panel across supports, except where noted, and with panel continuous over two or more spans. Allow 1/8" spacing at panel ends and 1/4" at panel edges. Nail 6" on center along panel edges and 12" on center at intermediate supports. Use 6d common nails for 1/2" thick panels and 8d common nails for 3/4" thick panels. Complete all nailing of each panel before glue sets.

Figure 16 - Plywood Specification from Drawing S-9

The underlayment attachment required by specification Section 06100 and the APA requirements referenced by both the specifications and the drawing notes are contradictory. The drawings and specification require Roxco to install the underlayment in strict accordance with APA recommendations, which state that "fasteners should be spaced so they do not penetrate framing." The specification Section 06100 also states the opposite, that "underlayment shall be screwed to the joists through the subfloor using type W power driven screws."

On June 20, 1996 it became apparent to Roxco's quality assurance manager that their subcontractor was not installing plywood underlayment in accordance with one of the specifications, which required the underlayment to be fastened to the joists through the subflooring. (Exhibit 20) During a routine walkthrough by the quality assurance manager, Roxco's subcontractor had stated that when he was in the first building – Building 2806 – the Government's technical representative had given him verbal instruction not to screw the

underlayment to the joists. This contradicted the specifications but was in accordance with a note on the structural drawings.

In response to a letter from Roxco requesting clarification of the subfloor and underlayment attachment requirements, the Government on June 27, 1996 forwarded to Roxco a copy of the APA standards referenced in specification section 06100 and drawing S-9. **(Exhibit 21)** The Government's response to Roxco's request for clarification of the specifications was that the Government would "not require underlayment to be attached through subfloor to joist." The Government never addressed the discrepancies in the contract documents, and never provided Roxco with concise directions on whether the underlayment was to be attached to the floor joist or not.

***No Window Layout Dimensions***

The architectural floor plans such as those on drawing A-1 (Sheet 61 of 94) do not provide any dimensions for the locations of the windows. **(Figure 17)**