


**Figure 17 - Typical Floor Plan from Drawing A-1/1**

The window locations had to be determined in the field during the framing of the buildings. The Government never provided a drawing or other information to Roxco to locate the windows.

***Swing Doors Deleted***

The architectural floor plans such as those on drawing A-1 (Sheet 61 of 94) show a double-swinging door between the family rooms and dining rooms. **(Figure 18)**




**Figure 18 - Detail of Swing Doors from Drawing A-1/1**

In a May 21, 1996 letter to the Government, Roxco expressed concerns about the safety of the doors. **(Exhibit 22)** The Civil Engineering squadron concurred with Roxco's opinion and informed the Contracting squadron on June 12, 1996 that the doors should be deleted. The Government directed Roxco to remove the installed doors and to modify the design to include only a cased opening at each location. The design drawings were never updated to reflect this change.

The Contracting Squadron informed Roxco of the Government's position on June 18, 1996, or 28 days after Roxco raised the issue. **(Exhibit 23)** At the time, the Government requested that Roxco propose a credit for the deletion of the doors.

Roxco's May 21, 1996 letter indicates that some of the doors had already been installed, so the deletion of the doors would have required rework in some of the units. The Government included the swing doors as a no-cost change in unilateral contract modification P00011, explaining that the cost of removing the installed doors and repairing the frames would offset the labor costs savings resulting from the deletion of the doors.

*__Expansion Joint Not Shown in Sheathing__*

Amendment 0001 to Roxco's contract included a detail of the EIFS system installation at the exterior windows. (Figure 19)




**Figure 19 - Expansion Joint Detail from Drawing R-13**

This detail shows an expansion joint filled with a backer rod and sealant around the perimeter of the buildings above the windows. The expansion joint goes through the EIFS insulation, but does not penetrate the ½" exterior gypsum sheathing. The Government required Roxco to cut the expansion joint through the sheathing after the sheathing had been installed by the framing contractor.

On September 6, 1995, a meeting between Roxco, the Government and the EIFS manufacturer's representatives was held which included a discussion about cutting an

expansion joint through the exterior sheathing around the perimeter of the buildings. **(Exhibit 24)** The drawings showed an expansion joint through the EIFS system at the same location, but not through the sheathing. Two days later, Roxco's field superintendent was instructed by Roxco's project management personnel to begin cutting the expansion joint. **(Exhibit 25)**

On September 19, 1995, Roxco informed the Government that they considered the work to be an addition to their contract. The Government did not respond to Roxco's letter until January 16, 1996, at which time they stated that they believed the work was not an addition to Roxco's contract. The EIFS manufacturer's representative was involved in the decision to cut the expansion joint through the sheathing, and the Government stated that the work was "required by the manufacturer" when they rejected Roxco's proposal for additional work.

In Pearson's opinion, the work was an addition to Roxco's contract and they should be compensated. At issue is the coordination of the design drawings with the EIFS manufacturer's requirements, which was the responsibility of the Government's designers.

Although an expansion joint was shown on the drawings, it was not shown extending all the way through the exterior sheathing. The sheathing was installed by the framing contractor, not the EIFS system installer, and the framing contractor was only obligated to follow the drawings as they related to his work, not the EIFS work. If the manufacturer of the EIFS system required another trade to prepare the sheathing a certain way, Armstrong should have included this requirement in the drawings. The manufacturer's literature did not specifically state that the sheathing must be cut wherever an EIFS expansion joint is installed, and there was nothing in the design drawings to indicate the requirement to either Roxco or their framing subcontractor.

*No Header Heights Provided for Windows*

The window schedule included on drawing A-16 (Sheet 76 of 94) did not specify the height at which the windows were to be installed. Neither was the height included in specification Section 08520 – Aluminum Windows. Roxco was left to assume that the window head height was the same as the doors or perhaps was determined by the EIFS details on the building exteriors. Especially confusing was the arched windows in the dining rooms, which would have been installed at a different head height from the other first floor windows. The omission was apparently addressed in the field. No written directions from the Government have been found.

