Paragraph 3.3 of specification Section 06100 clearly refers to surfaces such as interior walls and ceilings that are to receive drywall, ceramic tile, or other finishes. It does not clearly refer to floors. Nevertheless, discrepancy notices forwarded by the Government inspectors would instruct Roxco to construct the floors to this specification. **(Exhibit 9)**

The Government's inspectors used a variety of methods to measure the floors, including the use of a bubble level, a string line stretched across the floor, and surveying instruments. Some of the techniques – such as the use of surveying instruments - were excessive. The Government's apparent uncertainty about how to measure the floors suggests some uncertainty over how the specifications should be applied.

Acceptance of the buildings was painfully slow. On June 1, 1998, the Government sent a letter to Roxco expressing concern about the lack of progress turning over buildings for occupancy. **(Exhibit 10)** At that time the acceptance inspections had been ongoing for a year and one-half, since October 22, 1996, and the Government had only accepted seven duplexes and associated garages. The letter specifically mentions un-level floors as a major item holding up the acceptance of the buildings.

Three weeks later, on June 22, 1998, the Civil Engineering Squadron proposed that a credit be negotiated with Roxco for out-of-tolerance floors. **(Exhibit 11)** The memo reiterates the position that the Government had held from the outset of the project: The floors were unacceptable if they were not constructed in strict compliance with the tolerances in the contract documents, regardless of whether they were otherwise acceptable as indicated by Armstrong in their April 1996 construction evaluation. It is also clear that the Government's position at this point was that the floors were the major issue to be resolved in order to begin accepting buildings.

About two weeks later, on July 2, 1998 a meeting took place which further calls into question the Government's position on the floors. The contracting officer, contract administrator and other Government personnel met with a local realtor and a local home builder to assess the construction

of the duplexes. The contracting officer's record of this meeting clearly states that floors that had been previously identified as unacceptable by the Civil Engineering Squadron were unanimously considered acceptable by those present. **(Exhibit 12)** Furthermore, the realtor noted that the value of the buildings was not diminished by the quality of the floors. The Government had "received their moneys worth." We find it enlightening that three years after the start of construction, the Government was asking third parties about what was acceptable.

The Government's records included a document that sheds further light on issues that were influencing the rate at which the Government was accepting buildings, it is an agenda for a July 15, 1998 "Roxco Housing Contract Meeting." **(Exhibit 13)** The agenda describes a July 14, 1998 conversation regarding the Government's response to inquiries from the local press about the (slow) progress of the Barksdale Project. According to this document, the Government contracting officer's planned response was that the housing was not being accepted for occupancy because of potential problems with the EIFS as experienced on other projects on the East Coast. The potential problem was with the system design itself, not Roxco's installation.

Apparently an officer at Barksdale found the contracting officer's explanation "totally unacceptable." Because the EIFS was specified by the Government, any problems with the EIFS would be the Government's responsibility. The officer wanted the Government to state that the real reason the occupancy was being held up was "poor foundations, unlevel flooring and lack of quality control on the contractor's part." However, the contracting officer said that the Government "couldn't say that."

Clearly, the position that the Government had held from the outset of the project was incorrect. The Civil Engineering Squadron's uninformed belief that the floors were unacceptable if not built strictly within the tolerances in the contract documents was refuted by both the designers in April 1996 and the group of Government personnel and local businessmen in July 1998.

Soon after the July 2, 1998 meeting, the Government resumed the acceptance of buildings, starting with six duplexes and associated garages on August 5, 1998. These were the first buildings accepted since March 11, 1998. The Government's documents provide evidence that the acceptance of buildings had been needlessly delayed for up to five months because of the Government's mistaken belief that the floors were unacceptable.

*Government Would Not Allow Occupancy Without Written Warranties*

As previously stated, the Government's acceptance inspections of the buildings began on October 22, 1996. The Government allowed Roxco and their subcontractors to work to correct deficiencies in the first group of six buildings for several months before the Government on August 1, 1997 informed Roxco that they would not accept any buildings without first being provided with the written warranties required by the contract documents. **(Exhibit 14)** There was no contractual requirement for Roxco to provide warranties in advance of occupancy, and the Government's requirement to do so caused several problems and needless delays to the acceptance of certainly the first group of buildings, and possibly later groups as well.

The specification sections that required product or system warranties did not address the timing of the warranty submittals. The Government had no contractual basis for requiring Roxco to provide specific product warranties prior to occupancy.

The Government went a step further in a letter sent to Roxco on August 15, 1997. **(Exhibit 15)** Not only was the Government going to require written warranties in advance of occupancy, they were also going to require inspections by the manufacturers of the warranted systems and written assurances that the installations had been inspected and were acceptable. These additional requirements were not part of the contract documents and were not part of Roxco's contract. By requiring manufacturer inspections and written assurances, the Government was placing conditions on beneficial occupancy that were not a part of Roxco's contract.

A November 5, 1997 email suggests that the Government's decision to require warranties prior to occupancy was the result of their mistrust of Roxco. **(Exhibit 16)** It appears that the Government used their experience with Roxco to justify changing the conditions under which Roxco could complete their contract. The email also states that once the warranty issues were resolved, the Government expected to "start turnover of houses within 7-10 days." This is further evidence that the Government's requirement to obtain warranties as a condition of building occupancy was delaying the acceptance process.

