OTT & PURDY
A PROFESSIONAL ASSOCIATION
ATTORNEYS AT LAW
MTEL CENTRE SOUTH, SUITE 1100
200 SOUTH LAMAR STREET
JACKSON, MISSISSIPPI 39201

TELEPHONE (601) 969-4140
TELECOPIER (601) 353-0185

WILLIAM R. PURDY
Direct Dial Number
(601) 960-4202

MAILING ADDRESS:
P.O. DRAWER 1079
JACKSON, MS 39215-1079

January 4, 1998

John M. Gillum, Esq.
Manier, Herod, Hollabaugh & Smith
2200 First Union Tower
150 Fourth Avenue, North
Nashville, TN 37219

VIA FACSIMILE
615/242-4203
AND U.S. MAIL

RE: Principal: Exterior-Interior Specialties/Choctaw Ventures
Obligee: Roxco, Ltd.
Project: Wherry Housing, Barksdale AFB, LA
Surety: Nobel Insurance Company
Bond Nos.: STD 1537, STD 1540, STD 613774, STD 613773

SUBJECT: Response to Bond Claim Issues

Dear John:

This letter follows up my efforts to reach you by telephone last Wednesday, December 31, 1997, and the voice message left for you concerning the referenced matter.

Roxco, Ltd. is still prepared to meet in my offices with you and other representatives of Nobel Insurance Company this Friday, January 9, 1998. Please confirm whether Nobel can meet at that time. As I discussed with you on December 19, 1997, my schedule is very tight for this month. I could meet either Wednesday or Thursday of this week, if Friday is not convenient. However, because of trial and deposition schedules, if the meeting is postponed later than January 9, I shall not be available until the week of January 26, 1998. I do not know whether Roxco would be willing to wait that long before having some definite understanding of the direction this matter is headed. Of course, Roxco is also represented by Louisiana counsel who could perhaps be able to meet with you the weeks I am now committed to be elsewhere.

In our telephone conversation of Friday, December 19, 1997, you raised four issues which Nobel wanted to address in its next meeting with Roxco. These issues were:

(1) Caulking requirements;
(2) Mesh at cornices;
(3) Payments to Exterior-Interior on Phase II; and
(4) Allocation of delays to Exterior-Interior.

I have relayed these four concerns to Roxco which has provided a brief response for consideration by you and your client.

**I. Caulking Requirements**

As I understood your comments, Nobel believes that caulking requirements in the original contract specifications were voided by addendum. Roxco advises that an addendum was issued which replaced the original specification sections with new ones. However, according to Roxco, all of the new specification sections retained the requirement for caulking. Roxco has sent me relevant pages from each section of both the original and revised specification sections. These are attached hereto as Exhibits "A" and "B" respectively. Roxco has previously provided to Nobel the entire text of the addenda and the original specification.

It is true that Exterior-Interior did dispute its obligation to do the caulking. Roxco considered Exterior-Interior's objections to be frivolous given the comprehensive nature of the specifications incorporated into Roxco's respective subcontracts with Exterior-Interior. Nonetheless, in an effort to break the impasse and get the work accomplished, Roxco finally issued a change order to Exterior-Interior for caulking. However, even after issuance of the change order, Exterior-Interior still failed to perform the caulking work. This failure exposed much of the previously installed EIFS to water damage.

Following Exterior-Interior's default, Roxco rescinded the previously issued change order for the simple reason that the caulking was never performed by Exterior-Interior, even though it was a part of Exterior-Interior's *original* subcontract. Roxco has engaged Dynamic Builders to have the caulking work performed.

In summary, Roxco submits that caulking was a part of the original prime contract specifications as well as the new specifications issued by addenda. Caulking was always

deliberate ruse to mislead Roxco into thinking the cornices had mesh, while Exterior-Interior had no intention to put mesh in the remaining cornices.

Regardless, it was Exterior-Interior's subcontract obligation to deliver a product which would be warranted by its manufacturer and acceptable to the Government. This Exterior-Interior did not do. Roxco looks to Nobel's performance bond to rectify the consequences of this default.

**III. Phase II Payment**

You expressed concern on behalf of Nobel that Roxco appears to have paid Exterior-Interior 100% on Phase II, including all retainage, apparently contending that Roxco knew or should have known at the time payment was made that much of Exterior-Interior's work either was incomplete or was defective.

Roxco replies that it did not pay 100% of Exterior-Interior's subcontract amount for Phase II. Roxco does concede that the drywall was substantially paid and that the EIFS payment was in the neighborhood of the 90% range. However, Roxco made payments upon applications by and representations of Exterior-Interior as to percentages of work properly completed. Indeed, Exterior-Interior's lawyer claimed by letter dated March 19, 1997, that Roxco was underpaying Exterior-Interior. Roxco responded then and does now that "Roxco has consistently paid to Exterior-Interior the same percentage of completion for work performed by Exterior-Interior as the Government has approved and paid to Roxco."

The problem arises because of latent defects which were not discovered until after the payments had been made. According to both the Government's contract with Roxco and Roxco's subcontract with Exterior-Interior, payment does not constitute acceptance of defective work. One prime example is the cornice detail rework, discussed above. Following Exterior-Interior's default, Roxco has received a list of rework resulting from field inspections by the material manufacturer. The Government has made it very clear that no building will be accepted without full compliance with the work list provided by the material manufacturer, as well as the Government's own work list and punch list. Roxco believes Nobel is liable for the costs of performing these rework and punch lists.

## IV. Attribution of Delays

In our December 19 conversation, you contended that the work of many other subcontractors was also late and was keeping the buildings from being accepted, such that Nobel should not be asked to pay for all of the delay. Roxco responds that it has assessed Nobel with the delay costs relating only to those delays to project completion which directly result from Exterior-Interior's defaults. Roxco included only delays incurred *after* Exterior-Interior's default (March 19, 1997), and Roxco has not yet presented any delay costs attributable to Exterior-Interior before the default. Roxco believes that such previous delays by Exterior-Interior are very substantial, and Roxco reserves the right to assert such delays if an amicable resolution cannot be obtained.

While certainly other subcontractors did cause delays from time to time, the work of Exterior-Interior was the most critical for completion. In order to complete a house, Roxco has to completely scaffold it for two weeks at a time. The Government insists that Roxco tent buildings when the temperature is below 40 degrees. This completely shuts down all other work until the EIFS is completed and the scaffolding is moved to the next house.

Roxco reports that on the basis of worker headcount since Exterior-Interior's default, completion of the EIFS work has represented approximately 70% of the total labor on the project. In terms of dollars spent, the EIFS completion work has also represented an equivalent percentage. Roxco believes that, by any reasonable method of measurement, field overhead, general conditions, and other time-related expenses being incurred by Roxco are 70% attributable to Exterior-Interior's defaults.

In closing, I wish to reiterate that my purpose in calling you last week and in writing you today is to facilitate an exchange of information before our meeting so that we can spend our limited time productively. If I have mischaracterized your concerns or if there is other information which you do not believe Roxco has taken into account, by all means please let me know. Also, if there are other significant issues which we need to discuss, my preference is to at least talk about the basic points before our meeting so that both sides can be prepared

with documents or analyses which could promote a better understanding and, one hopes, a resolution.

Sincerely,

OTT & PURDY
A Professional Association

William R. Purdy

enclosures
xc: Roxco, Ltd.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ROXCO, LIMITED

PLAINTIFF

VERSUS NO. 02-176C

THE UNITED STATES

DEFENDANT

---

DEPOSITION OF DAVID PEARSON

---

Taken at the instance of the Defendant
In the Law Offices of Young Williams
210 East Capitol Street, Suite 2000
Jackson, Mississippi 39201
On September 12, 2006, at 9:00 a.m.
REPORTED BY: ABBY JULIAN, CSR
CSR NO. 1706

Page 2

APPEARANCES:

STEPHEN WILLIAMS, ESQUIRE
Young Williams, PA
210 East Capitol Street, Suite 2000
Jackson, Mississippi 39201
REPRESENTING THE PLAINTIFF

JOHN S. GROAT, ESQUIRE
BRYAN O'BOYLE, ESQUIRE
US Department of Justice
1100 L Street NW, Room 11050
Washington, DC 20005
REPRESENTING THE DEFENDANTS

ALSO PRESENT:
James Beach, Jeffery Montroy,
Ronald Robbins

Page 3

I-N-D-E-X

WITNESS:
DAVID PEARSON


| EXAMINATION | PAGE |
|---|---|
| BY: MR. GROAT | 4 |

EXHIBITS

| Exhibits NO. | Page |
|---|---|
| EXHIBIT 253 | 9 |
| EXHIBIT 254 | 67 |
| EXHIBIT 255 | 77 |
| EXHIBIT 256 | 89 |
| EXHIBIT 257 | 171 |


Page 4

MR. GROAT: Just an administrative note. Steve, for the record, we can state that the government's position is that the -- you know, I should pay his billed time for the actual deposition, and you're going to get back to me on what your position is.
MR. WILLIAMS: That's correct.
* * * * * *
DAVID PEARSON,
having first been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. GROAT:
Q. Sir, would you please state your full name for the record.
A. David Elton Pearson.
Q. Will you state your address, sir?
A. 3825 Colleen Drive, Montgomery, Alabama 36106.
Q. Is there any reason that you couldn't give full and complete responses to deposition questions today, such as illness or any other problem?
A. No, sir.
Q. In connection with your testimony in this case, what specifically have you been retained to do?

