Page 74

A. Well, the job was scheduled for 16 months and it actually took like four years. So when you ask that question, I'd have to say that there were periods of time when we could see that there were more people needed. But for instance -- the short answer to your question is yes, we did look at that, and we do believe that Roxco employed enough people -- deployed enough people -- to do it.
Now, that is not to say that there were not periods when Roxco was saying, "I need you to have more people out here." But the need for those people was created by circumstance. And in order to evaluate responsibility for that less people than needed, one also needs to evaluate the circumstances under which they were working.
For instance, it is not sufficient for one to read a notation in the diary that says, "Interior/exterior needs more people working on EIFS," and accept that on its face as demonstrating that the contractor had insufficient people. One also needs to look at the rate at which the framing contractor was making work available to him. And in some instances, it may have been that the rate that the framer was proceeding was slow, which impeded the need for the quantity of men that Roxco might have thought was

Page 75

necessary when it wrote that daily diary.
Q. Do you know the specific contract provisions that applied with regards to building turnover?
A. Yes.
Q. Is it conceivable that a contractor could have his work force deployed doing interior finish work until 7/31 and achieve building turnover by 8/5?
A. Could I look at that you're looking at?
Q. I'm looking at your as-built schedule summary, and I'm looking again at the lines "exterior skin" and "interior finish" which show work through 7/31 and then building turnover on 8/5.
A. Absolutely. Let me give you an example. You turned over all the buildings except one. The date is July 28th, 1996.
Here's the example: It's July 28th, 1996. You've got two buildings left to install -- I mean to turn over to the government. There are still a couple of sidewalks that haven't been poured, a mailbox that's not up, some numbers that are not on it. They've got seven days to do that. There are three or four light fixtures that haven't been hung on the last three buildings. You've got four or five days to do that. Very easily done.
Q. Okay. Now, having constructed this

Page 76

as-planned schedule, what was the next analysis you undertook?
A. An extensive investigation into what actually happened on this job.
Q. Okay. Who did that investigation?
A. Mr. Montroy and I.
Q. And what analysis specifically did you do?
A. We create -- well, the first thing that we did was attempt to use the pay applications to track the rate at which each of these activities that are portrayed on this as-planned schedule were performed. But it didn't work because there were two different pay applications for the two different funding issues and -- it just didn't work, so we abandoned that. Had great hopes for being able to do that, but it didn't work out.
The next thing that we did was to collect all of the daily diaries, the test reports on the site work, the test reports on concreting, correspondence that discussed the timing of performing work, the contract drawings, the RFI's, the change orders, everything that we could pull together to help us understand what actually happened on this job.
Q. Okay. Let me give this to the court reporter so we don't lose it. I think this was your copy. Let

Page 77

me turn to the documents that were provided today. Let me guess. I'll ask the court reporter: Is this the document you've identified where you compiled all the information you talked about?
A. Yes, it is.
MR. GROAT: I'd ask the court reporter to mark this as the next exhibit in order.
(EXHIBIT 255 MARKED)
BY MR. GROAT:
Q. Let me show you what's been marked as Exhibit 255.
A. This is a database that we created to compile into one location the data that we extracted from the source documents that I described to you a moment ago. And it's a printout of the tables that are in our access database.
Q. How is this database sorted, if you would, as far as the order the entries appear?
A. When one creates a database, you have the ability to print it in a number of different ways and I am -- I'm afraid I can't tell you. I just told our people to print it out, and I'm not sure how they printed it out. But my instruction to them was prepare a printout that has every entry and every column that's in our database, and it is my understanding that's what





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 78

you've been given.
Q. Okay. Having prepared this database, what steps did you take to perform an analysis?
A. We took this database, and we created the as-built drawing that is included in our report. And of course, with this, you have an endless -- endless may be a tad bit of a stretch -- but a near endless capacity to print this data out any way that you want to. And in looking at it, either on the screen or maybe some printout that we did, you can see what happened at any period of time. You can see the rate at which work is being performed. You can see which of the activities are influencing the speed of others. You can see when they're doing rework. You can see how much of the rework was done after payment. There's just -- this allows one to tell the story of this project. It's not the only document we used, but it certainly is a principal part of it.
Q. Explain to me, if you would, as specifically as you can and perhaps by reference to your as-built schedule, how the specific entries on this document were used to create the as-built schedule?
A. You have in front of you there the as-built summaries --
Q. I have a condensed copy of the report. I'm

Page 79

thinking it might be easier to examine it from a larger one.
A. Okay. Each of the activities that are listed down the left-hand side are essentially the same activities that are in the schedule that Roxco submitted and in the summary bar chart that we submitted. We've expanded the detail that is shown in this particular printout far greater, and we've included references to key events, and we've color coded it to show things that we were interested in displaying, and we've shown some red lines on it to indicate when Roxco left the job. And with this database, you can sort by all the EIFS work. And when you do so, you should find that the EIFS construction was done during these periods.
Now, it may also be possible to see what buildings they're working on depending on the amount of detail that was placed in the daily diary. Now, it is also possible to determine the rate at which this work is progressing which was important to us in our analysis. As explained to you a few moments ago, we determined that the start of each of these activities was the planned critical path because Roxco did not want to allow the predecessor crew to influence the speed of the crew that was currently critical.

