Page 118

government. Isn't that correct?
A. I think -- I believe you wanted to say "could have demobilized earlier but for."
Q. Exactly. Thank you for correcting me.
How did the government's demand that Roxco provide warranties prior to acceptance of the buildings interfere with Roxco's ability to demobilize?
A. Well, you can't demobilize until you've turned over all the buildings. If you can't turn over all the buildings because the government won't accept them because they don't have a warranty -- and remember we're not talking about the end of the job. We're talking about at a point in time when either none or very few buildings have been turned over. So they're not going to mobilize for a long time after this issue comes up.
Q. Let me take a look at the analysis again. Turn back to this and see if I can make some sense of this.
Turning back to sheet -- the as-built schedule. Is it your contention that Roxco could have demobilized before it obtained warranties for the EIFS work?
A. I don't make any contentions with the regard to the relationship between the EIFS warranty and

Page 119

demobilizing. The relationship that I evaluated was the relationship between the government saying, "I ain't going to take any more buildings until you give me a warranty," and Roxco's ability to turn over buildings during that period when the government says, "I'm not going to take any."
Q. Well, isn't it true that obtaining warranties was on the critical path to completion of the project -- obtaining EIFS warranties was necessarily on the critical path to completion of the project and demobilization?
A. You've asked a question that I have some hesitance in answering directly because I think I need to read the contract. But let me attempt it this way: I agree with you that the government is entitled to warranties. We searched this contract to see if there was any requirement that the government get all of its warranties before it accepted the building. We didn't find that. So if I'm right that there's no contract provision that says I give the government the warranties before they can accept the buildings, then one can assume that Roxco has to give the warranties before they achieve final completion, not substantial completion and beneficial occupancy. In that case, it is possible for Roxco to demobilize its work force

Page 120

before it supplies final completion; i.e., warranties and other things.
Q. Your analysis assumes, in fact, doesn't it, that Roxco could demobilize prior to obtaining warranties?
A. It does not.
Q. Isn't it true that Roxco, because of problems with the EIFS subcontractor, obtained the first warranty in November of 1997 for the EIFS work?
A. I don't know that date to be accurate, but I'll just suppose for a moment that you are right. It may be in our report.
Q. Where in your report do you analyze the impact of obtaining -- delays in the warranties upon Roxco's schedule?
A. Upon their scheduling? What do you mean by that?
Q. By scheduling, I mean the scheduling of the work towards completion of the project.
A. Well, here is what I've learned from the records: The government said, "I ain't going to take any more buildings until you give me a warranty." So I go back to the contract and I say, "Did the government have a right to do that," and I find the government did not have a right to do that, and I see there's a period

Page 121

where the government refuses to accept buildings. Now, if the government -- if the government defers the process of accepting a long list of buildings for warranties, then they have delayed the acceptance process. It doesn't mean they can't continue working, but it certainly does mean they can't turn over any buildings, which is a critical path, in my opinion.
Q. Well, was Roxco furnishing to the government warranties for the buildings on the critical path?
A. For a while, yeah.
Q. When was that?
A. When they refused to accept buildings until they got the warranties.
Q. Show me on your analysis, if you would, then, where the question of warranties was on the critical path.
A. You'd have to go back and read our text here that talks about the dates that they told --
Q. My understanding -- perhaps I'm being obtuse here, or maybe it's just getting late. But I thought the as-built schedule would show the critical path.
A. Here it is. For turnover.
Q. Where is the warranty question on the critical path?
A. It is somewhere in this bar here. It's





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 122

discussed in our text, but let me say this: At the time that the warranty issue was going on, it was influencing the rate at which they could turn over the building, but it was certainly not the only government-caused delay that was influencing the rate that they were turning over buildings.
Q. I see. So what you're saying is there might have been other concurrent delays. Is that correct?
A. If we use concurrent in the context of multiple government caused delays, yes. If you're using it in the context that there was a contractor-caused delay concurrent with the government's, I'd disagree with that.
Q. So by bar, for the purpose of keeping the record straight, you're referring to the --
A. Beneficial occupancy.
Q. Beneficial occupancy. If you could, go to your report and tell me where the question of the acceptance of the warranty is addressed.
A. Section K, building inspections and turnover, page 2 of 16.
Q. What volume is that in?
A. Section K is in Volume 2 of 3.
Q. Can you point me to the section that discusses delays regarding the warranty?

Page 123

A. Page 10 of 16 in Section K. I might add that this section goes further than just discussing the demand for written warranties. They wanted the manufacturers to come out and confirm that their materials had been installed correctly, which is yet another extracontractual requirement prior to turnover.
Q. Now, so it's your testimony that the government declined inspections pending the issuance of a warranty?
A. I think the government was out there inspecting all the time. It's my contention they would not accept the buildings. I don't know that they suspended inspections.
Q. Now, in your analysis, did you conclude that Roxco could have demobilized -- does your analysis assume that Roxco could have demobilized prior to providing the government warranties?
A. I don't think Roxco could have demobilized.
Q. Okay. So it's your opinion, then, that Roxco couldn't have demobilized until the warranties were provided to the government. Is that correct?
A. Correct.
Q. Under your analysis, did the government delay Roxco in obtaining warranties?
A. Yes.

Page 124

Q. How?
A. Through their extracontractual communications with the EIFS material supplier.
Q. Where is that in your report?
A. It's in the same section. It's on page 11 of 16. Bottom of the page.
Q. My question is: In this analysis, how did the government in any way interfere with Roxco's ability to obtain the warranties?
A. Well, there was a payment dispute between a subcontractor and a third tier supplier. Roxco did not know the basis for that pay dispute. It may have been a legitimate reason for not paying them. I'm going to paraphrase here. You just read that. I didn't read it. But just to paraphrase, if I recall, the supplier calls up the government and says I haven't been paid, so the government gets involved in it and says, "Oh, my God, we need to get this guy paid, and oh, by the way, he says he's not going to issue a warranty until he's been paid." And Roxco says, "Hold on a minute. This is a legitimate dispute about who's going to be paid here. Don't hold up my project because of a pay dispute at a lower tier sub than a material supplier."
And then Roxco got a lawyer involved in it, and the lawyer said what the government is doing is

