Page 174

what's out there," there's going to be a ton of it.
Q. So in other words, if the contractor assumed that the government would require monolithic pours, he would logically estimate a larger quantity of concrete because it would be more difficult to maintain the excavations during the pouring process?
A. Yeah. And I'd add to that if the contractor assumed that the government was going to disregard a recommendation that was totally appropriate for the type of soil that existed out here and totally appropriate for the soil that was approved; then yes, you'd be right.
Q. So this presumes -- the calculations that Mr. Montroy conducted presumes -- that the government would permit Roxco to pour the beams, and then in a separate pour, pour the slabs?
A. Or alternatively allow them to form them. But obviously, the far superior means and methods would be to allow the contractor to do what this plan told him he could do when he dug in this material, and that is pour them within 24 hours of opening them.
Q. This may be just ignorance on my part. You've used the term, "Alternatively, the calculations reflect the assumption that the government would permit the contractor to form the excavation."

Page 175

Can you explain what you mean by that?
A. Well, one means and method, which is really expensive but it can be done, is to clear off the site to the elevation of the bottom of the foundations. Form up all the beams, pour the beams, and then come back and put the fill inside of it. And nobody in their right mind is going to do that. Okay.
Now, if you do that, you're not going to have any sloughing. And a bidder bidding this job is certainly not going to bid it that way because if he does, he knows he's not going to build it because the government says the man that's going to build this job is the lowest responsible bidder.
Q. So Mr. Montroy's calculations reflected in Deposition Exhibit 257 reflect the assumption that either the government will permit the pouring of beams and then the subsequent pouring of a slab, or would they reflect that assumption because it's not realistic to assume that there would be -- that the foundation would be constructed by the forms, as you just described? Is that correct?
A. That's correct.
Q. You testified that there's a percentage overrun in such cases. What percentage overrun is appropriate when you're making such calculations as to

Page 176

an estimate of the amount of concrete required for foundations?
A. Well, waste factors vary depending on the type of material that you're working with. If you're working with rocks and clays and high cohesive materials, the waste factor is going to be less. If you're working with low cohesive materials, they could be the same as clays if you pour them quickly. But if you allow them to be exposed to the weather for long lengths of time and you know you're going to have to do that, then 20 percent waste may be appropriate.
Q. What calculations does Pearson contend reasonable in this case?
A. You mean Mr. Montroy?
Q. I meant Pearson in the collective.
A. I need to look here. He doesn't recall what waste factor he used here. It may not be shown on here. These may be precise calculations, and the adjustment he made was to add waste. We just have to look at it and answer the question that we agreed to answer for you earlier.
Q. So you'll have to provide supplemental information concerning the calculations?
A. That's correct.
Q. Turn to the hand and Dixie cup excavation

Page 177

costs. You conclude, do you not, that you believe that Roxco's estimate is reasonable?
A. I do.
Q. Upon what basis did you conclude that the estimate is reasonable?
A. Before I wore a nice shirt and a tie, I wore a pair of frogans and blue jeans and worked in a -- and a T-shirt and I worked out in the field. And I myself have had to take rebar out of a foundation and take cups and shovels and get the loose material out. I have also had the unfortunate experience of having it rain a few times after we excavated the foundation but before we pour it, and we had to rework them each time. I know that low cohesive material, when you walk across it, will slough off much worse than others. And if what Roxco says comports with my own experience, their calculation of the amount I cannot verify. But given the fact that there were so many foundations, they spent hundreds of thousands of dollars more, I concluded that it's a reasonable estimate. That's all I have to work on, and that's how I made the calculation.
Q. Is there any specific methodology or technique you used in doing this?
A. None other than what I just described to you.





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 178

Q. Are you aware of the basis upon which Roxco submitted its proposal to use ML fill to the government?
A. I've seen the submission made by Striebeck.
Q. Isn't it true that the submission and the engineer's report indicated that if ML fill was to be used, Roxco would have to carefully control moisture content of the fill?
A. Absolutely. No question about it.
Q. And isn't it true that the failure to properly control moisture would result in drying out of the fill and extreme difficulty in handling it?
A. We need to talk about that because when we talk about moisture in the fill, we have to talk about the timing of when the moisture is there. The most important time at which moisture has to be present in the appropriate quantity is when it's being compacted because virtually every soil has a moisture content that is optimum for achieving compaction. So the only time that it is possible to either add water to or dry out soils in a building pad is when the material is being compacted. Once a trench is dug, particularly one that's 12 inches wide and two and a half feet deep, you ain't going to control the moisture in it. Period, end of sentence. You can go out there with a spray

Page 179

gun, you can do anything you want to, it ain't going to help because the exposed surfaces are going to dry out if it's hot, and the exposed surfaces are going to slough off if it rains.
Q. Is it fair to say that it is very important to control moisture when using ML fill?
A. Yes, but it's important to control moisture in all types of engineered fill. And if you don't control it, you can't achieve the densities required to achieve the passing compaction tests. But don't let anybody fool you into thinking that once you've dug the trenches, you then have control over the moisture in those trenches. It ain't going to happen. The only way you can control the moisture in those trenches after you've dug them is to fill them full of concrete as quickly as possible.
Q. Isn't it true, consistent with Mr. Davis's analysis, that the problems Roxco encountered would have been less if the -- if they had utilized a more cohesive fill material?
A. That is true, but that -- to use another Alabama saying, if a dog had wings, he'd fly. In this instance, the government approved low cohesive material; and by doing so, they had an obligation to follow recommended practices for dealing with low

Page 180

cohesive material, and they disregarded them.
Q. So as I understand your response, you would agree that if Roxco had used cohesive -- a more cohesive fill material, they would have incurred less what we've characterized here as hands and Dixie cup excavation costs?
A. The answer to that is yes. But the reason they used low cohesive material was because this job was obtained by the low bidder. The low bidder anticipated using the ML material that was close. He submitted it; he got it approved. Once approved, it was incumbent upon both the contractor and the government to employ reasonably accepted means and methods for dealing with a foundation built on that low cohesive soil. The government completely disregarded those reasonably accepted normal industry practices for dealing with low cohesive soil.
Q. Is it your testimony that Roxco made the assumption in preparing its bid that it would utilize ML fill?
A. I can't speak to that. I don't know whether they knew what Striebeck was going to submit, but I do believe that they would have reasonably assumed that the government would follow generally accepted practices for dealing with whatever soil was approved.

Page 181

Q. Isn't it true the specifications specifically precluded the use of ML-type fill?
A. I believe that is true.
Q. It's your testimony -- it's your understanding that the bid would have been prepared -- let me very simple. Notwithstanding the fact that it's your testimony that the specifications precluded the use of ML fill, it's your testimony that Roxco's bid would have reflected the use of ML fill?
A. No, that's not exactly right. Let me tell it this way. Maybe this will get us past this. You can debate whether or not -- what people anticipated when they bid this job. I really don't know for sure. I do know that Striebeck submitted ML material, low cohesive material, and the government approved it. Now, maybe in retrospect, the government wishes they hadn't done that. And then if they did, so be it. But the fact that they approved it created an obligation by the government to follow good practices for installing a foundation in low cohesive material, and they disregarded them. And in lieu of following good practices in low cohesive material, they demanded a method that made it far worse.
Q. Post completion remedial work. In the second paragraph, you state that "Pearson has identified





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 182

$90,548 in costs to the initial EIFS contractor, EIS, for repairs to the slab edges."
A. Yes.
Q. Where, when, and how did you identify those costs?
A. Through a careful review of each of the invoices.
Q. Where are those calculations reflected?
A. It would just be a tabulation of the EIS invoices.
Q. Is that present with your work papers today?
A. I don't believe it is. We would be happy to provide that for you.
Q. How does this relate to Roxco's total claim -- this $90,000 figure relate to Roxco's present total claim against the government?
A. Let me read this just a moment. We attributed 70 percent or $281,000 of the $401,000 that Roxco spent after it poured the last slab correcting deficiencies in the slab to several government actions, the first being demanding that the slabs be poured under means and methods which prevented them from being poured in an accurate fashion, and the second imposing upon Roxco the requirement to comply exactly with levelness standards instead of reasonable and

