No. 02-176C
(Judge Sweeney)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ROXCO, LTD.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN M. SIMKIN
Assistant Director

JOHN S. GROAT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, NW, 8th Floor
Washington, D.C. 20530
Telephone: (202) 616-8260
Facsimile: (202) 514-7965
Attorneys for Defendant

OF COUNSEL:

BRYAN O'BOYLE
SENIOR TRIAL ATTORNEY
AIR FORCE LEGAL OPERATIONS AGENCY

January 10, 2007

# TABLE OF CONTENTS

PAGE

DEFENDANT'S REPLY TO PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION IN LIMINE . . . . . 1

ARGUMENT . . . . . 1

I. The Parties' Respective Contentions . . . . . 1

II. Federal Rule Of Evidence 702 Preludes The Admission Of Expert Opinions That Are Not Reliable And Relevant; A Party May Properly Contest The Admissibility Of Expert Testimony And Reports By A Motion In Limine; And, A Report based Upon An Erroneous Legal Theory Is Properly Subject To A Motion In Limine . . . . . 2

III. The Pearson Report Is Not Admissible For The Purpose Of "Assist[ing] The Court In Digesting The Voluminous And Technical Data Inherent In Disputes Of This Type" . . . . . 5

IV. As Matter of Law, The Government Did Not Have An Obligation To Accept Or To Reject Work On A Continuing Basis, And The Pearson Report Should Be Excluded Upon That Basis . . . . . 7

V. The Government Properly Required Roxco To Provide Manufacturer's EIFS Warranty, And The Pearson Report Should Be Excluded Upon That Basis . . . . . 9

VI. The Government Properly Insisted Upon Contractually Specified Construction Framing Tolerances, And The Pearson Report Should Be Excluded Upon That Basis . . . . . 13

VII. The Errors In The Pearson Report Are Not Segregable and Roxco Misstates The Impact Of The Report's Various Conclusion Upon The Delay Analysis . . . . . 17

CONCLUSION . . . . . 20

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

Aleutian Constructors v. United States,
24 Cl. Ct. 372 (1991) . . . . . 17

Blake Construction Co., Inc. v. United States,
987 F.2d 743 (Fed. Cir. 1993) . . . . . 16

Brock v. Superior Care Inc.,
840 F.2d 1054 (2d Cir. 1988) . . . . . 3

Engebretsen v. Fairchild Aircraft Corp.,
21 F.3d 721 (6th Cir. 1994) . . . . . 6

Essex Electro Eng'rs, Inc. v. Danzig,
224 F.3d 1283 (Fed. Cir. 2000) . . . . . 10

Gilbert v. Pan American World Airways, Inc.,
No. 85-4157 (S.D.N.Y. Feb. 23, 1989, and July 8, 1988) . . . . . 4

J.L. Simmons Co. v. United States,
188 Ct. Cl. 684, 412 F.2d 1360 (1969) . . . . . 16

Kiewit Construction Co. v. United States,
56 Fed. Cl. 414 (2003) . . . . . 17

Kinetic Builder's Inc. v. Peters,
226 F.3d 1307 (Fed. Cir. 2000) . . . . . 11

M.C. & D. Capital Corp. v. United States,
948 F.2d 1251 (Fed. Cir. 1991) . . . . . 12, 13

Masters v. Hesston Corp.,
291 F.3d 985 (7th Cir. 2002) . . . . . 4

Microstrategy, Inc. v. Business Objects, S.A.,
429 F.3d 1344 (Fed. Cir. 2005) . . . . . 3

Morganti Nat., Inc. v. United States,
44 Fed. Cl. 110 ( 2001) . . . . . 11

Norman v. United States,
56 Fed. Cl. 255 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

North American Trading v. Direct Mail Specialists,
697 F. Supp. 163 (S.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Penguin Industries, Inc. v. United States,
209 Ct. Cl. 121, 530 F.2d 934 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Schuman v. Mezzetti,
702 F. Supp. 52 (E.D.N.Y. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Seaboard Lumber v. United States,
308 F.3d 1283 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Stuyvesant Dredging Co. v. United States,
834 F.2d 1576 (Fed. Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Travelers Cas. and Sur. of America v. U.S.,
74 Fed. Cl. 75 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

United States v. Spearin,
248 U.S. 132 (1918) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Weeks Dredging & Contracting, Inc. v. United States,
11 Cl. Ct. 37 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Westfed Holdings, Inc. v. United States,
55 Fed. Cl. 544 (2003), aff'd in part, rev'd in part, 407 F.3d 1352 (Fed. Cir. 2005), on remand, 68 Fed. Cl. 661 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

White Mountain Apache Tribe of Az. v. United States,
10 Cl. Ct. 115 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3,8

William Green Construction Co., Inc. v. United States,
201 Ct. Cl. 616, 477 F.2d 930 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

## STATUTES, RULES AND REGULATIONS

48 C.F.R. 5.236-12(I) . . . . . . . . . . 12

48 C.F.R. 52.236-11(a) . . . . . . . . . . 12

48 C.F.R. 52.236-12(I), . . . . . . . . . . 12

Fed. R. Evid. 702 . . . . . . . . . . 4

## APPENDIX

1. Excerpts from deposition transcript of David Pearson . . . . . . . . . . 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ROXCO, LTD., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 02-176C |
| | ) | (Judge Sweeney) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFF'S
RESPONSE TO DEFENDANT'S MOTION IN LIMINE

Defendant, United States, respectfully replies to Roxco, Ltd.'s ("Roxco") December 15, 2006 response to the Government motion in limine ("Roxco Resp.").

ARGUMENT

I. The Parties' Respective Contentions

The Government's motion in limine ("Def. Mot.") demonstrates that Roxco's April 14, 2006 expert report ("the Pearson Report"), prepared by Messrs. David Pearson and Jeffery Montroy of Pearson Construction Management Ltd., should be precluded from admission into evidence because it sets forth and relies upon at least three incorrect legal conclusions regarding the parties' respective contractual duties and obligations. Roxco primarily argues that our motion in limine improperly challenges the assumptions regarding liability upon which the Reason reports relies. Roxco argues that a motion in limine, in contrast to a motion for judgment on the pleadings or for summary judgment, is not appropriate motion in which to challenge assumptions in an expert report and asserts that "[i]t is difficult to envision an expert report . . . which does not, at some level, operate on assumption regarding the obligations of a contract, or, stated differently, legal assumptions." Roxco Resp. at 3. Roxco argues that our arguments are not supportable by the cases we cited, and that our position, if adopted, would lead to the large-

scale rejection of expert reports because "[a]ll expert reports that contain, or in any way grounded on, any . . . [legal] . . . supposition would be inadmissible as legal opinion even if all parties (and the Court) agree that the supposition is correct." Roxco Resp. at 6.

As we demonstrated below, Roxco's opposition rests upon a fundamental misconception regarding the admissibility of expert reports and the utilization of those reports, ignores the Court's "gatekeeping obligations," and mistakenly contends that our motion in limine is improper because it raises issues of law about Roxco's entitlement to damages. Remarkably, Roxco also fails even to address one of the legal entitlement questions we challenge in the Pearson report (i.e., the acceptance of housing units at completion), which leaves our argument that the Pearson Report is wrong and is improperly based upon this improper conclusion of law uncontroverted. Moreover, contrary to Roxco's argument, the erroneous legal conclusions relied upon by the Pearson Report may not be segregated or removed from its analysis and Mr. Pearson's expected testimony on damages alleged due to Roxco.

## II. Federal Rule Of Evidence 702 Preludes The Admission Of Expert Opinions That Are Not Reliable And Relevant; A Party May Properly Contest The Admissibility Of Expert Testimony And Reports By A Motion In Limine; And, A Report based Upon An Erroneous Legal Theory Is Properly Subject To A Motion In Limine

As we demonstrated in our moving brief, a party may properly raise through a motion in limine an issue regarding an expert opinion as to entitlement. Def. Br. at 4-6. The premise of Roxco's contention – that a party cannot raise issues in a motion in limine that might otherwise be addressed in motion for judgment upon the pleadings or for summary judgment – is completely unsupported by citation to authority and is simply wrong. In a case upon which we relied in our moving brief, that Roxco fails to distinguish or even to acknowledge, this Court barred through a motion in limine the admission into evidence of an expert report that computed

interest upon a claim for lost profits when there was no statute or legal basis upon which to award such interest, and for other theories of damages that were not sustainable as a matter of law. White Mountain Apache Tribe of Az. v. United States, 10 Cl. Ct. 115, 118-20 (1986) (interlocutory order), further proceedings, 11 Cl. Ct. 614 ( 1987), aff'd, 5 F.3d 1506 (Fed. Cir. 1993) (Table).