*Floor Plan and Wall Sections Conflict at Exterior Slab Edge*

According to a note on drawing G-2 (Sheet 2 of 94) all plan dimensions were to the face of framing studs, typical. **(Figure 20)**

5. DIMENSIONS:
PLAN DIMENSIONS ARE TO FACE OF STUD, TYPICAL.

**Figure 20 – General Note from Drawing G-2.**

Thus the overall building dimensions shown on the architectural floor plans were to the outer face of the exterior wall studs. These overall building dimensions are the same dimensions called out for the overall size of the concrete foundation slabs, so the outside edge of the exterior wall framing should have been flush with the outer edge of the concrete slab. But the wall sections shown on drawing A-11 (Sheet 71 of 94) and other drawings showed the wall framing held back ½" from the edge of the slabs to allow the outside face of the ½" thick exterior sheathing to be flush with the face of the concrete foundation. **(Figure 21)**




**Figure 21 - Wall Section from Drawing A-11/1**

When Roxco asked for clarification of this issue, the Government responded by saying that Roxco could determine for themselves how to resolve the conflict.

On August 23, 1995, Roxco advised the government of the discrepancy in the drawings. **(Exhibit 26)** In their letter, Roxco advised the Government that they had been framing the buildings according to drawing S-9, which resulted in a requirement for additional EIFS insulation or other material to be installed on the face of the foundations

below the exterior sheathing. They informed the Government that they intended to start framing in accordance with drawing A-12 instead and requested the Government's concurrence.

At the time Roxco notified the Government of the drawing discrepancy, they were in the process of framing 21 buildings. Over a month later, on October 6, 1995, the Government advised Roxco that they could proceed according to either drawing. **(Exhibit 27)** The government did not specifically address the discrepancy in the drawings or address any potential consequences of following one drawing rather than the other.

*No Ridge Vent Called Out in Drawings for Garages*

A detail on drawing A-11 (Sheet 71 of 94) calls for a continuous vent to be installed at the ridge of the hip roofs. **(Figure 22)**




**Figure 22 - Ridge Vent Detail from DrawingA-11/4**

This detail is called out from the wall sections for the duplexes, but no such call-out is provided for the garage wall sections. There is no indication that such a vent is to be installed at the garages. The Government required Roxco to return to completed garages to install such vents, and did not acknowledge the omission in the drawings.

*<u>Improper Details at the Area Separation Wall (ASW)</u>*

The design of the duplex units included a 2-hour area separation wall (ASW) between the two units in each duplex building. The wall was to be constructed in accordance with a Gypsum Association design for separation walls. While the walls were being installed, design deficiencies were discovered that required modifications at the roof eaves and ridges, and the Government continually questioned the manner in which Roxco was installing the walls. The controversies regarding the installation continued for over a year until the Government took credit for the walls as constructed by changing the designation from separation wall to fire-rated wall.

The area separation wall (ASW) between the duplex units was shown in section view on drawing A-13 (Sheet 73 of 94) and was very generally described in specification Section 09250 – Gypsum Wallboard, Paragraph 3.4.1. Drawing A-13 showed a section through the ASW parallel to the roof ridge. **(Figure 23)**




**Figure 23 - ASW Intersection with Roof from Drawing A-13/1**

The detail did not provide instructions regarding what to do with the continuous ridge vent where it spanned across the top of the ASW. The Government gave Roxco direction on this

issue only after at least six buildings had been sheathed and the ridge vents installed across the top of the ASW.

The wall section at the ASW (**Figure 23**) provided no special roof construction where the wall meets the underside of the roof. The specifications stated only that the ASW was to be constructed according to a Gypsum Association test assembly design. Such test assembly designs include typical connection details at roofs, but these typical details are subject to modification for particular roof designs and for local codes. In April 1996 a gypsum construction consultant noted that a potential problem might exist where the ASW meets a combustible roof deck as shown in the above detail. There is no indication that the Government ever responded to this concern or discussed the detail with Roxco.

The contract documents also did not address the treatment of the eaves where the ASW met the exterior walls of the buildings. After this design discrepancy was noted by a fire protection engineer hired jointly by Roxco and the Government, the Government's technical representative provided a sketch showing the necessary revisions at the eaves. (**Figure 24**)




**Figure 24 - Government Sketch of ASW at Eave**

This sketch was provided only after Roxco and their subcontractors had been constructing the eave framing, sheathing, and interior finishes for many months. The design drawings were never updated to show these changes, and the above sketch was the only information provided to Roxco regarding this issue.