The most significant warranty issue, and the one which delayed the acceptance of the buildings, involved the Exterior Insulated Finish System (EIFS). Roxco terminated their initial EIFS subcontractor in February 1997, and soon after questions arose over the provision of the five-year EIFS manufacturer's warranty required by the specifications. On July 16, 1997, Roxco informed the Government that the manufacturer considered the system warrantable after specific corrections were made. **(Exhibit 17)** Two weeks later, Roxco requested the final acceptance inspection on Building 2759, on which the Government had begun "pre-final" inspections on October 22, 1996, more than 10 months earlier.

The Government responded with their August 1, 1997 letter stating that the warranties for the EIFS and for other systems had to be provided prior to acceptance. The Government apparently did perform an acceptance inspection on Building 2759 during the first week of August 1997 but they had no intention of accepting the building without the EIFS warranty.

There is no evidence in the documents that the Government performed another inspection on Building 2759. On November 30, 1997 the EIFS warranty for Building 2759 was received, and the building was accepted on December 24, 1997, or 14 months after it had first been inspected.

*__Government Interference with Supplier Payments__*

During the acceptance inspections of the buildings, the Government was informed that a supplier to Roxco's initial EIFS subcontractor had not been paid in full, and as a result the

manufacturer would not provide a warranty for the EIFS. The Government's reaction to this and another non-payment issue was nothing more than a punitive measure against Roxco and in no way contributed to the acceptance of the buildings. Furthermore, the actions taken by the Government were not allowed under the terms of Roxco's contract or any of the FAR clauses referenced within the contract.

On September 12, 1997 the Government contracting officer informed Roxco that her office had for some reason attempted to "facilitate" the efforts of Roxco's management by contacting a supplier to Roxco's original EIFS subcontractor to discuss EIFS warranty inspections. **(Exhibit 18)** The Government was informed by the supplier that no inspections would take place because the supplier hadn't been paid by the subcontractor. The contracting officer notified Roxco that if they could not document that the supplier had been paid, funds would be withheld from Roxco's next pay application.

The EIFS supplier was owed $51,284.92 from Roxco's subcontractor, but on October 2, 1997 the contracting officer informed Roxco that they had withheld $57,764.25 from Roxco's September 1997 pay application for the non-payment. **(Exhibit 19)** The Government never offered an explanation of why they withheld more than the disputed amount. The subcontractor was bonded and the Government was merely interfering with Roxco's subcontract relationships. The Government also had Roxco's bond and was at no risk in this instance.

On the same day, the Government informed Roxco that they were withholding $17,161.27 for non-payment to another supplier. **(Exhibit 20)** This letter referenced FAR clause 32.112-1 as justification for withholding the funds.

The contracting officer had also referenced FAR clause 32.112-1 in the earlier September 12, 1997 letter which threatened to withhold funds from Roxco. FAR clause 32.112-1 allows the Government to withhold money for the non-payment of any subcontractor or supplier with a direct relationship to the general contractor, in this case Roxco. But Roxco did not have a direct

relationship with the suppliers involved. And more importantly, FAR clause 32.112-1 was not part of Roxco's contract. In fact, the clause was not made a part of the FAR until October 1995, seven months after the Government issued Roxco's contract. When it was suggested to the contracting officer that the clause did not apply, the Government changed their argument, claiming instead that the Prompt Payment Act allowed them to withhold the funds. **(Exhibit 21)**

A legal opinion obtained by Roxco concluded that "there is nothing that requires or permits the Contracting Officer to withhold payment from Roxco because its subcontractor has not paid its subcontractors and suppliers." **(Exhibit 22)** Neither the Prompt Payment Act nor FAR clause 32.112-1 could be used as justification to withhold funds. Pearson has found no other language in Roxco's contract or the FAR clauses referenced in the contract that justify the Government actions.

The legal opinion was forwarded to the contracting officer, but there is no evidence in the documents that the Government replied to it. It appears that the issue with the EIFS supplier was resolved sometime in late November 1997, but it does not appear that the funds withheld by the Government were ever released to Roxco.

The Government's punitive withholding of funds from Roxco did nothing to "facilitate" the inspection and acceptance of the EIFS. The situation with the EIFS supplier was apparently resolved, but the actions of the Government only interfered with the process. The payment bonds held by Roxco and their subcontractor ensured that the suppliers would be paid in full. The Government's actions were unnecessary and were not allowed by Roxco's contract. The Government improperly withheld a total of $74,925.52 from Roxco's pay applications and the money was never subsequently released by the Government.

***Acceptance of Building 2759***

In September 1996 Roxco requested that the Government perform a "pre-final" inspection on the first two groups of buildings to be turned over. The events that transpired between that request and the eventual acceptance of the first building demonstrates the effects of the

Government's actions discussed above. The first pre-final inspections were eventually performed by the Government on October 22, 1996, and the first building – Building 2759 – was not accepted until December 24, 1997.

The inspections and other events leading to the acceptance of building 2759 and its associated garage are best summarized chronologically:

- On September 10, 1996 Roxco informed the Government that they had scheduled turnover inspections starting the week of October 14, 1996 for the first two groups of duplexes and associated garages. **(Exhibit 23)**

- On October 22, 1996 the Government performed the first acceptance inspection on building 2759. **(Exhibit 24)** Only the interior of the building was inspected. A total of 80 discrepancies were noted.

- In February 1997 the Government re-inspected building 2759. The exterior and one half of the interior (the "A" unit) were inspected. On February 26, 1997 the Government presented the results of the inspection to Roxco on a new "inspection checklist" form. The form includes 407 interior and exterior items to be checked in all the buildings. **(Exhibit 25)** The list had not been shared with Roxco prior to the re-inspection of 2759. The list of interior discrepancies in building 2759 grew from 80 in both units to 122 in the "A" unit alone.