Page 5

A. We were retained to collect the records on the Barksdale Air Force Base project and perform an independent analysis of Roxco's entitlement to time extensions and additional compensation.
Q. Who retained you to do that?
A. Steve Williams.
Q. And what provision was made for compensation?
A. Mr. Williams and his client, Ben Turnage, agreed to pay our normal hourly rates and expenses for the performance of our work.
Q. Is there any letter that summarizes the specific tasks that you've been given?
A. No, sir.
Q. Have you been retained to examine and render an opinion regarding the DCAA report?
A. We will respond or assist Mr. Williams in responding to the DCAA report.
Q. Have you been tasked with doing that?
A. To some extent, yes.
Q. What assistance have you provided?
MR. WILLIAMS: Can I ask for a clarification? Which DCAA audit report are you referring to? The report y'all submitted as a part of your expert witness disclosures or the earlier report that was scheduled by the court





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 6

and released -- I can't remember what date it was?
MR. GROAT: Thank you.
BY MR. GROAT:
Q. Let me clarify that to say both these -- have you been retained to review both reports?
A. Yes.
Q. And what specifically are you tasked to do with those reports?
A. Read them, determine the extent to which they may include data that would cause us to want to revise our report, and assist Mr. Williams in responding to the report during trial.
Q. Okay. Now, have in fact you reviewed both reports?
A. I have.
Q. Have in fact you made a determination to the extent that those--
MR. WILLIAMS: Please excuse me. This may resolve my issue.
MR. GROAT: We'll stop, of course.
(OFF THE RECORD)
BY MR. GROAT:
Q. To turn back to this, I understand that you were retained to review the DCAA audit and determine

Page 7

the extent to which that audit might cause you to in some manner revise your analysis. Is that correct?
A. That's correct.
Q. Have you prepared a written summary of your review of the DCAA audit?
A. Which one?
Q. Either DCAA audit.
A. We assisted Mr. Williams in the response to the first DCAA audit. We have not completed our review or written any notes or anything about the second DCAA audit, with the exception of one issue which we felt compelled to bring some documents to this deposition, and that is with respect to the Roxco bid where -- when the first auditor came to our office, she made a comment about Roxco's bid being flawed. We showed her documents that had appeared in the second one, and then it appeared, I think, in Mr. Beach's report so we said, "Why don't we just bring these documents and lay this to rest." There may be other issues that will come up later that we've not yet addressed.
Q. You indicated that you brought, then, documents today to address the question of your review of the DCAA audit as to contentions regarding Roxco's bid. Could you identify those documents for me?
A. They were in the package that was provided to

Page 8

you this morning.
Q. If you could, identify the specific document or documents.
A. Here they are, sir.
Q. Okay. And how do these documents relate to observations both in the DCAA audit reports and Mr. Beach's reports relative to Roxco's bid?
A. The government, that being either Mr. Beach or the auditor, has consistently opined that Roxco's bid was flawed because it failed to include any estimated cost for various components of the work. And as was explained to the auditor and as is documented through the evidence that we brought today, Roxco did in fact have money in its estimate for those items.
What the government failed to recognize is that they were reviewing a cost report to reach their conclusions and not Roxco's bid. And in that cost report, Roxco had moved certain estimated costs around to match the way that it had subcontracted the work, so where one might see a zero-dollar value for site work, that did not mean that they had no money in their estimate for site work. It only meant that the money for that had been moved into another code, and you can see that if you follow through these subcontracts. And that general explanation applies to all of the issues

Page 9

raised by the government with respect to zero bids for some items.
MR. GROAT: Let me ask the court reporter to mark this as the next exhibit in order and ask you to identify the chain you've just described to me.
(EXHIBIT 253 MARKED)
MR. GROAT: With your permission, I'll go behind the witness if I may.
MR. WILLIAMS: Sure.
A. I'm holding the job cost report dated 6/25/04. I currently have page 1 open. I'm going to flip this over to the first item which the government contends that Roxco had no bid for. And as I stated earlier, the government has misinterpreted this document as being Roxco's bid. It is not Roxco's bid. It is Roxco's cost report prepared sometime after Roxco's bid and after they had bought out the project. And the government has apparently looked at this and said that there was no money in concrete testing. As we see here, they are correct about that. It shows an original estimate of 0, it shows approved changes as 0, and total estimate as 0.
BY MR. GROAT:
Q. For the record, you're referring to a

Page 10

document titled "Job Cost Report," dated 6/25/04, page 4. Is that correct?
A. That's correct, and specifically we're looking at Code 1.343, concrete testing.
Now, I have also brought with me today --
Q. These documents are part of what's been marked Exhibit 253?
A. They are. I've also brought with me today the PSI subcontract, which is a subcontract for numerous types of testing including concrete testing. And as you'll see in the cost report under the heading 1.341, soil test, there is an estimate of $31,771. And if we go to the PSI subcontract, which I've also brought, we will see that exact figure in the PSI contract. And if we look at the scope of work that PSI is performing, we see that it includes the concrete testing, which the government states there is no estimate.
Q. I see.
A. So in essence, what has occurred here is that Roxco has moved money around in its estimate to match the method by which they subcontracted the work to the various contractors.
Q. So is it your testimony, then, that the PSI letter dated March 7th, 1995, which is a part of what's

Page 11

been marked as Deposition Exhibit 253, represents an estimate for all the testing for the contracted issues?
A. I can't speak to that, sir. I can speak to the fact that it includes the testing that was identified by the government as having a 0 estimate, and this document proves that, in fact, they did have money in their estimate and that it was included in the contract with PSI. And we do know that PSI did, in fact, perform these tests.
Q. Now, there's been an issue in this case with regards to a claim as to additional costs for density testing. Is that correct?
A. That's correct.
Q. Is the -- is Roxco's estimate for density testing included in the document that you've identified as PSI letter dated March 7th, 1995?
A. I believe that it is, sir, but I've not studied that closely.
Q. Is it --
MR. GROAT: Let me ask plaintiff's counsel: Is plaintiff intending to have a supplemental expert to address this issue?
MR. WILLIAMS: Other than cross-examining your expert witness to prove how wrong she is.
BY MR. GROAT:

Page 12

Q. Now, what, if any, analysis have you conducted of Mr. Beach's report?
A. I've read Mr. Beach's report two or three times, and I've asked Jeff Montroy to read Mr. Beach's report two or three times, and we're in the process of developing questions for Mr. Beach tomorrow.
Q. You've referenced bid documents for Roxco, but where are the original bid work sheets for Roxco?
A. We have them in our office, and they were made available to the DCAA auditor.
Q. So it's your contention these documents explain the absence of any provision -- explain the fact that certain testing was incorporated in one line and, in fact, reflected work done on two particular lines in the cost report. Is that correct?
A. Your statement is partially correct and partially incorrect. It appears that the government reached its conclusion regarding the flawed estimate based on a review of Roxco's cost report, not its estimate. And what we've done is brought evidence to demonstrate that there is no flaw. There is money for all of the items that was included, and the bid estimate papers are not involved in the proof we've brought to demonstrate the error of the government's findings.

Page 13

Q. Now, were you retained to review Roxco's request for equitable adjustment, sometimes just called a claim, to the contracting officer?
A. It was part of what we did, yes.
Q. Have you prepared any written analysis of that document?
A. At times, we might have, you know -- we certainly discussed it with Ron Robbins and with Pat Leech, but we didn't prepare a report of our findings with respect to the various issues within that claim. We performed our own independent evaluation.
Q. Are there records of your communications with Mr. Williams and Mr. Leech regarding your evaluation of the original REA report?
A. I don't think so. We held meetings in our office and we walked through the items and we'd asked them for documents on them. But all the while, that was a peripheral issue for us. Our primary objective was to perform our own analysis based upon our own review of the documentation. Whether or not it matched Roxco's REA was not a concern to us.
Q. Do the documents provided here today constitute the entire working file of Pearson's regarding this analysis?
A. Heavens, no.