Page 80

We could see in these records that Roxco actually began framing in earnest after a certain number of foundations and slabs had been poured. And that work was proceeding slower than planned, so Roxco waited later to start that work in earnest. The framing work in earnest. So we can, by careful review of the as-built records, identify which ones of these crews are pacing the work and when the next crew begins.
And what is so immediately obvious from a review of this drawing is this: Once these activities began, they were not able to progress without influence from the predecessor activity. For instance, the rework that was done on the framing and decking, the rework on the roof, all of the painting, additional work that had to be done, all of the rework after they paid 100 percent and the -- all of the problems associated with turnover influenced the speed at which each of these crews were able to work.
Q. Let me see if I can understand it. I understand your testimony to be that the critical path represents the logical train of activities, the shortest logical train of activities required to complete the project. Is that correct?
A. And the longest. It's both. By virtue of

Page 81

the fact that it has zero flow.
Q. It is the path that has zero flow?
A. Correct.
Q. Based upon your as-built schedule, you concluded that with the exception of beneficial occupancy, that the -- all the critical path items were completed in October of 1996? Is that correct?
A. That is correct, but I'd like to add this comment that's important: The rate at which building turnover progressed was influenced enormously by other trade work that was not yet completed for various reasons. So it is important that you not interpret this document to mean that it was just solely what's going on on this blank line, because that would be inaccurate. The rate at which the critical work of turning over the building is being done is being influenced by all of the activities that are going on above it, which was not a part of the plan and it was an imposition that occurred as a result of all the maladies on this job.
Q. So it's your contention, then, that the government is responsible for what you've described as maladies on the job. Is that correct?
A. That is one characterization that I applied a moment ago that I would refer back to my report with a

Page 82

far more amplified description.
Q. Let me turn to line 15 of the report, which shows EIFS work. Is that correct?
A. Yes.
Q. Now, you've depicted rework by using yellow. Is that correct?
A. That's correct.
Q. Now, EIFS rework was being done until -- according to this chart, until May of 1999. Is that correct?
A. That's correct.
Q. Have you identified the cause of the fact that EIFS rework was being done until May of 1999?
A. Well, there are a variety of causes, and there's a mixed bag of responsibility with respect to the EIFS.
Q. This is a case, then, of concurrent delay?
A. In some instances, yes.
Q. Just for the purpose of analysis, explain to me how the EIFS rework related to the critical path.
A. Okay. There was some EIFS rework that we attributed to Roxco and its subcontractor. One that comes to mind is the addition of the mesh at the eaves. We also found two issues that are directly related to the government. One is their insistence that they

Page 83

have -- that Roxco provide a warranty. I understand their concern about whether things are warrantable. They're entitled to have some concern about that and investigate it. It was not a contract requirement. In my opinion, they should not have withheld turning over the buildings until then.
Secondly, there is evidence in the file that the government withheld acceptance of the building for a design-related reason, which they attempted to mask under the -- a description of a different item.
Q. The government took the position, didn't they, that they weren't going to accept buildings until Roxco provided a warranty of the EIFS work?
A. There was a lot of more required by the government than just -- it wasn't just an EIFS warranty.
Q. Didn't the government take the position that they were going to require a warranty for the EIFS work before acceptance of the building?
A. They did.
Q. Did your analysis reflect the fact that from the government's perspective, the units couldn't be accepted until Roxco provided a warranty?
A. It did.
Q. How on this diagram does the as-built

Page 84

schedule reflect the government's requirement that a warranty be provided?
A. You don't see that on this particular document. We can't put everything on this document. Our review of that and our analysis of it is described in the text of our report.
Q. Isn't it true that if the government was correct and it was entitled to a warranty for the EIFS work, the critical path would go through the EIFS work and not building acceptance?
A. I can't agree with your characterization because you said if it's true that they were entitled to a warranty. I agree with you that they were entitled to a warranty. I just don't agree with you that they were entitled to withhold acceptance of the building until they got that warranty.
MR. GROAT: I'm going to take a brief break, and I'll be right back.
(OFF THE RECORD)
BY MR. GROAT:
Q. We're back on the record, and if you had your memory refreshed, let's clear up the record to the extent that we can.
A. Earlier, you asked me if I was aware of any documentation regarding Roxco's request to pour the