Page 125

wrong. They don't have a right to get involved in that. And it was an issue beyond my expertise, but it appears clear from the record that the government's introduction of themselves into this issue contributed to the delay in getting the warranties.
Q. When was the work completed -- EIFS work completed by Roxco so that the contractor -- so that the supplier could issue the warranty?
A. Well, when you say that, there is an assumption that there is a warranty about materials or about installation, and the answer to your question is going to be different depending on which building that they're looking at. They had 89 duplexes -- excuse me -- 86 duplexes and 49 garages turned over, so the date that they're ready is going to be different for each one of them.
Q. Well, my understanding is the first warranty was issued in November of 1979. Is that your understanding?
A. That was way earlier than I understood. I was still in South Carolina in 1979.
Q. 1997. Thank you. Is that your understanding or not?
A. You know, I need -- what kind of warranty are you talking about? Are you talking about a material





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 126

warranty, an installation warranty?
Q. I'm talking about the warranty the government insisted that Roxco provide prior to acceptance of the buildings.
A. Well, let's assume that you're right, that it's November of 1997.
Q. Okay. Well, this -- the dispute that you've referenced here regarding payment started in October of 1996. And I guess here your text itself indicates that on November 30th, the EIFS warranty for Building 2759 was received and the building was accepted on December 24th, 14 months after the first inspection. So that's the sequence as you understand it?
A. Bingo. Isn't that a coincidence?
Q. When was the EIFS work completed on the other buildings so as to permit the issuance of a warranty, based on your analysis?
A. On the other buildings?
Q. We've gotten this building, according to your records, 25 -- 2759 accepted. And my question would be: When was the work completed -- the EIFS work completed -- on the other buildings such that warranties could be issued?
A. I don't have that committed to memory.
Q. Now, it's your testimony, isn't it, that

Page 127

Roxco couldn't have demobilized until all the warranties were issued?
A. That's not my testimony. Typically, demobilization is an activity that's associated with physical work at the job site. It is not an activity that's associated with paperwork that's provided by the contractor to the government.
Q. Now, your analysis didn't -- let me see if I can't see which line it is concerning this EIFS work.
A. Fifteen.
Q. On line 15 shows this EIFS work continued, in fact, up through -- what's that? June of 1999?
A. I think it's May, isn't it?
Q. Either May or June of 1999. Who performed an analysis of the work that was done, you know, if you would, to the right of the critical path on line 15?
A. Jeff and I.
Q. Okay. And what specifically -- what specific analysis did you perform of that work?
A. I'll remind you that you asked me that same question this morning and it took about 20 minutes to answer it and I'll repeat it again if you'd like.
Q. I'm trying to get to the question of the government's responsibility for the -- how a determination was made that the government was

Page 128

responsible for that work and the data you had available to make that determination.
A. I recall answering that question. I'll repeat it if you like.
Q. If you could summarize it. Did you personally go through all the project records and determine that all that work was the responsibility of the government?
A. Well, as I mentioned to you this morning, I never concluded that all that work was the responsibility of the government. What I said was there was original contract work that had to be done that was the responsibility of Roxco and its subcontractor. There was legitimate corrective work that was the responsibility of Roxco and its subcontractor. There was legitimate repair work that was the responsibility of Roxco and its subcontractor that was made more difficult and delayed as a result of the government's flawed inspection process.
Q. Now, does your analysis assume that all the EIFS work could have been completed by August of 1995 as shown by the depiction -- if you would, all the work to the right of the -- where you've designated as the critical path on what's been marked -- on your as-built schedule?

Page 129

A. Absolutely not.
Q. Explain why, if you would.
A. Because it is physically impossible to install EIFS on 89 buildings in three weeks. And there was never a plan to complete it during that time frame, and there's no necessity including that it has to be done that quickly in order for my analysis to be accurate.
Q. Well, the government determined that it would not accept the buildings until the EIFS work was warrantied. Is that correct?
A. Correct.
Q. And in order for the government to accept the buildings -- in order for the government -- in order for Roxco to obtain the warranty, the EIFS work had to be complete. Is that correct?
A. I'm not sure about that.
Q. Well, does your analysis assume that Roxco could obtain the warranty while EIFS work was still ongoing?
A. Well, they did. I don't think they issued a warranty on every building on this job. I may be incorrect about that, but I believe you may have a warranty for a few buildings, and then you have a general warranty for the whole installation. And if

Page 130

you know differently or somebody else in this room knows differently, I ask you to correct me on that.
MR. GROAT: Why don't we take a break?
(OFF THE RECORD)
BY MR. GROAT:
Q. In the course of performing your analysis in preparation of the as-built schedule, did you consider the position that Roxco had previously taken with regards to problems with the performance of Cheneyworth?
A. Yes.
Q. What and how did you consider that in your analysis?
A. It's fully described in our report that what we did is this: We could see that Cheneyworth was causing problems, doing substandard work, didn't have enough people on the job, fights between the general contractor and Cheneyworth. They clearly were responsible for problems. And at the same time, we could see a long list of government-caused delays occurring concurrently. And I couldn't in good judgment say that any of that time period was solely attributable to either Cheneyworth or to the government, so I ascribed it as all concurrent.
Q. Now, referring to your reconciliation of

Page 131

delays along the critical path, I Bates-stamped it 0143. I think it's Tab 5 of the schedule analysis in your book.
A. Okay.
Q. Now, you just described problems with Cheneyworth's performance, and let me invite your attention to line 3 there. Could you read across that line and tell me what the various dates represent?
A. You are referring to the framing?
Q. The framing line, yes.
A. Framing, Roxco's planned schedule 6/1 to 7/14 for being critical. Duration of 44 days. As-built schedule critical for 47 days. Net delay for that particular activity three days. Cheneyworth performance problems three.
Q. What does the cumulative -- cumulative refers to the number of total days the project had been delayed?
A. Through that date, yes.
Q. So you attributed three days of delay on the critical path to Cheneyworth performance problems?
A. No, sir. I attributed a lot more than that. I attributed three solely as a result of Cheneyworth.
Q. Based upon your analysis, how much delay on the critical path was attributable to performance