Page 183

substantial compliance with levelness standards and requiring that the floors be reworked during the building turnover phase long after all the work on the slabs had been completed.
Q. Explain, if you would, the calculation of $401,405 in the concrete cost codes.
A. If you turn to Exhibit 5 --
Q. Yes.
A. -- the blue line reflects the time period over which Roxco incurred its actual cost on slab-on grade work. The red vertical line indicates the period during which the government made the final payment in November of 1996. Now, on the top left, you'll see a note, "$1,326,578 expended constructing the foundations and slabs." All right. You see a note across the top that begins at about the location of the red line, "$401,000 expended on slabs and grades after the last foundation was poured."
Q. Can you point me to the specific line item in the job cost record? Would it be reflected there as well as a $1,727,000 figure?
A. Jeff, do you know if that's in that cost report? It's probably a combination of several codes in their cost report. I will confirm this, but I believe that what Mr. Montroy did was take our database

Page 184

of the thousands and thousands of lines of cost data in Roxco's cost report and segregated those costs that related to slab-on grade and repairing slab-on grade work, and he prepared this blue cumulative line based on his segregation of the costs related to that work.
Q. It says here that -- there's a reference here to concrete cost codes, and what I'm trying to do is determine whether those cost codes are consistent with the -- what's been identified, I believe, previously as the project cost records, which I believe are Attachment 2 to this portion of your report.
A. Attachment 2 is just one of many reports that can be generated out of this cost system. In addition to have the ability to produce such reports, we have each element of cost in -- that makes up this summary. And Mr. Montroy isolated the concrete costs that were related to the concrete slabs from among all of the concrete codes. And the data on which he made this study was made available to the DCAA auditor.
Q. You know, I look at -- we've Bates-stamped it -- it's page 13 of the job cost records. We have Bates-stamped it 0946, and there's a cost code 3.320 slab-on grade.
A. Page 13, did you say?
Q. Page 13 of the job cost record. It's cost

Page 185

code Item 3.320?
A. This is not all of the costs related to slab-on grade.. It is the portion -- some portion of the cost that was coded to this particular code. There is reinforcing steel, there's forms, there's curing compound, there's lots of other codes here that relate to the slabs-on grade. And you'd have to extract from these codes those that apply to the slabs-on grade. There's reinforcing mesh, there's vapor barrier, finishing, anchor bolts.
Q. Isn't it true there was a lot of other work out at the site other than the concrete work on the slabs?
A. No question.
Q. And I'm looking in the cost codes and I don't see it clearly broken out, a basis to distinguish cost codes incurred on the slabs and cost codes incurred on other work that had to be done on the site.
A. Exhibit 2 is just a printout of one of the cost reports that were generated in the records. Exhibit 5 is based on our sort of a lot of records that are not going to be sorted in the same fashion as the report in Exhibit 2.
Q. I go through the summary and it states that -- it says, "Between March 22nd and November 1998,

Page 186

Roxco expended $401,405 in concrete cost codes."
A. Correct.
Q. My question is: How does one determine -- literally the report says "in concrete cost codes." It doesn't say in cost codes in some manner related to the slabs.
A. Right.
Q. And in fact, the cost items -- I'm assuming the cost reports were filed under these cost code items -- doesn't appear to break it out either. And my question is: How do you make the determination from the report and the attachments that the numbers we're talking about here were costs incurred on the slabs?
A. If you read the next sentence beyond the one you just read, it says about 77 percent of that or 280,000 spent on slab leveling and edge repair. Perhaps the easiest way to resolve this is for us to provide to you the specific invoices in our tabulation of that amount. Would that help you?
Q. If you want to supplement the report with that, sure, and perhaps we can just move on. But I just can't -- it doesn't seem to follow for me. It's a fair amount of money, and that's why we're spending time on it.
When you make the determination 70 percent of

Page 187

that, or 280,000, was spent on slab leveling and edge repair, how is that determination made?
A. Reading the invoices that Roxco paid for the repair work.
Q. In that case, certainly the invoices may be helpful in the examination.
A. They would be.
Q. And you say that amount does not include the $90,548 paid to EIFS?
A. That's right.
Q. How did Pearson identify $90,548 actually paid to EIS for repairs to slab edges?
A. EIS invoices.
Q. So again, this would be a case where the specific invoices would show this?
A. That's correct.
Q. If we're providing invoices, I ask we get the EIFS invoice as well.
A. Agreed.
MR. WILLIAMS: Is this a good time for a break?
MR. GROAT: Sure.
(OFF THE RECORD)
BY MR. GROAT:
Q. Did Roxco -- did Pearson -- perform an

Page 188

analysis of entitlement as to the items listed on pages 13 and 19 -- excuse me, pages 13 and 14 of the Section L, "Claim Pricing"?
A. Yes, we did, and I believe that our framing section has a text with respect to each of these.
Q. Who did that analysis?
A. It's a combination of myself and Mr. Montroy.
Q. I'll be asking you some questions regarding Book 2 if you have it there. Section L.
A. You're sure it's in 2? Are you giving me 2 or 3? Wood framing is in 1.
Q. Wood framing? Oh, I see. So these aren't going to be in 1? Wood framing is in --
A. If you're talking about wood framing, it's in 1.
Q. I'm sorry. F, I'm sorry. My notes are off.
Regarding the dimensional framing lumber, is it Roxco's contention that the specifications were very difficult to achieve utilizing the lowest grade lumber permitted?
A. Absolutely.
Q. And is it Roxco's contention that the government has a contractual obligation not to permit the use of lumber of a low grade such that it's very difficult to achieve the specifications?

Page 189

A. Well, you use the word "very difficult." I'd say that it's a major contradiction. Here we have another specification that says you can use No. 3 lumber. And then we have another specification that says we're going to measure within one quarter of an inch in 10 feet. Now, one quarter of an inch in 10 feet or 8 feet, whatever it is, is a common, garden variety shelf requirement you see everywhere. Number 3 material sends a message to a builder that this is low cost, this is a very low priced facility. This is not an important -- we ain't going to check things closely.
Now, low bidders -- I mean people that bid these jobs understand full well that in order to get it, they got to have the low price. And they don't have the luxury of six months to review these specifications. They have to prepare their price in just a few weeks. So there is a huge contradiction here in saying you can use this No. 3 material and then having a quarter inch. And in my opinion, the government, by sending this conflicting message, they caused the bidders to submit a price for installing No. 3 material, or perhaps some No. 2, but -- and they said to the bidder we're not going to require strict compliance with tolerances because any designer who is qualified to design this kind of work will understand

Page 190

that No. 3 material has sufficient structural characteristics but insufficient architectural characteristics to comply, even substantially comply with straightness in the specification.
Q. Is it your position, then, that the provision allowing the use of No. 3 lumber sent an implicit message that the government would not strictly enforce tolerances?
A. Yes, it does.
Q. Is it your contention that the government has a contractual obligation not to, to use your term, send such an implicit message?
A. The government can do anything that it wants to. And if they choose to say use No. 3 material and also want these tolerances yeah, they have the right to do that. But I think they have to suffer the consequences of it. And in lieu, they said no, you, Mr. Contractor, have to suffer the consequences of it because it wasn't my designer's obligation to get it right. It was you as the contractor's obligation to figure out that we didn't know what we were doing. And since we didn't know what we were doing, you're supposed to correct our mistake. That's the part I disagree with.
Q. Now, the problems that Roxco experienced in