Motions in limine "are a favored and useful tool" designed to prevent a party from introducing irrelevant, immaterial, or cumulative matters to expedite trial. Norman v. United States, 56 Fed. Cl. 255, 268 (2003) (quoting Weeks Dredging & Contracting, Inc. v. United States, 11 Cl. Ct. 37, 45 (1986) (citation omitted)). See also Seaboard Lumber v. United States, 308 F.3d 1283, 1302 (Fed. Cir. 2002) ("[I]n a bench trial, where no screening of the factfinder can take place, the *Daubert* standards of relevance and reliability for scientific evidence must nevertheless be met."); Microstrategy, Inc. v. Business Objects, S.A., 429 F.3d 1344, 1354-57 (Fed. Cir. 2005) (trial court's decision to preclude the admission of three expert reports was upheld where the reports had "shortcomings" because they "did not link a single loss to misconduct," ignored other significant factors that might have contributed to damages suffered by the plaintiff, and were based upon "principles and methods" that were "speculative and unreliable.").

The established practice of this Court to exclude expert testimony resting upon an incorrect legal premise pursuant to a motion in limine, moreover, is consistent with the practice of other courts. In Brock v. Superior Care Inc., 840 F.2d 1054, 1063-64 (2d Cir. 1988), for instance, the court discussed with apparent approval the filing of a motion in limine to determine the proper measure of damages. See also Gilbert v. Pan American World Airways, Inc., No. 85-

4157 (S.D.N.Y. Feb. 23, 1989, and July 8, 1988) (1989 WL16603 and 1988 WL74987) (questions of law upon the proper measure of damages should be addressed in limine); Schuman v. Mezzetti, 702 F. Supp. 52, 54 (E.D.N.Y. 1988) (motion and cross-motion for ruling in limine resulted in decision on substantive law which governed the measure of damages); North American Trading v. Direct Mail Specialists, 697 F. Supp. 163 (S.D.N.Y. 1988) (in limine ruling determined what damages could be proven at trial).

The principle premise of Roxco's opposition – that a party cannot raise issues in a motion in limine that might otherwise be addressed in motion for judgment on the pleading or for summary judgment – is fundamentally inconsistent with the Court's responsibility to exercise its "gatekeeping obligations" and to exclude evidence that is either irrelevant or unreliable. As we demonstrated in our moving brief, Federal Rule of Evidence 702 now provides that expert witness testimony is admissible only in certain circumstances:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) **the testimony is the product of reliable principles and methods**, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702 (emphasis added). The Court's "gatekeeping obligation" under Federal Rule of Evidence 702 requires that Court determine prior to admission that specialized expert testimony is "both relevant and reliable." See, e.g., Masters v. Hesston Corp., 291 F.3d 985, 991 (7th Cir. 2002). Assuming, as we have demonstrated, that the Pearson report rests upon incorrect legal assumptions regarding liability, the report is necessarily unreliable and should not

be admitted into evidence upon that basis.

As an alternative basis to argue against the granting of the Government's motion, Roxco argues that "the sheer number of factual issues" precludes the granting of the Government's motion. Roxco Resp. at 14. Notably, however, Roxco fails to identify any particular questions of disputed material facts that may have a possible bearing upon the issues we raise, so it is undisputed that there are no disputed facts relevant to this motion. Moreover, the three issues the Government has identified concern legal rights and obligations pursuant to the contract, clearly questions of law.

The Court's ruling upon the admissibility of the Report at this juncture will permit the parties to prepare for trial more efficiently with an understanding of the Court's position regarding the admissibility of the analysis in the Pearson Report. One legal issue is uncontroverted, the other two legal issues are straight forward, and Roxco has not identified any disputed factual issues. Deferring consideration of these issues, as Roxco incorrectly assumes is required, will significantly frustrate an orderly and efficient resolution of this matter.

## III. The Pearson Report Is Not Admissible For The Purpose Of "Assist[ing] The Court In Digesting The Voluminous And Technical Data Inherent In Disputes Of This Type"

Roxco' response to our motion rests upon a fundamental misconception about the proper function and admissibility of an expert report. Roxco's opposition begins by advising that "[b]oth the Pearson Report and the experts' testimony will be offered at trial to assist the Court in digesting the voluminous and technical data inherent in disputes of this type." Roxco Resp. at 2. Roxco's stated intention reflects a serious misconception about the admissibility of an expert report, confirming our position that the Pearson Report should be excluded at trial.

Rule of Evidence 702 permits the introduction of expert testimony under certain limited and defined circumstances as an exception to the hearsay rule, but makes no provision for the admission of expert reports. The Pearson Report and its attachments obviously constitute hearsay and, thus, properly inadmissible, in the absence of either a stipulation or another recognized exception to the hearsay rule. See Westfed Holdings, Inc. v. United States, 55 Fed. Cl. 544, 569 (2003) ("While FRE 703 permits an expert to testify based upon material not admitted into evidence, *see* Fed. R. Evid. 703, FRE 703 does not permit such materials to be admitted into evidence."), aff'd in part, rev'd in part, 407 F.3d 1352 (Fed. Cir. 2005), on remand, 68 Fed. Cl. 661 (2005); see also Engebretsen v. Fairchild Aircraft Corp., 21 F.3d 721, 728 (6th Cir. 1994) ("Rule 702 permits the admission of expert opinion *testimony* not opinions contained in documents prepared out of court.") (emphasis in original). This Court's determination of legal issues regarding entitlement and damages must be based upon the evidence the parties proffer and admit into evidence, and not by a discussion of an expert based upon the expert's allegedly independent inquiry.

Roxco's opposition states that "[i]n preparing the Pearson Report, its authors reviewed over 100,000 pages of project records. Both the Pearson Report and the experts' testimony will be offered at trial to assist the Court in digesting the voluminous and technical data inherent in disputes of this type." Roxco Resp. at 2. The admission of the Report for the purpose Roxco has identified would be improper because the Court's decision must be based upon evidence admitted at trial -- not the information considered by an expert in the expert's own investigation and thereafter discussed in the expert's report.

The objectionable, hearsay nature of the Person Report is especially evident here because Roxco's proffer of a lengthy narrative in the Pearson Report rests, in part, upon conversations of the experts with Roxco employees, which conversations are not reflected in any memorandum, frustrating any cross-examination or determination at trial what portions of the report are based upon such conversations. Appendix ("RA–") 3-5 (TR 33-40). The Pearson Report's narrative does not and cannot substitute for competent admissible evidence establishing the relevant facts at trial and the Court's consider of the report for the purpose Roxco proposes to introduce the Report into evidence would be error. Consequently, the purpose Roxco has identified for entering the Pearson Report "to assist the Court in digesting the voluminous and technical data" is improper, dramatically confirming the merit of the Government's objections to the introduction of the Pearson Report into evidence.

IV. As Matter of Law, The Government Did Not Have An Obligation To Accept Or To Reject Work On A Continuing Basis, And The Pearson Report Should Be Excluded Upon That Basis

Roxco's opposition to our motion in limine also contends the Pearson Report did not make a legal conclusion about the Government's obligation to inspect and accept work upon a continuing basis, and chides the Government for having elicited such testimony from Mr. Pearson at his deposition. Roxco Resp. at 6-7. Contradicting Roxco's contention, the Pearson Report unequivocally states the following:

> During construction, neither the contracting officer nor the other Government personnel administering the project deemed it appropriate to accept each stage of construction as it was completed. That decision caused Roxco to incur significant delays and additional costs.

Appendix to the Government's Moving Brief, ("A--") at 71. The Report then computes Roxco's

entitlement based upon the assumption that Roxco is entitled to compensation for such delays and costs.

Roxco actually recognizes the fact that the Pearson Report relies upon a legal conclusion and "believes, and at the proper time its attorney will argue, that the government should have accepted or rejected Roxco's work on a continuing basis." Roxco Resp. at 9. Given this recognition, it is illogical for Roxco to now suggest that the Pearson Report does not make a legal conclusion, and to chide the Government for having inquired about such a legal conclusion at Mr. Pearson's deposition. Roxco Resp. at 7. Undoubtedly, the Pearson Report's independent analysis is based upon a legal conclusion, i.e., that the Government had a duty to accept work upon a continuing basis, and Roxco proposes to premise its case at trial for damages upon this erroneous conclusion of law. Roxco Resp. at 7 & 9.

Roxco further contends that the "Pearson Report . . . contains merely a calculation of damages that should be allowed if the Court is persuaded that Roxco is correct on the point. If the Court ultimately concludes that Roxco is incorrect on that point, that portion of the Pearson Report will simply have no significance." Roxco Resp. at 9. Roxco is wrong to make such a simplistic assessment, and misses the point that our motion in limine is a recognized method to simplify issues prior to trial. E.g., White Mountain Apache Tribe of Az., 10 Cl. Ct. at 116. For this reason, the Pearson Report is properly subject to exclusion pursuant to a motion in limine.