There are two significant issues involving the AWS. The first is design deficiencies described above at the roof ridge and eaves. The second issue is a controversy over whether or not Roxco and their subcontractors installed the AWS in accordance with the contract documents, and whether the ASW as constructed constituted a two-hour separation wall.

There is no question of entitlement with regard to the first issue. The Government added money to Roxco's contract for the additional work in P00011, and they identified the design deficiencies and provided solutions to Roxco. The ridge vents in the roof were discontinued at the ASW. At the building eaves, the ASW assembly was to be extended out into the space between the building wall and the eave fascia, and the continuous soffit vent was to be discontinued on either side of the ASW, to be replaced by exterior gypsum board sheathing.

As was typical throughout the project, the Government presented Roxco with a barrage of two-way memos and other documents pointing out discrepancies with the ASW installation. In an effort to obtain contract funds that had been withheld by the Government for alleged inadequacies with the ASW construction, Roxco hired an independent consultant to inspect the drywall workmanship on the project in general and the ASW installation in particular. The consultant's May 1, 1996 report **(Exhibit 28)** concluded that the drywall workmanship on the project in general was equal to or better than acceptable industry practices, and the few deficiencies found were superficial and readily correctable. He stated that "it is my opinion that the Area Separation Wall as designed and installed at this project is sufficient to meet or exceed the intent of the tested system." His report also pointed out the design deficiencies at the roof ridge vent, which at the time had apparently not yet been addressed by the Government.

The Government rejected the conclusions of the consultant retained by Roxco. The memo to the Contracting squadron stating the Civil Engineering Squadron's position is typical in tone to many of the other memos written by the Government's technical representative. **(Exhibit 29)** No reason is presented for the rejection of the consultant's conclusions, and no mention is made of the design deficiencies. Instead, the technical representative uses the opportunity to further berate Roxco and its subcontractors for previously discussed discrepancies.

Of note is paragraph 2b of the Civil Engineering Squadron's memo, in which they state that Roxco is to provide a proposal to correct the ASW installation. This is due in part to the fact that the Civil Engineering Squadron was "assuming" that all separation walls installed to date were not fire caulked correctly and that some metal track was missing. Roxco's consultant had specifically stated that missing metal track did not affect the performance of the wall and that the design had been "fire tested without sealant or caulking therefore it is not a requirement for fire performance." The technical representative apparently ignored both of these observations.

Why Roxco should have supplied a proposal for corrections to the ASW at all is not clear, since the contract documents had not been changed and still represented what the finished, corrected ASW installation was to look like. And to require a proposal based on unfounded assumptions of deficiencies is unreasonable.

In an effort to resolve the installation issues, Roxco and the Government jointly retained the services of a fire protection engineer to inspect the ASW. His September 30, 1996 report **(Exhibit 30)** recommended several remedial repairs to the walls to ensure that they would perform in a similar manner to the tested assembly specified by the contract documents. More importantly, his report also noted that a 2-hour separation wall was not required by the edition of the Standard Building Code used on the project.

Following the submission of the fire protection engineer's report, Roxco continued with the construction of the ASW, having not been given any direction by the Government to make any changes to the design. During this time, the Government began discussing with others the possibility of changing the design from a 2-hour separation wall to a 1-hour fire rated wall. These discussions were not shared with Roxco. Instead, Roxco was again reminded by the Contracting Squadron that deficiencies existed in the ASW as constructed.

On February 14, 1997, the Government issued unilateral contract modification P00011, which among other things changed the ASW to a 2-hour fire-rated wall, even though the Government had determined that the wall was not required to be more than a 1-hour rated wall. The Government unilaterally reduced Roxco's contract by $27,316 as a result of the change. The Government's intent may have been to accept the work as installed at a lesser value than the value of what was originally specified. But instead, the Government modified the design after Roxco had spent a considerable amount of money constructing the ASW. The fire protection engineer hired by the Government and Roxco and the base fire protection engineer both agreed that an ASW was not required and that a 1-hour rated fire wall would be acceptable. The wall had been over-designed, and it was not until late 1996, or 18 months into the project, that the Government discovered this mistake.

The Government required Roxco to install ASWs in every unit, even after the Government learned that ASWs were not required. Although qualified consultants disagreed, the Government contended that Roxco's ASWs were not sufficiently constructed. They were sufficiently constructed; they just did not meet the Government's unduly strict requirements. Months later, in P00011, the Government unilaterally took a $27,316 credit for what amounts to their interpretation of the diminished value of the ASWs. In essence, the Government allowed Roxco to install what was specified, then changed the specification to something of lesser value, and took a credit for the change. Roxco is entitled to reinstatement of the costs improperly deducted from their contract for the ASW.