- On April 18, 1996, the Government presented Roxco with a list of 43 specific roofing items that they would be checking during their acceptance inspections. **(Exhibit 26)** The first roofing inspection on building 2759 had been performed two months earlier, in February 1997, and the Government was only now providing Roxco with an indication of what they considered acceptable.

- On April 23, 1997, the Government performed another acceptance inspection on building 2759. **(Exhibit 27)** It was the first re-inspection of the "B" unit since the initial October 22, 1996 inspection. Neither the exterior nor the "A" side of the building was re-inspected.

- On July 31, 1997 Roxco requested that building 2759 be inspected again for acceptance. The next day, the Government informed Roxco that buildings would not be accepted until the Government received all warranties specified in the contract documents. **(Exhibit 28)** At this point, Roxco had been working on the punchlist for building 2759

for 10 months, and this was the first indication from the Government that the building would not have been accepted even if the punchlist had been completed.

- From August 4, 1997 to August 7, 1997 the Government performed another inspection of building 2759. **(Exhibit 29)** The inspection appeared to include the interiors of both units, as well as the building exterior. The results of the inspection were presented to Roxco on yet another new form, and the discrepancies noted were not the same as those from the previous October 1996, February 1997 and April 1997 inspections. The Government had presented Roxco with an entirely new punchlist for building 2759.

- On August 8, 1997, Roxco requested clarification of several of the items on the new punchlist. **(Exhibit 30)** Two weeks later, the Government responded by refusing to provide clarification of all but one item. **(Exhibit 31)** The Government's position was that Roxco should already have been familiar with the items on the new list.

- On October 22, 1997 a two–way memo from the technical representative reiterated the Government's position that no buildings would be accepted without a warranty on the EIFS. **(Exhibit 32)** The memo also refers to a termite treatment warranty, which to this point had not been specifically mentioned by the Government.

- On November 30, 1997, Roxco received a warranty for the EIFS on building 2759. **(Exhibit 33)**

- On December 5, 1997 Roxco requested a final acceptance inspection on five duplexes and three associated garages, including building 2759 and garage 2763. **(Exhibit 34)**

- There is no record in the project documents of another inspection on buildings 2759 or 2763, but they were apparently accepted on December 24, 1997. **(Exhibit 35)**

The inspection process and the Government's reporting methods must have been confusing to Roxco. On October 22, 1996 the Government provided a punchlist for the interior of building 2759 that was not extensive. Roxco worked on this list of discrepancies for four months, only to have the Government present them with a new and more extensive list of discrepancies on February 26, 1997. The Government was apparently unprepared for Roxco's initial request for an acceptance inspection in October of 1996. It was not until the time of the February 1997 inspection that they knew what they should be looking at during their inspections, and their October 1996 list of discrepancies had only misled Roxco.

Roxco must have been further confused when – in August 1997 – the Government performed another inspection and presented Roxco with yet another list of discrepancies using yet another form. In July 1997 the Government had apparently performed a re-inspection of building 2759 based on the inspection checklists used in their February and April inspections. This re-inspection was not requested by Roxco and the results were not provided to Roxco. But when Roxco did request a re-inspection of the building, the Government provided the results not as a re-inspection, but as a new inspection using a new reporting format. At this point, it could not have been clear to Roxco whether they should have continued to work off the earlier February and April inspections, or instead work off the new August inspection. The Government was again misleading Roxco over what did or did not have to be corrected in the buildings.

Following the Government's inspection of building 2759 in August 1997, the acceptance of the building was clearly delayed by the Government's refusal to accept buildings without first receiving a warranty for the EIFS. Even though the Government performed an acceptance inspection on building 2759 during the first week of August 1997, they had informed Roxco on August 1, 1997 that no buildings would be accepted until all warranties required by the specifications had been received by the Government.

Roxco's contract described a two-week turnover process consisting of one Government inspection, punchlist corrections, and then turnover of each building. The first two groups of buildings took fourteen months or more. Throughout the process, the Government continually misled Roxco with multiple punchlists, untimely information about what was to be inspected, and unreasonable demands for warranty information and manufacturer's inspections only after the punchlist process had been going on for nearly a year. Clearly, the Government bears responsibility for most – if not all – of the delays associated with the building turnover process.

SECTION 01010

CONSTRUCTION REQUIREMENTS

PART 1 GENERAL

This section explains the procedures for construction management and inspection for the procurement of 82 Military Family Housing units (Phase II), at Barksdale AFB, LA. An option for construction of an additional 118 units (Phase I) may be exercised.

1.1 Functions and Responsibilities of the Procuring Contracting Officer (CO)

The CO is the 2nd Contracting Squadron, Barksdale AFB, LA and is responsible for the overall administration of the contract.

1.1 Technical Representative

The Government technical contract representative is designated as the Construction Contract Inspector (CCI). This designation includes, but is not limited, to the following specific functions of this contract:

A) Technical administration and inspection.

B) Recommending approval of shop drawings, samples, and materials.

C) Testing materials not otherwise specified to be performed by the Contractor or others.

PART 2 CONSTRUCTION MANAGEMENT.