Q. How large would that working file be?
A. We must have -- I'm going to estimate somewhere in the neighborhood of 40 boxes of documents in our office.
Q. What percentage of those 40 boxes constitute contract documents, and what percentage constitute analysis and review conducted by Pearson?
A. Would you define contract documents?
Q. By contract documents, I mean documents that were created either by the government or Roxco during the performance of the contract.
A. It's virtually all of it. All of the studies that we performed that we relied upon in our -- in deriving our opinions are either included in those three volumes of documentation in what we brought to you today. I mean, there may be a couple of items that fell through the crack; but our intention was to provide in our report the items that are required by Rule 26, which is the studies we undertook, the basis for which we reached our conclusions, and a statement of our conclusions. And over the weekend, we read through the report and we asked ourselves if we had, in fact, supplied everything. And then throughout that -- during that process, we found a few things, such as our database calculation of generator cost and that type of



thing, that we had not included in our report and we brought those to you today.
Q. If I can ask: What is your specific area of expertise?
A. I am a construction management expert with particular emphasis on scheduling, project management, program management.
Q. Have you previously been qualified as an expert by any courts or administrative bodies regarding construction management?
A. Yes, many times.
Q. In what specific areas have you been qualified as an expert?
A. All of the ones I just mentioned, in federal courts, state courts, arbitration all over the country.
Q. Now, if I can attempt to further, then, define what an expert in construction management renders opinions upon.
A. He renders opinions upon contract matters. He renders opinions upon constructability of projects, the application of particular techniques in certain means and methods, an understanding of estimating and a thorough understanding of cost reporting, a thorough understanding of particular equipment uses on a project. The entire gamut of construction management.



We advise owners on contracting schemes, on risk management, on developing programs, carrying programs through schematic drawings. We assist owners in hiring architects. We assist owners in developing contract forms with architects. We're often involved in the selection of contractors. And about half of our work is where parties ask us to form our opinions on matters involving disputes such as this one.
Q. Now, my question went to the matters in which you've been qualified as an expert either before a court or administrative body. And perhaps if we could be more specific, we could move this along.
When is the last time you were specifically recognized as an expert in construction management?
A. I don't recall. We would have to look back through all the cases that I've been involved in, and then you'd have to go to the record and find where there was a mention of construction management. And I'm sure they're there, but I testify four or five times a year and I just don't recall whether or not . . .
Q. In your report, you've listed various matters that you've handled. Would that refresh your recollection as to your last testimony?
A. If it would reflect -- refresh my



recollection, but with respect to whether or not in that particular case, there was the words "construction manager" used, or whether they talked about scheduling or some other aspect, I would have trouble with that recollection.
Q. When is the last time that you've testified and been qualified as an expert in any matter?
A. I'm going to look back at my -- I've testified twice since the last matter listed here. Testified in a case involving Duson Industries in Korea, ExxonMobil, and Fluor Daniel out of Texas. That case did not go to trial. It was in deposition. I testified in a matter in Dallas on the Dallas convention center.
Q. My question was addressed not to deposition testimony, but when were you recognized as an expert either by a court or another administrative body?
A. I think it would be federal court in Shreveport.
Q. What case was that?
A. The Hollywood Casino and Hotel in Shreveport, Louisiana, U.S. District Court, Western Division of Louisiana, Shreveport Division, Case CV00-1597S.
Q. What specifically -- what did your testimony involve in that case?

Page 18

A. Construction management, scheduling, delay claims.
Q. Do you recall what you were qualified as an expert to testify to?
A. I am certain that it involved scheduling and claims. I believe that it also involved construction management, but I'd have to defer to the record because my memory is not that good.
Q. What training and expertise do you have in contract -- what training and expertise do you have in construction scheduling?
A. I graduated from Auburn University in 1973 in building science where scheduling was part of the curriculum. I came out of Auburn. One of my first jobs as a project engineer was to prepare the schedules on a federal hospital project in Columbus, Georgia. I then was transferred to a Wherry Housing renovation rebuild in Sumter, South Carolina, where I was the project manager and I prepared the schedules and maintained the schedules and prepared all the reporting to the U.S. government on that.
I then became an estimator and a project manager for a commercial contractor in north Alabama where I prepared all the schedules, I made all the bids, I submitted all the bids. If I was successful, I

Page 19

was responsible for construction of all the projects that I had estimated.
In 1981, I went to work for Blount International where I began my career performing schedule analyses, working under the mentor -- my mentor was a fellow out of Montreal, Canada, named Duncin Robb who had testified in world court. He was a Scottish man. He lived in Montreal. And during the four years that I was with Blount, I performed approximately 16 schedule analyses on behalf of Blount and also on behalf of companies for which Blount was performing CM work, such as Raytheon, Martin Marietta.
And as a result of my relationship with Mr. Robb, he asked that I form a U.S. division of his company, which I did. We specialized in schedule analysis and claims for about six or seven years. And in the past 25 years, I've undertaken schedule analysis on well over 500 projects, and I've testified in courts, arbitrations, and mediations over 80 times about these subjects.
Q. So 80 testimonies. What testimony has specifically most recently involved critical path analysis?
A. A project in Dallas, Texas, where we were employed by Austin Commercial to evaluate a claim

Page 20

submitted by Manhattan Construction on a unique $300 million addition to the Dallas convention center that's built over bridges and roads and has one of the longest spans of -- free spans in the nation. We are constantly performing schedule analysis. We have approximately 25 projects in the office at this juncture. Approximately ten or 12 of those are active projects, and we're undertaking schedule analysis on virtually every one of them.
Q. My question went to your testimony concerning critical path analysis. And as I understand, the Dallas, Texas, case involved critical path analysis?
A. Every one of the projects that I mentioned to you involve critical path analysis.
Q. Now, when you perform critical path analysis, what software tools or techniques do you generally utilize?
A. When I perform critical path analysis, I don't concentrate solely on any particular software. Now, everyone who works in this industry knows that there is one manufacturer of software which has approximately 95 percent of the market, and that's Primavera. Primavera has a number of products out there. The one that they sell the most is P3, and P3 has some add-ons that you can buy, such as their

Page 21

document and control program which we often utilize.
We study -- on projects that have CPM schedules and those schedules are updated each month, we study those very carefully. On projects where the contract stipulates a particular type of schedule analysis be used, we endeavor to undertake that particular type of analysis. Where there is no stipulation that any particular method be used, then we select the best method based on our read of the quality of the documents.
Q. Okay. Let me ask you to define what you mean by critical path analysis.
A. Critical path analysis is a method by which one identifies the critical path. There are a variety of definitions of critical path. One is the critical path that was in the original schedule. Another is the critical path that was in each of the schedule updates produced during the course of the work. And there is also a critical path that exists in the as-built schedule. Yet another is a critical path that is devised as a result of impacting a schedule update and original schedule or some revised schedule during the course of the work.
Q. When you refer to the particular term "critical path," to what are you referring?





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 22

A. I'm referring to that group of activities that form the chain of events that dictate the longest path through the work. And by virtue of being the longest path through the work, it is also the shortest duration over which the work can be performed.
Q. What technique did you utilize in this case to determine the critical path?
A. We used a combination of the as-built critical path. We reviewed the original schedule, and we devised the critical path through that original schedule using our experience as construction managers and my own particular experience in working on multifamily housing. We're currently scheduling several wood frame multibuilding projects in our office, and we understand how they're built. And finally, we created an as-built critical path which we presented in our report.
In preparing our work, we also created a database of all of the records which we decided were sufficient for one to conclude when particular activities of work were prepared to be -- I brought with me today a printout of that database.
Q. What specific reference or could you name a specific reference that discusses the use of the particular technique that you utilized in this case?