Page 85

foundations immediately after excavating them and in such a way would prevent the problems that they encountered. And we found that correspondence dated September 11th, 1995.
Q. What did that correspondence provide?
A. This is a letter dated September 11th, 1995, from Roxco written to Ms. Kathleen Lee. It's Exhibit 10 to what I understand was a motion that was filed in the case.
MR. WILLIAMS: It was Exhibit 10 to Roxco's appendix to the plaintiff's motion for partial summary judgment which was filed a year or two ago.
MR. O'BOYLE: In this litigation or another case?
MR. WILLIAMS: In this litigation.
A. It is specifically addressing the building slabs. And I won't read all of it, but all of it essentially says the same things that are the subject of this case. In the third paragraph on page 2, it reads, "At one time, Roxco, Ltd., was authorized by government to place the grade beams before the slab was placed. This was done once, but then that authority was immediately rescinded. Miscellaneous note No. 1 on Sheet S9 actually tells us to pour the grade beams

Page 86

immediately after excavation. This cannot be done, and in large part is a major contributing issue."
BY MR. GROAT:
Q. In the reference on page 2 of the letter, it says, "On the contrary, we have gone out and sought creative solutions to this problem, but to date have heard no response from the government."
What were those -- do you know what those solutions were?
A. I do, and they're addressed in our report. And we discussed the chronology, we discussed the timing of Roxco making its report, we discussed the slow rate at which the government responded, and we discussed Roxco's continuous request that the government respond. Their final response, which I think came sometime in late September after they had poured a lot of the slabs, and the government's response was you can shallow up the garage slabs, but you can't shallow up the duplexes.
Q. So the letter you referenced, was it September 10, '95?
MR. WILLIAMS: Eleventh.
BY MR. GROAT:
Q. Eleventh. I'm sorry. Did that letter propose pouring the slabs -- the beams and the slabs --

Page 87

separately?
A. What the letter says is early on, you allowed us to do that, but you, the government, immediately rescinded that authority. And when you rescinded that authority, you created a condition where we had to pour the slabs monolithically.
Q. Let's turn to the scheduling question again that we've been discussing. You used the term "line of progress" scheduling technique. Can you tell me what that means, please?
A. It's actually "line of balance." It was created by an Englishman, and it's discussed in a book which I believe is partially authored by one of Mr. Beach's favorite authors -- Mr. Callahan wherein he discusses alternative scheduling techniques. And it's actually a preferred method for repetitive work, and it's one that Pearson Management employs on large, complex, high-risk projects.
We used it on the Chicago Bears stadium, obviously about a $640 million project, for much of our work, in lieu of a CPM schedule. We also used it extensively on the completion of the Westin Diplomat in Florida, which we were employed indirectly by the Department of Labor to complete. And we're currently employing it on projects which we are scheduling now.

Page 88

Q. Can you cite me to a reference, and by that I mean a text, a monograph, or a court-ordered decision which discusses the use of the line of balance scheduling technique as it relates to claims for delay?
A. I can't as I sit here, but I'd be happy to do that research and respond later if you'd like.
Q. I accept the offer in an effort to move things along.
A. If you have any interest in it, I can show you some of the cases we have testified in about that.
Q. So you have previously testified to use of line of balance?
A. Absolutely.
Q. In delay cases?
A. Yes, sir.
Q. Do you know whether there are any resulting decisions that approve the use of the line of balance technique which you've described?
A. You know, I don't. The cases that I've been involved in, you get a decision, but sometimes they'll say, "We like the way Mr. Pearson did it," but they don't say, "Well, we specifically liked his line of balance."
Q. That's fine. I understand. The same thing happens to me, but that's . . .

Page 89

Now, describe to me, if you would, the technique that is applied, the methodology that is applied to analyze delay -- the technique that is applied in analyzing a delay claim using the line of balance technique?
A. Yes. May I have a sheet of paper? I think I can draw a picture and do it. I'll call this "Hypothetical Delay Analysis Using Line of Balance."
(EXHIBIT 256 MARKED)
A. In this example, I'm going to assume that there are 100 houses. And my vertical axis has 100 houses on it; and on my horizontal axis, I'm going to put tick marks for months, and we'll put the months as 1, 2, 3, 4, 5, 6, and 7.
Now, when a contractor undertakes to construct 100 houses, let's suppose that he starts with the building pads. And he wants to install those building pads at a particular rate that we'll say will take a period of three units of time. This is site work. I'm going to call it "pad installation."
Now, following the installation of the pad, the contractor wants to install the concrete foundation. He understands that he can't start the concrete foundations the same day he starts the pad installation because if he did, the concrete foundation





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 90

man would be impeded by the speed at which the pads were made. So he says, "I will wait a unit of time, and I'll start the building foundations." And let's say that building foundations are projected to progress at a rate a little slower than the pad installation. So we'll call this "foundations and pad concrete."