Page 132

problems by Cheneyworth?
A. I think it's about 135, 138 days.
Q. And can you refer me to that section of your schedule analysis?
A. I will try. On page 6 of 10 in Schedule Analysis Section C, the penultimate paragraph begins, "In our opinion."
Q. Yes. I'm there. My question was how much of the delay of time was attributable to performance problems by Cheneyworth on the critical path.
A. This answers your question.
Q. This says 135 days was incurred during -- you say during the installation of framing, installation drywall and interior finishes?
A. Read the next sentence.
Q. How did you determine the 135 days were caused principally by Cheneyworth?
A. I didn't say principally by Cheneyworth. I said that they were concurrent with government-caused delays. And it was determined by calculating the amount of delay that incurred -- that was incurred during the performance period in which Cheneyworth was influencing the speed of work, 135 days. And by review of the records, I was able to determine that the contribution between Cheneyworth and the government

Page 133

could not be segregated reliably, so I concluded that they were concurrent.
Q. Can you explain to me the derivation of the 135 figure?
A. Yes. It is the difference between the plan duration and the actual duration of criticality of framing work.
Q. Is that a total delay analysis for the purposes of attempting to except out the Cheneyworth work?
A. Again, we have to be careful in how one uses the term "total delay." There's a context in which it could be used that I totally disagree with. But if one said, "Mr. Pearson, did you calculate the difference between the length of time that Roxco's schedule showed framing to be critical on its plan schedule and the length of time that framing was actually critical and then attribute that difference to Cheneyworth and the government," the answer would be yes. And if you elected to characterize that as the total time, I would agree with it. But again, you have to be careful because some people use the word "total time" in a context with which I would not agree.
Q. I'll go back. I'll have the deposition transcript and I'll have the benefit of your





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 134

explanation, so hopefully, I won't be one of those.
Now, in continuing to explain to me this diagram, can you show me how the 135 days figure into your as-built schedule, if you can?
A. Let me first direct your attention to two figures at Exhibit 5. You see at the end of foundation, the cumulative of 55 days of delay has been incurred along the critical path, cumulative delays, through the completion of criticality of foundations on 7/25. There's 7/25, and we see that -- we show foundations are no longer critical, and the criticality moves down to framing. Right?
Q. Right.
A. Okay. Then you see that -- we calculate the cumulative delays through framing, through MEP rough-ins, through insulation and drywall and interior finishes. And at the end of interior finishes, we're 190 days behind schedule. Here's interior finishes. Okay?
Q. Okay.
A. Now, we were able to determine through the records that although this was the critical path, the pace at which this was proceeding was caused by several factors, including Cheneyworth's slow performance in this activity.

Page 135

Q. By this activity, you're referring to 14?
A. To 14, and that's what we say here in each of these explanations given under clauses. For instance, insulation and drywall. Insulation and drywall was paced by the speed of framing work which was delayed by flawed contract documents, including the lumber spec, slab levelness, and edge condition issues related to flawed contract documents, flawed government inspection criteria, vapor barrier specifications, and Cheneyworth performance problems.
Now, let's read further into interior finishes. Interior finishes were delayed by the same issues that are listed under insulation and drywall, plus the government's requirement to sand out naturally occurring grain in the trim lumber. So we said, "Here is the critical path, these are the activities that are critical; but the speed at which these are moving are being influenced by these activities above it."
Q. Well, my question went to the -- where is the 135-day delay attributable to Cheneyworth reflected in the analysis in your as-built schedule?
A. It is here, it is in this text in the schedule analysis, and it can be visually observed as the difference between 7/25 and 10/21 -- excuse me, 10/21/96. That says 10/27. We have a discrepancy

Page 136

there. I think this should be to 10/27. I'm referring to the complete -- give me just a moment.
Q. Please take your time.
A. Looks like we might have a date discrepancy between what's shown -- a date that's listed on the as-built schedule and what's listed in Exhibit 5. I'll have to check that.
Q. Okay. I'm just trying to -- I go through this and I try to come up, well, how do I get the number 135 and I just can't seem to.
A. I hope you'll agree that I just explained it to you.
Q. You did. The trouble is when I do the -- when I go through the tables, I can't come up with 135 days is the problem.
A. Let me show you how to do that. Real easy. What's the cumulative delay that has accrued through the interior finishes?
Q. Interior finishes you identify 190 days.
A. That's right. Now, before this period started, the period in which Cheneyworth is influencing the speed of work, what's the cumulative number of days of delay?
Q. Fifty-five.
A. What's the difference between 190 and 55?

Page 137

Q. That's how you derive the figure. That's the question. That's what I was looking for. Just the difference between the interior -- and so you're saying the delay is -- and you're attributing all that delay -- I believe you used the phrase "delays caused principally by Cheneyworth." "Concurrent delays caused principally by Cheneyworth." Is that correct?
A. Well, with respect to the concurrency for which Roxco is responsible, it's Cheneyworth.
Q. I'm sorry. I lost that.
A. The term "concurrent delays" is sometimes misconstrued. For purposes of our discussion, we'll just -- we'll define concurrent delay as one delay caused by the government, one delay caused by the contractor occurring concurrently. Both of them having an influence on the critical path.
So in this paragraph, I say Cheneyworth is causing problems on the job. The government is causing problems on the job. I can't segregate the two, so I call it a concurrent delay. If the government is not entitled to any liquidated damages, and Roxco is not entitled to recover any time related on that.
Q. Now, also on page 128, there's a statement: "To be conservative, we further adjust the remaining 680 days of calendar delay during Roxco's tenure by





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 138

15 percent to allow for other contractor-caused delays that are concurrent with the government's delays."
A. Yes.
Q. What are those delays?
A. They are the correction of defective work for which Roxco was responsible. The length of time that Roxco actually expended correcting those things is far longer than it should have been, in my opinion, because of the government's flawed inspection procedures. But in fairness, if it was wrong and it needed to be repaired, the government ought to have -- to not be charged for the time that it would take Roxco to repair those things under normal, acceptable inspecting conditions.
Q. What methodology did you utilize to review the corrective work that Roxco performed?
A. We -- the records on this are quite voluminous. There are two-way memos. There are inspection reports. There is correspondence. There's just a ton of data available. Our first job was to pull all of that together, and then we segregated it by type of work to see what they were doing. And then we looked to see how the government was expecting it, which was one of Roxco's principal claims during the course of the work. And we found that the government