Page 191

regards to lumber, what percentage of those problems are attributable to what you characterize as dimensional framing?
A. Tons of it. Stud grade southern yellow pine, I'd venture a guess that none of the three of you gentlemen sitting on the other side of the table would pay to have your house built out of it. You wouldn't recommend any of your friends have it built out of it. If an architect came to you and told you they were going to specify it, you'd tell him to go home, you wanted another one. It's just never done, but they did it in this project.
The evidence demonstrates that the government zealously held Roxco to not just substantial compliance with tolerances, but with actual compliance with tolerances. I mean, they put straight edges on walls. They put up a transit and they checked them. And then after the drywall was installed, if they didn't like the looks of it, they'd take off the drywall.
Southern yellow pine arrives at the site with varying degrees of moisture, all of which are supposed to be within the ranges allowed by the SPIV. Once southern yellow pine stays on the job for a while, it will dry out, particularly after they put the roof on the building. And as it dries out, it changes in

Page 192

dimension. And these buildings, some of them sat for two years.
What do you think happens to -- when I built my own house, I planned on painting all the trim twice: Once before I moved into it, and the second time after a year and a half because I knew that once the material acclimated to the air conditioning that it was going to contract, and it does every time. If you build a house in Washington, D.C., unless you use an exotic wood like maple, it's going to do the same thing.
That's what happened on this job. Roxco painted and painted trying to get the cracks out, and they straightened out walls and did numerous things all as a result of a flawed lumber specification combined with an unreasonable inspection process.
Q. What percentage of the costs here are attributable to the government's provision permitting the use of No. 3 lumber? Can that be quantified?
A. No. I can't -- I can't separate the cost of each one of these issues separately. Just the cost records won't allow it to be done. But what we can do is see the enormous amounts of money that were spent, and we can see from the records that has -- and we quoted one daily diary where they said they culled 4,000 studs.

Page 193

Now, if any of us in this room built a house and you told the contractor you're going to pay him cost plus 10 percent and he told you he had to cull 40 percent of the studs he bought, you'd go ballistic. I mean, you just don't do it. And the reason you don't do it is because you expect your architect to specify a wood that has a low degree of culling. Some culling is always required in Grade 2, and Grade 3 is just out of the roof. Grade 1 is supposed to be near zero. And you can use some of the culled studs in blocking, but you -- there's not enough blocking to utilize all the studs they had to cull off of this job, simply because of the combination of a low grade of specified lumber and a strict adherence to the specified tolerances.
Q. Now, the government didn't specify any particular lumber, but allowed a particular grade of lumber. Isn't that correct?
A. The government listed numerous types of lumber that were acceptable.
Q. Roxco chose to use the lowest grade of the lumber that was --
A. Which is what the government tells the contractor to do. We want the lowest price. We're going to take the lowest price from the contractor. We're not going to give it to the number two bidder;





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 194

we're going to give it to the number one bidder.
Q. Let me jump down to the joist spaces from 24 to 16.
A. What page are we on?
Q. This is discussed in Section L, "Claim Pricing," and we're on page 21 of 44 of your Section F.
A. 21 of 44.
Q. I believe it starts on "joint spacing changes." Can you tell me what the nature of this claim is?
A. I have to read this. Will you give me a moment? (Reviews document)
MR. WILLIAMS: What's your Bates-stamp number on the page you're referring to?
MR. GROAT: 0308. Also, it's referenced at 0922.
A. Okay.
BY MR. GROAT:
Q. How much additional cost did Roxco encounter as a result of the joist spacing change from 24 to 16?
A. I can identify some cost in that. We were unable to segregate all of it from cost records because when there's a group of guys up there framing a building and they're told to install it on 16 inches of as opposed to 24 inches, you can't set up a cost code

Page 195

to capture the difference between 16 and 24.
Q. How much cost did Pearson identify?
A. I think that Cheneyworth asked for like $95,000 for this work. They were issued a change order for about $45,000 that included numerous things. Cheneyworth disputed that, wouldn't accept it, and there was a dispute about it and I think that was resolved in the arbitration that was held between them.
Q. What's the contention now, the additional costs that they're entitled to have as a result of the change from 24 to 16?
A. It is a component of the overall costs being requested, but I cannot isolate the specific amount.
Q. They've already been paid a portion of their costs?
A. They've been paid a portion.
Q. How much have they been paid?
A. It's a matter of record. This says $62,047.
MR. WILLIAMS: Just for your information, the record exhibit doesn't have -- it's missing several pages that you're talking to him about, including 0308. I don't know why it's missing from this copy.
MR. GROAT: Tell us the pages that are missing. Obviously, the copy firm had a problem.

Page 196

MR. WILLIAMS: Looks like it goes from 0282 to 0331.
MR. GROAT: Okay. We can make another copy.
BY MR. GROAT:
Q. Now, in the wood framing section, you indicate that Roxco budgeted $1,981,452. This is at page 12 of 19 in your Section F.
What, if any, analysis did Pearson make regarding that estimated cost?
A. I don't see that number.
Q. Page 12 of 19. We're in wood framing under the "Claim Pricing," Section L. I'm sorry. The small book, I should have said.
A. What is your question?
Q. What, if any, analysis did Pearson perform regarding that budgeted amount?
A. We determined that Roxco had sufficient materials to build the project for that amount and that they had subcontracted all of the labor required to do the framing for Cheneyworth, and the combination of those two things was a million -- roughly a little less than $2 million.
Q. Where is that analysis that you performed?
A. It's not an analysis. It's in their

Page 197

estimate. You go through their estimate records and you can count boards and you can go through Cheneyworth's subcontract and find out that Cheneyworth was signed up to install all of the framing members. So you need two documents, both of which have been made available to you: Cheneyworth subcontract and the detailed Roxco estimate.
Q. What analysis did you perform of the Roxco estimate?
A. We reviewed the Roxco estimate and determined that they had sufficient materials in that estimate to build the job.
Q. Did you review the costs that Roxco estimated for the materials?
A. Yes. And they issued purchase orders for that material for the prices that were listed in their estimate, sometimes less than was in the estimate.
Q. Was the estimate based upon the use of grade No. 3 lumber?
A. I believe -- I have a fuzzy recollection about that, but I can tell you that the first purchase order for materials is based on No. 3 material. I've seen that one.
Q. So it's your contention that the use of No. 3 lumber was not reasonable because of the





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 198

specifications. Is that correct?
A. I mean, if the government wanted -- go back to the point Mr. Beach said about the area separation walls. He said if the government wanted to overdesign something, they were fully -- had every right to do that. And my answer to you is if the government wanted to build this thing out of No. 3 lumber, they had every right to do so. But they just didn't have the right to ask the contractor to build it out of No. 3 lumber and build something that they thought was visually pleasing, because those two are mutually exclusive.
Q. So what you're saying, then, is there's an patent ambiguity in the specifications between the election to permit the use of No. 3 lumber and the tolerances specified?
MR. WILLIAMS: Object to the form. That's not what he said.
A. I agree with everything you said except the word "patent." I don't agree with patent ambiguity. I think it's an ambiguity that could not have been known until the contractor went out there to build it and saw what the government actually expected the contractor to build using materials he told him to build it out of.
BY MR. GROAT:
Q: I guess I don't understand that. The

Page 199

specifications provide for specific dimensions. Is that correct?
A. Yeah.
Q. And those specifications are demanding specifications?
A. No.
Q. No? They're typical specifications for residential housing?
A. Yes.
Q. You've testified that the use of No. 3 lumber is not typical for residential houses?
A. I have.
Q. Now, would a reasonable and prudent contractor recognize that it would be very difficult to achieve the specifications in the contract utilizing No. 3 lumber?
A. I think that he would do that. I think that he would. But, you know, what -- he knows that the government has hired a professional designer to develop a set of specifications and he delivered it to this contractor and the RFQ said, "You shall prepare your bid in accordance with the RFQ, and we're going to take the low bidder." So he reads through there, and he sees what he can build this thing out of. And then after he gets out on the job, the government says, "Oh,