In response to the Government's argument that the contracting officer did not have a duty to accept or reject work on a continuing basis, Roxco had two options: it either could respond to the arguments in Government's arguments in its motion in limine, argue the conclusion upon which the Pearson Report rests are correct, and defend the report or it could waive any right to

do so by its failure to respond. Perhaps in tacit recognition of the fact that the legal assumptions upon which the Pearson Report relies are indefensible, Roxco now has elected the second option, and properly waived any right to argue that the Government had an obligation to accept or reject work upon a continuing basis.

Since Roxco failed to present or establish any authority for the Pearson Report's conclusion that the contracting officer had a duty to accept each stage of construction as it was completed, this Court should accept the Government's now uncontroverted legal contention that contracting officer had no such duty. Not only is the Pearson Report inadmissible hearsay for the purpose Roxco has identified it will be proffered, the Pearson Report rests upon a legal assumption or conclusion that is simply wrong as a matter of law.

V. The Government Properly Required Roxco To Provide Manufacturer's EIFS Warranty, And The Pearson Report Should Be Excluded Upon That Basis

In response to the Government's motion in limine, Roxco has filed, "out of an abundance of caution," a related motion to allow it to file a substitute page for its expert report that deletes or redacts that portion of the Pearson Report that states a legal conclusion about how "the Government had no contractual basis for requiring Roxco to provide specific product warranties prior to occupancy." Plaintiff's Motion For Leave To Substitute Page Of Expert's Report (December 15, 2006) . We have responded in a separate filing to that motion by not objecting to the redaction, but demonstrate here that the simple deletion or redaction of the legal conclusion does not cure the underlying problem with the Pearson Report that it is based upon an underlying erroneous conclusions of law. This is because, in responding to our motion, Roxco states the following:

> Roxco's position regarding the timing of the warranty submittals is, of course, unchanged. It is plain that the contract does not specify the timing of the submission of warranties, and the Government's decision to require the submittals prior to occupancy was the result of a choice rather than a requirement. This choice caused damages to Roxco, and the Pearson Report properly explains and quantifies those damages.

Roxco Resp. at 10 (emphasis added).

Given Roxco's position, the error underlying the Pearson report's analysis is not cured by the simple redaction or deletion of the Pearson Report's statement of the legal assumption upon which it relies. The conclusions in the Report undisputably rests upon an erroneous conclusion of law that Roxco is entitled to compensation for the contracting officer's "choice" to require Roxco's proffer of the EIFS manufacturer's warranty prior to accepting any housing units for beneficial occupancy. That assumption is completely unfounded and simply wrong as a matter of law.

A contractor is entitled to be paid for its performance, in accordance with the requirements of its contract. William Green Construction Co., Inc. v. United States, 201 Ct. Cl. 616, 477 F.2d 930 (1973).

> A contractor seeking to prove the government's liability for a delay has the burden of proving the extent of the alleged delay, the causal link between the government's wrongful acts and the delay in the contractor's performance, and the alleged harm to the contractor for the delay. See Essex Electro Eng'rs, Inc. v. Danzig, 224 F.3d 1283, 1295 (Fed. Cir. 2000). In establishing the causal link, the contractor must show that the government's actions affected activities on the critical path of the contractor's performance of the contract.

Kinetic Builder's Inc. v. Peters, 226 F.3d 1307, 1317 (Fed. Cir. 2000); see Morganti Nat., Inc. v. United States, 44 Fed. Cl. 110 (Fed. Cl. 2001).

Roxco now contends that the Pearson Report properly rests upon the premise that Roxco is entitled to compensation for the contracting officer's "choice" to require that Roxco submit a contractually required EIFS manufacturer's warranty prior to the acceptance of Roxco's work upon particular housing units. In fact, Roxco specifically contends "the Government could have inspected and accepted housing units as they were completed to the point that they could actually be used for housing, and Roxco would still have the obligation to complete all aspects of the contract including furnishing the warranties." Roxco Resp. at 11.

As we demonstrated in our moving brief, the contracting officer clearly had the contractual right to decline to accept housing units until Roxco's proffer of the contractually required warranty, and was entirely justified in declining to inspect and accept the housing units. Def. Br. at 11-15. Roxco does not challenge any of these facts we relied upon in our moving brief addressing the basis for the contracting officer's action and this Court now should find these facts uncontroverted. Under these uncontroverted circumstances, the contracting officer's "choice" to require Roxco to proffer the manufacturer's warranty prior to the acceptance and occupancy of the units manifestly was reasonable, especially in view of the very serious EIFS installation problems that Roxco experienced with its subcontractor, and does not entitle Roxco to damages or compensation.

In response to our motion, Roxco refers to contract clause or provision, 48 C.F.R. § 52.236-12(i), Roxco Resp. at 12 n.4, which provides as follows:

> Unless otherwise specified in the contract, the Government shall accept, as promptly after completion and inspection, all work

> required by the contract or that portion of the work the contracting officer determines can be accepted separately. Acceptance shall be final and conclusive, except for latent defects, fraud, gross mistakes amounting to fraud, or the Government's rights under any warranty or guarantee.

48 C.F.R. § 5.236-12(i) (emphasis added). This contract clause affords the contracting officer, within his or her discretion, the right to accept the portion of the work that can be separately accepted. Likewise, 48 C.F.R. § 52.236-11(a), affords the contracting officer "the right to take possession of or use any completed or partially completed part of the work. . . ." Nothing in these provisions, however, required the contracting officer to take possession or acceptance of partially completed work, and Roxco has not cited any such authority in its opposition brief. [1] The requirement for a manufacturer's warranty was an important contractual requirement, the contracting officer properly insisted upon receiving the warranty, and Roxco's failure to provide the warranty justified the Governments's delaying final acceptance. See M.C. & D. Capital Corp. v. United States, 948 F.2d 1251, 1256 (Fed. Cir. 1991). Section 52.236-12(i) merely confirms the Government's argument that the Government acted within its rights under the contract and that Roxco is not entitled to compensation.

The Pearson Report reflects the erroneous legal conclusion that the contracting officer's "choice" to require the EIFS manufacturer's warranty prior to acceptance of housing units

---

[1] Indeed, the law is that prior possession or occupancy by the Government will entitle the contractor to an equitable adjustment if such occupancy delays the contractor, and the contractor is relieved of responsibility for the loss of or damage to work resulting from the Government's possession. 48 C.F.R. § 52.236-11(b). Given the circumstances here, it was not unreasonable for the contracting officer to make the "choice" to decline the acceptance of any housing units until Roxco proffered the contractually required EIFS manufacturer's warranty, especially in view of the very serious EIFS installation problems that Roxco experienced with its subcontractor.

resulted in delay which delay is the responsibility of the Government and that delay entitles Roxco to compensation is simply wrong as a matter of law. In M. C. & D. Capital, the Court found that the Government could properly take prior beneficial occupancy, but that the work was not finally accepted until all work was completed, including the provision of the contractually required manufacturer's warranty. 948 F.2d at 1256. Nothing in that case supports the conclusion that the contracting officer was required to make the choice to accept housing units for beneficial occupancy without the proffer of a contractually required manufacturer's warranty so as to entitle Roxco to compensation.

The Pearson Report, Roxco now argues, is properly premised upon the basis of a conclusion that Roxco is entitled to compensation due to the contracting officer's "choice" that Roxco proffer the EIFS manufacturer's warranty before the Government would accept housing units for occupancy. Roxco points to no contractual provision or legal theory that supports the conclusion reached in the Pearson Report. Roxco's apparent argument that the exercise of a contractually authorized "choice" entitles it to compensation is unsupported by any legal authority and directly conflicts with controlling precedent. The legal premise of the Pearson Report is incorrect and the Report should be excluded upon that basis.

## VI. The Government Properly Insisted Upon Contractually Specified Construction Framing Tolerances, And The Pearson Report Should Be Excluded Upon That Basis

The Government's motion in limine further demonstrates that the Pearson Report is premised upon an erroneous conclusion of law that the contract's allowance of the use of various grades of lumber, including Grade 3 lumber, for framing resulted in the Government's waiver of compliance with the contract's dimensional framing specifications. Def. Br. at 16-20. Roxco's

contention that the discussion and holding in Travelers Cas. and Sur. of America v. U.S. 74 Fed. Cl. 75 (2006), establishes that the specifications in the contract here are design rather than performance is meritless.