***Catwalk Framing Not Shown on Drawings***

Catwalks were built in the attics of the duplex units to provide access to mechanical equipment. The catwalks were not shown on the drawings, and they were only generally described in specification Section 06100 – Rough Carpentry. **(Figure 25)** The general description in Section 06100 was the only design information available to Roxco.

```
3.2.6   Cat Walks.

    Install double row of 2 x 6 lumber across top of ceiling joists adjacent to
    attic access panel continuous from end to end of attic area.  Lay boards
    with 1-inch space between.  Stager end joints with each joint on a support.
```

**Figure 25 - Catwalk Framing from Specification Section 06100**

Furthering Roxco's confusion on the installation of the catwalks was the fact that the contract documents allowed the contractor to use prefabricated roof trusses instead of the roof framing shown on the drawings. This resulted in ceiling joists (actually the bottom chords of the trusses) that were only 4" high. Roxco chose to use trusses, and the catwalk framing had to be revised to raise the catwalk above the insulation that would otherwise have fit within the ceiling joists and under the catwalk. Even though the contract documents allowed the use of trusses, they did not provide any framing details to be used with truss construction.

The Government never provided Roxco with any additional information about where to install the catwalks. On June 4, 1996, the Government did provide Roxco with a sketch showing how to raise the catwalks over the insulation. **(Exhibit 31)** The sketch added 2x4 boards spanning the truss webs to raise the 2x6 catwalk framing above the ceiling insulation and out of the way of the truss webs. The 2x4 framing is clearly an addition to what is described in the contract documents.

A June 6, 1996 memo from Civil Engineering to Contracting describes the framing method presented in the earlier sketch. **(Exhibit 32)** Paragraph 2 of the memo also states that it is the contractor's (Roxco's) responsibility to change any design elements that are affected by their use of trusses. We disagree. The use of trusses was allowed by the designers and included as an option in the contract documents. The problem with the catwalks was the result of Armstrong not providing an alternate design for the installation of

catwalks on prefabricated trusses instead of loose framing. Any design changes required by the use of trusses was the responsibility of the Government, not the contractor.

*EIFS Insulation Attachment at Porches*

The wall section at the porches was changed considerably in drawing R-4 issued with Amendment 0001. **(Figure 26)**




**Figure 26 - Section at Porch from Drawing R-4**

Roxco submitted RFI 40 **(Exhibit 33)** to the Government on August 26, 1995 to clarify the attachment of the sheathing and foam insulation at the "2 x 10 double header across opening" near the eave. The header is to be wrapped with EIFS insulation, but the drawing shows no framing members to which the insulation can be attached on the inside (or left

side in the drawing) of the header. The Government's response to the RFI was provided by the technical representative, who stated that all of the information required was on the drawing. He did not acknowledge the omission in the drawing, and he did not answer Roxco's question.

***Coat Closet Door Size***

Amendment 0001 to Roxco's contract added a type 13 door specification and changed the coat closet door on the first floor from a type 9 to a type 13. About two months after framing of the buildings started, it was discovered that the type 13 door, which was to be 6'-8" high, would not fit under the stair well as designed. **(Figure 27)**




**Figure 27 - Door 13 at Stair from Drawing A-14/1**

On August 1, 1995, Roxco submitted RFI 14 notifying the Government of the problem. **(Exhibit 34)** The Government's response was to install a 6'-6" door, which effectively changed the door 13 specification and the door schedule in the drawings. The contract documents were never modified to reflect this change.

***<u>Framing Dimension Changes Not Shown on Drawings</u>***

In the four amendments to Roxco's contract, the Government made many changes to the framing dimensions shown on the design drawings. The Government issued these amendments after the design drawings were completed, and it is not clear whether Armstrong was consulted about the changes.