2.1 Project Construction Meetings

2.1.1 Preconstruction Conference

Prior to the commencement of construction, a conference will be held to acquaint the participants with the general plan of contract administration and requirements under which the construction operations will proceed, and also to inform the Contractor, in detail, of his obligations concerning preferences and equal opportunity. Points for discussion will include, but not be limited to:

A) provision for and location of field offices;

B) location for project sign to be erected by the contractor;

C) coordination and approval of haul routes and disposal sites;

D) timely submission and processing of submittals for material, equipment, and shop drawings;

E) procedure for reporting deficiencies and insuring correction;

F) contractor quality control plan;

which the certificates apply. Copies of laboratory test reports submitted with certificates shall contain the name and address of the testing laboratory and the date or dates of the tests to which the report applies. Certification shall not be construed as relieving the contractor from furnishing satisfactory material, if, after tests are performed on selected samples, the material is found not to meet the specific requirements.

2.2.4 Materials, Fixtures, and Equipment Lists

As soon as practicable and before any material or equipment is purchased, the Contractor shall submit to the CO a complete list of materials, fixtures, and equipment to be incorporated in the work. With the material and equipment lists, the contractor shall submit applicable brochures, technical data, catalogs, cuts, diagrams, drawings, samples when required, and such other descriptive data as will give a complete description including trade name, model number, type, size, rating, and auxiliary equipment to be included. Submittal shall be in accordance with paragraph 2.2.2, Submittals of Shop Drawings and Operations and Maintenance Data.

2.2.5 Submittal of As-Built Drawings and Specifications

Minimum of 30 days prior to final inspection of the completed project, the Contractor shall submit to the CO, for approval, one full size set of as-built drawings, marked-up as actually constructed (see paragraph 2.7.3, As-Built Drawings), marked-up specifications complete with amendments, and any change orders. As-built drawings shall include mark-up of changes and revisions of all related sections, details, plans and elevations, notes, legends, etc., and, if necessary, sketches of enlarged details all done in a clear and precise manner. As builts shall also note the type of material used whenever material option is given in the specification.

2.2.6 Progress Photographs

The contractor shall, during span of project, furnish the CO with 35MM color photographs to depict construction progress. Photographic work shall be of a quality to illustrate progress clearly. Photographs must be taken between the first and 15th day of each month, and be delivered to the CO not later than the 20th day of the same month taken. Photographs shall be taken from various positions. Location of positions shall be coordinated with or may be selected by the CO. They shall show, inasmuch as practicable, work accomplished during the previous month. Each must be identified showing date made, contract title and number, as well as brief description of what each photograph depicts. Two copies of each photograph and 1 copy of each negative shall be furnished to the CO by date stipulated above. A minimum of 20 photographs will be furnished each month.

2.3 Inspection and Testing

2.3.1 General

Inspection will be accomplished by the contractor in accordance with the specified quality control program (see Part 3, CONSTRUCTION QUALITY CONTROL). Prior to start of construction, the contractor will submit his plan for quality control which will ensure sufficient inspection and test of all items of work, including that of subcontractors, to ensure

conformance to the contractor's plans and specifications with respect to the materials, workmanship, construction finish, and functional performance. The Government will maintain surveillance of the contractor's quality control operation and may determine the acceptability of workmanship and materials at any stage of the work. Tests required to be performed in place, such as tests of installed utility systems, will be performed by contractor personnel in the presence of the CO or his authorized representative. Laboratory tests of field samples, such as soil compaction test, and test of concrete and flexible pavement materials, will be performed by the contractor using qualified testing labs and personnel. The contractor shall perform all quality control inspection and/or testing in accordance with the provisions specified in Part 3, CONSTRUCTION QUALITY CONTROL.

2.3.2 Inspections

In general, the Government construction representative will confine it's work relationships to the prime contractor, his superintendent, or authorized contractor's representative. When the standard of the work is found to be below or otherwise differing from contract requirements, verbal notice will be given immediately to the prime contractor or representative by the CCI. If correction is not begun within 14 calendar days, a letter will be written to the contractor through the CO confirming the verbal notice, stating that the work must be made to correspond with the prescribed contract requirements. The work in question will be described and the applicable contract reference will be quoted. All defective work in place and all subsequent or superimposed work is the responsibility of the contractor. That portion of the rejected work including any dependent work may not be included as actual accomplished progress in the updating of the "Construction Progress Chart" nor invoiced or paid for.

2.4 Construction Facilities and Temporary Controls

2.4.1 Coordination and Access to Site

The work to be performed under this contract is on an active installation. The Contractor shall coordinate work operations with the CCI prior to starting work. The Contractor shall have a superintendent who speaks, reads, writes, understands the English language, and acts for the Contractor and is available on the job site throughout each work day. This superintendent shall be approved by the CO.

2.4.2 Notification

The Contractor shall notify the CO and the CCI when the superintendent is planning to be absent from the project site for more than two work days. The Contractor will substitute a qualified person, and receive approval of that qualified person from the CO, prior to the beginning of the superintendent's absence. Prior to the superintendent returning to the project, the Contractor shall notify the CCI.

2.4.3 Contractor's Employee Restrictions

Contractor's employees shall be restricted to areas within the immediate vicinity of this work plus direct routes to and from the site as may be

2.5.4 Dust Control

Dust shall be minimized at all times; including nonwork hours, weekends, and Federal legal holidays. Soil at the site and at other areas disturbed by the Contractor's operations shall be sprinkled or treated with dust suppressers as necessary to control dust. Dry power brooming shall not be permitted. Vacuuming, wet mopping, wet sweeping, or wet power brooming shall be done instead. Air blowing will be permitted only for removing nonparticulate debris as from reinforcing bars. Sandblasting shall not be permitted unless the dust therefrom is confined. Only wet cutting of concrete blocks, concrete, and asphalt shall be permitted. Unnecessary shaking of bags shall not be permitted where concrete mortar and plaster milling done.