Page 23

A. I'm not sure what you mean by reference.
Q. Well, is there a textbook, a court case, or a monograph that would discuss the particular technique, theory, or methodology that you utilized in this case?
A. Over the past 25 or 30 years, there have been numerous articles written about various techniques, including the as-built critical path. Your Mr. Beach quoted the one that was written by Mr. Callahan.
Now, the term "as-built critical path method" is very much like saying we're talking about an automobile here. But when you're talking about an automobile, there are various types of automobiles. Some you'd have, some you'd not have. So the mere reference to an as-built critical path does not provide sufficient information for a trier of the fact to understand what the analyst has in fact done.
Now, I agree with many of the criticisms that Mr. Callahan wrote about in his treatise on this matter. The trouble with Mr. Callahan's report is he chose to mention issues which, if employed, would compromise the reliability of an as-built method. We did not undertake any of those.
Furthermore, in virtually every case that I've testified about, an as-built critical path has either been the focus or has been a central element of

Page 24

the testimony that I've given about schedule analysis.
Q. What reference -- and I use that term broadly to include either a textbook, a court case, a board decision, or a monograph -- would discuss the technique or methodology that you used -- would most closely discuss the technique or methodology that you used in this case?
A. Yes, Mr. Wickwire wrote an article about it some time ago. He has continued to write on it. There have been numerous court cases in which it's been used. And the U.S. government has kept very much of their attention to the IKEA case. It kind of meandered back and forth on their use of the as-built method. So there are court cases out there that discuss the use of the as-built method.
But if I had known this was going to be a memory test, I would have checked my library to see what-all there is out there. But certainly if one goes through all of the -- go to the Internet or go to the library, you're going to find a variety of writings dealing with the as-built critical method.
Q. Can you identify today any reference -- the reference that most directly addresses the particular methodology you used in this case?
A. As I sit here, no. Although I did mention

Page 25

one that Mr. Wickwire wrote.
Q. I know of some of the writings that you're talking about. Can you direct me to a particular article that he's written or -- I believe he's written some texts as well?
A. He's a prolific writer on the subject.
Q. I know there's a lot out there, but -- having cited some of this myself in other ways, I'm aware of some of it. But what I'm interested in is any discussion or reference that discusses the particular methodology you used in this case.
A. I understand your question. Other than Mr. Wickwire, I'd have to go back to my library and find some references.
Q. Now, can you tell me, given the methodology you used in this case, whether there's an objective method to test the reliability of the methodology?
A. Certainly.
Q. What is that method?
A. That method is to review the data and determine whether or not the events which are being evaluated are in fact events that qualify for time extension, and review the evidence in the case to determine whether or not it is reasonable to conclude that the duration over which those events are alleged





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 26

to have caused delay is reasonable.
Q. You've identified that it would be necessary to determine whether the particular events identified qualify for a time extension?
A. Correct.
Q. And whether it's reasonable to conclude -- and I wasn't able to follow that line of reasoning.
A. That the durations that are attributed to each of those excusable events are reasonable.
Q. Now, you've previously testified, I believe, that the critical path is the group of activities that dictate the longest path through the work. Is that correct?
A. That's correct.
Q. Have you reviewed your analysis in this case to determine whether the activities that you identified on the critical path constitute the longest path through the work?
A. I have.
Q. What did you conclude?
A. They do.
Q. You've also identified that -- you've indicated and testified that in performing this analysis, you have to determine whether particular events qualify for time extension. Is that correct?

Page 27

A. That's correct.
Q. As far as the events that you've placed on the critical path, have you determined whether those events qualified for a time extension?
A. It's certainly my opinion that they do.
Q. In performing this analysis of what events qualify for a time extension, have you reviewed the contract and the contract specifications?
A. I have.
Q. And do you regularly testify with regards to the proper interpretation of contracts and contract interpretation?
A. Your question is too general for me to say yes or no. But yes, I do with respect to issues involving matters of construction and the way contractors prepare their bids, what they do during the bid process and what happens in the event of conflicts when there are conflicts in the specifications. We are not designers. We're not -- none of us are PE's. We're construction people. So if a question arises regarding a design issue, then I defer to people, such as I have in this case, Mr. Davis and Mr. Carmichael.
Q. I believe it's your testimony that the technique you utilized in this case has been subject to publication, and that the document you've identified --

Page 28

you've identified Mr. -- is it Wickshire?
A. Wickwire. He's one of your neighbors in D.C.
Q. I think he teaches at GW, if I'm not mistaken. As an individual who publishes the material would be most closely -- most closely addresses the technique?
A. No. That's not quite what I said. You asked me if I was aware of any writings, and I mentioned Mr. Wickwire.
Q. Are there other writings that you can identify that would more closely address the technique you utilized?
A. You asked me that question before, and I'm afraid that I just can't draw one from memory. But there's a lot of -- a lot of people write about a lot of different things, and I'm sure there's -- somebody's written about virtually every method that's used, pro and con.
Q. Is it your testimony here today that Mr. Wickwire's publications would support the use of the analysis that you used in this case?
A. I don't have any -- I won't make any representation about what Mr. Wickwire intended. I can tell you this, that I have testified conservatively 30 times using the as-built critical path method, and I

Page 29

have never been told that it was an invalid method by a judge. I've had consultants find fault with it, but, you know, I found fault with the way that they were doing things too.
Q. Can you identify the case that you've handled that resulted in a published opinion that would most closely parallel the methodology that you used in this case?
A. I'm not aware of one that -- well, I can do this. I could provide for you an opinion written by a judge in Memphis, Tennessee, that said he relied entirely upon my analysis and I used the as-built method.
Q. Did that opinion specifically address and describe the methodology that you used in this case?
A. I knew you were going to ask me that question. I just -- maybe 20 years ago my memory would have been that good, but it's not today.
Q. Can you perhaps point me sufficiently to the decision out of Memphis that might -- so I might attempt to go back and take a look?
A. I'll make it easy on you. If you'll make a request, I'll forward it to you.
Q. If that's all right with counsel, we can -- I actually prefer you to run it through Mr. Williams.

Page 30

Now, did your analysis of the delay issue in this case include conclusions and analysis regarding the contract specifications?
A. You'll have to be more specific about that because it's the contract specs involved some design issues that I'm not qualified to testify about.
Q. Does your scheduling analysis rest in part upon conclusions you reached regarding the proper reading of certain contract provisions?
A. You'll have to identify those provisions.
Q. Have you been recognized as an expert in issues concerning foundations?
A. As it relates to construction and delays to foundations, but not as it relates to the design of foundations.
Q. Have you been recognized as an expert concerning soils as they relate to construction?
A. As they relate to workability, as they relate to the cost and the equipment that one employs in procuring and installing particular types of earth, rock, et cetera. But not in the design of particular types of material.
Q. What is -- in what cases have you been recognized as an expert concerning soils as it relates to -- I believe you used the term "workability." Is

Page 31

that correct?
A. Yeah. That would fall under the general category of construction management; and, you know, having testified in 80 cases or so, there's going to be a bunch of them that involve soil issues, and I would just have to look back at my record. One that comes to mind -- I don't know if it matches or not, but there were a number of soil issues on this Shreveport matter, Hollywood Casino.
Q. My question goes to: What type of opinions have you rendered in such cases?
A. All of my opinions relate to the constructability of soils the conflicts if they exist in the specifications and what one can expect in terms of actually performing the construction work related to the soils. The effect of encountering unexpected soils, the delay caused by those soils, the problems that a contractor can encounter while performing work in various types of soils, all of it relates to the constructability issue.
You know, I've dug the ditches myself. There was a time when I -- in high school when I had to do that. And then shortly after I got out of college, I was a field guy wearing frogans and going around laying out foundations and putting chalk on the ground and

Page 32

digging the foundation and putting in the rebar and I -- I don't know this business just from sitting behind a desk and paperwork. I've actually done it myself.
Q. Now, in performing the analysis, what I'm going to ask you to do is go through in as great of detail as possible and tell me what exactly Pearson and you, in particular, what universe of data you considered in formulating your opinions.
A. Every document that we reviewed in our office, and as I stated earlier, hordes of boxes of those documents. Now, obviously, not every document that we looked at had some bearing upon an opinion that we have. But we have endeavored to review all of the documents, and we've endeavored to identify those that might have a bearing on this case. And when Mr. Beach writes a report or when the DCAA auditor writes a report that mentions something that we perhaps haven't seen, then we go look to find that document and see if it modifies what we think.
Q. You identified the universe of documents which you've described to be approximately 40 boxes. Is that correct?
A. Something in that neighborhood, yes, sir.
Q. What other data have you considered in

Page 33

preparing this report?
A. Conversations with Ron Robbins and Pat Leech about things that happened on the job. We read something in a letter and perhaps it wasn't completely clear to us, and we say, "What do you mean by that?" And then sometimes their explanation would provide an amplification that was helpful, sometimes not. But in general, our objective is to learn everything that we possibly can, first from the documents that are available to us, and then secondly from the reports and documents that are prepared by the government.
Q. So we have the 40 documents, and then we have conversations with --
MR. WILLIAMS: Excuse me. Forty boxes.
BY MR. GROAT:
Q. Forty boxes. And then we have conversations with Mr. Ron Robbins and Pat Leech. Is that correct?
A. That's correct.
Q. What other data exists that you analyzed in this case in formulating your opinion?
A. That's all that comes to mind.
Q. You indicated conversations with Mr. Ron Robbins and Patrick Leech. Is that correct?
A. That's correct.
Q. Who had these conversations?