The next critical activity is the framing subcontractor. The framing subcontractor says, "I'm a great guy. I can do X number of houses per week. You need to crank me up fast." Well, the contractor in this hypothetical case says, "I'm tickled to death that you can build them that fast, and I'd be happy for you to progress at that rate, but I've got a foundation contractor who has agreed to produce foundations for me at this rate. So I'm going to hold -- I'm not going to start you for two periods." So we'll have a two-period lag here. And this guy is going to progress at a faster rate, but he can progress no faster. We can't move this line any farther to the left. Otherwise -- because if we did, the rate of his progress would be impeded by the rate at which the concrete guy is pouring the slabs.

Now, you can see the thinking of this in Roxco's schedule, although it's not in this form. Okay?

Page 91

BY MR. GROAT:

Q. My understanding was that Mr. Robbins testified that Roxco's schedule that you analyzed was a CPM analysis for one house. Is that -- is my recollection correct or not?

A. I'm not sure what he was talking about. I can venture a guess, but I didn't talk with him about that.

Q. Have you reviewed his deposition testimony relative to this?

A. I don't recall reading, no.

Q. Continue, if you would. Explain to me how your analysis of this relates to delay and the responsibility for delays.

A. Okay. Here's framing. Now, in this, what we've done, Mr. Groat, is balance the rates of progress of each of these crews so that none of the preceding crews influence the rate of the preceding crew. And thus the term "line of balance." Balancing rates of production. And in housing, in piping work, in any kind of repetitive work, this is the preferred method to schedule that work because these rates of progress have to be balanced. And it's also not important in most instances, although not in all of them, which house is done in each case. It's just important that

Page 92

you got enough pads here, and he's got enough concrete foundations done and enough framing done.

Now, what we see happen on this project -- may I use a red pen if somebody has one? I'm going to show you an as-built. All right. In this hypothetical condition, I'm going to assume that the pad installation goes essentially as planned. A little bit slower, but essentially as planned. But I'm going to assume that this contractor incurs a number of problems. You can't lay out the houses. You encounter hidden concrete. You're working with a flawed specification. You're required to attempt to construct a foundation that is almost impossible to do. And you incur delays as a result of that. And because of those issues, I'm going to show that the pad contractor essentially completes on time, but his work progresses at a much slower pace.

Now, what happens to the framing contractor when the foundation rate of pouring is delayed? Here's what happens: A, you either don't start him until later. Or B, you force him to proceed at a much slower rate. Or C, you start him on time and you let him start and stop, all three of which are issues for which that framing contractor is going to want more money, in addition to the foundation contractor wanting more

Page 93

money for the problems that he incurred.

Now, I have -- I have created in trials these planned and as-built lines of balance and shown where these clashes occurred and described the influence that they had on the crews by using the records available and that we will create some of these for demonstrative evidence in this trial if it goes to that point.

Q. Let me see if I understand, you know, where we're going, and maybe then I can go back. Now, my understanding is that under your analysis as reflected in the as-built schedule, that Roxco is entitled to extended overhead because of government-caused delay. Is that correct?

A. That's correct.

Q. And the inclusive period in which you contend that Roxco is entitled to extended overhead is what?

A. It is -- I think it's actually two periods. It's described in the report. And if I misquote it, I would --

Q. First, go back to the report, and I want to tie that, if I can, to the chart to see if I understand the derivation.

A. Okay. In Section C, page 4 of 10 of our report -- it is your Bates No. 0126 -- we begin a discussion, "For the 823 days of delay incurred during



07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 94

Roxco's tenure." And we begin that discussion by listing 28 separate events for which we have concluded that the government bears responsibility. Now, by listing those events, we have -- if you'll recall earlier our conversation about the two parts a delay claim: One, is it an event that entitles a contractor to a time extension, and the second is the quantification of it. In these two pages, we identify the events that we believe are -- qualify as an excusable event.

Now, in the preceding pages, we discuss moving left to right the events that occurred in each one of these critical path activities. We attribute liability to the government for the foundations and some of the framing. We attribute no liability to government for the EIFS problems, and we attribute 85 percent of what is left to the government. And we have done that in that fashion because on each of these activities, when we look at each one of them, we see a pervasive, voluminous list of government caused delays. And that is the basis on which I've made the judgment that the government bears 85 percent responsibility.

Q. Your judgment is the government bears 85 percent of the responsibility as to a claim for extended overhead. Isn't that correct?

Page 95

A. It is.

Q. And in your opinion, what must the contractor prove to be entitled to extended overhead?

A. He must prove that the sole cause of the delay was the government's liability, and he must demonstrate that the duration that he's derived is reasonable, and he must prove that there's documentation to support his conclusions, and he must prove that he's used a valid basis for deriving those quantifications.

Q. Isn't it true that if a contractor is not entitled to extended overhead, if he had -- if he could not have completed the work for the period that he seeks because of other outstanding work?

A. Not necessarily. You'd have to demonstrate that other outstanding work was on or near the critical path, or influenced the speed of work in the critical path.