Page 139

was doing one thing that we thought was actionable, that it was -- entitled Roxco to additional time and additional compensation, and that is this: The government steadfastly refused to accept any work any time during the course of work.
In other words, their inspectors were told, "You inspect it, you find something wrong, you tell them about it, but don't you ever, don't you ever accept anything." And what that allowed the government to do -- and they used this liberally -- is come back time and time and time again and say, "Whoops, I want to look at it again." That is a flawed inspection process. It is -- in the several hundred jobs I've been involved in, I don't recall ever seeing it done -- utilized to the extent that was utilized on this project, and it's just clearly wrong.
Q. Okay. Is it -- was it your conclusion in performing this analysis that the government had the contractual obligation to accept work as it was performed?
A. I want to define "accept work."
Q. Please do and be as precise as you can.
A. The government had four or five inspectors out on the job every day. They were out there -- there's no question they were out there looking at the

Page 140

work. There's no question that they identified deficiencies. It is my contention or my opinion that the government was obligated to either A, tell the contractor to stop and fix it or B -- and B, not allow the next item of work to be installed until it had been fixed.
What the government did instead is occasionally point out things, but then allow the work to continue. And then when they got to the end, they said, "Oh, no, we have to go back and do this all over again."
Q. Okay. So where is -- if you could -- and I know I've seen this before in your report, but you discussed this. Could you point out to me where this is in the report? And I want to see how this factors into the schedule analysis, if you could.
A. I think it's scattered throughout various sections. It's in the building turnover section probably more so than in any other section. I'll go about this any way you want to, if you want me to read it or just talk about.
Q. I'd like you to specifically point to where it specifically discusses this in the report because what I want to see is how this impacts on the schedule analysis.

Page 141

A. Okay. Specifically Section K, "Building Inspection and Turnover," starting on page 2.
Q. This will be Volume 2. Right?
A. This would be Volume 2.
Q. Okay. And which section?
A. Section K.
Q. What page of section K?
A. Well, it's -- the whole section addresses this. If you're talking about specifically with respect to the government's refusal to accept each stage of the work, that begins on page 2.
Q. Okay. Is it your contention, then, that the government had a contractual obligation to inspect work -- inspect and accept work as it was performed?
A. They didn't have to accept it if they -- if they deemed it deficient. They had an obligation to define exactly why it was deficient, describe what had to be done, monitor the work, confirm that it had been done, and approve the work at that point. Now, where the government broke down was they were fully willing to tell Roxco what they did wrong. They were fully willing to go by and look at it. But even after they looked at it, they said, "Hold on. I'm not accepting this. This is not -- I can't accept this work."
And Roxco tried time and time again to get





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 142

the government to do what is normal industry practice of signing a document and saying, "I've inspected this. It's okay. You're not going to have to come back and be subjected to yet another inspection on it." And they refused to do it time and time again. And they -- the government even wrote a very clearly worded memorandum specifically instructing their inspectors to conduct the inspections in that fashion.
Q. I see you're going through the documents.
A. I was looking for that memo that the government wrote. I can't remember what exhibit this is, dated July 17th, 1996.
MR. WILLIAMS: That's part of Exhibit 3 to this section of his report.
MR. GROAT: Okay.
A. Here it is.
MR. WILLIAMS: Second page.
BY MR. GROAT:
Q. You said that standard industry practice provides that inspectors on the job have the authority to accept work as conforming. Is that correct?
A. Absolutely.
Q. Are you aware of the standard practice in government contracting?
A. I've been involved in a lot of government

Page 143

contracting work and I've never -- it's been my experience in all of those jobs that the government employees were fully willing to participate in inspections, sign off on forms, and agree that the work as acceptable before the follow-on work continued. And in all the construction work that we do, there are milestones that have to be achieved and inspections made before the next element of work proceeds. And even in homes that are not built for the government, you have to get a foundation inspection, and the inspector comes out there and looks at it and says pour it and he doesn't come back. Then he comes in when the MEP has roughed in and he leaves a green card that says you can install drywall in this building, and he don't come back. And then he comes back to it a couple of other times, and he doesn't come back any time. He signs off on it and says it's okay.
Q. If you could, explain to me the impact that the government's -- that the government's refusal to accept work when it was performed had as far as the as-built schedule.
A. We could be here an hour or two on this one, but I'll give you a good example. You see all these yellow lines?
Q. You're referring to yellow lines on the

Page 144

as-built schedule which you've identified as rework, yes.
A. That is rework that was done because of this memo where the government said we're not accepting anything. So after the contractor gets to 100 percent -- you see these little red triangle bars here? -- the government goes back out there and says, "Oh, by the way, I don't like what you did right here. Tear it all off and do it again. I don't like what you did. Go repair it again. I don't like these floors you put the tile on. Pull the tile up, and have your man come back out there and rub on it for a while." That is the kind of thing that I'm talking about. It is untimely inspections. It is completely dysfunctional in my view. Just to quote a word from Mr. Beach here, it's "bizarre."
Q. Now, you've indicated then -- is it your testimony that most of the rework that's shown on the as-built schedule was necessitated by the fact that the government did not accept work when it was performed as we've been discussing?
A. It was my representation to you that all the yellow on here was created by that -- there were other instances where rework was done, but there's no yellow on here. But we've only yellowed the bars that

Page 145

indicate that work was -- that rework -- was done after completion of the activities when it should have been inspected and approved as the work continued.
Q. Your analysis assumes, then, that all the work shown in yellow as rework on your as-built schedule is the responsibility of the government because it did not conduct inspections as the work -- conduct inspections and issue acceptances as the work was performed. Is that correct?
A. You know, I will defer to the government's explanation of what it did. And you have kind of a long question there with several different subparts of it, and some of them I could agree with and some of them I couldn't. I'll let the government explain why they did it.
But my point is simply this: The government issued a directive to their inspectors, "You ain't going to accept nothing. Roxco sends you a form over that says sign this thing, don't you ever sign that thing. What you do is you keep looking at it, you keep telling them what's wrong. But I don't want you to ever remove the right of the government to go back and look at anything on any building." And as a result of that, when they got through installing the work and the government paid 100 percent, Roxco spent millions of