Page 200

by the way, I didn't mean that. I meant this. And you're going to have to build to this now." That is the part that's caused this claim.
Q. How much additional would Roxco have to have budgeted if they assumed the use of a higher grade lumber?
A. Depends on what type of lumber that you're talking about.
Q. You testified that in your view, that it was inappropriate to use Grade 3 lumber?
A. No, I didn't say that, sir. I said the government could -- they could design a bowling ball to go in the floor of these things if they chose to. It's up to them. It's their designer's decision what to do. I just wouldn't want it in my house, and I don't think any of us in this room would want it in our house. It's the contradiction. It's the "give me a low price follow the -- buy the materials I've told you to buy." But when you get out to build the job, it's "oh, by the way, I didn't mean that. You should have known I didn't want you to do that. I wanted you to do this." That's the problem.
Q. In your view, what lumber should the government have specified in order to meet the specified dimension requirements?

Page 201

A. That's a great question. I was hoping you'd ask me that one. If the government inspected this building in the normal fashion that we're accustomed to seeing in the industry day in and day out, the government could have specified either spruce or finger joint pine, both of which have relatively straight characteristics and both of which have a fairly reasonable cost. But I'll tell you, neither one of those would have met the exact criteria that this group of inspectors required.
Now, for this group of inspectors, I'd tell them they need to go buy a composite 2-by-4 or specify metal studs which are precisely straight, but you're not going to like the sound characteristics within the house. But if you insulate them a bunch and put a couple layers of Sheetrock, you might get what you want.
Q. Are you saying it's virtually impossible to comply with the contract specifications with regards to the dimensions?
A. Given the materials that the government said the contractor could use to build them by, absolutely.
Q. Now, would any of the materials that the government specified that the contractor could use have permitted, in your opinion, the building of the

Page 202

structures in accordance with the specifications?
A. Substantially but not exacting. So even if they used some of the higher-priced materials, they wouldn't have satisfied this group of inspectors.
Q. How much additional costs would Roxco have incurred if they had budgeted the use of materials that you would regard as suitable for the inspection of the residences?
A. I think your question is flawed by assuming that Roxco should have budgeted a higher cost, because they shouldn't have. They're supposed to bid the lowest price material in the specs, and that's what they did. The way -- the proper way to state that is if the architect had specified the kind of material needed to produce what this government wanted, what would he have specified and how much would that have cost.
Q. If you could, answer that question.
A. All right. A composite 2-by-4 that is manufactured out of wood chips and has a plastic composition in it and can be poured, much like a decking material and is -- it is absolutely straight, absolutely true plane, has no warp, no wane, no knots, they would get exactly what they wanted out of that. Secondly, they could have done a metal stud. But if

Page 203

they had done a metal stud, they would have a number of additional costs outside of lumber, such as additional drywall insulation for sound transmission issues.
Q. Metal stud wouldn't have complied with the specifications either. Isn't that correct?
A. It would have surpassed the specifications.
Q. The specifications in this case provided for wood studs, I believe. Isn't that correct?
A. They did, but you asked me what would have worked.
Q. What would have complied with the specifications, was my question?
A. Some of the most expensive woods that are listed as acceptable could have been used with reasonable success in achieving substantial compliance with the tolerances. They would not have been used with reasonable success given the criteria that these government inspectors applied.
Q. Is it your contention that the government inspectors were requiring dimensions not set forth in the plans and specifications?
A. No, sir. They were -- it's my opinion that they were demanding exact compliance with the specifications as opposed to substantial compliance with the specifications.

Page 204

MR. WILLIAMS: He asked dimensions. Do you understand him to mean tolerance?
A. I did understand you to mean tolerance. Thank you.
MR. WILLIAMS: Do you mean tolerance?
MR. GROAT: Yes, I did. Thank you.
BY MR. GROAT:
Q. In your view, requiring exact compliance with specifications is unreasonable?
A. It is. If I might add about that, the best piece of evidence in the government's files was that after demanding exact compliance for months and months and never getting any building turnovers, they invited a builder, a real estate agent, and some people to come out and look at the buildings, and they told -- all of those people told them yes, this building -- these buildings are good, these buildings are -- you got your money's worth. Yes, they're inhabitable. Yes, they're marketable.
Q. What would the additional cost factor have been in the -- for materials associated with procuring a higher grade framing lumber?
A. It depends on what grade of lumber was bought. It can be as much as twice as much as.
Q. What was the total material associated for

Page 205

framing?
A. Several hundred thousand dollars. I don't recall.
Q. In your opinion, Roxco could have substantially alleviated the problems they encountered in framing by incurring additional costs in materials for framing and materials. Is that correct?
A. No, sir, that is incorrect because you have to understand the chronology of events. Roxco buys the material that the government specified. They have No. 3 sent to the job site. They start building. They have problems with it. They don't buy any more No. 3. They start buying No. 2. They frame up many buildings, and then the government comes along and says, "I don't like this. Let's put a straight edge on this. I don't like this. Let's cut this one out. Let's set up a transit over here." So by the time that the full bloom of what the government was demanding was known, Roxco had already framed up a bunch of houses. So at that juncture, they would have had to tear down 40 or 50 houses and then rebuild them with the more expensive lumber. So the cost for doing that would have been several million dollars.
Q. There's a correction discussed on pages 12 and 13 of your analysis indicating that the rough





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 206

carpentry-related claims in Roxco's REA total $1,562,682, which is 68 percent of their loss. Right at the bottom of the page.
A. Yes.
Q. Did you review the calculations that are reflected in the claim for $1,562,000?
A. Yes.
Q. And what are those -- how did you review those assumptions?
A. How did we total a million 562?
Q. As I understand it, the claim here was that this is a rough carpentry-related claim, and this entire section covers both rough carpentry and items which are not rough carpentry. Finish carpentry.
A. The finish carpentry items are not in here.
Q. I see things such as door framing, knee wall revisions.
A. All of those are rough framing issues. We're not talking about the door frame itself. We're talking about the rough framing with dimensional lumber as opposed to door moldings, door frames, that type of thing.
Q. Let's move on to roofing. Isn't it true that part of the problem involving the roofing concerned Roxco's use of the wrong nails to secure the flashing

Page 207

on the roof?
A. Which flashing are we talking about?
Q. My understanding is after the installation of flashing, it was discovered that nails without the proper heads were used. As a result, the flashing flexed and Roxco went back. It's not clear that the government directed it, but went to the expense of replacing the flashing, which involved removing a substantial portion of the roof.
A. I need to know which flashing.
Q. This was the valley flashing. That's Section G of your report. I think it's page 6 of 6.
A. What's your question?
Q. Isn't it true that the origin of this problem was that Roxco used the wrong nails to secure the valley flashing?
A. I don't believe that's true, sir. The origin of this problem is the failure of the government to provide specific instructions on how to build it. And if you read the narrative that's described on page 6 of 6, it is a description of how not to design valley flashing, how an owner doesn't answer questions when they need it, how they refer them to reference standard, and how the contractor has to be the one to make suggestions. And how finally the decision about