First, Roxco misconstrues our motion. Roxco incorrectly states that our motion is based upon the Pearson Report and its belief that there is an alleged contract specification discrepancy to use Grade 2 and Grade 3 lumber at the same time. Roxco Resp. at 12. As we stated in our motion, the Pearson Report rests upon the erroneous legal conclusion found at ROXCO REPORT 0288, A27, where the Pearson Report states the following legal conclusion: "The two specifications contradicted each other, and neither specified a grade of lumber appropriate for the framing tolerances required by the Government." A27. Roxco's expert, Mr. Pearson, testified at his deposition that the contract's allowance of Grade 3 lumber "sends a message to a builder that this is low cost, this a very low priced facility. This is not an important – we ain't going to check things closely." A204 (TR 189). The Pearson Report also states the "tolerances exceeded what could reasonably be achieved with the substandard grade of lumber specified." ROXCO REPORT 0291, A30. This was further established by Mr. Pearson at his deposition where he testified that "[t]he evidence demonstrates that the government zealously held Roxco to not just substantial compliance with tolerances, but with actual compliance with tolerances." A205 (TR191). The conclusion of the Pearson Report rest upon an erroneous conclusion of law that, because the contract allowed for the contractor's use of various grades of lumber, including at a minium Grade 3 lumber, the Government could not require "actual" compliance with the contract's dimensional and tolerance specifications for framing.

The contract specifications for lumber and its erection tolerances of not more than 1/8" or 1/4" in 8 feet out of plumb were in the nature of performance specifications -- not design specifications as alleged by Roxco. A136. Roxco now ignores the fact the contract specifications for lumber sets forth only a minimum grade, and that Roxco had discretion to determine the specific species and grade of lumber it used for construction. Contract specification 06100 established the specifications for "Rough Carpentry." A105. Para. 2.1.1, entitled "Framing Lumber," of contract specification 06100 set forth a "Table of Grades for Framing and Board Lumber" that allowed a variety of different wood species amongst which Roxco could select for construction. A110. Para. 2.1.1 of contract specification 06100 clearly stated the following: "Framing lumber such as studs, plates, caps, collar beams, cant strips, bucks, sleepers, nailing strips, and nailers and board lumber such as subflooring and wall and roof sheathing shall be one of the species listed in the table below. **Minimum grade of species shall be as listed.**" A110 (emphasis added). Depending upon the species utilized, No. 3 or No. 2 Grade was the "minimum grade" that Roxco could select in accordance with this specification. A110. Furthermore, para. 3.1.7.1 of contract specification 06100, entitled "Studs," clearly required Roxco to "[s]elect studs for straightness and set plumb, true, and in alignment." A115.

Consequently, the contract only set certain minimum grades of lumber that could be used in construction, left the discretion to Roxco to determine whether to use a higher grade of lumber, placed the responsibility upon Roxco to select studs for straightness and to set the studs "plumb, true, and in alignment," and to then exercise other proper workmanship skills to meet the required tolerance of not more than 1/4 inch in 8 feet out of plumb. A136. Under the terms and provisions of the contract, Roxco was allowed to select a higher grade of lumber in an effort

to expend less time and labor to meet the dimensional specifications, or select a lower grade of lumber to minimize material costs with the possibility of a concurrent increase in time and labor to meet the required dimensional specifications.

"It is the obligations imposed by the specification which determine the extent to which it is 'performance' or 'design,' not the other way around." Blake Construction Co., Inc. v. United States, 987 F.2d 743, 746 (Fed. Cir. 1993). The discretion afforded Roxco by the contract in both selecting the lumber and achieving tolerance specifications make these specifications in the nature of performance specifications.

> According to the classic formulation defining design and performance specifications, design specifications "set forth in precise detail the materials to be employed and the manner in which the work [is] to be performed," from which the contractor is "not privileged to deviate . . ., but [is] required to follow . . . as one would a road map. In contrast, typical 'performance' type specifications set forth an objective or standard to be achieved . . . ," requiring the contractor to exercise its ingenuity in achieving the standard of performance, in selecting the means, and in assuming a corresponding responsibility for that selection. J.L. Simmons Co. v. United States, 188 Ct. Cl. 684, 412 F.2d 1360, 1362 (1969). "Detailed design specifications contain an implied warranty that if they are followed, an acceptable result will be produced." Stuyvesant Dredging Co. v. United States, 834 F.2d 1576, 1582 (Fed. Cir.1987) (citing United States v. Spearin, 248 U.S. 132, 39 S. Ct. 59, 63 L. Ed. 166 (1918)). In contrast, the government does not impliedly warrant the adequacy of performance specifications. Stuyvesant, 834 F.2d at 1582.
>
> * * *
>
> However, crucial elements still required Aleutian's ingenuity and expertise to achieve the government's desired performance. Even though a contract may contain some design specifications, when a crucial element of a contract requires the contractor to use its own expertise and ingenuity, a *Spearin* warranty does not arise as to that element of the contract. See Penguin, 530 F.2d at 937

> [Penguin Industries, Inc. v. United States, 209 Ct. Cl. 121, 530 F.2d 934 (1976)].

Aleutian Constructors v. United States, 24 Cl. Ct. 372, 378 (1991); Kiewit Construction Co. v. United States, 56 Fed. Cl. 414, 422 (2003) (same). The contract specifications here clearly afforded Roxco considerable discretion and are properly considered performance specifications.

As we demonstrated in our moving brief, the Pearson Report's incorrectly concludes as a matter of law that the Government did not have the right to insist upon "actual" compliance with the contract specifications due to the low grade or alleged "substandard" lumber allowed for the project. Def. Br. at 16-20. The report is wrong as a matter of law and the Court should exclude the Report upon that basis.

## VII. The Errors In The Pearson Report Are Not Segregable and Roxco Misstates The Impact Of The Report's Various Conclusion Upon The Delay Analysis

In our moving brief, we explained the practical significance of the incorrect legal conclusion upon which the Pearson Report rests. Roxco does not contest our representation that, based upon Pearson's work papers and the testimony of Mr. Pearson, the Pearson report reflects an analysis of a database of approximately 19,000 lines items printed on 380 pages. Roxco has not prepared a computerized data base setting forth the logical interrelationship between activities in determining the critical path, but relied instead upon Mr. Pearson's and Mr. Montroy's personal review of those individual 19,000 line items in determining what Roxco contends is the critical path. Def. Br. at 2.

In response to our motion, Roxco now contends that any error in the assumptions upon which Pearson Report relies can be segregated from the Pearson Report's delay analysis. For

example, addressing the legal assumption regarding Roxco's contention that the Government was obligated to accept housing units upon a continuing basis, Roxco now contends that "The Pearson Report, however, contains merely a calculation of damages that should be allowed if the Court is persuaded that Roxco is correct **on the point**. If the Court ultimately concludes that Roxco is incorrect on that point, that portion of the Pearson Report will simply have no significance." Roxco Resp. at 9 (emphasis added). Likewise, addressing the assumption regarding Roxco's contention that the Government was not entitled to insist upon EFIS warranties prior to acceptance, Roxco now contends that "The Pearson Report merely quantifies the damages that Roxco incurred because of the Government's poor and unnecessary choice. The Pearson Report's conclusions regarding the EIFS warranty issue are limited to critical path analysis and quantification of damages." Roxco Resp. at 12. Similarly, in addressing the assumption regarding Roxco's contention that the Government was not entitled to insist upon compliance with the framing specifications, Roxco now contends "The Pearson Report simply explains the problems and quantifies the damages which flowed from the Government's breach." Roxco Resp. at 14.

Roxco's attempt to minimize the impact of any errors in its expert report by contending that any errors in its Pearson Report and its expert testimony can be segregated from other matters in the report conflicts with Mr. Pearson's own testimony. Mr. Pearson testified that the delay analysis upon which the Pearson report is based does not permit the attribution of specific delay to specific alleged errors and omissions. Specifically addressing the Roxco's allegations regarding the lumber specifications, Mr. Pearson testified as follows:

Q. What percentage of the costs here are attributable to the government's provision permitting the use of No. 3 lumber? Can that be quantified?

A. No. I can't -- I can't separate the cost of each one of these issues separately. Just the cost records won't allow it to be done. But what we can do is see the enormous amounts of money that were spent, and we can see from the records that has -- and we quoted one daily diary where they said they culled 4,000 studs.

RA10 (TR 192-92).

Due to the unusual methodology utilized in preparing the Pearson Report, should the Court sustain any of the Government's objections to the Pearson Report and expected expert testimony, the Government and ultimately the Court will have to determine the impact of the error. Assuming for the sake of argument that any of the Pearson analysis is properly admissible, assessment of the impact identified in our motion will involve the formidable task of reviewing the approximately 19,000 line items on 389 pages and attempting to determine the impact of those erroneous assumptions upon Roxco's delay analysis, without the benefit of computer data base setting for the logical interrelationship between the 19,000 activities identified. In contrast, the issues we now raise require resolution of three discreet issues of contact interpretation. No proper basis exists to defer resolution of the legal issues the Government raises. Resolution of these questions at the earliest possible juncture, as the Government now urges, will permit the Government to conduct any required analysis in an

efficient manner, will avoid burdening the Court with the parties' attempting to address this issue at trial, and, thereby, will promote an efficient resolution of this matter.

CONCLUSION

For the reasons set forth in our moving brief and above, the Court should enter an order in limine precluding from introducing into evidence at trial the Pearson Report dated April 14, 2006.