*<u>Amendment 0001</u>*

- Closet wall next to bedroom #3 was changed to a 2 x 6 framed wall to accommodate plumbing.
- The first floor coat closet door was changed from a type 9 to a type 13.
- The mechanical room was moved 6". The direction was not specified.
- On all lower level floor plans, a 4'-4" dimension next to door #5 was changed to 4'-0".
- On all lower level floor plans, a 4'-0" dimension "on left side kitchen title" was changed to 3'-8".
- The floor-to-floor dimension was to be changed in accordance with other dimensional changes listed in the addendum.
- The back wall of the second floor linen closet was changed to 2 x 6 framing.
- The wall behind the lavatory in the powder room on the first floor was changed to 2 x 6 framing.
- In the master bedrooms, the closet wall was to extend to the hall wall to form a plumbing chase.
- The plan of the trash area in the garages was changed as described in sketch R-2.

- An 8" dimension at the eaves was changed to 9 ½"
- Floor-to-floor heights were changed on all relevant sections from 8'-11 ½" to 9'-0".
- The dimension from the top of the second floor deck to joist bearing was changed to 8'-1 ½" from 8'-0".
- The first floor to landing dimensions and the riser heights were changed at the stairs.
- The landing to second floor dimensions and the riser heights were changed at the stairs.
- The door opening widths at door types #4 and #5 were changed from 2'-8" wide to 3'-0" wide.
- The width of door type #6 was changed from 2'-0" to 2'-4".

*Amendment 0002*

- Two dimensions on revised drawing R-11 issued with Amendment 0001 were changed.

As memorialized in the foregoing text, the Government made many, many changes to the wood framing contract documents. Roxco appropriately requested that the Government update the contract documents to incorporate all of these revisions. The Government steadfastly refused to do so and showed no consideration for the problems created by their refusal. As the Government stated time and again, they simply expected Roxco to somehow keep track of whatever changes the Government decided to make.

As previously stated, the Project was completed three years later than planned. The largest portion of that delay occurred during final inspection and turnover of the buildings for occupancy. Roxco's approved schedule anticipated that final inspection and turn over of all buildings to start on April 15, 1996 and complete on August 5, 1996, a period just under four months. Roxco actually scheduled acceptance inspections of the first group of buildings in October 1996, two months after the project was originally scheduled for completion. The first building was accepted by the Government on December 24, 1997, fourteen months after the initial acceptance inspection was requested. When Roxco ceased managing the project on November 5, 1998, only 30 of the 86 duplexes had been turned over, along with their associated garages. The last building was accepted for beneficial occupancy on August 20, 1999, three years after the originally planned completion date of the project.

Records memorializing that period indicate that the Government did not employ reasonable inspection and acceptance criteria and purposely deferred acceptance of the buildings for invalid reasons, both of which necessarily delayed acceptance of the buildings, causing costly delays and continual inspection and re-inspections.

In Pearson's opinion, the following actions by the Government needlessly delayed the acceptance of the all the buildings on this project.

1. Contrary to standard industry practice the Government refused to either accept or reject work at the time that it was installed by Roxco. The Government waited until the work was covered by another trade's work or final inspection to reject work that had been installed months and sometimes years earlier. The cost to repair even properly rejected work under such a system is significantly greater than would be incurred if the work had not been covered by follow on trades' work.

2. Throughout the project, the Government's only direction to Roxco was to conform to the contract documents, which as discussed in earlier text was in many instances flawed. Consequently, Roxco expended significant sums and experienced significant delays while attempting to comply with flawed contract documents and the Government's unreasonable acceptance criteria.

3. The concrete floors were poured during a ten month period ending in March 1996. Thereafter, wood framing and all other trades work was installed on top of the concrete floors, including vinyl tile and carpet. Years later, the Government refused to accept buildings because they would not accept the concrete floors. In July 1998, the Government realized that their acceptance criteria was unreasonable and began accepting those buildings.

4. The exterior of these buildings was covered with EIFS, a stucco-like material that was being blamed for a number of failures across the nation and was the subject of much litigation. Project records indicate that the Government delayed acceptance of these buildings until they could determine if the EIFS design on these buildings was acceptable. The Government's intentional deferral of building acceptance for "design" reasons is an event for which Roxco should be compensated.

5. Building acceptance was delayed several months because the Government would not accept any building for occupancy without first receiving written warranties for the work. There is no such requirement in this contract.

6. The Government interfered with Roxco's subcontractors and suppliers, thereby hindering Roxco's ability to execute the work.

Following are discussions of each of these actions, as well as a description of the turnover process used on the first building to be accepted for occupancy, Building 2759.