2.5.5 Noise

The maximum use of "low-noise-emission products", as certified by the Environmental Protection Agency, shall be made when available. Blasting or explosives shall not be permitted.

2.6 Quality Control System

The inspection system shall include the following minimum requirements. Detailed requirements are specified in Part 3 of this section, CONSTRUCTION QUALITY CONTROL.

2.6.1 Inspection Procedures

The inspection procedure which the contractor uses shall be reported on the contractor's Daily Quality Control Report and shall conform to the following:

A) Preparatory Inspection. This shall be performed prior to beginning any work on any definable feature. It should include a review of contract requirements; a check to assure that all material and/or equipment have been tested, submitted, and approved; a check to assure that provisions have been made to provide required control testing; examination of the work area to ascertain that all preliminary work has been completed; and a physical examination of materials and equipment to assure that they conform to approved shop drawings or submittal data and that all necessary materials and/or equipment are on hand.

B) Initial Inspection. This shall be performed as soon as work begins on a representative portion of the particular feature of work and should include examination of the quality of workmanship as well as a review of control testing for compliance with contract requirements.

2.7 Acceptance of Construction.

2.7.1 General

No work shall be accepted without a final inspection. A final inspection may be made of the contract work as a whole or, when provision is made for progressive completion, or each successive portion as it reaches the appropriate stage. The inspection must find no deficiencies other than punch list items or items awaiting seasonal opportunity to complete.

2.7.2 Punch Lists

A final punch list is a record of all incomplete or unsatisfactory items of contract work as of the date of the phased occupancy inspection or final inspection, which is prepared by the Government construction representative. Contractor shall prepare a preliminary punch list of all work (his own and subcontractors) and shall have items corrected before requesting a final inspection by Government. Contractors list shall be turned over to Government upon request of final inspection. Government reserves the right not to preform final inspection, if in their opinion, the project is not ready for final inspection.

A) Separate punch lists will be prepared for each portion of the building or part of the work and should include:

1) date of inspection;

2) scope and location of work covered; and

3) description of each incomplete or unsatisfactory item of work with each item numbered consecutively for convenient reference.

4) names and offices of personnel represented in the inspection.

B) Punch list line items will be specific as to location of the deficiency, except for deficiencies of a general nature common to all the work.

C) Copies of all punch lists shall be sent to the contractor with a letter of transmittal requesting prompt correction of the items listed.

D) At the time of final settlement, the amount stated by the CO as necessary for the correction of items on the punch list shall be withheld from the amount of final settlement.

2.7.3 As-Built Drawings

Concurrent with submission of DD Form 1354 described in paragraph 3.11.3, one print of each of the drawings accompanying the specifications shall be neatly and clearly marked in red to show all variations or changes between the construction "as-built" and that indicated or specified. The drawings shall be delivered to the CCI. If a choice of materials or methods is permitted, the as-built drawings shall define the construction actually provided. Variations shall conform to standard drafting practice and

include such supplementary notes, legends, and details as required. Utilities shall be dimensioned from a known point, or an existing permanent object, to the center line of the ditch, or structure. Legibility and clear portrayal of the as-built construction and marked prints shall be subject to approval of the CCI. A final test or inspection will not be scheduled until required as-builts have been turned over to the Government. The accuracy of as-builts will be reviewed and if in error will be returned to the Contractor for rework. Improper as-built drawings will not be considered a punch list item, but they must be completed and acceptable before final tests or inspection will be considered complete. Thirty days after acceptance of the as-built prints, the Contractor shall submit corrected original contract documents to the CO for acceptance. Final payment will not be made until acceptance of original as-builts documents are accepted by the CO.

## PART 3 CONSTRUCTION QUALITY CONTROL

### 3.1 General

The Contractor shall comply with the quality control provisions as specified herein. The Contractor shall perform all quality control inspection and/or testing required by this contract unless specifically designated to be performed by the Government. The quality control system consists of plans, procedures, and organization necessary to provide materials, equipment, workmanship, fabrication, construction, and operations which comply with Contract requirements. The system shall cover construction operations, including fabrication both on-site and off-set, and shall be keyed to the proposed construction sequence. If the Contractor fails to submit an acceptable Quality Control plan within the time herein prescribed, the CO may refuse to allow construction to start if an acceptable interim plan is not furnished or will withhold funds from progress payments in accordance with the Contract Clause entitled "Payments Under Fixed-Price Construction Contracts" until such time as the Contractor submits an acceptable final plan.

### 3.2 Coordination Meeting

Prior to start of construction, the Contractor shall meet with the CO and discuss the Contractor's quality control system. During the meeting, an understanding of the system details shall be developed, including the forms for recording the Contractor's quality control operations, control activities, testing, administration of the system including fabrication on-site and off-set, and the interrelationship of Contractor and Government control and surveillance. Meeting minutes shall be prepared by the Contractor, signed by both the Contractor and the CO, and shall become a part of the Contract file. Subsequent conferences shall be held prior to beginning of each major phase of construction including off-set work.

### 3.3 Quality Control Plan

#### 3.3.1 General

Prior to the start of construction, the Contractor's quality control plan shall be submitted for acceptance. Construction will be permitted to begin only after approval of the Contractor's quality control plan or approval of

that portion of the plan applicable to the particular feature of work to be started. The Contractor's quality control plan shall identify the personnel, procedures, instructions, records, forms, and as a minimum, shall include the following:

A) A description of the quality control management organization.