A. Jeff Montroy and myself.
Q. You also testified that you had conversations when you read something in a letter, and that these conversations clarified that matter. Is that correct?
A. Correct.
Q. Did you rely upon representations by Mr. Ron Robbins and Mr. Patrick Leech that are not reflected or that don't simply reflect clarification of correspondence or other documents?
A. We have three volumes, about 200 pages of text over there. It would be a stretch for me to attempt to answer that as a yes or no because my memory is just not that good. It's too many issues involved.
Q. Did you maintain -- did you or those under -- operating under your supervision in this case maintain records of their conversations with Mr. Ron Robbins and Mr. Patrick Leech relative to the case?
A. I don't want to leave you under the impression that occasionally we wouldn't write some notes. But as we continued our investigation and decided what we thought were the facts, then we don't maintain those things.
Q. Is it your testimony that the standard practice in expert testimony would permit relying upon statements that are not reduced to some sort of



memorandum or note in the record?
A. Well, that's a legal question you and Mr. Williams will have to wrangle about. But to the fullest extent possible, we prefer corroboration of oral testimony in the records. And in the event that we're unable to find corroborating written evidence, we occasionally will rely upon representations made by individuals. And most of the time when we do that, we'll make a notation of such in our report.
Q. My question actually went to your experience as an expert and in testifying in construction management. And is it your testimony -- is it the standard practice in construction management that if an expert considers oral representations as a basis for conclusions in the report, that these oral representations would be reduced to a note or memorandum in the report?
A. I would say no. In all the reports that I read by other consultants, you sometimes see it, you sometimes don't.
Q. What is your standard practice?
A. I described that to you just a moment ago. I'll repeat it if you like.
Q. Please do.
A. To the extent that we hear oral



representations, we look for corroborating evidence in the files. If we find evidence that contradicts the oral representation, we won't rely on it. If we don't find corroborating evidence, but the explanation given fits with all of the rest of the facts that we've seen, then we'll adopt it.
Q. And what is your standard practice with regards to the maintenance of records of such oral representations?
A. Most of the time, when we ask questions such as this that we're trying to fill a hole in something that we're writing, so we'll have a text much as you're reviewing there and we'll want to finish it up. And when we hear something, we will make a decision about what we're going to include in the report, and it ends up in our report. That's our practice.
Q. Now, will you be able to identify in this report the matters which are based solely upon oral representations of Mr. Leech or Mr. Robbins?
A. I doubt it. Given all of the pages of text and studies that we've done, it would take me a couple of days to go through and carefully check it and identify which ones we relied upon. But I would attempt to do that if that's your preference.
Q. My understanding is you can't because -- my



understanding is your testimony is there is no record of the conversations that Pearson had with Mr. Robbins and Mr. Leech relative to this matter.
A. But what you do have, sir, is my written opinion in some 200 pages. And if you find something in there that you deem inaccurate, I'd be happy to respond to it.
Q. Now, in the universe of materials that you considered, we've identified 40 boxes and conversations with Mr. Robbins and Mr. Leech. Was there any other data source upon which you relied?
A. I mentioned that we looked at Mr. Beach's report. We looked at the DCAA audit. And to the extent that those had mentions of things in them that we thought might alter our understanding, then we might have modified what we'd written. But that's all that I can think of.
Q. Has there been any modification or change to your report based upon Mr. Beach's report?
A. We've not made any modifications, but I anticipate we might have a few.
Q. What specific areas do you feel that Mr. Beach's report would warrant modifying your report?
A. One in particular is his inclusion of Mr. Leech's testimony where he said he wasn't involved





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 38

in the bid and our report stated that he was. I think you must be right about that. And then tomorrow as a result of the questions that we plan to ask Mr. Beach, there may be a few others. It's very hard to go through as many records as we've done, write as much as we've done, and not have any errors.
Q. In identifying the data that you've considered, the report clearly states that you considered other expert opinions which you retained. Isn't that correct? And we had those depositions yesterday.
A. Yes, that's correct.
Q. Does your report rest in part upon the opinions rendered by those experts?
A. It does.
Q. Let's start, if you would -- we have the report here, and I'll ask you to -- I'm going to draw your attention to some specific points and see if we can't get a little particular. If you would, turn to page 9 of your report, which we've Bates-stamped here. I think the references to pages here may make things a little quicker.
A. From time to time, I might ask you to allow me to look at my original report, which would be the same, but just because this may be a little more

Page 39

difficult to orient myself.
Q. Any matter that would expedite the examination, I would be happy.
I have one other question with regards to the data considered. Did you or Mr. Montroy actually visit the site?
A. Mr. Montroy did.
Q. Have you ever visited the site?
A. I have not.
Q. Have you viewed photographs or pictures of the site?
A. I have.
Q. Now, at page 9 of your report, you discuss certain conclusions reached relative to the foundation. Is that correct?
A. I think you said page 9?
Q. I Bates-stamped the report, so it reads Roxco Report 0009. So when I refer to page 9 . . .
A. I'll try to remember that. I have that in front of me, yes.
Q. I'd ask you to review that page. And the question was whether this page addresses the testimony, the opinions issued both by Mr. Davis and Mr. Carmichael.
A. I think that it does, yes.

Page 40

Q. Were you present yesterday for Mr. Davis's testimony?
A. I was.
Q. Based upon your consideration of his testimony, do you agree that he identified three factors which made construction of the project more difficult: That is, the height of the slab above the grade, the particular fill material utilized, and the native soil present?
A. I believe that those are individual components from an engineering standpoint, but I do not believe that they -- that those issues described in total the problems for which the government bears responsibility.
Q. Do you agree with Mr. Davis's testimony that Roxco would have bid the job based on a terms he used, a colloquial term he used, a "Bubba contractor," who would have been familiar with constructing residential foundations but not familiar with use of metal forms?
A. It's not my recollection that Mr. Davis testified that Roxco would have bid this project using Bubba. His description of Bubba was one that was elicited as a result of your discussions about how these things get built, and he was describing for you his vast experience in how residential construction is

Page 41

built. And I agree with his characterization to the extent that his characterization described the type of subcontractor that performs this type of work, whether it's government work, any type of residential work. They are typically thinly capitalized, and they're typically at the bottom of the rung in terms of sophistication. But they're the ones who provide the low bid, and they're the ones who consistently install the work properly. And because they perform the work properly and the lowest bid, they're sometimes referred to as Bubbas.
Q. Isn't it true that the contractors that -- the subcontractors -- that Roxco selected in this case didn't successfully perform the work as to the foundation?
A. I cannot agree with that statement.
Q. Isn't it true that Mr. Davis concluded that the use of metal forms would have alleviated some of the problems encountered in the construction of this project?
A. I believe when he was asked to form a hypothetical conclusion about it, he answered that it did. But Mr. Davis did not know that, in fact, Roxco attempted to use metal forms.
Q. Where is the fact that Roxco attempted to use





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 42

metadata forms in this report?
A. It's not in our report because we didn't know that it was an issue.
Q. What document establishes the fact that Roxco attempted to use metal forms?
A. I have not looked for a document. Such a document may exist, but Mr. Robbins explained to us yesterday they did, in fact, attempt to use metal forms.
Q. Which contractor attempted to use metal forms?
A. I can't answer that question. I don't know.
Q. Do you have -- have you previously rendered testimony concerning the use of metal forms versus wooden forms in the construction of foundations?
A. Yes, I have.
Q. What special training and expertise do you have as to the use of metal forms versus wooden forms in the construction of foundations?
A. Form design was part of our class work at Auburn when I graduated in building science. And in my eight- or nine-year tenure as a contractor, we designed forms. And over the course of our consulting to owners and to contractors about forming systems, we've consulted with them about the pluses and minuses of

Page 43

using metal forms and wood forms. And I can tell you unequivocally that it is a rare instance that a residential contractor even attempts to use metal forms on projects such as this.
Q. It was Mr. Davis's testimony, wasn't it, because of the height of the slab above the grade that the use of metal forms might have been advantageous?
A. That's correct, because -- he said that based on hypothetical questioning by you about other types of forms that might have alleviated some of the problems. But if you'll recall, Mr. Davis also added that the use of metal forms would not have alleviated the need for driving stakes immediately next to the ditch on the exterior and that the driving of those stakes would have compromised the edges of the deep, narrow footings. And because of that, their use would have been minimal any improving in problems that occurred on this job.
Q. Why didn't metal forms work on this job?
A. They didn't work on this job for two reasons: One, I -- the one that I mentioned to you that the stakes -- even though you use metal forms, the stakes that have to be driven to keep those forms in place are in the same location as if one used wood forms. Secondly, the braces can be spaced farther apart using

Page 44

a metal form, but that doesn't help in an instance where the earth is of such composition that the form braces won't hold unless you place them at a closer distance. So there's no advantage in using metal forms on the bracing. So his comment about the advantage of metal forms had solely to do with the possible use of them to span a greater distance. But on particular houses where the in situ soil or the backfill was the low cohesive material, the braces would have given away.
Q. His testimony was, wasn't it, that if you utilized metal forms, that less bracing would have been required. Is that correct?
A. That is partially correct.
Q. How -- what qualification did he add to that conclusion?
A. The qualification he added was that even though you used a metal form, which by its nature has a greater resistance to bending and because of that greater resistance to bending it can be braced at a farther distance apart, that would not solve the problem of the inability of the in situ soils to hold the bracing. So if you put the bracing farther apart, you're creating a greater load for the bracing because there's fewer braces and a greater load on them.