Q. So is it true that your analysis presumes that the contractor can recover extended overhead notwithstanding the existence of concurrent delay?

A. No. As we have -- as we discussed in our report, we have reduced Roxco's entitlement by two periods of concurrent delay. The first being the work of Cheneyworth and the second being legitimate

Page 96

corrective work that given reasonable inspection criteria, would have been performed in a much shorter duration than it was actually performed.

Q. I believe your testimony has just been that you do not contend that the Roxco -- that the delays Roxco encountered in finishing the EIFS work is the responsibility of the government. Am I correct on that?

A. You are incorrect about that.

Q. Okay. What of the EIFS delays does Roxco contend are the responsibility of the government?

A. I'll do my best to list through them. I have several. First, there is a dysfunctional inspection process. The government wrote a memo stating that they would never -- they should never accept any work, period. Don't accept any work. I've never seen in my career an inspection entity taking that position.

So in essence, a contractor is entitled to rely on the inspectors to do their job and to report to them whether or not the work that they have completed is sufficient for them to move to the next phase. There are numerous two-way memos regarding work that the government considered deficient, and there are numerous responses to those. I find fault with the government for their method of inspection. So because

Page 97

of that, the period during which a lot of this corrective work was performed was extended; and I -- and the government is responsible for that.

Secondly, a number of these subcontractors went bankrupt because of the government's actions. All contractors that work on these types of projects are thinly capitalized and can't take a lot of these kinds of problems. And when the government creates so many problems that their cash flow can't continue, in my view, the government is liable for that.

Next, there is a document that states that the government will not accept any of the buildings until they obtain a warranty. We agree that the government is entitled to a warranty on the EIFS. We disagree that the government is entitled to withhold acceptance, beneficial occupancy of the buildings until they obtain that warranty.

Fourth, the government wrote a memorandum stating that they were withholding acceptance of the buildings because of concerns about the EIFS design, and the memo suggests that the government is attempting to mask the reason that they're withholding acceptance of those buildings so that they gave the appearance that it was actually the contractor and not the design. So I hold the government responsible for those items.





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 98

Q. Okay. Let's go specifically to the work here that was required for EIFS and the analysis that was performed. Based upon your as-built schedule, specifically line 15 -- we take this out -- and line 15 shows that EIFS work was being performed up through and including May of 1999. Is that correct?
A. That's correct.
Q. Okay. Now, what of the EIFS work that shows here -- if you would, EIFS rework activity -- from approximately November 1997 to May of 1999, what of that EIFS rework do you contend was the responsibility of the government?
A. When we talk about particular items of work, when we look at specifically what is being done, we will see that there are some legitimate EIFS repairs that need to be performed. But the timing of those repairs was late because of the government's flawed inspection process.
Now, there were detail issues about how -- as is the case in much of this project, about what details apply, how they're to be applied. But where there exist legitimate punch list items that are performed out to 5/24/05, it is my conclusion that the timing of performing that work is the result of the government's flawed inspection procedure. Then to the extent that

Page 99

they are performing illegitimate repair work and destructive testing and that type of thing, that the government is responsible for it.
Q. So is it your testimony that you or those working for you have analyzed all the EIFS work represented on line 15 and determined that all the EIFS work from November through -- is it May?
A. May, yes.
Q. That will be November of --
A. '97.
Q. November of '97 through May of '99 was in some manner the responsibility of the government?
A. That's correct.
MR. WILLIAMS: Want to break for lunch?
(OFF THE RECORD)
BY MR. GROAT:
Q. I'm again trying to get to the method of analysis reflected on the as-built schedule. I believe it's your testimony that this is based on a line of balance analysis. Is that correct?
A. In part.
Q. And in part, it reflects a critical path analysis?
A. Yes.
Q. And in part, it reflects the estimated

Page 100

duration of the project and the actual duration of the project. Is that correct?
A. Yes.
Q. Are you aware of any reference that would establish the validity of using a blended CPM, line of balance, and duration of delay analysis such as you have used here?
A. I'd have to refer back to my library at the office. But in addition to that, I can tell you that in the many times that I've testified, I've used this blended analysis numbers of times.
Q. So is it fair, then, to refer to this as a case of blended CPM, line of balance, and total delay?
A. Those are general terms that are often misquoted when used in the context of a -- that includes more words. So while I might agree with you to some extent, if I reviewed the way that you described those things in context and I understood the details that you thought were attached to each of those words, I might agree or disagree with you. It's too general an explanation to form an opinion about whether or not it's valid or invalid.
Q. But is it fair to say, then, that this has elements of a CPM, line of balance, and total delay analysis?