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 146

dollars, millions of dollars doing rework again. Now, even if it was legitimate rework, it should have been caught when the work was being performed, not after it was completed.
Q. What, if any, contract provision required the government to inspect after completion of the particular work?
A. Would you restate that again?
Q. What, if any, contract provision required the government to inspect and accept work after the completion of the particular activity?
A. In the punch list phase, they can prepare punch lists. The idea of a punch list at the end of a job is that the work is completed and the government can come out and run a punch list. That's common. And there is a provision in this contract that discusses that punch list and says it's going to be 14 days long. That's the provision I think you may be referring to. And there's no problem with that. That's a garden variety provision that's in virtually every contract: AIA, Corps of Engineers, Veterans Administration.
Q. Well, perhaps I can break it down into smaller questions. What, if any, contract provision required the government to inspect after every -- after the completion of every step of the construction?

Page 147

A. I can't quote a provision. I'll go look for one. But I'll tell you that as a construction man, I don't recall in my 25 years of ever seeing inspections conducted in this fashion.
Q. What, if any, contract term required the air force to accept work after the completion of particular construction activities?
A. Again, I'd have to go look for them. I don't know that there's one there. I can tell you that -- I'm repeating myself here -- never seen anything like this.
Q. In the case of a government contract -- in the case of this contract, who had authority to accept work on behalf of the government?
A. You would have to tell me that because it's a matter of bureaucracy of the government. And typically, it's the inspector because if you don't have an inspector out there that has the ability to inspect the work and determine whether it's right or wrong, you've got the wrong man out there.
Q. In connection with the EIFS work, are you aware of claims that Roxco made against its EIFS subcontractors?
A. I am.
Q. What consideration did you give

Page 148

representations made in those claims in your delay analysis?
A. It's explained in our analysis.
Q. Could you point to that, please? I have the Subsection C. I think that would be Book 1.
A. First it's included in the 15 percent that we've attributed to Roxco. So you multiply, I think, 633 days or something times 15 percent and you get like 80 days. So it's included in that 80 days. Also in our costing report, you will see that Roxco incurred a cost of some -- several, 3 to $400,000 in eaves cost even after recovering $1 million in the lawsuit, and we've attributed none of that to the government, 100 percent to Roxco.
Q. Are you aware of representations that Roxco made during the course of the controversy concerning the EIFS regarding the impact of contractual omissions by the EIFS contractor as it related to delay incurred by Roxco?
A. I am.
Q. What were those contentions?
A. They said that the EIFS delayed the job.
Q. How long did they say the EIFS delayed the job?
A. I think a lawyer wrote a letter and said a

Page 149

bunch of days.
Q. How many days?
A. I don't have it committed to memory. Mr. Beach has it in his report.
Q. Did you review the analysis upon which Roxco relied in making that representation?
A. No, I did not. I don't normally use lawyers' letters as a basis for my schedule analysis. I like to do my own.
Q. Is your delay analysis consistent with the conclusions expressed in the correspondence prepared on Roxco's behalf with regards to the delay analysis?
A. With respect to Cheneyworth and interior/exterior causing delay, yes. With respect to the quantification of those delays, no.
Q. Okay. Is it true, then, that Roxco attributed -- how much did Roxco attribute to Cheneyworth in the arbitration in that case? Do you recall?
A. I don't recall.
Q. Did you review the basis upon which Roxco made those representations?
A. No.
Q. It's true, isn't it, that the representations that Roxco has made concerning delay in the Cheneyworth





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 150

matter and in the EIFS matter are inconsistent with the conclusions you reached in your delay analysis?
A. With respect to duration. Not with respect to causing delays.
Q. Are these differences significant in your --
A. Yeah, they are. And I would challenge someone to develop a critical path that demonstrates what was written in those letters and explain and prove that their lawyers were right.
Q. I believe it's your testimony -- if I'm misstating it, it's getting late in the afternoon. I believe your testimony was that it would be unlikely that Roxco would have demobilized in the absence of the issuance of warranties and the full acceptance of the buildings. Is that correct?
A. No. Remember that this warranty issue came up in the -- when they first started turning over buildings. And they had to stay there until they turned over all buildings. They couldn't demobilize after they just turned over one or two buildings, which was the issue that was the issue du jour, so to speak, at that point in time. So the whole concept of demobilizing and the warranty just don't fit in my way of thinking about this.
Q. Under your analysis as reflected in the

Page 151

as-built schedule, when would Roxco have demobilized in the absence of errors and omissions attributable to the government?
A. I think I have that. Where is my -- 585 days earlier than November 1998 because it --
Q. What date would that have been, then, that you calculate the day --
A. We would have to run it through a calculator, but it's 238 days later than the original contract duration.
Q. The original contract duration you calculated to be in October of 1996. Is that correct?
A. Sixteen months -- it's whatever the -- we had a summary of the as-planned schedule out here a few minutes ago. Where is that?
Q. I think that's an attachment in the scheduling appendix to your report.
A. You are right. The question is can we find it.
The original contract duration was 495 days, and the original contract completion date was August 5th, 1996. Now, we're saying but for the government-caused delays solely, they would have finished 585 days earlier than they did or 238 days later than 8/5/96.