Page 208

how it was going to be done was finally resolved after 79 percent of the roofing had been installed.
So then after all that roofing has been installed, somebody says, "I don't like the nails back on the ones that you did, so let's go back and install those." And if memory serves me right, that is all a part of that 47-item roof punch list that came out after the roofing had been installed.
Q. In fact, after the roofing was installed, it failed almost immediately because they used the wrong nails. Isn't that what happened?
A. That is inaccurate.
Q. Isn't it true that as the roof was exposed to heat, the flashing flexed and it came up under the shingles and Roxco made a determination to replace the flashing on its own?
A. I don't dispute that from time to time there are areas of the flashing that needed to be repaired. But if it is your contention that somehow all of this flashing problem is Roxco's because in a particular location the flashing happened to, you know, bug bulk up because a roofing nail didn't hold in one location, then I'm okay with that. But don't extend it to describe a problem that's greater than that.
Q. Did the government ever direct that this

Page 209

flashing detail -- that Roxco replace this flashing?
A. What flashing at what building?
Q. Valley flashing details discussed at page 6 of 6 of your report.
A. Read page 6 of 6, if you would, and direct me to a particular reference and explain to me what your question is.
Q. My question is: Did the government ever direct that Roxco make changes to the valley flashing details that it installed?
A. Make changes to the details that it installed. I have a specific recollection about that, but given the nature of all of the changes that they made to the design, particularly of the flashing, I'd have to say yeah, they probably did.
Q. Well, now, there are two possibilities existing in this case, aren't there? One possibility is that the installation was so bad that Roxco determined they had to replace it on their own. And another possibility would be that the government inspected the work and directed that Roxco...
My question is: What happened in this case? Did the government direct that Roxco make the change, or did Roxco make the change of its own volition?
A. There are 86 buildings out here, and there's





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 210

valley flashing on every one of them, and I need to know which buildings you're referring to and during what period of time you're alleging that Roxco had to correct some deficient work.
Q. Well, my question is you're claiming $269,000, and my question is, Did the government direct that work, or did Roxco determine to do that work on its own?
A. I can't rule out the possibility that Roxco might have recognized that it had some defect out on some roof that it needed to correct. But what we find fault with is the government watched -- A, the government didn't have any details for flashing; B, they said use reference standards, and we all know reference standards have lots of different details and they're subject to interpretation. And if it was ever possible to build a job with just reference standards, you'd never hire an architect to do that. And you did hire an architect. He just didn't do his job.
So Roxco goes about making suggestions about how to do this because the government won't spend the money to design it. Then after Roxco installs 100 percent of the roofing, the government comes out there and says, "Oh, by the way, I got a 43-item punch list here that I want you to comply with." After all

Page 211

the roofs are on. That is a dysfunctional and unrealistic and just totally unacceptable way of approaching construction.
Q. I guess my original question was: Isn't it true the real origin of this valley flashing detail was the fact that Roxco used the wrong nails to install the valley flashing details?
A. Are we talking about all 86 buildings?
Q. Based on your knowledge, what was the origin of the problem?
A. The origin of the problem was that the government never provided Roxco with a detail about how to do it, which is the first sentence in our -- let me read that to you, under "Valley Flashing," page 6 of 6. "No detail was provided in the contract drawings for the installation of flashing at the roof valleys where the various roof intersections meet."
Q. Isn't it true that Roxco used nails that were not suitable for the installation of valley flashing details?
A. Well, that's debatable. The government said you go to a spec SMACNA and we want this Simplex nail. The roofer said, "I have to warranty this roof against leakage, and if I use those little Simplex nails, this thing is going to come out. I want to use this

Page 212

inch-and-a-half-long nail that I know will hold because I've been doing it all my life." And it's my understanding the government said, "Nope, don't want that nail. Going to send you back out there to replace them." But I don't --
Q. You indicated -- I'd like specifically where do you have this understanding to what occurred as to the valley flashing detail? Where did you acquire this understanding?
A. Are you talking about the whole text?
Q. You just indicated to me that the roofer came back and indicated that they wanted to use an inch-and-a-half nail.
A. It's in the records.
Q. Is it in the attachments to your report?
Let me refer you to page -- I guess it's Attachment 6 to your report 0487 or Bates-stamp, Roxco letter dated April 30th, 1996.
Isn't it true that Roxco proposed a specific manner in which to install the valley flashing?
A. That's correct.
Q. And isn't it true that there was also a request for information issued by Roxco on October 7th, 1996?
A. Where are you reading that?

Page 213

Q. That's Attachment 7 to that section.
A. Okay.
Q. And a T. Reeves suggested the work be at no cost to the government, and this proposal was approved by the contracting officer. Is that what that document indicates?
A. It is.
Q. Is there anything in the report that you found suggesting that the government directed Roxco to remove work or to proceed in any particular fashion on this valley flashing installation?
A. Can I ask you to repeat that?
Q. Is there anything you found in the record to suggest that the government directed Roxco to proceed in any manner with correction of the valley flashing installation?
A. I don't know quite how to answer that question. Perhaps I'm -- as you say, the day is getting long. But these records indicate that there was a discussion about how to install the valley flashing, and there was an agreement about how it was going to be done.
Q. The problem was they had gone ahead and installed it in a manner that failed. Isn't that correct?





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 214

A. I think that is true, that with respect to a few buildings or in a few locations, that is true. But are you suggesting that it happened everywhere on the whole job?
Q. My understanding is -- this is based -- I'm inferring this from the document, that they simply went ahead and installed the valley flashing on a large number of structures using the wrong type of nails. And they determined themselves when it failed, they had to go back and correct it.
Is there something wrong with that scenario?
A. Hold on just a moment. Can I ask you on what basis you concluded that the roofing failed?
Q. My understanding is there are reports indicating that the government inspectors saw the valley flashing curving up underneath the -- what started this was the government inspectors saw that the valley flashing was curving up underneath the shingles and made inquiry. And when they asked how it was installed, they were told and Roxco went ahead and then recognized that the wrong type of nails were used to install the flashing.
But I just -- from your report, you conclude apparently the government is liable for this and I just don't know the basis.

Page 215

A. Give me just a minute to read this again.
Q. If you want to confer with Mr. Montroy, I have no objection.
A. Okay. I think this may be the issue, sir. On page 6 of 6 in "Roofing," there is a discussion about how over half of the roofing had been installed before the government approved the method of installing the flashing.
Q. Apparently, the government didn't watch them installing the wrong type of nails. The roofing failed --
A. There was no knowledge of wrong type of nails. There was no knowledge of which nails were going to be appropriate until after they had installed half of them.
Q. My understanding is the installation didn't comply with the cited standards and failed after a couple of months, and Roxco went ahead and did this work on their own.
A. Well, I'm trying to help you with that. Don't assume that before roofing started there was an agreement about how to install the flashing.
Q. I don't believe there was.
A. Don't assume that the government had a flashing detail and knew what they wanted, because they

Page 216

didn't. The government didn't decide what they wanted and didn't tell Roxco what they wanted until most of the roofs have been installed.
Q. I understand. And by the way --
A. Let me finish my scenario. You say to me, "Mr. Pearson, isn't that true that Roxco installed the wrong nails and the government inspector saw some of them buckling and Roxco agreed to go back and take that roof off where that valley flashing is?" I want to assume for a moment that you're right about that. But what if the roofing nails that were buckling were in that 50 percent that were installed before the government told them what they wanted?
Q. I'm not rendering a professional opinion that Roxco is entitled to compensation for this work. I don't know what occurred. Your report states that they're entitled to recover this. I'm asking the basis for your conclusion that they're entitled to recovery.
A. And that's the answer I just gave you.
Q. And that is?
A. That is that as stated on page 6 of 6, there was no detail of how to do it. Roxco goes out there and does it in a fashion that his roofer thinks is appropriate, and the government comes along, not after he installed one building, not after he installed two

Page 217

buildings. Even though they have four inspectors out there, they come out after they've installed 50 percent of it and say, "I don't like the way you're doing it. Let's talk about how this one ought to be done." And they come to an agreement about how it ought to be done and Roxco starts doing it.
And then the government says, "Look over here on building so-and-so and so-and-so, my stuff buckling over there." Okay. We'll go back and we'll take out that roofing and we'll replace it. We'll do it the way we agreed, but you have to -- you cannot lose sight of the fact that A, there was no detail in the contract and B, the inspectors watched it for 50 percent of the time, the installation, without saying how they wanted it done; C, they finally come to an agreement about it, and D, the government makes them go back to the first 50 percent and do it the way they decided halfway through the job.
Q. So under your analysis, there's no dispute that the work as originally installed was defective. Is that correct?
A. I disagree with -- "defective" assumes that it was installed incorrectly in accordance with the standards that were in place at the time. There were no standards in place at the time.