Respectfully submitted,
PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

BRIAN M. SIMKIN
Assistant Director

/s/ John S. Groat
JOHN S. GROAT
Attorney
Commercial Litigation Branch
Department of Justice
ATTN: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20530
(202) 616-8260
Fax (202) 514-7965
jack.groat@usdoj.gov

Of Counsel:
Bryan O'Boyle
Senior Trial Attorney
Air Force Legal Operations Agency

January 10, 2007

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ROXCO, LIMITED

PLAINTIFF

VERSUS NO. 02-176C

THE UNITED STATES

DEFENDANT

---

# DEPOSITION OF DAVID PEARSON

---

Taken at the instance of the Defendant
In the Law Offices of Young Williams
210 East Capitol Street, Suite 2000
Jackson, Mississippi 39201
On September 12, 2006, at 9:00 a.m.
REPORTED BY: ABBY JULIAN, CSR
CSR NO. 1706



07ad3d71-6638-4b8b-ac0e-e8b533e03026

APPEARANCES:

STEPHEN WILLIAMS, ESQUIRE
Young Williams, PA
210 East Capitol Street, Suite 2000
Jackson, Mississippi 39201
REPRESENTING THE PLAINTIFF

JOHN S. GROAT, ESQUIRE
BRYAN O'BOYLE, ESQUIRE
US Department of Justice
1100 L Street NW, Room 11050
Washington, DC 20005
REPRESENTING THE DEFENDANTS

ALSO PRESENT:
James Beach, Jeffery Montroy,
Ronald Robbins



I-N-D-E-X

WITNESS :
DAVID PEARSON


| EXAMINATION | PAGE |
|---|---|
| BY : MR. GROAT | 4 |

EXHIBITS

| Exhibits NO. | Page |
|---|---|
| EXHIBIT 253 | 9 |
| EXHIBIT 254 | 67 |
| EXHIBIT 255 | 77 |
| EXHIBIT 256 | 89 |
| EXHIBIT 257 | 171 |




MR. GROAT: Just an administrative note. Steve, for the record, we can state that the government's position is that the -- you know, I should pay his billed time for the actual deposition, and you're going to get back to me on what your position is.
MR. WILLIAMS: That's correct.
* * * * * *
DAVID PEARSON,
having first been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. GROAT:
Q. Sir, would you please state your full name for the record.
A. David Elton Pearson.
Q. Will you state your address, sir?
A. 3825 Colleen Drive, Montgomery, Alabama 36106.
Q. Is there any reason that you couldn't give full and complete responses to deposition questions today, such as illness or any other problem?
A. No, sir.
Q. In connection with your testimony in this case, what specifically have you been retained to do?



A. We were retained to collect the records on the Barksdale Air Force Base project and perform an independent analysis of Roxco's entitlement to time extensions and additional compensation.
Q. Who retained you to do that?
A. Steve Williams.
Q. And what provision was made for compensation?
A. Mr. Williams and his client, Ben Turnage, agreed to pay our normal hourly rates and expenses for the performance of our work.
Q. Is there any letter that summarizes the specific tasks that you've been given?
A. No, sir.
Q. Have you been retained to examine and render an opinion regarding the DCAA report?
A. We will respond or assist Mr. Williams in responding to the DCAA report.
Q. Have you been tasked with doing that?
A. To some extent, yes.
Q. What assistance have you provided?
MR. WILLIAMS: Can I ask for a clarification? Which DCAA audit report are you referring to? The report y'all submitted as a part of your expert witness disclosures or the earlier report that was scheduled by the court





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 30

Now, did your analysis of the delay issue in this case include conclusions and analysis regarding the contract specifications?
A. You'll have to be more specific about that because it's the contract specs involved some design issues that I'm not qualified to testify about.
Q. Does your scheduling analysis rest in part upon conclusions you reached regarding the proper reading of certain contract provisions?
A. You'll have to identify those provisions.
Q. Have you been recognized as an expert in issues concerning foundations?
A. As it relates to construction and delays to foundations, but not as it relates to the design of foundations.
Q. Have you been recognized as an expert concerning soils as they relate to construction?
A. As they relate to workability, as they relate to the cost and the equipment that one employs in procuring and installing particular types of earth, rock, et cetera. But not in the design of particular types of material.
Q. What is -- in what cases have you been recognized as an expert concerning soils as it relates to -- I believe you used the term "workability." Is

Page 31

that correct?
A. Yeah. That would fall under the general category of construction management; and, you know, having testified in 80 cases or so, there's going to be a bunch of them that involve soil issues, and I would just have to look back at my record. One that comes to mind -- I don't know if it matches or not, but there were a number of soil issues on this Shreveport matter, Hollywood Casino.
Q. My question goes to: What type of opinions have you rendered in such cases?
A. All of my opinions relate to the constructability of soils the conflicts if they exist in the specifications and what one can expect in terms of actually performing the construction work related to the soils. The effect of encountering unexpected soils, the delay caused by those soils, the problems that a contractor can encounter while performing work in various types of soils, all of it relates to the constructability issue.
You know, I've dug the ditches myself. There was a time when I -- in high school when I had to do that. And then shortly after I got out of college, I was a field guy wearing frogans and going around laying out foundations and putting chalk on the ground and

Page 32

digging the foundation and putting in the rebar and I -- I don't know this business just from sitting behind a desk and paperwork. I've actually done it myself.
Q. Now, in performing the analysis, what I'm going to ask you to do is go through in as great of detail as possible and tell me what exactly Pearson and you, in particular, what universe of data you considered in formulating your opinions.
A. Every document that we reviewed in our office, and as I stated earlier, hordes of boxes of those documents. Now, obviously, not every document that we looked at had some bearing upon an opinion that we have. But we have endeavored to review all of the documents, and we've endeavored to identify those that might have a bearing on this case. And when Mr. Beach writes a report or when the DCAA auditor writes a report that mentions something that we perhaps haven't seen, then we go look to find that document and see if it modifies what we think.
Q. You identified the universe of documents which you've described to be approximately 40 boxes. Is that correct?
A. Something in that neighborhood, yes, sir.
Q. What other data have you considered in

Page 33

preparing this report?
A. Conversations with Ron Robbins and Pat Leech about things that happened on the job. We read something in a letter and perhaps it wasn't completely clear to us, and we say, "What do you mean by that?" And then sometimes their explanation would provide an amplification that was helpful, sometimes not. But in general, our objective is to learn everything that we possibly can, first from the documents that are available to us, and then secondly from the reports and documents that are prepared by the government.
Q. So we have the 40 documents, and then we have conversations with --
MR. WILLIAMS: Excuse me. Forty boxes.
BY MR. GROAT:
Q. Forty boxes. And then we have conversations with Mr. Ron Robbins and Pat Leech. Is that correct?
A. That's correct.
Q. What other data exists that you analyzed in this case in formulating your opinion?
A. That's all that comes to mind.
Q. You indicated conversations with Mr. Ron Robbins and Patrick Leech. Is that correct?
A. That's correct.
Q. Who had these conversations?

Page 34

A. Jeff Montroy and myself.
Q. You also testified that you had conversations when you read something in a letter, and that these conversations clarified that matter. Is that correct?
A. Correct.
Q. Did you rely upon representations by Mr. Ron Robbins and Mr. Patrick Leech that are not reflected or that don't simply reflect clarification of correspondence or other documents?
A. We have three volumes, about 200 pages of text over there. It would be a stretch for me to attempt to answer that as a yes or no because my memory is just not that good. It's too many issues involved.
Q. Did you maintain -- did you or those under -- operating under your supervision in this case maintain records of their conversations with Mr. Ron Robbins and Mr. Patrick Leech relative to the case?
A. I don't want to leave you under the impression that occasionally we wouldn't write some notes. But as we continued our investigation and decided what we thought were the facts, then we don't maintain those things.
Q. Is it your testimony that the standard practice in expert testimony would permit relying upon statements that are not reduced to some sort of

Page 35

memorandum or note in the record?
A. Well, that's a legal question you and Mr. Williams will have to wrangle about. But to the fullest extent possible, we prefer corroboration of oral testimony in the records. And in the event that we're unable to find corroborating written evidence, we occasionally will rely upon representations made by individuals. And most of the time when we do that, we'll make a notation of such in our report.
Q. My question actually went to your experience as an expert and in testifying in construction management. And is it your testimony -- is it the standard practice in construction management that if an expert considers oral representations as a basis for conclusions in the report, that these oral representations would be reduced to a note or memorandum in the report?
A. I would say no. In all the reports that I read by other consultants, you sometimes see it, you sometimes don't.
Q. What is your standard practice?
A. I described that to you just a moment ago. I'll repeat it if you like.
Q. Please do.
A. To the extent that we hear oral