<u>*Government Refusal to Accept Each Stage of Work*</u>

The Government typically employed a technical representative and three full-time inspectors to monitor the construction process. Even so, the Government provided Roxco with very little guidance regarding the acceptability of the work that was put in place. The Government's stated position was that neither their technical representative nor their inspectors would accept any work in place prior to the final acceptance of the buildings. Instead, their role was limited to identifying deficiencies in the work with respect to the contract documents. In effect, the Government was willing to tell Roxco when they considered the work deficient, but was not willing to tell Roxco when they considered it acceptable.

During construction, neither the contracting officer nor the other Government personnel administering the project deemed it appropriate to accept each stage of construction as it was completed. That decision caused Roxco to incur significant delays and additional costs.

Early in the project, Roxco prepared inspection and acceptance forms to be used by Roxco's quality assurance superintendent to document the completion and acceptance of each stage of work. **(Exhibit 1)** The Government inspectors initialed their acceptance on these forms, which provided Roxco with assurance that work could proceed to the next stage without the risk of later being told the covered work was unacceptable. **(Exhibit 2)**

Soon after Roxco presented the Government with forms that had been signed by the inspectors, the Government technical representative instructed the inspectors not to sign any forms that implied acceptance in any way. **(Exhibit 3)** The technical representative claimed that the intent of the inspectors' signatures on Roxco's forms was only to "verify work was installed before contractor continued to next phase of work." This claim is dubious, since it is unlikely that Roxco wanted or needed any verification that they had in fact installed the work being inspected.

The Government's refusal to accept each stage of the work put Roxco and its subcontractors in a very difficult position. Any time Roxco directed work to be covered by following trades (such as the installation of drywall over the framing) they did so at their own risk. If the Government then identified some deficiency with the covered work – possibly some detail that had been overlooked during their earlier inspections – the Government expected Roxco to absorb the cost of making the necessary repairs. Each time Roxco directed succeeding work to proceed, they could only guess at what deficiencies the Government inspectors might later choose to look for in the covered work.

Evidence of the problems created by the Government's refusal to accept work can be found in the activities of the Government inspectors. The daily inspection records and memos generated by the inspectors included numerous references to untimely inspections and removing work in place to inspect work that had been covered. **(Exhibit 4)**

## Untimely Notification of Items to Be Inspected

Compounding the problems created by the Government's refusal to accept each stage of the work and their unwillingness to stop the installation of unacceptable work was the fact that the Government did not give Roxco any advanced information regarding what was or was not acceptable. It is normal for pre-construction meetings to be held on a project before the installation of each major building component. There is evidence that such meetings took place on this project. But there is no evidence that the Government used these meetings to provide Roxco with any useful guidance regarding the Government's inspection criteria.

The only guidance ever offered by the Government was that the work must conform to the contract documents. But as discussed earlier, there were many errors and omissions in the contract documents. So, following them did not resolve the problems Roxco was experiencing. The Government in most cases denied that the errors and omissions existed, and in other cases expected Roxco to suggest solutions and submit them for the Government's approval but without the Government's guidance.

One of the most contentious and long-running issues on the project was the Government's insistence that Roxco utilize poor drawing details, vague specifications and general industry standards to construct the work. A good example relates to the asphalt shingle roofing. Roxco began installing the asphalt shingle roofing and sheet metal flashings on August 17, 1995. The lack of specificity in the contract documents led to an immediate barrage of correspondence between Roxco and the Government regarding the methods and quality of the installation.

Four major areas of confusion developed over the roof flashing: the metal fascia wrap, the porch flashing, the valley flashing, and the metal drip edge at the eaves. In all four cases, the confusion stemmed from the lack of detail in the contract documents. There simply was not enough detail in the contract documents to build that work. Roxco interpreted the vague and insufficient documents in one manner and the Government interpreted them differently. Disagreement over the installation of the metal fascia was not resolved until April 26, 1996, eight

months after Roxco started the roofing. **(Exhibit 5)** An acceptable method of installing the porch and valley flashings was not determined until late September or early October 1996, about 13 months after roofing work commenced. **(Exhibit 6)**

It does not appear that the disagreements over the installation of the metal drip edge at the eaves were ever fully resolved, and the Government continued noting discrepancies with the installation during punchlist inspections. It is not clear how Roxco or its subcontractors were ever able to determine what was acceptable to the Government.