B) The number, classifications, qualifications, duties, responsibilities, and authorities of personnel. A copy of the letter, signed by an authorized official of the firm, which describes the responsibilities and delegates the authorities of the system manager shall be furnished.

C) Procedures for processing shop drawings, samples, certificates, and other submittals.

D) The Contractor's quality control activities to be performed, including those of subcontractors, off-set fabricators, and suppliers.

E) Quality control testing procedures.

F) Documentation format for Contractor's quality control activities and testing.

3.3.2 Acceptance

The quality control plan will be reviewed by the CO. The Contractor shall make such changes and additions necessary for clarity and completeness as requested by the CO. Acceptance of the Contractor's plan is predicated on satisfactory performance during construction. Acceptance is conditional and the Government reserves the right to require the Contractor to make changes in the quality control plan, personnel, and operations to correct deficiencies to assure Contract compliance.

3.3.3 Changes

When the Contractor proposes changes in the quality control plan or implementation, during construction, the CO shall be notified in writing. No change shall be made prior to acceptance in writing by the CO.

3.3.4 Submittal

A list of tests which the Contractor shall perform is provided at the end of this section. The list shall give the test name, the test requirements, and the personnel and laboratory, to include qualifications of each, responsible for each type of test. List of tests is provided in Attachment #2.

3.4 Quality Control Organization

3.4.1 General

The quality control system manager and surveillance personnel shall be a graduate Architect or Engineer with a minimum of 3 years experience in this

type of construction or, if approved by the Contracting Officer, be experienced and background qualified to perform their assigned responsibilities with a minimum of 10 years experience at a foreman and/or superintendent level.

3.4.2 System Manager

The Contractor shall identify this individual, who shall be responsible for overall management and have the authority to act in all CQC matters for the Contractor. Contractor shall submit resume of System Manager and his staff (Quality Control Staff) for Government approval before the start of any construction. System Manager shall not be the Project Superintendent or have any other duties except quality control. System Manager shall not be subordinate to superintendent. System Manager shall have the authority to stop work on any phase of construction that is not in compliance with the contract documents.

3.4.3 Personnel

A staff shall be maintained under the direction of the Contractor's Project Manager to perform all QC activities. The actual strength of the staff during any specific work period may vary to cover work phase needs, shifts, and rates of placement. The personnel of this staff shall be fully qualified by experience, appointment, and technical training to perform their assigned responsibilities.

3.5 Quality Control Meetings

The Contractor's Project Manager shall meet with the CO at regular intervals, weekly or as considered necessary by the CO, to assess the effectiveness of the quality control system. Special meetings may be called at any time when desired by the CO. Reports will be reviewed to determine their effectiveness in the overall quality control system. Particular emphasis will be placed on discussion of methods to eliminate the recurrence of problem areas.

3.6 Submittals

Procedures for processing shop drawings, samples, certificates, and other submittals shall be developed. The procedures shall include the establishment of responsibilities to assure at each level adequate review and approval; timely delivery, including verification procedures; and proper storage.

3.6.1 Submittal Control Form

The Contractor shall review the Contract requirements and provide those submittals needed to assure compliance. Contractor shall submit for review and approval, in duplicate, AF Form 3000, Shop Drawings, and Materials Submittal Control Form, or equivalent form.

3.6.2 Certification

The Contractor is responsible for, and the quality control manager shall certify that, the submittals comply with Contract requirements.

3.6.3 Sample Testing

If a sample of tested material from a proposed source fails to meet specification requirements, the Contractor shall provide a sample for testing from another source and/or the material presented by the sample shall be replaced, and the cost of testing the replaced sample will be borne by the Contractor. The Contractor will be entitled to no additional compensation or extension of time due to any requirements for sampling and testing of the materials.

3.6.4 Government Approved Submittals

When submittals are required to be approved, each copy of the drawings will be identified as having received such approval by being so stamped and dated. Delays in the approval process shall not be the basis for consideration of a time extension when such delay is the result of the Contractor's failure to make proper submittal or make corrections in accordance with the specifications or the CO comments or is a result of a resubmittal which is required because of an unsatisfactory original submittal. Approval action will not relieve the Contractor of his responsibility for compliance with the Contract but will indicate only that the general method of construction and detailing is satisfactory.

3.6.5 Deviations

All proposed deviations from Contract requirements shall be submitted in writing to the CO for approval. Only the CO has the authority to approve deviations from contract requirements.

3.7 Control of On-site and Off-site Construction

The Contractor's quality control system shall include at least the following three phases of control and management for definable features of work:

3.7.1 Preparatory Phase

This control phase shall be performed before beginning work on each definable feature of work. Action shall be taken to ensure that only materials and equipment which comply with Contract requirements are purchased and/or used in off-set fabrication, unless specific deviations are approved as specified above. This control phase shall include a review of Contract requirements to assure that materials and equipment delivered to the job site and samples conform to Contract requirements and that control testing, including procedures, are finalized. This control shall also include examination of the work area, upon which new work is to be placed, to verify that work over which new work is to be placed conforms to Contract requirements and determination that required materials are on hand and properly stored. The CO shall be notified at least 24 hours in advance "of each preparatory activity."

3.7.2 Initial Phase

This phase of control must be accomplished at the time of arrival of workmen on-site to accomplish a definable feature of work and at any time new workmen or crews arrive for assignment to the work. The Contractor's quality control system shall be organized in such a manner to permit the transfer of information on quality requirements specified in this Contract to each workman before he starts. It is also during this phase that control testing to prove the adequacy of the Contractor's control procedures shall be initiated and verified. The CO shall be notified at least 24 hours in advance of each initial activity.