Page 45

Q. Now, based upon your examination of the record, did Roxco retain a subcontractor that had experience with the use of metal forms?
A. I can't speak to that. I don't know.
Q. But you characterized the individuals that Roxco retained in this case as experienced tradesmen. Is that correct?
A. That's correct, I did.
Q. Did these individuals have experience in -- based upon your review, in the construction of foundations as was directed in this case?
A. Yes.
Q. So it's your testimony that the Roxco subcontractors working on this case had experience in the construction of foundations in which the slab was some 3 feet above the integrated grade level. Is that correct?
A. Well, you're asking such specifics that I can't answer directly to that. I mean, it's been 11 years ago and I haven't talked to those guys. But I can tell you this: That having been a contractor, having done this work myself, that the people who do this work actually make their living and they feed their families and they pay their pickup truck rent based on the ability to perform this work. And if they





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 46

come out and they say, "I'll install this slab for this amount of money," they're going to do their own investigation and they're not going to go out there and attempt it if they don't think they're qualified to do it. Roxco is not going to let them do it if they don't have experience forming and pouring house slabs. So it's -- while there's no absolute proof, there is sufficient evidence that these people would not have been used, they would not have been sought, they would not have agreed to try had they not had experience doing this work.
Q. What is that evidence?
A. The fact that they showed up and that they attempted to do it.
Q. Now, Mr. Davis described a Bubba contractor who attempted to do -- who could do simple residential slab construction with a bracing consisting merely of -- I think he used the term 2-by-8's in the back of the pickup truck. He described this job as considerably more difficult in large part because the slab was higher off the grade. Is that correct?
A. I disagree with that characterization. If you're trying to make a connection between the Bubba story that he told and the type of contractor that was here and the job being more difficult and Bubba not

Page 47

really being up to this, I disagree with that characterization completely. That is not what he said. What he was doing was portraying to you the general type of person who does this kind of work, and he was absolutely right about that.
Now, that does not mean that this guy is not qualified to do a house slab that has a 3-foot edge. He certainly is. He can do that with 2-by-8's. He can do it with plywood. They build those forms day in and day out. And in fact, they did it here. The sole problem that they experienced was the one that was related to the soil's inability to hold a form, not Bubba's ability to build the form and install it properly.
MR. WILLIAMS: Good time for a break?
(OFF THE RECORD)
BY MR. GROAT:
Q. What, if any, basis -- did you conduct any analysis to determine whether Roxco subcontractors had experience in constructing slabs similar to the one in this -- similar to the one specified by this contract?
A. Yes.
Q. What was that analysis?
A. A review of the plans and specifications with regard to these foundations. If one were reading those

Page 48

specifications and looking at those drawings without knowing the history of what happened with this job, one would conclude that there's no -- nothing particularly difficult about this, nothing unusual about these foundations.
Q. Is it your testimony that the -- it's typical for slabs to be 18 inches to 3 feet off the grade level in residential housing construction?
A. I've seen them up to 5 feet deep. As a matter of fact, Mr. Davis and Mr. Carmichael recommended that the foundations on my own home be 5 feet deep. However, those 5-feet deep ditches dug in plastic clay that was highly cohesive and there was no chance of them fluffing off. Now, Mr. Carmichael did recommend that they be poured within 24 hours after we excavated them because the moisture variation could change the volume of the soil. So the dimensions of these ditches in and of themselves are not anything particularly unusual. I'll omit the word "particularly." Not anything unusual.
Q. Let me continue on page 10 of your report. At the very bottom, there's the statement of -- at the bottom of that page, there's the statement: "Most of Roxco's difficulties constructing the slab foundation arise -- combined effect with the government's flawed

Page 49

design." And then you continue: "That is, specifying a low cohesive engineered fill material requiring that the foundation slabs be poured monolithically and refusing to accept Roxco's reasonable solutions."
What do you mean by the phrase "specifying a low cohesive engineered fill material"?
A. First of all, let me state that these specifications are confusing. And it may be that some of those soils that are specified you may not include low cohesive engineering fill, so I have some hesitation now after having written this about that. But you have identified correctly the sentence which I think encapsulates what I view to be the principal problem here.
Q. What I asked you was what you meant by the phrase. If I could direct your attention to the specific phrase, "specifying a low cohesive engineered fill material."
What did you mean by that?
A. Low cohesive means that the particles don't hang together.
Q. Is it your testimony that the specifications in some manner specified a low cohesive fill, engineered fill material?
A. There is a specification that describes a low





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 50

cohesive engineered fill material. There is some question about whether or not that particular specification applies to this particular engineered fill. But at the time that we wrote this, it was our interpretation that there was at least one of several specifications that included a low cohesive material.
Q. Isn't it true that Roxco could have used -- the specifications permitted Roxco to use a cohesive engineered fill material if they wanted to?
A. That's correct.
Q. You have then the phrase "refusing to accept Roxco's reasonable solutions." What do you mean by that?
A. This goes to the heart of the problem here, Mr. Groat, in my opinion. There was confusion about the soil specifications. We know that the government approved a low cohesive ML material. And perhaps they have some regrets about that. Perhaps Roxco has some regrets about that. But what happened afterwards was a series of maladies that produced a less than acceptable end product on the foundation.
Roxco reached out to the government to find a solution, and they proposed solutions. And they didn't propose every possible solution, but the government steadfastly refused to entertain any of those

Page 51

solutions. And it is the government's management or lack of management and poor decision making after the work started and after the ML material was delivered to the site and after all the problems developed that I find fault with the government.
Q. You used the phrase "Roxco's reasonable solutions." What were Roxco's reasonable solutions?
A. Roxco's reasonable solutions included, of course, shallowing the beams. It is also a fact that the government would not allow the ditches to be poured separately from the slabs. They wanted a monolithic pour. And pouring the grade beams in this type of material within 24 hours after they're being excavated is crucial. Or alternatively, they could have been formed. But forming them would have prevented monolithic pours.
The key problem here is that low cohesive material will not maintain its shape after it's been excavated. It will not do it. And the experience that -- the problems that Roxco experienced were all related to that. The government turned a blind eye to that and said, "I don't care. You go do it this way." And with the exception of A, allowing porches to be poured separately, and B, late in the game allowing the garages to be shallowed.

Page 52

Now, I hold the government responsible for making those poor decisions given the facts that they were confronted with. And I hold the government responsible for some of the problems associated with these slabs that went on for years because of their poor judgment in dealing with that problem.
Q. You've identified two of Roxco's reasonable solutions. Is that correct?
A. I did.
Q. One would be shallowing the beams. Is that correct?
A. That's correct.
Q. And the other was?
A. Forming the beams. And the third one that was available -- and if the government had cared, they could have investigated this themselves and reached the same conclusion -- that it made more sense to go ahead and pour those beams within 24 hours after being dug.
Q. I'm aware of documents that reflect Roxco's proposal of shallowing the beams. What documents reflect Roxco's proposal to pour the slabs monolithically? Excuse me. Not pour the slabs monolithically.
A. If you form the beams, it means you can't pour the slab monolithically, and they asked to form

Page 53

the beams.
Q. That's specifically what I'm interested in. What documents support that -- I read in here that your conclusion is that Roxco proposed reasonable solutions. And what I'm looking for is what specific solutions Roxco proposed.
A. You have a good command of the records here, sir, and I agree with you that there's some fuzzy documentation related to these issues. At one time, a year or so ago, I had these in better focus than I do now. But let me just state it this way: A, if there is no written record of Roxco's saying we want to dig these trenches and pour them within 24 hours, if no such document exists, in my opinion, the government should have recognized that was the -- a viable solution and gone to Roxco and said, "Why don't you start pouring these within 24 hours?" Because that is, in fact, the preferred construction means and method for dealing with foundations of this dimension in low cohesive soil. So as the construction administration group with an architect on staff and five or six people, they should have recognized that.
Q. My question was actually to attempt to clarify what reasonable solutions Roxco presented to the government for this.