Page 101

A. I think that is fair to say.
Q. Why did you utilize this approach rather than a straight CPM analysis?
A. Well, this is in some respects a straight CPM analysis.
Q. Well, you previously indicated, I believe, that the use of a line of balance analysis was appropriate for delay claims in this case?
A. For certain elements of it, yes.
Q. What specific elements warrant application of the line of balance technique?
A. Well, if you recall in our report, we produced some production graphs based on payments and money expended. And those graphs -- I think we have one for the framing, the -- I can't remember. They're in our reports, and one can see there the rate at which work was performed based on dollars expended. That is in some respects a line of balance for that element of work.
You can also produce lines of balance based on the rate at which they poured foundations, made pads available, made framing in each building available, completed painting, et cetera. And each -- and the lines of balance on each of those elements of work are instructive, and they provide valid evidence regarding





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 102

the speed of work. And when combined with a knowledge of the delays that were incurred on those elements of the work, one can evaluate the extent to which those delays influence that rate of progress.
Q. Now, maybe I could understand better if we could be more specific. So as to this as-built schedule, explain to me, if you would, how you made use of a calculation of the rate of projects based upon payments made.
A. Well, there were a few instances where you could track the rate at which foundations, as I recall, were installed based on payments. We had problems with that payment study, and I have a fuzzy recollection of that one. But the money expended by Roxco on each of these elements -- on some of these elements, not all of them -- can be traced; and through that, one can see the extent to which Roxco was working on the original contract work and the extent to which Roxco was doing rework. You can combine that with invoices that are in Roxco's files to verify the periods in which they're doing rework and the periods in which they're doing original contract work. All of those are documents which provide data that in conjunction with a valid as-built schedule allows one to reach the conclusions that I've reached.

Page 103

Q. By payments made, are you referring to payments made by Roxco to subcontractors or payments made by the government to Roxco?
A. Both.
Q. Can you give me one instance reflected on the as-built schedule that reflects your use of government payments to Roxco in your analysis?
A. I can' remember one specifically.
Q. Are there other work papers or other analyses that would clarify, you know, where this information is utilized?
A. I don't recall.
Q. Who actually prepared the as-built schedule?
A. It was a combination of the people that did the input for the database in our office, Jeff Montroy, and myself.
Q. Is there any possibility you could clarify --. I really have two questions in an attempt to understand this, and one would be where you utilized information concerning payments made by the government, where and how you utilized this in the preparation of the chart and where and how you utilized the information regarding payments by Roxco in the preparation of the as-built schedule. And certainly if we can clarify this through some informal consultation, I'm not trying

Page 104

to drag out the examination. I just want to move on. Do you mind taking a brief break and allowing him to confer with Mr. --
A. I don't think we need to.
Q. No?
A. Roxco's pay applications track the schedule activities on their plan schedule. You're going to see the same pay items as you see in that schedule. And as Roxco completes work and submits a pay application, you see the percentage of work that is accomplished in each pay period. Now, that process of reviewing that body of evidence and determining the rate at which Roxco is performing that work became complicated within a few months after Roxco began its pay applications because of this funding issue. And it's been a while since I've looked at it, but we weren't able to track that rate for the entire progress of the work, but we were able to see early in the job how many slabs that they were pouring, et cetera.
Now, with respect to your second question, how did we use payments made to subcontractors to establish the as-built and what information did we learn from that: Roxco has detailed cost records for, you know, period after about 19 -- I can't remember -- 1995, early 1996. You can also go back to the actual

Page 105

invoices, and those invoices for many of the people that are working on this job explain exactly what they're doing and the hours that they're working. That information allows one to see where they were working and at what rate. When you combine that with inspection reports, the government-made letters that they wrote about things that they wanted done, you're able to gather sufficient information to determine what's driving the job and what effect delay events are having on the rate of progress.
As I say, this is a common practice that I have undertaken for over 20 years, and I've testified about it at least 50 times and undertaken this type of analysis on at least 3-400 projects.
Q. How many projects have you testified on this that have sought extended overhead based on the IKEA formula?
A. Well, when you talk about the Ikley formula, you're talking about a measure -- a way of measuring home office damages. And, you know, I can't -- I won't attempt to count the number of times that I've used the Ikley formula, but I certainly have used it in the past.
Q. Have you ever testified in a case involving a claim against the government in which a contractor





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 106

sought Ikley -- excuse me -- home office overhead on the basis of the Ikley formula?
A. I feel confident that I have. We've been involved in several Veterans Administration projects. And it's been a few years ago, but I believe we have calculated several of them on the Ikley calculation. Of course, I was Blount's contract manager for four and a half years and prepared their claims. And during that time period from 1981 to '85, we frequently used Ikley.
Q. Now, turning again to your as-built schedule, the as-built schedule assumes, does it not, that all delay to the right of the critical path is the responsibility of the government?
A. I don't understand your question.
Q. Well --
A. When you say to the right, I'm confused by that statement.
Q. Well, is it possible on this -- let me see if I can't turn to specific items and maybe we can get to it this way. I'll be referring you to the -- let me turn you to page -- it's my page 0126, and it's page 4 of 10 of your Section C analysis.
A. Okay.
Q. In subparagraph 1, the report states, "The