Page 152

Q. You'll have to be patient with me and go to the tables and explain to me the duration of the dates.
A. Roxco's planned schedule, Roxco's duration 495. The last date is 8/5/96.
Q. Is that shown --
A. 8/5.
Q. Is that shown then on your as-built schedule?
A. No, sir. But there was a -- there is a schedule that shows -- this is just as-built. It's not as-planned. There's another exhibit that does what you want, and we will find it if you'll be patient with me.
Q. I think I know the one you're talking about.
A. Here we go.
Q. The as-planned schedule summary?
A. There you go.
Q. Based on the as-planned schedule summary, you concluded that completion would have been 1996, August 5th?
A. You're talking about but for the delays, the government-caused delays?
Q. As-planned. In other words, as planned without any delays?
A. As-planned is just the original contract, which is, of course, without any delays.
Q. Was I correct or was I wrong when I stated

Page 153

that?
A. I tried to be real careful here. The original contract duration was 495 days, which yielded a contract completion date of August 5th, 1996.
Q. Okay.
A. Your question to me is but for the owner-caused delays?
Q. Yes.
A. When could Roxco have finished?
Q. Yes.
A. All right. The government is solely responsible for 585 days. The job was actually completed 833 days late. Somebody help me and make sure I'm not missing something. Hold on. I want to make sure I'm right.
One other footnote: We are working solely with Roxco's duration on the job. AIG came on after Roxco, so the date I give you about when Roxco left is the day they left the job, not when the project was completed.
Q. I understand from your as-built schedule, Roxco left the job on November 5th, 1998. Is that correct?
A. That's correct. Now, Roxco was out there for a total of 1,318 days.

Q. Okay.
A. All right. That yields a delay if you do 1,318 -- put minus 495.
Q. Which is the original --
A. That's right.
Q. -- calculation?
A. That is a delay of 823 days.
Q. 800?
A. Twenty-three days.
Q. Twenty-three days. Total delay?
A. Total delay. Now, we say that Roxco is entitled to recover extended overhead for 585 days. 585.
Q. 585 extended overhead?
A. That's correct. Now, if you subtract that from that --
Q. Right.
A. We say Roxco and the government are jointly responsible for like 238 days.
Q. My question is really simplistic, and let me tell you right where I'm going and maybe you can solve this: I just -- I want to know with regards to the calculation -- and I'm going here to the warranty question -- does Roxco's claim for extended overhead include periods of time during which they hadn't



obtained a warranty for the EIFS work?
A. Yes, but only that period when the government refused to accept buildings because they had not furnished a warranty. Now, there may have been other periods where Roxco was trying to get the warranty and they didn't get it; but the government was nonetheless continuing to accept buildings.
Q. So what I have to do, then, is add 585 days to your 8/5/96 figure, and that will give me the inclusive dates for which Roxco seeks extended overhead?
A. They don't seek extended overhead for the original contract duration. Only for this 585. It is the difference.
Q. You're taking the original contract scheduled completion date, adding the 585 days, and Roxco contends it is entitled to extended overhead until that 585th day?
A. Sort of right. There's a total delay of 823 days.
Q. Okay.
A. In that 823 days, there are 585 of them and they're not necessarily consecutive like starting on Day No. 1 after the original contract completion date or necessarily the last date. It's just that during



that 823-day period, there is a period of 585 days for which the government bears liability for extended overhead.
MR. GROAT: We'll take a quick break.
(OFF THE RECORD)
BY MR. GROAT:
Q. Let me see if I can wrap up this extended overhead.
Your analysis is that the original project was scheduled to be completed on August 5th, 1996. Is that correct?
A. Yes.
Q. You have identified under your analysis the project was delayed 833 days after that. Is that correct?
A. That is through Roxco's tenure.
Q. Okay. And of the 833 days --
MR. WILLIAMS: Twenty-three.
BY MR. GROAT:
Q. Twenty-three. Of the 823 days, Roxco's calculation -- you have determined that Roxco is entitled to extended overhead for 585 days. Is that correct?
A. That's correct.
Q. I believe it's your testimony that 585 days



does not represent a continuous period. Is that correct?
A. Correct.
Q. Can you give me a breakdown on the inclusive periods for which Roxco seeks extended overhead based on your analysis?
A. I think 85 percent of the delays that accrued through the completion of the foundations and then 85 percent of the delays that accrued after the turnover period began.
Q. Now, if you allowed -- isn't it true that the claim for extended overhead would be a continuous period representing the delay from scheduled completion to the adjusted date to reflect all the delays?
A. Define "adjusted date."
Q. Well, I'm struggling with the notion that period of extended overhead is not continuous because in my, you know, simplistic thinking, in a claim for extended overhead, you look at the date the contractor contended that he would have finished but for government-caused delay. And you look at the date that he actually finished given government-caused delay. You subtract the two, and the period is a continuous period. And I've understood you to testify that in this case, it's not a continuous period.





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 158

A. As you just defined it, I agree with you. It's a continuous period. The difference is -- you're exactly right in the way you just defined it. But when you look at the as-built schedule, there was a total delay duration there like 830 some-odd days. And there's 238 of which we don't request additional -- Roxco has not requested additional extended overhead.
Q. So your version of it being two periods constitutes the fact that they're two periods in which you've identified delays, and then you compute extended overhead based upon the scheduled completion date and adding the total delay claim. Is that correct? Have I not gotten it again?
A. It's close enough. It's a matter of record. It's close enough.
Q. If you could clarify. I'm struggling with the concept because I want to understand what the inclusive period is. How have I misstated it?
A. When you said earlier that -- you said the contractor says he could have completed the job but for the government-caused delays on this date. He actually finished it on that date, and the duration is 585 days. I agree with that completely. But the 585 days may not all be back-to-back delays one right after another in one period. They were incurred over two or three

Page 159

different periods. Some at the beginning of the job: hidden concrete, wrong layout, foundation building problems. And the other more significant one at the end of the job in the building, turnover period. You know, the building turnover period lasted like 630 -- 600-plus days. And we're not claiming all that 600 some-odd days. We're only claiming that 85 percent of the difference between the planned and actual duration for that turnover period. Does that help?
Q. Yes, it does. And I think it was have just a case of miscommunication. Thank you for your patience.
Let's turn to Volume 3 of your report, if you would, please.
(OFF THE RECORD)
BY MR. GROAT:
Q. Okay. Let's turn to page -- your page 5 of 19. We've Bates-stamped that as 0914, "Soil Density Tests."
Now, you indicate here that the government interpreted the specifications to require 416 tests. Roxco actually performed 555 tests. On what basis do you conclude that in that section, Roxco is entitled to recover its cost to perform 139 additional tests?
A. In POO11, the government said, "Roxco, you should have done 416 tests. You only did 268. You owe