07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 218

Q. Did the specifications call out SCN architectural sheet metal standards?
A. Sir, if you go to reference standards, you're going to find number of different details related there, and you can't know which one you're supposed to use. And it's up to your designer to provide the contractor with the detail that he wants. And he did attempt to do that; he just produced very vague drawings. Then when Roxco said your drawings are vague, the government didn't go to the architect and say, "Give me some good designs." They said, "Roxco, tell me what you want to do." So "do my designer's job for them." I mean, it's just bizarre.
Q. Let me ask you to go to page 5 of 19 of Section L, the pricing section. This will be the small book.
A. Okay.
Q. Time-related field general conditions. How were the average daily time-related field conditions calculated?
A. By adding up the budgeted amount that Roxco had for field general conditions.
Q. Who performed those calculations?
A. I did.
Q. And the budgeted per diem costs code?

Page 219

A. Well, you can't go to one particular cost code and find it. And once you identify the cost codes with -- in which those costs are captured or their budgets are captured, you then have to isolate those codes that capture time-related costs as opposed to non-time-related costs. And my recollection is that we provided that list for you in our calculations here. It's in Tab C.
Q. Sorry. Tab?
A. Tab C of the pricing.
Q. That's based on the calculation of Tab C?
A. Yes, sir.
Q. Okay. Who performed those calculations?
A. Myself and Jeff Montroy probably helped, and I probably had Paula King in our office assist with this as well.
Q. Was this claim in Roxco's request for an equitable adjustment?
A. I believe it was. I don't know if it was in this form.
Q. Did Roxco hire additional people for this work?
A. They did.
Q. What was -- what did Roxco budget for site management?

Page 220

A. When you ask for site management, you know, we could go back through the cost report and select those codes that we would both agree capture the budget for site management, and that would take some time to do. But I will tell you that within the time-related field general conditions, Roxco budgeted $736,104 for those.
Q. And you've indicated an adjustment factor here indicating 85 percent. What does that indicate?
A. Where are you, sir?
Q. I'm still at page 5 of 19, page 5 of 19 in Section L, "Claim Pricing."
A. We're talking about two different things here. Tab C1, which I directed your attention to, is the budgeted time-related field general conditions. Paragraph C2 on page 5 addresses the additional time-related field general conditions, which is increasing the staff -- Roxco's staff -- to deal with all of the problems that the government-caused on this project.
Q. Who additional did Roxco specifically hire to supervise on the project?
A. We would have to go back through the reports and identify those individuals. I have listed them here. We could do that because we have a cost report

Page 221

that would enable us to do it.
Q. Did Roxco have any turnover on the personnel that were originally assigned to the project?
A. Oh, absolutely. You have a job last four years, I can guarantee a bunch of people are going to drag up.
(OFF THE RECORD)
BY MR. GROAT:
Q. Let me invite your attention to Section I of your report, "Interior Finishes," at page 1 through 4. And I'd like to direct your attention specifically to page 3 of 11. And in your analysis, did you conclude that eggshell and orange peel textures are mutually exclusive?
A. Yes.
Q. Now, this is Interior Painting Schedule, Contract Provision 0900?
A. I believe that's correct.
Q. Doesn't eggshell finish refer to a finish on paints?
A. It is a paint finish. But, sir, what you have not been told is that these federal spec paint numbers are for flat paint. They're not for eggshell paint. So we actually have more contradiction there than has been recognized. These FSTTP29? That's flat





07ad3d71-6638-4b8b-ac0e-e8b533e03026

paint. That's not eggshell.
Q. And the FSTP650?
A. That is also a flat paint, but I believe that those -- I'm going beyond my good memory here, but I believe those may be for wood trim.
Q. The statement here that eggshell and orange peel textures are mutually exclusive, upon what did you base that conclusion?
A. I have been involved in many projects which required eggshell finish, including the construction of my own house and my own office. And the difference between eggshell finish and orange peel finish is simply the difference between the appearance of an egg and the appearance of an orange. One of them is flat and has a unique texture to it, and it is very hard to apply and it's almost impossible to touch up.
If you have a flaw on the wall with an eggshell finish, you have to repaint the whole wall. It is extremely expensive to apply. It requires an unusual amount of sanding and preparation for drywall.
Orange peel finish, on the other hand, is very different than that. It requires a lesser degree of drywall preparation because the application of the texture for the orange peel covers up the imperfections in the drywall. I have never seen in my career anyone



specify they wanted an eggshell finish on an orange peel texture.
Additionally, whenever a texture is to be applied, there's a specification that describes the material and the application for the texture. No such specification exists here.
Third, the federal paint specs here are for flat paint which is the cheapest, the easiest, the easiest to touch up, the easiest to apply type of paint that there is.
Q. So it's your contention, then, that the specification is ambiguous on its face because of the specification of -- the mention here of a provision of eggshell finish and orange peel texture?
A. You use the word "ambiguous." I'd go beyond that. I'd say it's contradictory. It's -- if someone reviewed this and asked themselves what they had to apply, if it were me, I'd look at the federal spec on the paint which says flat paint and recognizing that there's no such thing as eggshell on orange peel.
Q. In reading the specification, you'd recognize that immediately?
A. I think it's reasonable for a contractor bidding this job to say these people want flat paint. And Mr. Beach included in his report a copy of the



contract with the painter, and he said we told the painter he had to do the texture. That's not true. What he didn't tell you is that there's a handwritten note at the bottom that says if you want the texture, you have to add $45,000 to my subcontract. And then when the government demanded it, Roxco paid the painter $45,000.
Q. Well, you say the reasonable contractor would assume the use of the specified federal paint numbers. Is that correct?
A. That's correct.
Q. How would the reasonable contractor interpret the specifications -- the provision here, eggshell finish; (orange peel texture)?
A. Obvious mistake.
MR. GROAT: No further questions.
(DEPOSITION CONCLUDED AT 4:50 P.M.)
* * * * * *

____________________
Signature of the Witness
SUBSCRIBED AND SWORN to before me this ________ day of ____________________, 20__.

____________________
NOTARY PUBLIC
My Commission expires: ____________________



CERTIFICATE OF COURT REPORTER

I, ABBY PATE JULIAN, Certified Shorthand Reporter and Notary Public in and for the State of Mississippi at large, hereby certify that the foregoing pages contain a full, true, and correct transcript of the proceedings as taken by me at the time and place heretofore stated in the aforementioned matter and later reduced to typewritten form by me to the best of my skill and ability.

I further certify that I placed the witness under oath to truthfully answer all questions in this matter under the authority vested in me by the State of Mississippi.

I further certify that I am not in the employ of or related to any counsel or party in this matter and have no interest, monetary or otherwise, as to the final outcome of this proceeding.

WITNESS MY SIGNATURE AND SEAL, this the 21st day of September, 2006.

____________________
ABBY PATE JULIAN, CSR
CSR NO. 1706
My Commission Expires:
March 18, 2008





07ad3d71-6638-4b8b-ac0e-e8b533e03026

**SETTLEMENT AGREEMENT**

This Settlement Agreement is made and entered into, by and between Roxco, LTD (hereinafter " Obligee") and Nobel Insurance Company (hereinafter "Surety").