Page 36

representations, we look for corroborating evidence in the files. If we find evidence that contradicts the oral representation, we won't rely on it. If we don't find corroborating evidence, but the explanation given fits with all of the rest of the facts that we've seen, then we'll adopt it.
Q. And what is your standard practice with regards to the maintenance of records of such oral representations?
A. Most of the time, when we ask questions such as this that we're trying to fill a hole in something that we're writing, so we'll have a text much as you're reviewing there and we'll want to finish it up. And when we hear something, we will make a decision about what we're going to include in the report, and it ends up in our report. That's our practice.
Q. Now, will you be able to identify in this report the matters which are based solely upon oral representations of Mr. Leech or Mr. Robbins?
A. I doubt it. Given all of the pages of text and studies that we've done, it would take me a couple of days to go through and carefully check it and identify which ones we relied upon. But I would attempt to do that if that's your preference.
Q. My understanding is you can't because -- my

Page 37

understanding is your testimony is there is no record of the conversations that Pearson had with Mr. Robbins and Mr. Leech relative to this matter.
A. But what you do have, sir, is my written opinion in some 200 pages. And if you find something in there that you deem inaccurate, I'd be happy to respond to it.
Q. Now, in the universe of materials that you considered, we've identified 40 boxes and conversations with Mr. Robbins and Mr. Leech. Was there any other data source upon which you relied?
A. I mentioned that we looked at Mr. Beach's report. We looked at the DCAA audit. And to the extent that those had mentions of things in them that we thought might alter our understanding, then we might have modified what we'd written. But that's all that I can think of.
Q. Has there been any modification or change to your report based upon Mr. Beach's report?
A. We've not made any modifications, but I anticipate we might have a few.
Q. What specific areas do you feel that Mr. Beach's report would warrant modifying your report?
A. One in particular is his inclusion of Mr. Leech's testimony where he said he wasn't involved

Page 38

in the bid and our report stated that he was. I think you must be right about that. And then tomorrow as a result of the questions that we plan to ask Mr. Beach, there may be a few others. It's very hard to go through as many records as we've done, write as much as we've done, and not have any errors.

Q. In identifying the data that you've considered, the report clearly states that you considered other expert opinions which you retained. Isn't that correct? And we had those depositions yesterday.

A. Yes, that's correct.

Q. Does your report rest in part upon the opinions rendered by those experts?

A. It does.

Q. Let's start, if you would -- we have the report here, and I'll ask you to -- I'm going to draw your attention to some specific points and see if we can't get a little particular. If you would, turn to page 9 of your report, which we've Bates-stamped here. I think the references to pages here may make things a little quicker.

A. From time to time, I might ask you to allow me to look at my original report, which would be the same, but just because this may be a little more

Page 39

difficult to orient myself.

Q. Any matter that would expedite the examination, I would be happy.

I have one other question with regards to the data considered. Did you or Mr. Montroy actually visit the site?

A. Mr. Montroy did.

Q. Have you ever visited the site?

A. I have not.

Q. Have you viewed photographs or pictures of the site?

A. I have.

Q. Now, at page 9 of your report, you discuss certain conclusions reached relative to the foundation. Is that correct?

A. I think you said page 9?

Q. I Bates-stamped the report, so it reads Roxco Report 0009. So when I refer to page 9 . . .

A. I'll try to remember that. I have that in front of me, yes.

Q. I'd ask you to review that page. And the question was whether this page addresses the testimony, the opinions issued both by Mr. Davis and Mr. Carmichael.

A. I think that it does, yes.

Page 40

Q. Were you present yesterday for Mr. Davis's testimony?

A. I was.

Q. Based upon your consideration of his testimony, do you agree that he identified three factors which made construction of the project more difficult: That is, the height of the slab above the grade, the particular fill material utilized, and the native soil present?

A. I believe that those are individual components from an engineering standpoint, but I do not believe that they -- that those issues described in total the problems for which the government bears responsibility.

Q. Do you agree with Mr. Davis's testimony that Roxco would have bid the job based on a terms he used, a colloquial term he used, a "Bubba contractor," who would have been familiar with constructing residential foundations but not familiar with use of metal forms?

A. It's not my recollection that Mr. Davis testified that Roxco would have bid this project using Bubba. His description of Bubba was one that was elicited as a result of your discussions about how these things get built, and he was describing for you his vast experience in how residential construction is

Page 41

built. And I agree with his characterization to the extent that his characterization described the type of subcontractor that performs this type of work, whether it's government work, any type of residential work. They are typically thinly capitalized, and they're typically at the bottom of the rung in terms of sophistication. But they're the ones who provide the low bid, and they're the ones who consistently install the work properly. And because they perform the work properly and the lowest bid, they're sometimes referred to as Bubbas.

Q. Isn't it true that the contractors that -- the subcontractors -- that Roxco selected in this case didn't successfully perform the work as to the foundation?

A. I cannot agree with that statement.

Q. Isn't it true that Mr. Davis concluded that the use of metal forms would have alleviated some of the problems encountered in the construction of this project?

A. I believe when he was asked to form a hypothetical conclusion about it, he answered that it did. But Mr. Davis did not know that, in fact, Roxco attempted to use metal forms.

Q. Where is the fact that Roxco attempted to use

Page 130

you know differently or somebody else in this room knows differently, I ask you to correct me on that.
MR. GROAT: Why don't we take a break?
(OFF THE RECORD)
BY MR. GROAT:
Q. In the course of performing your analysis in preparation of the as-built schedule, did you consider the position that Roxco had previously taken with regards to problems with the performance of Cheneyworth?
A. Yes.
Q. What and how did you consider that in your analysis?
A. It's fully described in our report that what we did is this: We could see that Cheneyworth was causing problems, doing substandard work, didn't have enough people on the job, fights between the general contractor and Cheneyworth. They clearly were responsible for problems. And at the same time, we could see a long list of government-caused delays occurring concurrently. And I couldn't in good judgment say that any of that time period was solely attributable to either Cheneyworth or to the government, so I ascribed it as all concurrent.
Q. Now, referring to your reconciliation of

Page 131

delays along the critical path, I Bates-stamped it 0143. I think it's Tab 5 of the schedule analysis in your book.
A. Okay.
Q. Now, you just described problems with Cheneyworth's performance, and let me invite your attention to line 3 there. Could you read across that line and tell me what the various dates represent?
A. You are referring to the framing?
Q. The framing line, yes.
A. Framing, Roxco's planned schedule 6/1 to 7/14 for being critical. Duration of 44 days. As-built schedule critical for 47 days. Net delay for that particular activity three days. Cheneyworth performance problems three.
Q. What does the cumulative -- cumulative refers to the number of total days the project had been delayed?
A. Through that date, yes.
Q. So you attributed three days of delay on the critical path to Cheneyworth performance problems?
A. No, sir. I attributed a lot more than that. I attributed three solely as a result of Cheneyworth.
Q. Based upon your analysis, how much delay on the critical path was attributable to performance

Page 132

problems by Cheneyworth?
A. I think it's about 135, 138 days.
Q. And can you refer me to that section of your schedule analysis?
A. I will try. On page 6 of 10 in Schedule Analysis Section C, the penultimate paragraph begins, "In our opinion."
Q. Yes. I'm there. My question was how much of the delay of time was attributable to performance problems by Cheneyworth on the critical path.
A. This answers your question.
Q. This says 135 days was incurred during -- you say during the installation of framing, installation drywall and interior finishes?
A. Read the next sentence.
Q. How did you determine the 135 days were caused principally by Cheneyworth?
A. I didn't say principally by Cheneyworth. I said that they were concurrent with government-caused delays. And it was determined by calculating the amount of delay that incurred -- that was incurred during the performance period in which Cheneyworth was influencing the speed of work, 135 days. And by review of the records, I was able to determine that the contribution between Cheneyworth and the government

Page 133

could not be segregated reliably, so I concluded that they were concurrent.
Q. Can you explain to me the derivation of the 135 figure?
A. Yes. It is the difference between the plan duration and the actual duration of criticality of framing work.
Q. Is that a total delay analysis for the purposes of attempting to except out the Cheneyworth work?
A. Again, we have to be careful in how one uses the term "total delay." There's a context in which it could be used that I totally disagree with. But if one said, "Mr. Pearson, did you calculate the difference between the length of time that Roxco's schedule showed framing to be critical on its plan schedule and the length of time that framing was actually critical and then attribute that difference to Cheneyworth and the government," the answer would be yes. And if you elected to characterize that as the total time, I would agree with it. But again, you have to be careful because some people use the word "total time" in a context with which I would not agree.
Q. I'll go back. I'll have the deposition transcript and I'll have the benefit of your

Page 134

explanation, so hopefully, I won't be one of those.
Now, in continuing to explain to me this diagram, can you show me how the 135 days figure into your as-built schedule, if you can?
A. Let me first direct your attention to two figures at Exhibit 5. You see at the end of foundation, the cumulative of 55 days of delay has been incurred along the critical path, cumulative delays, through the completion of criticality of foundations on 7/25. There's 7/25, and we see that -- we show foundations are no longer critical, and the criticality moves down to framing. Right?
Q. Right.
A. Okay. Then you see that -- we calculate the cumulative delays through framing, through MEP rough-ins, through insulation and drywall and interior finishes. And at the end of interior finishes, we're 190 days behind schedule. Here's interior finishes. Okay?
Q. Okay.
A. Now, we were able to determine through the records that although this was the critical path, the pace at which this was proceeding was caused by several factors, including Cheneyworth's slow performance in this activity.