Perhaps the flagship example of the Government's untimely and unreasonable inspection criteria is demonstrated in its roofing inspections. On April 18, 1997 the Government provided Roxco with a list of 43 specific roofing details that would be checked during acceptance inspections on the buildings. **(Exhibit 7)** Prior to issuance of that document no inspection criteria existed. Furthermore, two months prior to issuing that list the Government had paid Roxco for 99% of the roofing in Pay Application 24, submitted at the end of February 1997. **(Exhibit 8)** In summary, the Government watched Roxco install virtually every roof on the project then waited until the roofing on all buildings was virtually complete to advised Roxco of its roof acceptance criteria. Such actions are unreasonable, particularly in light of the fact that the contract documents explaining how the roofs were to be installed were vague and conflicting.

After April 1997, the date that the Government finally determined for themselves how the roofing should be installed and inspected, they began to withhold money from Roxco's pay applications for roofing work that did not conform to their untimely determination. The Government did that by reducing payments on Roxco's post-April 1997 pay applications. The Government began to reduce Roxco's overall progress payments and reduce the percentage complete shown in the pay applications for roofing work paid in previous applications.

Simply stated, the Government did not provide guidance until the roof installation was complete, which was too late.

## *Government Would Not Accept Floors*

One of the major issues cited by the Government in their refusal to accept the buildings was floors that were not level within the tolerances specified in the contract documents. Because of this refusal, buildings that otherwise would have been accepted sat empty for months while the Government waited for unnecessary and costly repairs to the floors. There is compelling evidence in the documents that the Government's position on the floors was incorrect, and as a result Roxco incurred significant costs and delays.

From the outset of the project, the Government's technical representative and inspectors began checking the levelness of first the concrete slabs and then the plywood second floors. Their inspections were limited to determining whether the floors were level within the tolerances set forth in the contract documents. In an April 18, 1996 construction evaluation of the project, Armstrong stated that the degree to which un-level concrete slabs presented a problem depended on several factors, included the extent to which the unevenness was discernible to the occupants. **(Figure 1)**

> 13. **What affect does building an uneven slab have on the long-term use and maintenance of the units?**
>
> **Answer: The degree of affect depends upon where it occurs and to what extent. So long as walls are plated level and the unevenness is undiscernible in walking or furniture erectness and there are no irregularities to transfer through the finish floor tile, there should be no effect on use or maintenance. There would be no structural impact as long as other items , such as, minimum slab thickness, steel placement, ect. have not been compromised. No slab can be poured and finished perfectly level. The specifications allow a variance of 1/4-inch in 10-feet.**

**Figure 1 – From Page III-5 of the April 1996 Armstrong Evaluation**

Nevertheless, the Government insisted on no less than strict compliance with the tolerance set forth in the contract documents. That is particularly troubling when one realizes that much of the unlevel

floor problem was the result of flaws in the contract documents. See Sections D - Engineered Fill and Section E - Building Foundation/Slabs.

The Government's notices of discrepancies with the floors usually contained general references to out-of-level floors in one or more buildings. Often Roxco's reply was that they checked the floors and found no problems.

What is clear from the documents is that although the Government was continually notifying Roxco that the floors were out of tolerance, neither the contract documents nor the Government's inspection techniques were clear or consistent. When inspecting the framed second floors, the Government would typically quote specification Section 06100 – Rough Carpentry. **(Figure 2)**

3.3 ERECTION TOLERANCES

a. Framing members which will be covered by finishes such as wallboard, plaster, or ceramic tile set in a mortar setting bed, shall be within the following limits:

1. Layout of walls and partitions: 1/4 inch from intended position;
2. Plates and runners: 1/4 inch in 8 feet from a straight line;
3. Studs: 1/4 inch in 8 feet out of plumb, not cumulative; and
4. Face of framing members: 1/4 inch in 8 feet from a true plane.

b. Framing members which will be covered by ceramic tile set in dry-set mortar, latex-portland cement mortar, or organic adhesive shall be within the following limits:

1. Layout of walls and partitions: 1/4 inch from intended position;
2. Plates and runners: 1/8 inch in 8 feet from a straight line;
3. Studs: 1/8 inch in 8 feet out of plumb, not cumulative; and
4. Face of framing members: 1/8 in 8 feet from a true plane.

-- End of Section --

**Figure 2 - Paragraph 3.3 from Specification Section 06100**