3.7.3 Follow-up Phase

The follow-up phase shall be performed continuously to verify that control procedures are providing an end product which complies with Contract requirements. Adjustments to control procedures may be required based upon the results of this phase and control testing.

3.8 Testing.

3.8.1 General

The Contractor shall perform tests specified or required to verify that control measures are adequate to provide a product which conforms to Contract requirements. The location and frequency of tests required depends on the manner in which the work is being performed and the uniformity and quality of the tests obtained. A minimum testing program for Quality Control testing is outlined in Attachment 1, Table I. The specific material technical specification may require additional testing which is not included in Attachment 1, Table I. Additional testing will be required by the CO at no additional cost to the Government when the minimum testing program is not considered to be adequate or applicable or when visual evidence indicates the materials are unsuitable or other types of materials are involved. If the test method is not specified, the latest appropriate ASTM, CRD, AASHTO, Military or Federal Standards shall be used. Periodic check tests may be made by the CO to insure compliance with Contract requirements. The Contractor shall perform the following activities and provide the corresponding data:

A) Verify that test procedures comply with Contract requirements.

B) Verify that facilities and testing equipment are available and comply with testing standards.

C) Check test instrument calibration data against certified standards.

D) Verify that recording forms, including all of the test documentation requirements, have been prepared.

3.8.2 Noncompliance

Tests indicating noncompliance with the Contract shall be reported immediately to the CO with recommendations to correct the deficiencies.

The CO will approve steps to be taken to alleviate noncompliance conditions if the specifications do not. The CO may designate the location of additional sampling and the type of test to be performed.

3.8.3 Laboratory Facilities and Procedures

The Contractor shall procure the services of an approved laboratory at the project site. The laboratory facilities, including personnel and equipment, shall comply with ASTM E 329.

A) The CO reserves the right to utilize the Contractor's control testing laboratory and/or equipment to make assurance tests and to check the Contractor's testing procedures, technique, and test results at no additional cost to the Government.

B) Notification of Noncompliance. The CO will notify the Contractor of any noncompliance with the foregoing requirements. The Contractor shall, after receipt of such notice, immediately take corrective action. Such notice, when delivered to the Contractor or his representative at the site of the work, shall be deemed sufficient for the purpose of notification. If the Contractor fails or refuses to comply promptly, the CO may issue an order stopping all or part of the work until satisfactory corrective action has been taken. No part of the time lost due to any such stop orders shall be made the subject of claim for extension of time or for excess costs or damages by the Contractor.

C) Log Book and Sample Numbers. A testing log book shall be maintained at the laboratory and be divided into five parts for recording sample numbers of tests on (S) soils and base course material, (A) asphalt and asphaltic concrete, (C) concrete, (G) aggregates, and (O) other types of material such as masonry, roofing material, etc. Each sample and test shall be assigned a laboratory number at the time of arrival of the sample at the laboratory or beginning of the test. This number shall contain the last four digits of the Contract number, a letter as described above, and then followed by the sample number. Retests of failed test samples shall be assigned the same number as the original tests with a final letter to identify them as a retest, for example 0062-A-132, 0062-A-132A, etc.

3.8.4 Submittal of Test Reports

Copies of each test result shall be prepared with all necessary data recorded and with documentation and computations compiled. Distribution of two copies to the CCI shall be made within the following workday after each test is completed. The Government will furnish copies of the test report forms (see Attachment 3), upon request by the Contractor. The Contractor may use other forms, as approved.

3.9 Quality Control Report.

3.9.1 General

The Contractor shall maintain daily records and shall submit reports of quality control activities daily. The reports shall be factual records containing numerical data of the Contractor's daily quality control activities and resulting actions. The reports shall be submitted on approved forms in duplicate by noon of the next workday following the day of the report. The Contractor shall provide one copy for the Contracting Officer and one copy for the CCI. Copy of QC report is provided in Attachment #4.

A) The report shall contain a record of inspections for all work accomplished subsequent to the previous work. Separate reports for different phases of work may be submitted by the responsible quality control inspectors or the reports may be consolidated into one report if all quality control activities and results are covered and the responsible quality control inspectors are identified. A single report is preferred.

B) In all cases, the report or reports shall be verified and signed by the one person delegated this responsibility by the Contractor. The verification shall contain the statement that all supplies and materials incorporated in the work are in compliance with the terms of the Contract except as noted. A sample of a typical Contractor quality control report form is included at the end of this section.

3.9.2 Specific Requirements

The reports shall include the following:

A) Phase or phases of construction underway during the time of the report, including a listing of equipment and number of people involved in the activity by craft and the duration of the activity.

B) Type, number, and locations of inspections that were made.

C) Results of inspections, including nature of deficiencies observed and corrective actions taken or to be taken.

D) Report of tests performed with the results of the tests, including failures; the specification requirement; and any tolerance where applicable and remedial action taken or to be taken. Test results, including all computations, shall be attached to the report form. Where test results cannot be completed by the time the report is submitted, a notation shall be made that the test was performed and the approximate date test results will be available. Delayed test results shall be submitted with a report form on the date received.

E) Other information as applicable to the project, including:

1) weather conditions;

2) subcontractor operations;

3) monitoring of materials and equipment upon arrival at the job site for compliance with approved shop drawings, damage during transit, and proper storage;

4) off-site surveillance activities; and

5) job safety.