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 54

A. I recall one, sir, dealing with shallowing the beams. And I --
Q. That's -- I can locate the documents for that, but my question is: Were there other solutions that Roxco proposed for this problem?
A. I am convinced that there were, and I can't quote the records for that. You've asked me two or three times for those records, and each time I've told you I can't produce them. But I've also added that it is my opinion that had the government had a qualified group of people, they would have recognized that the note on the drawings that said pour these within 24 hours applies to low cohesive material and is meant to be utilized in precisely the kind of material that was in situ here and was used as backfill. They could have helped the solution; and they're the engineers, not Roxco.
Q. Now, I'm interested in moving this along as quickly as possible.
Mr. Montroy assisted you in preparing the report. Is that correct?
A. He did.
Q. Did he take a lead role in doing the initial draft?
A. He took a lead role in some of sections. Not

Page 55

all of them.
Q. Would it assist you at all to take a brief break and discuss this issue with Mr. Montroy to see if we can identify the specific solutions Roxco proposed?
A. I think I answered that. You asked me which specific solutions for which there was documentation, and I answered "shallowing the beams."
Q. Well, you also indicated, I believe, that there were two cases. And one, you indicated that Roxco proposed not pouring the slabs monolithically. And what I'm trying to do is identify the basis for this statement that Roxco proposed reasonable solutions. If this read "Roxco proposed a solution," we could move on. I'm trying to get the basis for the conclusion that Roxco proposed several solutions to the government.
A. As I sit here, sir, the only actual document that I am aware of that memorializes a solution was shallowing the beams. As I sit here, that's all I recall.
Q. Would the statement that Roxco proposed reasonable solutions have been based on conversations that you or Mr. Montroy might have had with other individuals?
A. I'm sure they were.

Page 56

Q. Do you know what those specific solutions were that Roxco proposed?
A. One was forming the beams.
Q. It's your understanding that Roxco proposed to government as one of the solutions that the beams be formed?
A. That's correct.
Q. Do you have any other understandings about what Roxco proposed to the government?
A. I believe that they asked to be able to pour the beams immediately after they were excavated, but I don't have a document to support that.
Q. Now, you also discussed with me that in your opinion, the government had the duty to suggest to Roxco solutions for this problem. Is that correct?
A. That's correct.
Q. Is your analysis of the framing issue based in part upon your conclusion that the government has such a duty?
A. Would you amplify by what you mean by framing solutions?
Q. We've talked about the problems with the foundation and slabs. And I asked you to identify the specific solutions Roxco proposed.
A. You meant forming, not framing?

Page 57

Q. I'm sorry. If I misspoke, yes. Forming. And in the course of responding to that question, you said that you thought the government should have investigated the circumstances and proposed to Roxco a solution. Is that correct?
A. I did.
Q. And my question is: Does your analysis of this issue rest in part upon your conclusion that the government had such a duty?
A. It does.
Q. Upon what basis do you conclude that the government has such a duty?
A. They took on the role of the interpreter of the design. They did not -- as far as we can tell from the records, they did not ask the designer to opine on these issues. If they did, we found no record of it. So in essence, they took on the role of interpreting Armstrong's design, of interpreting the geotechnical report, of interpreting the applicability of the details on their drawings when a low cohesive material was used. When they took on that responsibility, they set -- they were obligated to have the experience and understanding about what happens when one excavates in a low cohesive material because that's a design issue. It's not just a means and methods issue. The records





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 58

indicate they had no understanding of that.
Q. Is it your understanding that Roxco prepared its bid based upon the contract and the specifications or the contract, the specifications, and the geotechnical report?
A. I can't speak to the geotechnical report. I could tell you what typically happens, but that was not the question.
Q. If you could, turn to page 15 of your report.
A. You're referring to Bates No. 15?
Q. Yes, I am, if you would, please. And there's a reference here to the fact that the remaining contract balance in the second paragraph?
A. Yes.
Q. What, if any, analysis did you perform concerning the contract balance?
A. We reviewed the records available to determine the money that comprised the difference between the revised, fully executed contract price and the cash payments made on the contract.
Q. Now, was this issue addressed in Roxco's original claim to the contracting officer?
A. I don't recall that it was.
Q. Okay. Did you in your analysis rely upon other issues that either -- that may not have been

Page 59

identified in Roxco's claim to the contracting officer?
A. Your question -- you'll have to be more specific in identifying those because I don't know what you're talking about.
Q. My question is: In your report, do you address alleged errors and omissions by the government that were not addressed in Roxco's claim to the contracting officer?
A. I believe we do.
Q. You do?
A. I think we do.
Q. So you never conducted a review to determine whether all the issues you've raised in the report were raised in the REA. Is that correct?
A. We were aware of some issues that were in the Roxco REA that we did not include in our report.
Q. My question is the converse: Did you include in your report issues that were not addressed in the REA?
A. It depends on how broadly one answers that question. I believe that the issues that are discussed in our report are essentially the same issues that are discussed in the Roxco report. Now, when I make that statement, I'm using the broad umbrella of big issues. Now, as we look at individual issues like within the

Page 60

framing, within the EIFS, within the painting, et cetera, our finding are different than those. But by and large, the same events that are included in the Roxco report are in our report.
Q. If you would turn to page 123 of the report. Section C, that is.
Who asked you to review the question of the contract balance?
A. Actually, I brought it up. I said, "Steve, shouldn't we include in this a full reconciliation of all of the money that the government owes Roxco?" And he said, "Yes, we should."
Q. By Steve, you're referring to?
A. Mr. Williams. And he said, "Yeah, you're right." And that is our typical practice in our reports is to provide a reconciliation that deals with everything.
Q. Was this done based upon your submission to Mr. Williams of a draft report, or was this based upon preliminary conversations?
A. Preliminary conversations.
Q. Now, as to Section C, schedule analysis, would it be correct to refer to this as a total delay claim?
A. No, sir.

Page 61

Q. Why is that not the case?
A. I'm assuming in your characterization "total delay claim" meaning that Roxco is claiming every day on the job. And while it is true that we have concluded that Roxco is not solely responsible for any days on the job, we have concluded that Roxco is concurrently liable for about 238 days of delay, and that the government is responsible for the remainder of some 585 days.
Q. Then is it a total delay claim less acknowledged responsibility by the contractor?
A. I would not characterize it that way. I'd characterize it as a -- well, you know, depends on how you use the term "total delay claim."
Q. How is the term "total delay" generally used in construction management?
A. When one says the original contract date was X, the contractor expended on Y, and we're claiming 100 percent of those days.
Q. Now, at the very end of the second paragraph in Section C, there's a sentence: "Not only was Roxco stilled in experience, they conducted a very similar project for the same client at another location on time and within budget."
MR. WILLIAMS: Constructed.





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 62

BY MR. GROAT:
Q. Constructed. Is that correct?
A. To my knowledge, it's correct.
Q. Did this other project contain the requirement for the construction of foundations similar to the one in this case?
A. I'd have to look at the details on that.
Q. You're not familiar with whether the other project provided for the construction of foundations similar to the one in this case. Is that correct?
A. I have looked at those drawings, I believe, and I -- it's been a good, long time since I've looked at them. And as I state in this report -- I don't know if it's in this section. It may be in the introduction -- I believe there are far more similarities than there are differences. And while the details from one job to the other may vary in some respects, they are largely similar. And to make a comparison between the two, in my opinion, is reliable. And I'll add that Mr. Cheneyworth, who was a problem on this project, was also on the Warner Robbins project. And despite that, Roxco had a good showing on that project.
Q. Did the other project have the -- provide for this use of similar EIFS siding?

Page 63

A. No. There was a different type of siding. But, you know, it had wood framing. It had a concrete slab. It had porches. It had roofs. It had a turnover period. It had concrete slabs that had -- you know, weren't perfect. It had a painting specification. It had, you know, a myriad of the very same types of things that are here. And I think it is disingenuous for one to point to one or two differences in it and suggest that because of those, they're not comparable. It's my opinion that they are comparable.
Q. Let me go through your analysis, if I may, and -- if you could, I'd refer your attention to page 0124 and specifically the reference to Exhibit 2. And explain to me what this -- what you've characterized as Roxco's as-planned schedule which you have depicted in Schedule 2, Exhibit 2, your report reveals?
A. Would you like for me to do that with the benefit of having that in front of me?
Q. Yes, please. The exhibit itself is at page 0137. There should be a copy there.
A. Where is it?
Q. 0137.
A. I'd prefer to use mine.
Q. Please go ahead.