Page 107

government's refusal to provide updated contracts that incorporated all of their changes," and you state, don't you, "delays for which the government bears responsibilities include but are not limited to the following"?
A. Right.
Q. Now, I take it your analysis concluded that this government's refusal to provide updated contracts was not in accordance with the contract?
A. Absolutely.
Q. Did you identify any specific contractual provision that required the government to provide updated contract documents?
A. I can't quote a clause, but I can tell you that it's my understanding that the government is obligated to prepare -- to provide clear and concise contract documents from which the contractor can use to build the project. I can also tell you that in my opinion, the quantity of changes on this project rose to the point that it was absolutely necessary for the government to produce a new set of drawings. And they failed to do so, and as a result of failing to do so, they increased the contractor's cost and caused delay by making it difficult for the management of Roxco to disseminate information about how to build this

Page 108

project.
Lastly, I can tell you that on the projects that we've been program managers on and the projects we've been brought in in the middle of to resolve disputes, I have at least on a half-dozen occasions directed that the architect prepare an updated set of plans when there were far fewer changes made than existed on this job.
Q. Isn't true, isn't it, that Roxco was required to provide as-built drawings? Isn't that correct?
A. It is true, but I'm sure you're not attempting to suggest that an as-built drawing is the same thing as a clear and concise set of contract drawings which the government was obligated to provide to Roxco. The as-built drawings were what was built; and what happened, sir, was that the quantity of changes grew to the point that they had so many RFI's and sketches and pasties and Post-its and staple marks that they couldn't keep up with what they were supposed to build.
Q. Was the -- was this issue that you've identified concerning conformed contract documents in Roxco's request for an equitable adjustment to the contracting officer?
A. It was, and it was also included in

Page 109

Mr. Leech's letter to the government in the summer of 1996. And in that letter, he tells the government I've been asking you for months to give me an updated set of plans, and you've refused to do so.
Q. What impact did this refusal have upon Roxco's schedule?
A. I can't give you a number of days. I have not attempted to ascribe a number of days to that particular event. I can tell you that I know from personal experience that it increases the difficulty of the work, it makes it harder to build, it makes it harder to disseminate information accurately. And I believe that it impacted the work, but I can't quantify it separately.
Q. Turn to subparagraph 4. Would you read that into the record?
A. "Flawed engineering fill specifications including vague and confusing requirements and the government's approval of a noncohesive soil material for the engineered fill."
Q. Okay. What do you mean by the phrase "flawed engineering fill specifications"?
A. In our report, we talk about various flaws in the engineering fill specifications. Mr. Carmichael addresses those flaws in his report. Now, with





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 110

respect -- I'm sorry. Those are the ones I'm referring to.
Q. Now, you also indicate that the government's approval of a noncohesive soil material for the engineered fill, that contributed to the delay?
A. It did but by virtue of the way that the government managed it. On the one hand, they said it's okay to use noncohesive soil. But oh, by the way, I will not allow you to undertake means and methods that are appropriate for noncohesive soil, such as pouring within 24 hours after opening a ditch, forming the -- not allowing them to form the beams and not allowing them to change the configuration of the slab so that they could resolve the problems that they were encountering.
Q. So is it your contention the government had the contractual obligation not to approve the use of noncohesive soil material and should have only approved the use of cohesive soil materials?
A. No, sir.
Q. Well, I understand Mr. Davis's testimony to be that the election of Roxco to use ML fill contributed to the difficulties in this project. Is that correct?
A. Well, the way that you asked him the

Page 111

questions yesterday elicited answers from him that were incomplete. And when you gave him an opportunity to amplify, he explained to you what he meant by that. And I won't attempt to repeat exactly what he said, but in essence, he said the same thing that I said several times today. You know, the low cohesive material was okay if the government would allow means and methods that were appropriate for low cohesive material, but they approved the low cohesive material and then demanded that they use means and methods that were totally inappropriate for low cohesive material.
Q. Did the government actually demand any specific means and methods for the construction of the slab other than requiring that it be repoured in a monolithic fashion in accordance with the plans and specifications?
A. That is the major issue. That's the major issue, but I'll go a step further and say not only what they required -- that they required a monolithic slab, but they specifically prohibited Roxco from making the corrections that would have allowed Roxco to work with the low cohesive material.
Q. Isn't it true what Roxco did was actually suggested considerably reducing the size of the beams in an effort to alleviate the problem?