Page 160

us the difference between 416 and 268."
Q. Does that solely concern POO11, this section here?
A. It does.
Q. We'll move on. "Reconstruct 27 building pads." You state in that section, "In October 1995, the government demanded Roxco to remove and reconstruct all building pads that had not been tested as often as the government mistakenly believed should be tested." Is that correct?
A. Yes.
Q. Who for the government demanded that Roxco remove and construct all building pads?
A. I don't have that committed to memory.
Q. Are there any documents here that would clarify that? I don't have any objection at all to your conferring with Mr. Montroy or anything else.
(OFF THE RECORD)
A. We don't have it in our report. We believe it's in the records. We'll look for it.
BY MR. GROAT:
Q. In the effort of moving things along, you've volunteered to provide me certain citations to documents in connection with your analysis. If I could ask if this is located, that I be provided the document

Page 161

as well, I'd appreciate it.
Did you conduct an analysis to determine whether the testing Roxco performed actually was sufficient as to these building pads?
A. Sufficient or deficient?
Q. Sufficient.
A. We did.
Q. And what was that analysis? What did that analysis consist of?
A. We reviewed all of the inspection reports on those pads. And my -- again, I'm operating here from somewhat of a fuzzy memory. But my recollection is that there were some density tests that failed, but there were subsequent density tests made that showed that they passed. And that there were sufficient tests made to demonstrate that the pads had been constructed properly.
Q. Is that -- is the documentation concerning what the tests Roxco performed available as part of your report?
A. No, it's not. But we have an assembly of the test reports. As a result of the questioning yesterday of Mr. Davis and Mr. Carmichael, the questions about what density standard the soil was tested to and they couldn't produce for you the document that demonstrated





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 162

which testing criteria was used, we had our office deliver those to us today, and we have them here.
Q. If you want to clarify, in connection with this building pad, what density test was Roxco utilizing for the purposes of complying with the contract specifications? With some help from Mr. Montroy.
(OFF THE RECORD)
A. Well, you may be interested in this. You were interested yesterday in what compaction density was required and what criteria was being used: 95 percent, and it shows that ASTMD 1557 here.
BY MR. GROAT:
Q. Now, the issue here is the allegation that the government incorrectly directed Roxco to rework? Excuse me.
A. That's correct.
Q. Remove and reconstruct all building pads that had not have been tested. Is that correct?
A. Well, I don't think it was a matter of not have been tested. Not tested in accordance with the government's interpretation of what they should have done, 6 inches per lift, D1 -- blah, blah, blah.
Q. What testing was Roxco performing on these pads?

Page 163

A. Just a moment.
(OFF THE RECORD)
BY MR. GROAT:
Q. So, I guess my question goes to: You performed an analysis to determine that Roxco had, in fact, performed sufficient tests on the building pads?
A. Yes.
Q. Who did that analysis?
A. Mr. Montroy. And just a few minutes ago, you mentioned that we agreed to provide you with the test reports on the first time that they were constructed, and we'll do that.
Q. Okay. And that should eliminate that one if you can pull those in the interest of moving things along.
Turning to the building coordinate discrepancies. Did you make an attempt to calculate the actual costs Roxco incurred as the result of building cost discrepancies?
A. Attempt, yes. But to my knowledge, there were no actual costs maintained that -- done based on an estimate.
Q. In a case like this, would it have been feasible for Roxco to maintain actual cost records?
A. That's debatable. One man says yes, and

Page 164

another says no. But this group, and by this group, I mean both Roxco and the government -- were satisfied to use estimates during the course of work. And as such, Roxco had no motivation to maintain exact records when they were agreeing that estimates were okay.
Q. Now, with regard -- when did the government accept estimates with regards to claims in this case?
A. I'd point directly to the government's P0011 where the government itself created hordes of estimates, refused to give them to anybody for five or six years, and jammed them down Roxco's throat in the form of a unilateral modification.
Q. Are you aware of other cases in which the parties utilized estimates in this case?
A. Yes, sir.
Q. What are those?
A. Every change order that was developed, to my knowledge -- there may have been an exception or two -- they were based on estimates. And both the government's and Roxco's calculation of the hidden concrete was based on estimates. And the government collected $269,000 from the first contractor based on their estimate of the costs they incurred.
Q. Didn't the government utilize estimates because Roxco failed to provide actual cost data?

Page 165

A. No, sir. It's common practice in the construction business to use estimates.
Q. What was Roxco's contractual obligation in this case with regards to the submission of request for equitable adjustment?
A. To provide a reliable basis for calculating a reasonable damage. It does not require precision. It just needs to be reasonable for the scope of work included.
Q. Is it your contention that Roxco had no contractual obligation to provide actual cost data for request for equitable adjustment?
A. You know, you're getting me in the FARs there. I believe that the Fars state that the government has a right to audit, and they can look at the costs that were incurred. But I don't believe that the fact that the government has the right to review by audit is -- can be interpreted as meaning that the contractor's obligated to use its actual cost to price claims.
Q. So the answer to my question, then, is no?
A. Restate your question.
Q. The question was: Is it your position that the contractor has no obligation to provide actual cost data?





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 166

A. That's not my position.
Q. Is it your position that the contractor has no contractual obligation to provide actual cost data for requests for equitable adjustment?
A. That's not my position.
Q. Is it your position that the contractor can rely on estimated costs rather than actual costs in submitting requests for equitable adjustment?
A. It is.
Q. With regards to the issue of hidden concrete addressed in page 8 of 19 and 9 of 19 of "Pricing Claim," did you calculate Roxco's actual cost incurred as the result of the hidden concrete?
A. By Roxco, do you mean Roxco alone or Roxco and the subcontractors?
Q. I mean in this case Roxco and its subcontractors for the work performed.
A. The work that we did in that regard is explained on page 8 of 19 in Section L.
Q. Did you examine records maintained by Roxco with connection to the actual costs incurred in disposing of the hidden concrete?
A. Again, are you talking about just Roxco or Roxco and Striebeck?
Q. First, Roxco.