**WITNESSETH**

WHEREAS, Obligee entered into four subcontracts (hereinafter "Subcontracts") with Exterior-Interior Specialties, Inc./Choctaw Ventures, Inc. (hereinafter "Principal"), two (2) subcontracts dated March 30, 1995 and two (2) subcontracts dated February 23, 1995, in connection with the Wherry Housing Phases II and I at the Barksdale Air Force Base in Bossier City, Louisiana (hereinafter the "Projects"); and

WHEREAS, four (4) Subcontractor's Bonds, bond numbers STD 1537, STD 1540, 613773, and 613774 (hereinafter the "Bonds"), were issued naming Exterior-Interiors Specialties, Inc./Choctaw Ventures, Inc., as principal, Nobel Insurance Company, as surety, and Roxco, LTD, as obligee, in connection with the Subcontracts and the Projects; and

WHEREAS, Obligee declared Principal to be in default in connection with the Subcontracts and the Projects on March 14, 1997; and

WHEREAS, Obligee terminated Principal in connection with the Subcontracts and the Projects; and

WHEREAS, Obligee made a claim against the Bonds and filed suit against Principal and Surety in the United States District Court for the Western District of Louisiana, Shreveport Division, Civil Action number CV-97-2158 (hereinafter the "Suit"); and

R2HS0001878

ROXCO23435

WHEREAS, Obligee and Surety have agreed to a compromise and settlement pursuant to the terms of this Settlement Agreement as set forth hereinafter.

NOW, THEREFORE, in consideration of the premises, and other good and valuable considerations, receipt and sufficiency of all of which is hereby acknowledged, the parties hereto agree as follows:

1. Upon the execution of this Settlement Agreement, Surety shall pay to Obligee the total sum of ONE MILLION FIFTY THOUSAND ($1,050,000.00) DOLLARS as follows:

(a) Surety shall pay $20,000.00 on bond number STD1537;

(b) Surety shall pay $108,000.00 on bond number STD1540;

(c) Surety shall pay $63,478.65 on bond number 613773; and

(d) Surety shall pay $858,521.35 on bond number 613774.

2. Obligee further agrees and declares that the Bonds issued in connection with the Subcontracts and the Projects are hereby canceled and terminated. Obligee shall write upon the Bonds "CANCELED AND TERMINATED" and return the original Bonds to Surety.

3. Obligee agrees to dismiss with prejudice all claims against the Surety in connection with the Suit.

4. Obligee and Surety mutually release and discharge each other of and from any and all claims, demands, and causes of action of every kind or character, both in law and equity, known or unknown, developed or undeveloped, discovered or undiscovered, which they have or may have now or in the future in connection with and relative to the Projects, the Subcontracts, the Bonds, and the Suit, except as expressly set forth

hereinafter. This mutual release shall inure to the benefit of all heirs, successors, and assigns of the parties hereto, but this mutual release is not intended to confer benefits upon nor to release any parties not expressly mentioned.

5. Obligee hereby assigns to Surety all its claims and causes of action against the Principal, and any claims and causes of action for insurance coverages pertaining thereto or in connection therewith, including claims and causes of action against Principal's insurance carriers and Obligee's insurance carriers, which pertain to direct costs of the correction of defective or nonconforming work performed by Principal or anyone on its behalf and any property damage resulting therefrom or caused thereby. Obligee retains all other claims and causes of action against the Principal, including but not limited to claims for completion of Principal's work and all extra costs incurred by Obligee as a result of delays and disruption for which the Principal may be responsible. The balances of the Subcontracts as of the date of Principal's termination, including earned but unpaid contract sums, unearned subcontract sums and retainages, shall be applied as a credit against the claims and causes of action retained by Obligee. As of the date of Principal's termination, the total balances of the Subcontracts was in the amount of $371,333.62.

6. As to the claims assigned by Obligee to Surety, Surety shall have full right and power to pursue those claims in litigation or otherwise in the name of Obligee and/or in the name of Surety, and Surety shall have the exclusive right to prosecute, recover, or compromise any such claims. Surety shall be entitled to all recoveries generated from the assigned claims, and Surety shall be responsible for all costs incurred by Surety in prosecuting the assigned claims. Obligee shall, at its expense, if any, fully cooperate with

Surety in connection with providing reasonable information and documents, as well as witnesses and testimony, necessary for Surety to pursue and/or prosecute the assigned claims. However, if the Obligee is named in any action pertaining to insurance coverages which relate to the claims assigned by Obligee herein to Surety, the Surety will arrange for representation of the Obligee in such action at no expense to the Obligee.

7. In the event that Surety either pursues the pending Suit against the Principal in the name of the Obligee or files a separate suit against Principal in the name of Obligee which produces a counter-claim or third party claim by Principal against Obligee, Surety shall defend but not indemnify Obligee in connection with the counter-claim or third party claim. Obligee shall have the right, at its expense, to retain separate counsel to supervise, co-counsel, or defend itself in connection with any such counter-claim filed by Principal against Obligee.

8. Surety hereby assigns to Obligee any claims or causes of action which Surety may have against any design professionals, suppliers, or manufacturers pertaining to or growing out of Principal's work pursuant to the Subcontracts and the Projects, and any recoveries (less reimbursement to Obligee of reasonable direct costs incurred by Obligee in prosecuting said claims) shall be divided 75% to Obligee and 25% to Surety. Obligee shall have the right to prosecute any such claim in its name and/or in the name of Surety, and Obligee shall have the exclusive right to prosecute or compromise any such claim in its sole discretion. In the event that any such suit filed by Obligee in its name and/or in the name of Surety produces a counter-claim or third party claim against Surety, Obligee shall defend but not indemnify Surety in connection with any such counter-claim or third party claim. Surety shall, at its expense, if any, fully cooperate with Obligee in

connection with providing reasonable information and documents, as well as witnesses and testimony, necessary for Obligee to pursue and/or prosecute the assigned claims.

9. Obligee has advised Surety that Obligee has claims against the Government pertaining to the Projects, and Surety stipulates that it has no interest in or right of recovery from Obligee's claims against the Government or any of Obligee's separate claims or causes of action pertaining to the Projects which are not expressly stated in paragraph 8 hereof.

10. The parties hereto agree to fully cooperate with each other and execute any further documents or court filings necessary to accomplish all matters set forth herein.

11. In the event that any provision of this Agreement is deemed to be ambiguous or unclear, neither party hereto shall be deemed to be the drafter of said provision.

12. In the event that any provision in this agreement is deemed to be unenforceable or void by operation of law, any such provision contained herein shall be severed from this agreement and shall not affect any other parts of this agreement, which shall remain fully enforceable.

13. The parties hereto acknowledge that they have full authority and proper corporate resolution to enter into this Settlement Agreement.

14. The parties hereto agree that this Settlement Agreement may be executed in counterparts with each fully executed agreement being deemed an original.

IN WITNESS WHEREOF, the parties have entered into this Settlement Agreement on the dates and in the capacities as set forth hereinafter.



R2 HS 0001882

#60513

ROXCO23439

Ronald Robbins, President of
Roxco, LTD ("Obligee")

BY: [signature]

ITS: PRESIDENT

DATE: 3-30-98

Personally appeared before me, the undersigned, a Notary Public in and for said county and state, Ronald Robbins, with whom I am personally acquainted, and who, upon his oath, swears to the contents of this instrument, and upon his oath acknowledged himself to be the President of Roxco, LTD, and that he, as such officer, being authorized so to do, executed and swears to the foregoing instrument for the purposes therein contained by signing the name of said corporation by the said Ronald Robbins as such officer.

WITNESS my hand and official seal at office in Jackson, Hinds County, MS on this the 30th day of March, 1998.