Page 135

Q. By this activity, you're referring to 14?
A. To 14, and that's what we say here in each of these explanations given under clauses. For instance, insulation and drywall. Insulation and drywall was paced by the speed of framing work which was delayed by flawed contract documents, including the lumber spec, slab levelness, and edge condition issues related to flawed contract documents, flawed government inspection criteria, vapor barrier specifications, and Cheneyworth performance problems.
Now, let's read further into interior finishes. Interior finishes were delayed by the same issues that are listed under insulation and drywall, plus the government's requirement to sand out naturally occurring grain in the trim lumber. So we said, "Here is the critical path, these are the activities that are critical; but the speed at which these are moving are being influenced by these activities above it."
Q. Well, my question went to the -- where is the 135-day delay attributable to Cheneyworth reflected in the analysis in your as-built schedule?
A. It is here, it is in this text in the schedule analysis, and it can be visually observed as the difference between 7/25 and 10/21 -- excuse me, 10/21/96. That says 10/27. We have a discrepancy

Page 136

there. I think this should be to 10/27. I'm referring to the complete -- give me just a moment.
Q. Please take your time.
A. Looks like we might have a date discrepancy between what's shown -- a date that's listed on the as-built schedule and what's listed in Exhibit 5. I'll have to check that.
Q. Okay. I'm just trying to -- I go through this and I try to come up, well, how do I get the number 135 and I just can't seem to.
A. I hope you'll agree that I just explained it to you.
Q. You did. The trouble is when I do the -- when I go through the tables, I can't come up with 135 days is the problem.
A. Let me show you how to do that. Real easy. What's the cumulative delay that has accrued through the interior finishes?
Q. Interior finishes you identify 190 days.
A. That's right. Now, before this period started, the period in which Cheneyworth is influencing the speed of work, what's the cumulative number of days of delay?
Q. Fifty-five.
A. What's the difference between 190 and 55?

Page 137

Q. That's how you derive the figure. That's the question. That's what I was looking for. Just the difference between the interior -- and so you're saying the delay is -- and you're attributing all that delay -- I believe you used the phrase "delays caused principally by Cheneyworth." "Concurrent delays caused principally by Cheneyworth." Is that correct?
A. Well, with respect to the concurrency for which Roxco is responsible, it's Cheneyworth.
Q. I'm sorry. I lost that.
A. The term "concurrent delays" is sometimes misconstrued. For purposes of our discussion, we'll just -- we'll define concurrent delay as one delay caused by the government, one delay caused by the contractor occurring concurrently. Both of them having an influence on the critical path.
So in this paragraph, I say Cheneyworth is causing problems on the job. The government is causing problems on the job. I can't segregate the two, so I call it a concurrent delay. If the government is not entitled to any liquidated damages, and Roxco is not entitled to recover any time related on that.
Q. Now, also on page 128, there's a statement: "To be conservative, we further adjust the remaining 680 days of calendar delay during Roxco's tenure by

15 percent to allow for other contractor-caused delays that are concurrent with the government's delays."
A. Yes.
Q. What are those delays?
A. They are the correction of defective work for which Roxco was responsible. The length of time that Roxco actually expended correcting those things is far longer than it should have been, in my opinion, because of the government's flawed inspection procedures. But in fairness, if it was wrong and it needed to be repaired, the government ought to have -- to not be charged for the time that it would take Roxco to repair those things under normal, acceptable inspecting conditions.
Q. What methodology did you utilize to review the corrective work that Roxco performed?
A. We -- the records on this are quite voluminous. There are two-way memos. There are inspection reports. There is correspondence. There's just a ton of data available. Our first job was to pull all of that together, and then we segregated it by type of work to see what they were doing. And then we looked to see how the government was expecting it, which was one of Roxco's principal claims during the course of the work. And we found that the government



was doing one thing that we thought was actionable, that it was -- entitled Roxco to additional time and additional compensation, and that is this: The government steadfastly refused to accept any work any time during the course of work.
In other words, their inspectors were told, "You inspect it, you find something wrong, you tell them about it, but don't you ever, don't you ever accept anything." And what that allowed the government to do -- and they used this liberally -- is come back time and time and time again and say, "Whoops, I want to look at it again." That is a flawed inspection process. It is -- in the several hundred jobs I've been involved in, I don't recall ever seeing it done -- utilized to the extent that was utilized on this project, and it's just clearly wrong.
Q. Okay. Is it -- was it your conclusion in performing this analysis that the government had the contractual obligation to accept work as it was performed?
A. I want to define "accept work."
Q. Please do and be as precise as you can.
A. The government had four or five inspectors out on the job every day. They were out there -- there's no question they were out there looking at the



work. There's no question that they identified deficiencies. It is my contention or my opinion that the government was obligated to either A, tell the contractor to stop and fix it or B -- and B, not allow the next item of work to be installed until it had been fixed.
What the government did instead is occasionally point out things, but then allow the work to continue. And then when they got to the end, they said, "Oh, no, we have to go back and do this all over again."
Q. Okay. So where is -- if you could -- and I know I've seen this before in your report, but you discussed this. Could you point out to me where this is in the report? And I want to see how this factors into the schedule analysis, if you could.
A. I think it's scattered throughout various sections. It's in the building turnover section probably more so than in any other section. I'll go about this any way you want to, if you want me to read it or just talk about.
Q. I'd like you to specifically point to where it specifically discusses this in the report because what I want to see is how this impacts on the schedule analysis.



A. Okay. Specifically Section K, "Building Inspection and Turnover," starting on page 2.
Q. This will be Volume 2. Right?
A. This would be Volume 2.
Q. Okay. And which section?
A. Section K.
Q. What page of section K?
A. Well, it's -- the whole section addresses this. If you're talking about specifically with respect to the government's refusal to accept each stage of the work, that begins on page 2.
Q. Okay. Is it your contention, then, that the government had a contractual obligation to inspect work -- inspect and accept work as it was performed?
A. They didn't have to accept it if they -- if they deemed it deficient. They had an obligation to define exactly why it was deficient, describe what had to be done, monitor the work, confirm that it had been done, and approve the work at that point. Now, where the government broke down was they were fully willing to tell Roxco what they did wrong. They were fully willing to go by and look at it. But even after they looked at it, they said, "Hold on. I'm not accepting this. This is not -- I can't accept this work."
And Roxco tried time and time again to get



Alderson Reporting Company
1-800-FOR-DEPO

07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 186

Roxco expended $401,405 in concrete cost codes."
A. Correct.
Q. My question is: How does one determine -- literally the report says "in concrete cost codes." It doesn't say in cost codes in some manner related to the slabs.
A. Right.
Q. And in fact, the cost items -- I'm assuming the cost reports were filed under these cost code items -- doesn't appear to break it out either. And my question is: How do you make the determination from the report and the attachments that the numbers we're talking about here were costs incurred on the slabs?
A. If you read the next sentence beyond the one you just read, it says about 77 percent of that or 280,000 spent on slab leveling and edge repair. Perhaps the easiest way to resolve this is for us to provide to you the specific invoices in our tabulation of that amount. Would that help you?
Q. If you want to supplement the report with that, sure, and perhaps we can just move on. But I just can't -- it doesn't seem to follow for me. It's a fair amount of money, and that's why we're spending time on it.
When you make the determination 70 percent of

Page 187

that, or 280,000, was spent on slab leveling and edge repair, how is that determination made?
A. Reading the invoices that Roxco paid for the repair work.
Q. In that case, certainly the invoices may be helpful in the examination.
A. They would be.
Q. And you say that amount does not include the $90,548 paid to EIFS?
A. That's right.
Q. How did Pearson identify $90,548 actually paid to EIS for repairs to slab edges?
A. EIS invoices.
Q. So again, this would be a case where the specific invoices would show this?
A. That's correct.
Q. If we're providing invoices, I ask we get the EIFS invoice as well.
A. Agreed.
MR. WILLIAMS: Is this a good time for a break?
MR. GROAT: Sure.
(OFF THE RECORD)
BY MR. GROAT:
Q. Did Roxco -- did Pearson -- perform an

Page 188

analysis of entitlement as to the items listed on pages 13 and 19 -- excuse me, pages 13 and 14 of the Section L, "Claim Pricing"?
A. Yes, we did, and I believe that our framing section has a text with respect to each of these.
Q. Who did that analysis?
A. It's a combination of myself and Mr. Montroy.
Q. I'll be asking you some questions regarding Book 2 if you have it there. Section L.
A. You're sure it's in 2? Are you giving me 2 or 3? Wood framing is in 1.
Q. Wood framing? Oh, I see. So these aren't going to be in 1? Wood framing is in --
A. If you're talking about wood framing, it's in 1.
Q. I'm sorry. F, I'm sorry. My notes are off.
Regarding the dimensional framing lumber, is it Roxco's contention that the specifications were very difficult to achieve utilizing the lowest grade lumber permitted?
A. Absolutely.
Q. And is it Roxco's contention that the government has a contractual obligation not to permit the use of lumber of a low grade such that it's very difficult to achieve the specifications?