3.10 Completion Inspection

At the completion of all work or any increment thereof established by a completion time elsewhere in the specifications, the Construction Quality Control System Manager shall conduct a completion inspection of the work and develop a "punch list" of items which do not conform to the approved plans and specifications. Such a list shall be included in the Construction Quality Control documentation, as required by paragraph 3.9, QUALITY CONTROL REPORT, and shall include the estimated date by which the deficiencies will be corrected. The Construction Quality Control System Manager or his staff shall make a second completion inspection to ascertain that all deficiencies have been corrected and so notify the CO. The completion inspection and any deficiency corrections required by this paragraph will be accomplished within the time stated for completion of the entire work or any particular increment thereof if the project is divided into increments by separate completion dates. After second inspection items have been corrected, the CO and his representative shall perform a final inspection.

3.11 Project Closeout.

3.11.1 Maintenance Manual

Sheets shall be 8-1/2" x 11", except pull out sheets may be neatly folded to 8-1/2" x 11". Manuals shall be bound in plastic covered, 3 ring, loose leaf binder with title of project lettered on front and shall contain:

A) Name, address and trade of all subcontractors.

B) Complete maintenance instructions; name, address, and telephone number of installing Contractor and manufacturer's local representative for each piece of operative equipment.

C) Catalog data on plumbing fixtures, valves, water heaters, heating and cooling equipment, temperature control, fan, electrical panels, service entrance equipment, site utility equipment, and all light fixtures.

D) Manufacturer's name, type, color designation for ceramic tile, resilient floors, windows, doors, brick, concrete block, paint, roofing, other materials.

E) Submit six copies of Maintenance Manual, prior to request for

substantial completion inspection.

3.11.2 Operation and Maintenance Instruction

The Contractor shall provide at his expense a qualified manufacturer's representatives to completely check out all mechanical and electrical systems and items covered by the drawings and specifications. This requirement shall be scheduled just prior to and during the initial start up. After all systems are functioning properly the representatives shall instruct maintenance personnel of the installation Civil Engineering organization in the proper operation and maintenance of each item. In addition to instructions given at the project site, the installation personnel shall be given a one day classroom instruction course on operation and maintenance of the systems.

3.11.3 Preparation of DD Form 1354 "Transfer and Acceptance of Military Real Property"

At the conclusion of the project the Contractor will be responsible to compile and furnish to the CO, DD Form 1354, indicating all costs and quantity data of materials and systems furnished and installed. A list of items for which the costs and quantity data is required will be furnished to the Contractor. Such information will be returned to the CO within 10 days from the receipt of the list. A sample DD Form 1354 checklist is provided as Attachment 5.

-- End of Section --

H-805. PROGRESS SCHEDULES AND REPORTS(AFFARS 5336.291)

(a) In accordance with FAR 52.236-15, the reports contemplated by the clause titled "Schedules for Construction Contracts" shall be accomplished on and in accordance with instruction pertaining to AF Form 3064, Contract Progress Schedule, and AF Form 3065, Contract Progress Report. Mobilization/demobilization will not be allowed as a line item on the Progress Schedule. Costs for those items must be included in other elements of work.

(b) Upon award of this contract the contractor will be furnished (3) copies of the AF Form 3064, Contract Progress Schedule. This schedule shall be completed and delivered to the Preconstruction Conference for Government evaluation. The Progress Schedule must be approved by the Government prior to start of physical work on the project job site.

H-806. PREPARATION OF MATERIAL APPROVAL SUBMITTALS

In accordance with FAR 52.236-5, the submittals contemplated by the clause herein entitled "Material and Workmanship" shall be accomplished on and in accordance with instructions pertaining to AF Form 3000, Material Approval Submittal.

H-807. INTERRUPTION OF UTILITY SERVICES

The Government may not be held responsible for interruptions of utility service and will not be liable for contractor delays, damages, or increased costs occasioned by any such interruption of service.

H-808. SUPERINTENDENCE OF CONTRACT

In accordance with FAR 52.236-6, at all times during performance of this contract and until work is completed and accepted, the contractor shall provide a superintendent who will be on the job site at all times when work is being performed. The superintendent will be responsible for ALL employees (including subcontractors) and have the authority to plan work and direct ALL employees. The superintendent will be appointed in writing and this letter submitted to the Contracting Officer, setting forth the authority delegated to the superintendent.

H-809. CONTRACT COMPLETION INSPECTIONS

The contractor shall schedule (with 3 working days notice)a pre-completion inspection to be held approximately 14 days before the expiration of the contract. This inspection will result in a "punch list" indicating items to be furnished or work to be performed by the contractor or subcontractor in order to complete the work specified in the contract documents. This list will not be construed to be all inclusive. A copy of the list will be furnished to the contractor for his use in completing the contractual work. The contractor shall be responsible for scheduling the contract completion inspection. An inspection list shall be made at the scheduled completion inspection. This list shall consist of items of work to be completed or corrected by the contractor. The contracting officer's representative has the authority to stop the inspection if he/she believes the contractor is not ready for a completion inspection. If the inspection is stopped because the contractor is not ready, the contractor will be placed on Liquidated Damages when the performance time expires. If there is no contract completion inspection list, the work will be accepted and the contractor may send in the final invoice. If the inspection is completed and there is an inspection list, the contractor will be notified in writing, that he/she has 14 days to complete the listed items and the value of the items shall be retained. A copy of that letter shall be sent to the contractor's surety. If the inspection list is not completed within the specified 14 days, the contractor may be subject to the Default clause of the contract and liable for the amount of the incomplete items as well as procurement costs.