Page 64

A. May I just give you an explanation of it without your asking questions?
Q. That would be -- the most efficient way that you think to explain the chart to me is -- I'm fine with that.
A. May I also have a copy of Roxco's originally bar chart? I think we included it as an exhibit.
Q. I think it's Exhibit -- if you go to the page -- that will be at -- okay. If you want to take that one, that's a little larger. This one has been reduced in size.
A. Okay. I'm going to need -- Jeff, if I might, a sheet of our paper. Just a blank sheet. Okay.
Q. If I may, I'll come behind you.
A. I'll move this out of the way to make it easier.
This is the schedule which Roxco -- it would probably make more sense if it was right side up.
This is the schedule which Roxco submitted and the government approved. This is a bar chart. It is not a CPM schedule. It includes a number of things such as the percentage of the work that Roxco anticipates performing on each activity each month. We also have a cash curve that's shown here. Now, there are numerous things shown on this schedule. Pearson

Page 65

reduced this schedule to these activities.
Q. By activities, you mean the activities on the as-planned schedule summary?
A. That is correct, which is Exhibit --
MR. WILLIAMS: Two.
A. Two, the scheduling section.
Now, in preparing this very summary level schedule, we were interested in two things: One, what are the primary components of these buildings. And we've identified those primary components. The second issue that we were interested in including is where is the critical path in this project.
Now, a CPM schedule is not the best schedule to use on a project that is linear and involves significant repetitive work. The best schedule to use is a schedule called a line of balance schedule where contractors balance the rate of production for each element of the work. And we can see in Roxco's schedule that Roxco was, in fact, balancing the rate of progress for each one of these activities such that once they started and enough of each of the activity was performed, the rate at which the work continued after the next activity began didn't influence the speed of work. Let me show you that.

Page 66

BY MR. GROAT:
Q. I'd ask you to be patient and explain why you rejected the use of CPM.
A. I didn't reject the use of CPM. What we did is convert this into a CPM schedule and identify the critical path. And I am explaining to you how we went about identifying the critical path on this schedule.
Q. If you'd continue, please.
A. Okay. Housing projects are very linear, meaning you have 86 slabs, you have 49 garages, and the pouring of those slabs -- the sequence in which you pour those slabs is not important. What is important is the rate at which you pour those slabs. It's very much like a piping job on a big power plant where there's 15,000 linear feet of carbon pipe and 10,000 linear feet of alloyed pipe. Sometimes where you erect that pipe is important, but it is not nearly as important as the rate at which you pour it. Excuse me -- erect it.
I want to show you what a line of balance schedule looks like. Let's take site work which goes from July 28th, '95, to 7/31/96. One knows, from a review of that, that the bar cannot possibly influence the rate of pouring foundations because foundations began on 5/1. In order to begin on 5/1, one can deduce

Page 67

that sufficient site work has to be completed in order that the foundation on the first slab can be poured. So if we showed this on a line of balance schedule, this is the way that it would appear. (Indicating)
I'm going to put number, percent of buildings. And they start site work here and site work goes like so. And they go from no -- having no site work done on any building to having a site work done on all the buildings, and they put in all the streets, et cetera.
Now, this schedule --
Q. Could you label that? I'll have to ask this --
A. Label that "site work."
MR. GROAT: I'll ask the court reporter to mark this as next in order.
(EXHIBIT 254 MARKED)
A. Okay. Back to this comment. This work started on 3/28, so let's put 3/28 here. And we know that foundations began on 5/1, so I'm going to put here 5/1, and I want to show foundations going through 2/28. This is a critical point. So on this line of balance schedule, what this shows is after there is a sufficient number of pads ready on the site work, the contractor begins foundations.

Page 68

Now, after there is a sufficient number of foundations, the contractor begins framing. And there's a month's difference between the date that they start foundations and the date that they start framing.
BY MR. GROAT:
Q. You're referring, if I may, to the line foundations and the date shown of 5/1 --
A. That's correct.
Q. And line framing with a date shown of 6/1. Is that correct?
A. That is correct. And I've put 5/1 on my little drawing here. Now, here is a rendition of the framing. Okay. All right.
Now, moving forward now, we'd see on my line of balance that once sufficient foundations are completed, we start framing on 6/1, so what we see here is a restraint coming from foundations to starting framing.
Now, this is a critical point. How do I know that the remainder of these foundations are not critical to the pace of framing? I know that because as a contractor, the only way that he can make money, the only way that he can satisfy his subcontractors is once each one of these guys starts, they need to be able to progress at a speed that is not impeded by the

Page 69

previous contractor. So these rates of progress are critically important, and we can identify the critical path through the job by the start of each of those and by the knowledge we have that it makes no sense and no contractor would schedule the progress of foundations to go slower than the framing contractor needs to go. And there is evidence of understanding of that flow and that rate of progress in this schedule which we've portrayed in ours.
So carrying that explanation about the foundation and framing forward, we see that Roxco did not anticipate that exterior skin would influence the work -- the speed of MEP rough-in. And they're, in fact, right. Once the sheathing is placed on the outside of the roof, and even before then, you can start running the wire through the framing. You can start putting in some of the air-conditioning systems. You can do some rough-in. There are some elements of all of that work that is weather sensitive, but there's plenty available that Roxco planned to start MEP rough-ins sufficiently that it could continue unencumbered on July 15th.
Then we see the insulation and drywall starts on 9/1. Why do you start insulation and drywall? For two reasons: One, you have a building that's ready to





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 70

commence insulation and drywall, and you expect the rate of progress of these other activities to proceed at a rate that they will not influence the speed at which this contractor works.
So as we walk through this schedule, it is evident that the critical path has to be in the start of each of these activities or the substantial start. And where we find that the substantial start occurred only after a greater number of buildings was done is -- in the previous activity relates to installation of drywall and interior finishes.
Interior finishes we've projected to be critical for several months when they'd start turnover on April 15th and continue to 8/5. And we stated our report, we devised this duration ourselves based on conversations with Roxco, but that -- because that was not an element of their schedule.
Q. Let me see if I can understand this. In the as-planned summary schedule, your summary assumes that the exterior skin work and the interior finish work, based on Roxco's bar chart, would be completed on 7/31. Is that correct?
A. That's correct.
Q. Now, is it your conclusion then that Roxco -- does this as-planned schedule analysis then assume that

Page 71

Roxco would complete the exterior skin and interior finish work on 7/13?
A. I believe that reads 7/31.
Q. Excuse me. 7/31. Is that correct?
A. That is what their schedule shows. And it's hard to know what they mean by the exterior skin because on the exterior skin, you've got wood columns. Frequently -- they're not wood columns. They're some kind of form column. But there are a lot of things on the exterior skin that can be -- that can wait until the end of the job. And we don't know what those are, but we can surmise that they would be elements of the work that would not influence work that's ongoing inside the building.
Q. Then as I understand this, this analysis assumes that Roxco could complete the work on 7/31 and have the buildings accepted by 8/5. Is that correct?
A. That's somewhat of a mischaracterization, sir. The government stipulated the contract duration on this job, and the government asked the contractor to prepare a schedule demonstrating how he planned to comply with the contract documents. He did that in the form of this bar chart schedule, which is also a pay application, loaded and cash flow loaded, and the government accepted it. Our summary is simply a

Page 72

rendition of what's been presented here with the critical path identified.
Q. Is it your testimony that Exhibit 2 represents a reasonable as-planned schedule for the construction of the project?
A. Yes.
Q. Now, is your testimony that having completed interior finish work and site work and exterior skin work on 7/31, Roxco could reasonably conclude that the government would accept the project by 8/5?
A. Absolutely. Let me add this, sir, just for clarification so you don't think, "Well, that doesn't make sense to me."
The site work line includes a variety of things. A, it includes preparation of the building pads in order to build the concrete foundations. That's just one element of what's comprised in that summary bar. It includes all of the work that was done on the alleys. It includes work on the curbs and gutters, on the sidewalks. And it is possible to pour the last sidewalk on 7/31 and turn over the last building on 8/5. Just as it's impossible -- it's possible to hang a light fixture on the outside of a wall on 7/31 and turn over the last building on 8/5.
Q. Did Roxco's estimate reflect estimates of the

Page 73

crew size and numbers relative to this as-planned schedule summary?
A. I don't recall. I can tell you this: The schedule that Roxco submitted to the government was accepted without revision.
Q. Well, the reasonableness of the schedule depends, does it not, upon the assets Roxco intended to deploy to get the work done?
A. No question about it. That's absolutely correct.
Q. With regards to the foundation work, if Roxco retained an exceptionally competent contractor with an extremely large work force, then the possibility existed that the foundation work could be accelerated. Isn't that correct?
A. That's one of many hypothetical scenarios that one could develop on this job. Now, this schedule reflects what Roxco planned to achieve, and it was Roxco's obligation to deploy resources to perform the work at the rate shown here. And I believe that they did that, and that the only reason it didn't work is for the reasons that are described in our report.
Q. Did you analyze whether the crew sizes that Roxco deployed were sufficient to do work at a rate consistent with the as-planned schedule summary?