Page 112

A. We just showed you a letter dated September 11th where in addition to that and before that, Roxco asked to be allowed to pour the foundations within 24 hours, and the government said okay but then immediately rescinded it.
Q. That's not correct. Isn't it correct that letter actually involved an approaching storm; and because the storm was coming, the government said on this one occasion, we'll let you pour the beams and then the slab, and that there was never any agreement generally to pour beams and slabs?
A. You said a lot in that statement. You'll have to pull that letter out and show me --
MR. WILLIAMS: Right now you're asking him what the letter said and you're trying to recast it in something that's not in the letter, and that's not what the letter says. You might want to read what your contracting officer says about how she responded to that letter. Or any of the letters that are in the summary judgment motion.
A. Would you restate your question?
BY MR. GROAT:
Q. Isn't it true that letter arose in the context in which Roxco asked on a one-time basis to be able to pour the beams and the slabs separately because

Page 113

of an approaching storm? The government recognized that the moisture would cause problems and allowed Roxco on a one-time basis to pour the beams and then the slab?
MR. WILLIAMS: I'll object to form of the question as assuming facts not in evidence.
MR. GROAT: I'm asking if he's aware of the fact.
MR. WILLIAMS: Not in evidence anywhere.
A. Let me answer this in two ways: First, I am not aware that's the conditions under which -- but this letter and every other piece of evidence in this case proves that the government would not allow Roxco to pour the open trenches within 24 hours any time under any circumstances with perhaps the one exception that you mentioned when they got a storm coming. And my point is it was the only way that a contractor can deal with low cohesive material, and if anybody ought to know it, it's the designer standing over there on the other side of the trench watching it.
BY MR. GROAT:
Q. How much delay did Roxco suffer as a result of this what you've identified in subparagraph 4 here?
A. I can't ascribe a particular number of days to this event. I will at trial show the rate at which





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 114

they actually poured foundations, and I will show all of the events that resulted in the delay and my conclusion about the part of that that the government is responsible for. And if the government wants to say, "Well, Mr. Pearson, you can't tell me if it's 14 or 17 or 19 or 9," so be it.
Q. What analyses have you performed in that regard?
A. I reviewed the records regarding what these contractors did every day. I reviewed the pour records to see the speed at which they actually worked. I reviewed the records to see when they encountered hidden concrete. I reviewed the records regarding all the problems they're having with the forming. I've reviewed the records regarding changing four contractors, trying somebody to get out there each time. And when you array all of those facts over a line of balance that shows the rate that they're pouring foundations, in my opinion, two reasonable people could have a disagreement about maybe whether it's, you know, ten days or 12 days, but I don't think two reasonable people could have a different opinion about whether it's one day or 40 days.
Q. Where is this analysis set forth in your report?

Page 115

A. It is discussed in the text.
Q. Could you point out -- you've referenced that you intend to testify with regards to the analysis. And can you point me to where it's specifically discussed in your report?
A. In the schedule analysis section. And there's a full discussion of it in the building slab section.
Q. The building slab section is the engineered fill section? Is that the section you're talking about?
A. Well, at Exhibit 5 to Section C schedule analysis, we list some of the event. And I think Mr. Beach has found a couple of times when we should have included an event in a clause that we did not, but it's certainly in other parts of the report where that's listed. In the building foundations, we discussed the delays that occurred during that period, and we go further to state that both the government and Roxco agreed that there was a delay. So there's not a question about whether there is. There's just a question about the quantification of it.
Q. I'm trying to get to these specific items and determine whether we can quantify these.
A. Well, I'll volunteer this. It may help you.

Page 116

You know from reading our report that we have lumped a number of these things together, and we've evaluated them as a group. And we've not attempted in this report to provide you with a specific number of days that we've attributed to each one of these events. And many of them overlap. Many of them, the records for it, you know, make -- require me to make a judgment in that regard. And to the extent that I have made a judgment, it has been based upon a thorough review of the records. And at trial, I will explain what I did and why I grouped them together and how I arrived at --
Q. Well, if you're going to do it at trial, I'd like you to do it now.
A. It's no different than what's said in my report.
Q. So all of the analysis is set forth in the report that you described?
A. I believe that it is.
Q. Now, let's turn to subparagraph 20, if you could. This is on page Bates-stamped 0127.
A. Okay.
Q. Could you read that into the record?
A. "The government's demand that Roxco provide written warranties prior to acceptance of the buildings."

Page 117

Q. How did that result in delays for which the government bears responsibility?
A. Well, if there are buildings that are ready to be turned over or have some punch list items that need to be done, and the government says, "You know what, I'm not going to accept any warranty -- I'm not going to accept any of these buildings until I get a warranty," then there will be a period of time when Roxco is not turning over buildings as a result of not having the warranty.
Q. Now, as I understand it, this is a claim for extended overhead. Is that correct?
A. In part.
Q. If it's -- in the delay element, if there's another element, what is that element other than the extended overhead element?
A. I see your point. Well, we'd have to look at it. I think some of the direct cost claims may have a time component in them. Certainly, extended overhead is the primary -- extended field overhead, I should say, is the primary delay component associated with the schedule analysis.
Q. And the claim for extended overhead presumes that the contractor could have completed the project and demobilized but for some acts or omissions by the