Page 167

A. I don't recall that Roxco set up a separate code to do that. My recollection is that it was -- that their calculation was made by estimate. I believe that at the time that they discussed costing for this some, but not all, of the hidden concrete had been removed, and an allowance was made for a portion of the concrete that they expected to be discovered in the future. And some, in fact, was. And I believe that it was estimated, and I recall the government had a map or some document that identified where all this stuff was and they gave it to Roxco and the two of them bantered back and forth about quantities and then they came within maybe just a few thousand dollars of each other and then the government issued POO11 for 224,000 and then went and collected 269 from the contractor that actually didn't remove it. So it seems odd to me the government would be so interested in Roxco's pricing of this when Roxco should ask the question on what basis did the government prove that it was able to collect $269,000 from the contractor that didn't remove it.
Q. What review did you conduct of the Striebeck records regarding the cost that Striebeck incurred when moving the concrete?
A. There is an invoice from Striebeck at Exhibit 4, which lists the amount of money that they

Page 168

requested, and this adds up to about $195,0000.
Q. Did you review the underlying -- any underlying documentation to determine whether that invoice was correct?
A. We looked at the conversations back and forth between the government and the contractor and concluded that they agreed that they were playing music off the same sheet, as we say in Alabama, or their numbers were in the same ballpark, as we also say in Alabama. So there was a general agreement that was about what it was worth.
Q. So where are those conversations reflected?
A. They're in the documents between the government and Roxco. And there are maps available. And this is one of the issues about which there's a bunch of documentation on cost and negotiations.
Q. I'm trying to get to how you calculate Roxco's total entitlement regarding the hidden concrete claim.
A. I really don't have any more to add than what we've written here, and I believe that our text explains in detail exactly how we get to our number.
Q. You state in the opening of your report that you can't -- didn't rely upon statements in Roxco's request for an equitable adjustment. Is that correct?

Page 169

A. That is true; and by that, I meant with respect to entitlement, with respect to anything. Now, as you go through this pricing section, you're going to see where we adopted some of Roxco's pricing methodologies, and we did that because after a review, we decided that Roxco's estimate of that cost was reasonable, it's the best evidence available, and it comported with our review of the documents.
Q. My understanding is this dispute arose when the government observed that trucks leaving the site weren't filled, and that the pricing was originally agreed on a per truck basis and the government said, "Whoa, if you're going to go out of here with a little bit of concrete in the truck, we're not going to pay by truck." Then the whole arrangements that had been made by that informal resolution of the matter quickly fell apart based on distrust and what they perceived as the unfairness in paying by the truckload. And with that background, have you conducted an analysis of the actual costs that Roxco incurred in this case?
A. Well, because such a huge portion of it was incurred by Striebeck and the underlying records for that are unavailable, we then looked at the communications between the government and Roxco. And what we found was that those communications resulted in





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 170

a general agreement about the universe of money that this was worth. And from my perspective and in my humble opinion, the fact that this government collected $269,000 from a contractor that should have done it, establishes at least one value that the judge should take into consideration in deciding how much should be paid to Roxco.
Q. You indicated that Striebeck records are not available?
A. There are Striebeck records available, but, I mean, whether or not they had any truckloads, all that stuff, I don't know. And frankly, when we saw the later conversations, we decided there was no value in spending Roxco's money to look at this further, particularly when the government itself established a value.
Q. Now, is there a contingency agreement here between Roxco and Striebeck regarding amounts due?
A. There is.
Q. On what do you base that?
A. There's an agreement between the parties about that.
Q. Is that included in your report?
A. I don't believe it is.
Q. Was that a document that's previously

Page 171

been . . .
MR. WILLIAMS: You've had it. It's the liquidating agreement with Striebeck.
BY MR. GROAT:,
Q. Now, let's turn, if you would, to page 10 of 19 of your additional concrete estimate.
Now, you indicate in the last sentence of the second paragraph, "In Pearson's estimation, the total concrete required for grade beam slabs and porches was 207,665 cubic yards at a cost of $392,831. How did you compute that?
A. Mr. Montroy did a quantity takeoff.
Q. Now, did Mr. Montroy's calculations presume that the excavations for this would be -- what assumptions did he make regarding the excavations?
A. His calculations are in the documents we provided for you.
Q. Is this one of attachments?
A. No, sir. It's in the things we gave to you today.
Q. If I could take a look at those, I would appreciate it.
MR. GROAT: Could I have this marked as the next in order, please?
(EXHIBIT 257 MARKED)

Page 172

BY MR. GROAT:
Q. Could you identify 257 for the record, please?
A. 257 is Mr. Jeff Montroy's calculations of the concrete required in the building foundations for this job. And I'd like to add this, that this is one of the things we found this last weekend that we said we need to provide this to the government. And he said, "I think I might have made an adjustment that is not shown on these sheets." A slight adjustment, so the figure that you see in the report and the figure here may be a little different. But substantially, you'll be able to follow how he made the quantity takeoff for the concrete there. And we will identify for you the cause for any variance.
Q. Did his calculations assume that the excavations would be only to the actual width of beams? Or did he assume that the excavations would, in fact, reflect a tapering in order to avoid the excavations sloughing off into the bottom of the excavations?
A. If -- the calculations will reflect how he did that. And without looking at them -- if I were doing it, I would have assumed that the ditches would be dug to the exact dimensions, and then I would add a factor for waste at the end which is -- for additional

Page 173

concrete, some sloughing, that type of thing. But I'd say that one should not expect very much sloughing if you were preparing this estimate at the outset because you'd assume that the government, if they followed the recommendations for this type of soil, would let you pour within 24 hours and there wouldn't be any sloughing.
Q. Mr. Davis's testimony, I believe, was that the -- depending upon the particular type of fill utilized, it would either be more or less difficult to construct the slabs as the government specified.
A. Well, again, this is one that gets kind of complicated. But the note on the drawings say pour the open trenches within 24 hours. Now, I know as a contractor, and the engineers that were here yesterday know, and the government should have known that the reason for that note is that the in situ soils were the same as the fill. And a lot of these foundations were dug in in situ soils and they're low cohesive material and you cannot expect them to maintain their dimensions for very long. So there's a note that says pour them quick. So if the government allowed the contractor to pour them quick, there wouldn't be any sloughing. But on the other hand, if the government said, "You know, I want this thing poured monolithically, I don't care