[signature]
Notary Public

My Commission Expires: MISSISSIPPI STATEWIDE NOTARY PUBLIC MY COMMISSION EXPIRES AUG. 17, 1999 BONDED THRU STEGALL NOTARY SERVICE

Nobel Insurance Company ("Surety")

BY: Douglas W. Caudill

ITS: Secretary

DATE: March 26, 1998

STATE OF Texas

COUNTY OF Dallas

Personally appeared before me, the undersigned, a Notary Public in and for said county and state, Douglas W. Caudill, with whom I am personally acquainted, and who, upon his oath, swears to the contents of this instrument, and upon his oath acknowledged himself to be the Secretary of Nobel Insurance Company and that he, as such officer, being authorized so to do, executed and swears to the foregoing instrument for the purposes therein contained by signing the name of said corporation by the said Secretary as such officer.

WITNESS my hand and official seal at office in Dallas County, Texas on this the 26th day of March, 1998.

Notary Public

My Commission Expires: 4-01-2000

SUZAN E. TURNER
NOTARY PUBLIC
State of Texas
Comm. Exp. 04-01-2000

R2HS 0001884



#59450

ROXCO23441

# Senergy®

April 8, 1997

Mr. Gill Smith
Roxco, Limited
PO Box 6478
Bossier City, LA 71171-6478

RE: Wherry Housing Barksdale AFB
Bossier City, LA
ThoroWall A (PB) and ThoroWall H (PM) System

Dear Mr. Smith:

As a follow-up to my observations of the finished buildings, many items were found to be deficient in meeting the project specifications, ThoroWall specifications, and common building requirements. This report is not intended to be a punch list, but rather a general outline of the existing conditions of the deficiencies of the project that must be rectified prior to receiving a warranty.

- All vinyl accessories that butt against either the window frame or the EIFS bands around the windows must be sealed so that water cannot penetrate behind the system.

- Due to the improper alignment of the window sill, sealants will be required at the abutment of the window sills and the EIFS bands, so as to not allow water entry behind the system. The original discussions on the job-site of the first building was to chamfer back the EPS so that a joint could be developed at the abutment of the sill and EIFS band. Obviously, this did not happen.

- All intersections of the vinyl accessories must be sealed properly so that water is not allowed to penetrate behind the wall system.

- All electrical, TV cables, and telephone box attachments must be attached and sealed properly so that water does not enter behind the wall system. This also includes the attachment and penetrations of the cables related to the aforementioned items. The wall cladding is not to be used as an attachment surface, this also includes the attachment of the down spouts.

- All dryer vents and exhaust vent openings that were either cut into the wall surface after the system completion or not properly encapsulated during the installation must be properly sealed with Primer Base Adhesive and 117 mesh and reinstalled and properly sealed so as to not allow water entry

- All EIFS surfaces must be fully encapsulated with Primer Base Adhesive, 117 mesh and ThoroWall Acrylic Finish. In the event the bands are to be coated, due to the color scheme requirements, the entire surface area of the banding must be painted with Thoro ThoroSheen Product. In the event

ATCH #4
1 of 3

the mesh is visible, the area will require to be reskimmed with the Primer Base Adhesive, retextured and repainted. In some cases, it appears that the cornice band was either not back wrapped or not fully encapsulated with Primer Base Adhesive and 117 Mesh. In this case, this area will be required to be removed and installed per manufacture's requirements. Where properly installed the abutment of the cornice trim and the soffit vent will be required to be sealed with sealant so as to eliminate water entry.

- Where the system has been damaged or the wall claddings are not fully keyed into the accessories, cracking occurred and touch-up will be required.
- Kick out (diverter flashings) are required at all areas where the roof terminates at its lowest point perpendicular to the plane of the wall. Sealants are required where the flashing and the system intersect. The underside of the system directly above the roof surface must be fully encapsulated with Primer Base Adhesive, 117 mesh, and the appropriate color of finish. No mesh or EPS should be visible
- In all areas where the garage door trim overlaps or abuts the wall cladding, sealant must be installed to eliminate water entry behind the trim or wall system. Sealants are required at the abutment of the storage door trim as well.
- On many buildings, stains could be detected running down the wall surface. It is possible this staining could have occurred prior to the roof being completed or the flashing being completed, these areas must be tested to insure that this situation is not still occurring.
- In many areas, the roof flashing does not overlap the system properly or the flashing is not terminated properly to eliminate water entry behind the system. In all cases the flashing is required to overlap the system a minimum of 2 inches, and sealants installed to the lower side of the flashing.
- Sealants are required around the perimeter of the gable vents. Not one gable vent was sealed.
- As was noted, many details of the drawings had not been installed as they should have been. These areas will need to be identified and corrected per manufacturer's requirements ( this means many areas will require to be fully skimmed and refinished).
- To specifically point out each situation of every building would be impossible. All the items mentioned above occur to some degree almost on every building.
- Please note that all repairs, touch ups, repaints, etc. must be accomplished utilizing ThoroWall/ThoroSheen Products.
- Once you have reviewed and corrected the deficiencies, please feel free to contact David Priest, or Darragh Construction Materials, so that he and I can schedule a walk-through to review the corrections.

Atch 4
2-f3

Wherry Housing
April 8, 1997
Page 3

If you have any questions, please feel free to contact me.

Very truly yours,

David Smith

David Smith
Technical Applications Consultant

DS/yo

cc: R. Donovan

Atch 4
3 of 3

# Senergy®

April 30, 1997

Mr. Jack Keating
Foxco, Limited
PO Box 6478
Bossier City, LA 71171-6478

RE: Wherry Housing Project
Barksdale AFB, LA

Dear Mr. Keating:

As you are aware, an on-site inspection of the above referenced project was made on the 2nd and 3rd of April, 1997. Per our discussion at that time in your office, we discussed the many deficiencies that were present and that many questionable conditions appear to exist. We also discussed the situation of the transitioning of product line changes on the final buildings.

Please find enclosed, the copies of the correspondence pertaining to the deficiencies, conditions, etc. Due to the situation that has evolved and of the current status of the project, be advised that no warranties will be issued until all applications meet ThoroWall, Senergy, and project specifications and that all products have been paid for in full.

Please contact me directly, so that we may schedule a meeting of all parties to resolve this situation.

If you have any questions, please feel free to contact me.

Very truly yours,

David Smith -ψ

David Smith
Technical Applications Consultant

cc: F. Glenn
J. Doyle
K. DiDonato
K. Darragh/Darragh Co.
D. Priest/Darragh Co.

Enclosure

a division of

Atch #5

GENERAL CONTRACTOR

GUNITE CONTRACTOR

# ROXCO, LTD.

PHONE (601) 825-4193
FAX (601) 825-8997
P.O. BOX 64 • BRANDON, MISSISSIPPI 39043

December 5, 1997

BAFB Letter No. 435

Ms. Kathleen A. Lee
Contracting Officer
2nd Contracting Squadron
841 Fairchild Avenue
Barksdale AFB, LA 71110-2271

**RE: Contract No. F16602-95-C0013**
**Replace Wherry Housing**
**Barksdale AFB, LA**

**SUBJECT: Acceptance Inspection Schedule**

Dear Ms. Lee:

ROXCO, Ltd. respectfully request the Final Acceptance Inspection of buildings on Shreveport Road. Specifically, buildings 2759, 2767, 2769, 2801, 2805, and garages 2763, 2771 and 2803, be subject to a Final Acceptance Inspection on December 8, 1997 with documentation and associated warranty paperwork being submitted to your office at that time. It is our intent to deliver additional completed buildings as expeditiously as possible.

Sincerely,

Jim Smith
QA Manager

| | |
|---|---|
| G.B. | |
| G.S. | |
| P.R. | |
| J.S. | |
| M.J. | |
| Pat L. | ✓ |
| | |
| | |
| | |

ROXCO40837