Page 189

A. Well, you use the word "very difficult." I'd say that it's a major contradiction. Here we have another specification that says you can use No. 3 lumber. And then we have another specification that says we're going to measure within one quarter of an inch in 10 feet. Now, one quarter of an inch in 10 feet or 8 feet, whatever it is, is a common, garden variety shelf requirement you see everywhere. Number 3 material sends a message to a builder that this is low cost, this is a very low priced facility. This is not an important -- we ain't going to check things closely.
Now, low bidders -- I mean people that bid these jobs understand full well that in order to get it, they got to have the low price. And they don't have the luxury of six months to review these specifications. They have to prepare their price in just a few weeks. So there is a huge contradiction here in saying you can use this No. 3 material and then having a quarter inch. And in my opinion, the government, by sending this conflicting message, they caused the bidders to submit a price for installing No. 3 material, or perhaps some No. 2, but -- and they said to the bidder we're not going to require strict compliance with tolerances because any designer who is qualified to design this kind of work will understand

Page 190

that No. 3 material has sufficient structural characteristics but insufficient architectural characteristics to comply, even substantially comply with straightness in the specification.
Q. Is it your position, then, that the provision allowing the use of No. 3 lumber sent an implicit message that the government would not strictly enforce tolerances?
A. Yes, it does.
Q. Is it your contention that the government has a contractual obligation not to, to use your term, send such an implicit message?
A. The government can do anything that it wants to. And if they choose to say use No. 3 material and also want these tolerances yeah, they have the right to do that. But I think they have to suffer the consequences of it. And in lieu, they said no, you, Mr. Contractor, have to suffer the consequences of it because it wasn't my designer's obligation to get it right. It was you as the contractor's obligation to figure out that we didn't know what we were doing. And since we didn't know what we were doing, you're supposed to correct our mistake. That's the part I disagree with.
Q. Now, the problems that Roxco experienced in

Page 191

regards to lumber, what percentage of those problems are attributable to what you characterize as dimensional framing?
A. Tons of it. Stud grade southern yellow pine, I'd venture a guess that none of the three of you gentlemen sitting on the other side of the table would pay to have your house built out of it. You wouldn't recommend any of your friends have it built out of it. If an architect came to you and told you they were going to specify it, you'd tell him to go home, you wanted another one. It's just never done, but they did it in this project.
The evidence demonstrates that the government zealously held Roxco to not just substantial compliance with tolerances, but with actual compliance with tolerances. I mean, they put straight edges on walls. They put up a transit and they checked them. And then after the drywall was installed, if they didn't like the looks of it, they'd take off the drywall.
Southern yellow pine arrives at the site with varying degrees of moisture, all of which are supposed to be within the ranges allowed by the SPIV. Once southern yellow pine stays on the job for a while, it will dry out, particularly after they put the roof on the building. And as it dries out, it changes in

Page 192

dimension. And these buildings, some of them sat for two years.
What do you think happens to -- when I built my own house, I planned on painting all the trim twice: Once before I moved into it, and the second time after a year and a half because I knew that once the material acclimated to the air conditioning that it was going to contract, and it does every time. If you build a house in Washington, D.C., unless you use an exotic wood like maple, it's going to do the same thing.
That's what happened on this job. Roxco painted and painted trying to get the cracks out, and they straightened out walls and did numerous things all as a result of a flawed lumber specification combined with an unreasonable inspection process.
Q. What percentage of the costs here are attributable to the government's provision permitting the use of No. 3 lumber? Can that be quantified?
A. No. I can't -- I can't separate the cost of each one of these issues separately. Just the cost records won't allow it to be done. But what we can do is see the enormous amounts of money that were spent, and we can see from the records that has -- and we quoted one daily diary where they said they culled 4,000 studs.

Page 193

Now, if any of us in this room built a house and you told the contractor you're going to pay him cost plus 10 percent and he told you he had to cull 40 percent of the studs he bought, you'd go ballistic. I mean, you just don't do it. And the reason you don't do it is because you expect your architect to specify a wood that has a low degree of culling. Some culling is always required in Grade 2, and Grade 3 is just out of the roof. Grade 1 is supposed to be near zero. And you can use some of the culled studs in blocking, but you -- there's not enough blocking to utilize all the studs they had to cull off of this job, simply because of the combination of a low grade of specified lumber and a strict adherence to the specified tolerances.
Q. Now, the government didn't specify any particular lumber, but allowed a particular grade of lumber. Isn't that correct?
A. The government listed numerous types of lumber that were acceptable.
Q. Roxco chose to use the lowest grade of the lumber that was --
A. Which is what the government tells the contractor to do. We want the lowest price. We're going to take the lowest price from the contractor. We're not going to give it to the number two bidder;

we're going to give it to the number one bidder.
Q. Let me jump down to the joist spaces from 24 to 16.
A. What page are we on?
Q. This is discussed in Section L, "Claim Pricing," and we're on page 21 of 44 of your Section F.
A. 21 of 44.
Q. I believe it starts on "joint spacing changes." Can you tell me what the nature of this claim is?
A. I have to read this. Will you give me a moment? (Reviews document)
MR. WILLIAMS: What's your Bates-stamp number on the page you're referring to?
MR. GROAT: 0308. Also, it's referenced at 0922.
A. Okay.
BY MR. GROAT:
Q. How much additional cost did Roxco encounter as a result of the joist spacing change from 24 to 16?
A. I can identify some cost in that. We were unable to segregate all of it from cost records because when there's a group of guys up there framing a building and they're told to install it on 16 inches of as opposed to 24 inches, you can't set up a cost code



to capture the difference between 16 and 24.
Q. How much cost did Pearson identify?
A. I think that Cheneyworth asked for like $95,000 for this work. They were issued a change order for about $45,000 that included numerous things. Cheneyworth disputed that, wouldn't accept it, and there was a dispute about it and I think that was resolved in the arbitration that was held between them.
Q. What's the contention now, the additional costs that they're entitled to have as a result of the change from 24 to 16?
A. It is a component of the overall costs being requested, but I cannot isolate the specific amount.
Q. They've already been paid a portion of their costs?
A. They've been paid a portion.
Q. How much have they been paid?
A. It's a matter of record. This says $62,047.
MR. WILLIAMS: Just for your information, the record exhibit doesn't have -- it's missing several pages that you're talking to him about, including 0308. I don't know why it's missing from this copy.
MR. GROAT: Tell us the pages that are missing. Obviously, the copy firm had a problem.



MR. WILLIAMS: Looks like it goes from 0282 to 0331.
MR. GROAT: Okay. We can make another copy.
BY MR. GROAT:
Q. Now, in the wood framing section, you indicate that Roxco budgeted $1,981,452. This is at page 12 of 19 in your Section F.
What, if any, analysis did Pearson make regarding that estimated cost?
A. I don't see that number.
Q. Page 12 of 19. We're in wood framing under the "Claim Pricing," Section L. I'm sorry. The small book, I should have said.
A. What is your question?
Q. What, if any, analysis did Pearson perform regarding that budgeted amount?
A. We determined that Roxco had sufficient materials to build the project for that amount and that they had subcontracted all of the labor required to do the framing for Cheneyworth, and the combination of those two things was a million -- roughly a little less than $2 million.
Q. Where is that analysis that you performed?
A. It's not an analysis. It's in their



estimate. You go through their estimate records and you can count boards and you can go through Cheneyworth's subcontract and find out that Cheneyworth was signed up to install all of the framing members. So you need two documents, both of which have been made available to you: Cheneyworth subcontract and the detailed Roxco estimate.
Q. What analysis did you perform of the Roxco estimate?
A. We reviewed the Roxco estimate and determined that they had sufficient materials in that estimate to build the job.
Q. Did you review the costs that Roxco estimated for the materials?
A. Yes. And they issued purchase orders for that material for the prices that were listed in their estimate, sometimes less than was in the estimate.
Q. Was the estimate based upon the use of grade No. 3 lumber?
A. I believe -- I have a fuzzy recollection about that, but I can tell you that the first purchase order for materials is based on No. 3 material. I've seen that one.
Q. So it's your contention that the use of No. 3 lumber was not reasonable because of the





07ad3d71-6638-4b8b-ac0e-e8b533e03026