IN THE UNITED STATES COURT OF FEDERAL CLAIMS

ROXCO, LIMITED

PLAINTIFF

VERSUS NO. 02-176C

THE UNITED STATES

DEFENDANT

---

DEPOSITION OF DAVID PEARSON

---

Taken at the instance of the Defendant

In the Law Offices of Young Williams

210 East Capitol Street, Suite 2000

Jackson, Mississippi 39201

On September 12, 2006, at 9:00 a.m.

REPORTED BY: ABBY JULIAN, CSR

CSR NO. 1706



07ad3d71-6638-4b8b-ac0e-e8b533e03026

APPEARANCES:

STEPHEN WILLIAMS, ESQUIRE
Young Williams, PA
210 East Capitol Street, Suite 2000
Jackson, Mississippi 39201
REPRESENTING THE PLAINTIFF

JOHN S. GROAT, ESQUIRE
BRYAN O'BOYLE, ESQUIRE
US Department of Justice
1100 L Street NW, Room 11050
Washington, DC 20005
REPRESENTING THE DEFENDANTS

ALSO PRESENT:
James Beach, Jeffery Montroy,
Ronald Robbins



I-N-D-E-X

WITNESS :
DAVID PEARSON


| EXAMINATION | PAGE |
|---|---|
| BY : MR. GROAT | 4 |

EXHIBITS

| Exhibits NO. | Page |
|---|---|
| EXHIBIT 253 | 9 |
| EXHIBIT 254 | 67 |
| EXHIBIT 255 | 77 |
| EXHIBIT 256 | 89 |
| EXHIBIT 257 | 171 |




MR. GROAT: Just an administrative note. Steve, for the record, we can state that the government's position is that the -- you know, I should pay his billed time for the actual deposition, and you're going to get back to me on what your position is.
MR. WILLIAMS: That's correct.
* * * * * *
DAVID PEARSON,
having first been duly sworn, was examined and testified as follows:
EXAMINATION
BY MR. GROAT:
Q. Sir, would you please state your full name for the record.
A. David Elton Pearson.
Q. Will you state your address, sir?
A. 3825 Colleen Drive, Montgomery, Alabama 36106.
Q. Is there any reason that you couldn't give full and complete responses to deposition questions today, such as illness or any other problem?
A. No, sir.
Q. In connection with your testimony in this case, what specifically have you been retained to do?



A. We were retained to collect the records on the Barksdale Air Force Base project and perform an independent analysis of Roxco's entitlement to time extensions and additional compensation.
Q. Who retained you to do that?
A. Steve Williams.
Q. And what provision was made for compensation?
A. Mr. Williams and his client, Ben Turnage, agreed to pay our normal hourly rates and expenses for the performance of our work.
Q. Is there any letter that summarizes the specific tasks that you've been given?
A. No, sir.
Q. Have you been retained to examine and render an opinion regarding the DCAA report?
A. We will respond or assist Mr. Williams in responding to the DCAA report.
Q. Have you been tasked with doing that?
A. To some extent, yes.
Q. What assistance have you provided?
MR. WILLIAMS: Can I ask for a clarification? Which DCAA audit report are you referring to? The report y'all submitted as a part of your expert witness disclosures or the earlier report that was scheduled by the court





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 30

Now, did your analysis of the delay issue in this case include conclusions and analysis regarding the contract specifications?
A. You'll have to be more specific about that because it's the contract specs involved some design issues that I'm not qualified to testify about.
Q. Does your scheduling analysis rest in part upon conclusions you reached regarding the proper reading of certain contract provisions?
A. You'll have to identify those provisions.
Q. Have you been recognized as an expert in issues concerning foundations?
A. As it relates to construction and delays to foundations, but not as it relates to the design of foundations.
Q. Have you been recognized as an expert concerning soils as they relate to construction?
A. As they relate to workability, as they relate to the cost and the equipment that one employs in procuring and installing particular types of earth, rock, et cetera. But not in the design of particular types of material.
Q. What is -- in what cases have you been recognized as an expert concerning soils as it relates to -- I believe you used the term "workability." Is

Page 31

that correct?
A. Yeah. That would fall under the general category of construction management; and, you know, having testified in 80 cases or so, there's going to be a bunch of them that involve soil issues, and I would just have to look back at my record. One that comes to mind -- I don't know if it matches or not, but there were a number of soil issues on this Shreveport matter, Hollywood Casino.
Q. My question goes to: What type of opinions have you rendered in such cases?
A. All of my opinions relate to the constructability of soils the conflicts if they exist in the specifications and what one can expect in terms of actually performing the construction work related to the soils. The effect of encountering unexpected soils, the delay caused by those soils, the problems that a contractor can encounter while performing work in various types of soils, all of it relates to the constructability issue.
You know, I've dug the ditches myself. There was a time when I -- in high school when I had to do that. And then shortly after I got out of college, I was a field guy wearing frogans and going around laying out foundations and putting chalk on the ground and

Page 32

digging the foundation and putting in the rebar and I -- I don't know this business just from sitting behind a desk and paperwork. I've actually done it myself.
Q. Now, in performing the analysis, what I'm going to ask you to do is go through in as great of detail as possible and tell me what exactly Pearson and you, in particular, what universe of data you considered in formulating your opinions.
A. Every document that we reviewed in our office, and as I stated earlier, hordes of boxes of those documents. Now, obviously, not every document that we looked at had some bearing upon an opinion that we have. But we have endeavored to review all of the documents, and we've endeavored to identify those that might have a bearing on this case. And when Mr. Beach writes a report or when the DCAA auditor writes a report that mentions something that we perhaps haven't seen, then we go look to find that document and see if it modifies what we think.
Q. You identified the universe of documents which you've described to be approximately 40 boxes. Is that correct?
A. Something in that neighborhood, yes, sir.
Q. What other data have you considered in

Page 33

preparing this report?
A. Conversations with Ron Robbins and Pat Leech about things that happened on the job. We read something in a letter and perhaps it wasn't completely clear to us, and we say, "What do you mean by that?" And then sometimes their explanation would provide an amplification that was helpful, sometimes not. But in general, our objective is to learn everything that we possibly can, first from the documents that are available to us, and then secondly from the reports and documents that are prepared by the government.
Q. So we have the 40 documents, and then we have conversations with --
MR. WILLIAMS: Excuse me. Forty boxes.
BY MR. GROAT:
Q. Forty boxes. And then we have conversations with Mr. Ron Robbins and Pat Leech. Is that correct?
A. That's correct.
Q. What other data exists that you analyzed in this case in formulating your opinion?
A. That's all that comes to mind.
Q. You indicated conversations with Mr. Ron Robbins and Patrick Leech. Is that correct?
A. That's correct.
Q. Who had these conversations?





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 34

A. Jeff Montroy and myself.
Q. You also testified that you had conversations when you read something in a letter, and that these conversations clarified that matter. Is that correct?
A. Correct.
Q. Did you rely upon representations by Mr. Ron Robbins and Mr. Patrick Leech that are not reflected or that don't simply reflect clarification of correspondence or other documents?
A. We have three volumes, about 200 pages of text over there. It would be a stretch for me to attempt to answer that as a yes or no because my memory is just not that good. It's too many issues involved.
Q. Did you maintain -- did you or those under -- operating under your supervision in this case maintain records of their conversations with Mr. Ron Robbins and Mr. Patrick Leech relative to the case?
A. I don't want to leave you under the impression that occasionally we wouldn't write some notes. But as we continued our investigation and decided what we thought were the facts, then we don't maintain those things.
Q. Is it your testimony that the standard practice in expert testimony would permit relying upon statements that are not reduced to some sort of

Page 35

memorandum or note in the record?
A. Well, that's a legal question you and Mr. Williams will have to wrangle about. But to the fullest extent possible, we prefer corroboration of oral testimony in the records. And in the event that we're unable to find corroborating written evidence, we occasionally will rely upon representations made by individuals. And most of the time when we do that, we'll make a notation of such in our report.
Q. My question actually went to your experience as an expert and in testifying in construction management. And is it your testimony -- is it the standard practice in construction management that if an expert considers oral representations as a basis for conclusions in the report, that these oral representations would be reduced to a note or memorandum in the report?
A. I would say no. In all the reports that I read by other consultants, you sometimes see it, you sometimes don't.
Q. What is your standard practice?
A. I described that to you just a moment ago. I'll repeat it if you like.
Q. Please do.
A. To the extent that we hear oral

Page 36

representations, we look for corroborating evidence in the files. If we find evidence that contradicts the oral representation, we won't rely on it. If we don't find corroborating evidence, but the explanation given fits with all of the rest of the facts that we've seen, then we'll adopt it.
Q. And what is your standard practice with regards to the maintenance of records of such oral representations?
A. Most of the time, when we ask questions such as this that we're trying to fill a hole in something that we're writing, so we'll have a text much as you're reviewing there and we'll want to finish it up. And when we hear something, we will make a decision about what we're going to include in the report, and it ends up in our report. That's our practice.
Q. Now, will you be able to identify in this report the matters which are based solely upon oral representations of Mr. Leech or Mr. Robbins?
A. I doubt it. Given all of the pages of text and studies that we've done, it would take me a couple of days to go through and carefully check it and identify which ones we relied upon. But I would attempt to do that if that's your preference.
Q. My understanding is you can't because -- my

Page 37

understanding is your testimony is there is no record of the conversations that Pearson had with Mr. Robbins and Mr. Leech relative to this matter.
A. But what you do have, sir, is my written opinion in some 200 pages. And if you find something in there that you deem inaccurate, I'd be happy to respond to it.
Q. Now, in the universe of materials that you considered, we've identified 40 boxes and conversations with Mr. Robbins and Mr. Leech. Was there any other data source upon which you relied?
A. I mentioned that we looked at Mr. Beach's report. We looked at the DCAA audit. And to the extent that those had mentions of things in them that we thought might alter our understanding, then we might have modified what we'd written. But that's all that I can think of.
Q. Has there been any modification or change to your report based upon Mr. Beach's report?
A. We've not made any modifications, but I anticipate we might have a few.
Q. What specific areas do you feel that Mr. Beach's report would warrant modifying your report?
A. One in particular is his inclusion of Mr. Leech's testimony where he said he wasn't involved

Page 38

in the bid and our report stated that he was. I think you must be right about that. And then tomorrow as a result of the questions that we plan to ask Mr. Beach, there may be a few others. It's very hard to go through as many records as we've done, write as much as we've done, and not have any errors.
Q. In identifying the data that you've considered, the report clearly states that you considered other expert opinions which you retained. Isn't that correct? And we had those depositions yesterday.
A. Yes, that's correct.
Q. Does your report rest in part upon the opinions rendered by those experts?
A. It does.
Q. Let's start, if you would -- we have the report here, and I'll ask you to -- I'm going to draw your attention to some specific points and see if we can't get a little particular. If you would, turn to page 9 of your report, which we've Bates-stamped here. I think the references to pages here may make things a little quicker.
A. From time to time, I might ask you to allow me to look at my original report, which would be the same, but just because this may be a little more

Page 39

difficult to orient myself.
Q. Any matter that would expedite the examination, I would be happy.
I have one other question with regards to the data considered. Did you or Mr. Montroy actually visit the site?
A. Mr. Montroy did.
Q. Have you ever visited the site?
A. I have not.
Q. Have you viewed photographs or pictures of the site?
A. I have.
Q. Now, at page 9 of your report, you discuss certain conclusions reached relative to the foundation. Is that correct?
A. I think you said page 9?
Q. I Bates-stamped the report, so it reads Roxco Report 0009. So when I refer to page 9 . . .
A. I'll try to remember that. I have that in front of me, yes.
Q. I'd ask you to review that page. And the question was whether this page addresses the testimony, the opinions issued both by Mr. Davis and Mr. Carmichael.
A. I think that it does, yes.

Page 40

Q. Were you present yesterday for Mr. Davis's testimony?
A. I was.
Q. Based upon your consideration of his testimony, do you agree that he identified three factors which made construction of the project more difficult: That is, the height of the slab above the grade, the particular fill material utilized, and the native soil present?
A. I believe that those are individual components from an engineering standpoint, but I do not believe that they -- that those issues described in total the problems for which the government bears responsibility.
Q. Do you agree with Mr. Davis's testimony that Roxco would have bid the job based on a terms he used, a colloquial term he used, a "Bubba contractor," who would have been familiar with constructing residential foundations but not familiar with use of metal forms?
A. It's not my recollection that Mr. Davis testified that Roxco would have bid this project using Bubba. His description of Bubba was one that was elicited as a result of your discussions about how these things get built, and he was describing for you his vast experience in how residential construction is

Page 41

built. And I agree with his characterization to the extent that his characterization described the type of subcontractor that performs this type of work, whether it's government work, any type of residential work. They are typically thinly capitalized, and they're typically at the bottom of the rung in terms of sophistication. But they're the ones who provide the low bid, and they're the ones who consistently install the work properly. And because they perform the work properly and the lowest bid, they're sometimes referred to as Bubbas.
Q. Isn't it true that the contractors that -- the subcontractors -- that Roxco selected in this case didn't successfully perform the work as to the foundation?
A. I cannot agree with that statement.
Q. Isn't it true that Mr. Davis concluded that the use of metal forms would have alleviated some of the problems encountered in the construction of this project?
A. I believe when he was asked to form a hypothetical conclusion about it, he answered that it did. But Mr. Davis did not know that, in fact, Roxco attempted to use metal forms.
Q. Where is the fact that Roxco attempted to use





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 130

you know differently or somebody else in this room knows differently, I ask you to correct me on that.
MR. GROAT: Why don't we take a break?
(OFF THE RECORD)
BY MR. GROAT:
Q. In the course of performing your analysis in preparation of the as-built schedule, did you consider the position that Roxco had previously taken with regards to problems with the performance of Cheneyworth?
A. Yes.
Q. What and how did you consider that in your analysis?
A. It's fully described in our report that what we did is this: We could see that Cheneyworth was causing problems, doing substandard work, didn't have enough people on the job, fights between the general contractor and Cheneyworth. They clearly were responsible for problems. And at the same time, we could see a long list of government-caused delays occurring concurrently. And I couldn't in good judgment say that any of that time period was solely attributable to either Cheneyworth or to the government, so I ascribed it as all concurrent.
Q. Now, referring to your reconciliation of

Page 131

delays along the critical path, I Bates-stamped it 0143. I think it's Tab 5 of the schedule analysis in your book.
A. Okay.
Q. Now, you just described problems with Cheneyworth's performance, and let me invite your attention to line 3 there. Could you read across that line and tell me what the various dates represent?
A. You are referring to the framing?
Q. The framing line, yes.
A. Framing, Roxco's planned schedule 6/1 to 7/14 for being critical. Duration of 44 days. As-built schedule critical for 47 days. Net delay for that particular activity three days. Cheneyworth performance problems three.
Q. What does the cumulative -- cumulative refers to the number of total days the project had been delayed?
A. Through that date, yes.
Q. So you attributed three days of delay on the critical path to Cheneyworth performance problems?
A. No, sir. I attributed a lot more than that. I attributed three solely as a result of Cheneyworth.
Q. Based upon your analysis, how much delay on the critical path was attributable to performance

Page 132

problems by Cheneyworth?
A. I think it's about 135, 138 days.
Q. And can you refer me to that section of your schedule analysis?
A. I will try. On page 6 of 10 in Schedule Analysis Section C, the penultimate paragraph begins, "In our opinion."
Q. Yes. I'm there. My question was how much of the delay of time was attributable to performance problems by Cheneyworth on the critical path.
A. This answers your question.
Q. This says 135 days was incurred during -- you say during the installation of framing, installation drywall and interior finishes?
A. Read the next sentence.
Q. How did you determine the 135 days were caused principally by Cheneyworth?
A. I didn't say principally by Cheneyworth. I said that they were concurrent with government-caused delays. And it was determined by calculating the amount of delay that incurred -- that was incurred during the performance period in which Cheneyworth was influencing the speed of work, 135 days. And by review of the records, I was able to determine that the contribution between Cheneyworth and the government

Page 133

could not be segregated reliably, so I concluded that they were concurrent.
Q. Can you explain to me the derivation of the 135 figure?
A. Yes. It is the difference between the plan duration and the actual duration of criticality of framing work.
Q. Is that a total delay analysis for the purposes of attempting to except out the Cheneyworth work?
A. Again, we have to be careful in how one uses the term "total delay." There's a context in which it could be used that I totally disagree with. But if one said, "Mr. Pearson, did you calculate the difference between the length of time that Roxco's schedule showed framing to be critical on its plan schedule and the length of time that framing was actually critical and then attribute that difference to Cheneyworth and the government," the answer would be yes. And if you elected to characterize that as the total time, I would agree with it. But again, you have to be careful because some people use the word "total time" in a context with which I would not agree.
Q. I'll go back. I'll have the deposition transcript and I'll have the benefit of your

Page 134

explanation, so hopefully, I won't be one of those.
Now, in continuing to explain to me this diagram, can you show me how the 135 days figure into your as-built schedule, if you can?
A. Let me first direct your attention to two figures at Exhibit 5. You see at the end of foundation, the cumulative of 55 days of delay has been incurred along the critical path, cumulative delays, through the completion of criticality of foundations on 7/25. There's 7/25, and we see that -- we show foundations are no longer critical, and the criticality moves down to framing. Right?
Q. Right.
A. Okay. Then you see that -- we calculate the cumulative delays through framing, through MEP rough-ins, through insulation and drywall and interior finishes. And at the end of interior finishes, we're 190 days behind schedule. Here's interior finishes. Okay?
Q. Okay.
A. Now, we were able to determine through the records that although this was the critical path, the pace at which this was proceeding was caused by several factors, including Cheneyworth's slow performance in this activity.

Page 135

Q. By this activity, you're referring to 14?
A. To 14, and that's what we say here in each of these explanations given under clauses. For instance, insulation and drywall. Insulation and drywall was paced by the speed of framing work which was delayed by flawed contract documents, including the lumber spec, slab levelness, and edge condition issues related to flawed contract documents, flawed government inspection criteria, vapor barrier specifications, and Cheneyworth performance problems.
Now, let's read further into interior finishes. Interior finishes were delayed by the same issues that are listed under insulation and drywall, plus the government's requirement to sand out naturally occurring grain in the trim lumber. So we said, "Here is the critical path, these are the activities that are critical; but the speed at which these are moving are being influenced by these activities above it."
Q. Well, my question went to the -- where is the 135-day delay attributable to Cheneyworth reflected in the analysis in your as-built schedule?
A. It is here, it is in this text in the schedule analysis, and it can be visually observed as the difference between 7/25 and 10/21 -- excuse me, 10/21/96. That says 10/27. We have a discrepancy

Page 136

there. I think this should be to 10/27. I'm referring to the complete -- give me just a moment.
Q. Please take your time.
A. Looks like we might have a date discrepancy between what's shown -- a date that's listed on the as-built schedule and what's listed in Exhibit 5. I'll have to check that.
Q. Okay. I'm just trying to -- I go through this and I try to come up, well, how do I get the number 135 and I just can't seem to.
A. I hope you'll agree that I just explained it to you.
Q. You did. The trouble is when I do the -- when I go through the tables, I can't come up with 135 days is the problem.
A. Let me show you how to do that. Real easy. What's the cumulative delay that has accrued through the interior finishes?
Q. Interior finishes you identify 190 days.
A. That's right. Now, before this period started, the period in which Cheneyworth is influencing the speed of work, what's the cumulative number of days of delay?
Q. Fifty-five.
A. What's the difference between 190 and 55?

Page 137

Q. That's how you derive the figure. That's the question. That's what I was looking for. Just the difference between the interior -- and so you're saying the delay is -- and you're attributing all that delay -- I believe you used the phrase "delays caused principally by Cheneyworth." "Concurrent delays caused principally by Cheneyworth." Is that correct?
A. Well, with respect to the concurrency for which Roxco is responsible, it's Cheneyworth.
Q. I'm sorry. I lost that.
A. The term "concurrent delays" is sometimes misconstrued. For purposes of our discussion, we'll just -- we'll define concurrent delay as one delay caused by the government, one delay caused by the contractor occurring concurrently. Both of them having an influence on the critical path.
So in this paragraph, I say Cheneyworth is causing problems on the job. The government is causing problems on the job. I can't segregate the two, so I call it a concurrent delay. If the government is not entitled to any liquidated damages, and Roxco is not entitled to recover any time related on that.
Q. Now, also on page 128, there's a statement: "To be conservative, we further adjust the remaining 680 days of calendar delay during Roxco's tenure by





07ad3d71-6638-4b8b-ac0e-e8b533e03026

Page 138

15 percent to allow for other contractor-caused delays that are concurrent with the government's delays."
A. Yes.
Q. What are those delays?
A. They are the correction of defective work for which Roxco was responsible. The length of time that Roxco actually expended correcting those things is far longer than it should have been, in my opinion, because of the government's flawed inspection procedures. But in fairness, if it was wrong and it needed to be repaired, the government ought to have -- to not be charged for the time that it would take Roxco to repair those things under normal, acceptable inspecting conditions.
Q. What methodology did you utilize to review the corrective work that Roxco performed?
A. We -- the records on this are quite voluminous. There are two-way memos. There are inspection reports. There is correspondence. There's just a ton of data available. Our first job was to pull all of that together, and then we segregated it by type of work to see what they were doing. And then we looked to see how the government was expecting it, which was one of Roxco's principal claims during the course of the work. And we found that the government

Page 139

was doing one thing that we thought was actionable, that it was -- entitled Roxco to additional time and additional compensation, and that is this: The government steadfastly refused to accept any work any time during the course of work.
In other words, their inspectors were told, "You inspect it, you find something wrong, you tell them about it, but don't you ever, don't you ever accept anything." And what that allowed the government to do -- and they used this liberally -- is come back time and time and time again and say, "Whoops, I want to look at it again." That is a flawed inspection process. It is -- in the several hundred jobs I've been involved in, I don't recall ever seeing it done -- utilized to the extent that was utilized on this project, and it's just clearly wrong.
Q. Okay. Is it -- was it your conclusion in performing this analysis that the government had the contractual obligation to accept work as it was performed?
A. I want to define "accept work."
Q. Please do and be as precise as you can.
A. The government had four or five inspectors out on the job every day. They were out there -- there's no question they were out there looking at the

Page 140

work. There's no question that they identified deficiencies. It is my contention or my opinion that the government was obligated to either A, tell the contractor to stop and fix it or B -- and B, not allow the next item of work to be installed until it had been fixed.
What the government did instead is occasionally point out things, but then allow the work to continue. And then when they got to the end, they said, "Oh, no, we have to go back and do this all over again."
Q. Okay. So where is -- if you could -- and I know I've seen this before in your report, but you discussed this. Could you point out to me where this is in the report? And I want to see how this factors into the schedule analysis, if you could.
A. I think it's scattered throughout various sections. It's in the building turnover section probably more so than in any other section. I'll go about this any way you want to, if you want me to read it or just talk about.
Q. I'd like you to specifically point to where it specifically discusses this in the report because what I want to see is how this impacts on the schedule analysis.

Page 141

A. Okay. Specifically Section K, "Building Inspection and Turnover," starting on page 2.
Q. This will be Volume 2. Right?
A. This would be Volume 2.
Q. Okay. And which section?
A. Section K.
Q. What page of section K?
A. Well, it's -- the whole section addresses this. If you're talking about specifically with respect to the government's refusal to accept each stage of the work, that begins on page 2.
Q. Okay. Is it your contention, then, that the government had a contractual obligation to inspect work -- inspect and accept work as it was performed?
A. They didn't have to accept it if they -- if they deemed it deficient. They had an obligation to define exactly why it was deficient, describe what had to be done, monitor the work, confirm that it had been done, and approve the work at that point. Now, where the government broke down was they were fully willing to tell Roxco what they did wrong. They were fully willing to go by and look at it. But even after they looked at it, they said, "Hold on. I'm not accepting this. This is not -- I can't accept this work."
And Roxco tried time and time again to get

Page 186

Roxco expended $401,405 in concrete cost codes."
A. Correct.
Q. My question is: How does one determine -- literally the report says "in concrete cost codes." It doesn't say in cost codes in some manner related to the slabs.
A. Right.
Q. And in fact, the cost items -- I'm assuming the cost reports were filed under these cost code items -- doesn't appear to break it out either. And my question is: How do you make the determination from the report and the attachments that the numbers we're talking about here were costs incurred on the slabs?
A. If you read the next sentence beyond the one you just read, it says about 77 percent of that or 280,000 spent on slab leveling and edge repair. Perhaps the easiest way to resolve this is for us to provide to you the specific invoices in our tabulation of that amount. Would that help you?
Q. If you want to supplement the report with that, sure, and perhaps we can just move on. But I just can't -- it doesn't seem to follow for me. It's a fair amount of money, and that's why we're spending time on it.
When you make the determination 70 percent of

Page 187

that, or 280,000, was spent on slab leveling and edge repair, how is that determination made?
A. Reading the invoices that Roxco paid for the repair work.
Q. In that case, certainly the invoices may be helpful in the examination.
A. They would be.
Q. And you say that amount does not include the $90,548 paid to EIFS?
A. That's right.
Q. How did Pearson identify $90,548 actually paid to EIS for repairs to slab edges?
A. EIS invoices.
Q. So again, this would be a case where the specific invoices would show this?
A. That's correct.
Q. If we're providing invoices, I ask we get the EIFS invoice as well.
A. Agreed.
MR. WILLIAMS: Is this a good time for a break?
MR. GROAT: Sure.
(OFF THE RECORD)
BY MR. GROAT:
Q. Did Roxco -- did Pearson -- perform an

Page 188

analysis of entitlement as to the items listed on pages 13 and 19 -- excuse me, pages 13 and 14 of the Section L, "Claim Pricing"?
A. Yes, we did, and I believe that our framing section has a text with respect to each of these.
Q. Who did that analysis?
A. It's a combination of myself and Mr. Montroy.
Q. I'll be asking you some questions regarding Book 2 if you have it there. Section L.
A. You're sure it's in 2? Are you giving me 2 or 3? Wood framing is in 1.
Q. Wood framing? Oh, I see. So these aren't going to be in 1? Wood framing is in --
A. If you're talking about wood framing, it's in 1.
Q. I'm sorry. F, I'm sorry. My notes are off.
Regarding the dimensional framing lumber, is it Roxco's contention that the specifications were very difficult to achieve utilizing the lowest grade lumber permitted?
A. Absolutely.
Q. And is it Roxco's contention that the government has a contractual obligation not to permit the use of lumber of a low grade such that it's very difficult to achieve the specifications?

Page 189

A. Well, you use the word "very difficult." I'd say that it's a major contradiction. Here we have another specification that says you can use No. 3 lumber. And then we have another specification that says we're going to measure within one quarter of an inch in 10 feet. Now, one quarter of an inch in 10 feet or 8 feet, whatever it is, is a common, garden variety shelf requirement you see everywhere. Number 3 material sends a message to a builder that this is low cost, this is a very low priced facility. This is not an important -- we ain't going to check things closely.
Now, low bidders -- I mean people that bid these jobs understand full well that in order to get it, they got to have the low price. And they don't have the luxury of six months to review these specifications. They have to prepare their price in just a few weeks. So there is a huge contradiction here in saying you can use this No. 3 material and then having a quarter inch. And in my opinion, the government, by sending this conflicting message, they caused the bidders to submit a price for installing No. 3 material, or perhaps some No. 2, but -- and they said to the bidder we're not going to require strict compliance with tolerances because any designer who is qualified to design this kind of work will understand

Page 190

that No. 3 material has sufficient structural characteristics but insufficient architectural characteristics to comply, even substantially comply with straightness in the specification.
Q. Is it your position, then, that the provision allowing the use of No. 3 lumber sent an implicit message that the government would not strictly enforce tolerances?
A. Yes, it does.
Q. Is it your contention that the government has a contractual obligation not to, to use your term, send such an implicit message?
A. The government can do anything that it wants to. And if they choose to say use No. 3 material and also want these tolerances yeah, they have the right to do that. But I think they have to suffer the consequences of it. And in lieu, they said no, you, Mr. Contractor, have to suffer the consequences of it because it wasn't my designer's obligation to get it right. It was you as the contractor's obligation to figure out that we didn't know what we were doing. And since we didn't know what we were doing, you're supposed to correct our mistake. That's the part I disagree with.
Q. Now, the problems that Roxco experienced in

Page 191

regards to lumber, what percentage of those problems are attributable to what you characterize as dimensional framing?
A. Tons of it. Stud grade southern yellow pine, I'd venture a guess that none of the three of you gentlemen sitting on the other side of the table would pay to have your house built out of it. You wouldn't recommend any of your friends have it built out of it. If an architect came to you and told you they were going to specify it, you'd tell him to go home, you wanted another one. It's just never done, but they did it in this project.
The evidence demonstrates that the government zealously held Roxco to not just substantial compliance with tolerances, but with actual compliance with tolerances. I mean, they put straight edges on walls. They put up a transit and they checked them. And then after the drywall was installed, if they didn't like the looks of it, they'd take off the drywall.
Southern yellow pine arrives at the site with varying degrees of moisture, all of which are supposed to be within the ranges allowed by the SPIV. Once southern yellow pine stays on the job for a while, it will dry out, particularly after they put the roof on the building. And as it dries out, it changes in

Page 192

dimension. And these buildings, some of them sat for two years.
What do you think happens to -- when I built my own house, I planned on painting all the trim twice: Once before I moved into it, and the second time after a year and a half because I knew that once the material acclimated to the air conditioning that it was going to contract, and it does every time. If you build a house in Washington, D.C., unless you use an exotic wood like maple, it's going to do the same thing.
That's what happened on this job. Roxco painted and painted trying to get the cracks out, and they straightened out walls and did numerous things all as a result of a flawed lumber specification combined with an unreasonable inspection process.
Q. What percentage of the costs here are attributable to the government's provision permitting the use of No. 3 lumber? Can that be quantified?
A. No. I can't -- I can't separate the cost of each one of these issues separately. Just the cost records won't allow it to be done. But what we can do is see the enormous amounts of money that were spent, and we can see from the records that has -- and we quoted one daily diary where they said they culled 4,000 studs.

Page 193

Now, if any of us in this room built a house and you told the contractor you're going to pay him cost plus 10 percent and he told you he had to cull 40 percent of the studs he bought, you'd go ballistic. I mean, you just don't do it. And the reason you don't do it is because you expect your architect to specify a wood that has a low degree of culling. Some culling is always required in Grade 2, and Grade 3 is just out of the roof. Grade 1 is supposed to be near zero. And you can use some of the culled studs in blocking, but you -- there's not enough blocking to utilize all the studs they had to cull off of this job, simply because of the combination of a low grade of specified lumber and a strict adherence to the specified tolerances.
Q. Now, the government didn't specify any particular lumber, but allowed a particular grade of lumber. Isn't that correct?
A. The government listed numerous types of lumber that were acceptable.
Q. Roxco chose to use the lowest grade of the lumber that was --
A. Which is what the government tells the contractor to do. We want the lowest price. We're going to take the lowest price from the contractor. We're not going to give it to the number two bidder;

we're going to give it to the number one bidder.
Q. Let me jump down to the joist spaces from 24 to 16.
A. What page are we on?
Q. This is discussed in Section L, "Claim Pricing," and we're on page 21 of 44 of your Section F.
A. 21 of 44.
Q. I believe it starts on "joint spacing changes." Can you tell me what the nature of this claim is?
A. I have to read this. Will you give me a moment? (Reviews document)
MR. WILLIAMS: What's your Bates-stamp number on the page you're referring to?
MR. GROAT: 0308. Also, it's referenced at 0922.
A. Okay.
BY MR. GROAT:
Q. How much additional cost did Roxco encounter as a result of the joist spacing change from 24 to 16?
A. I can identify some cost in that. We were unable to segregate all of it from cost records because when there's a group of guys up there framing a building and they're told to install it on 16 inches of as opposed to 24 inches, you can't set up a cost code



to capture the difference between 16 and 24.
Q. How much cost did Pearson identify?
A. I think that Cheneyworth asked for like $95,000 for this work. They were issued a change order for about $45,000 that included numerous things. Cheneyworth disputed that, wouldn't accept it, and there was a dispute about it and I think that was resolved in the arbitration that was held between them.
Q. What's the contention now, the additional costs that they're entitled to have as a result of the change from 24 to 16?
A. It is a component of the overall costs being requested, but I cannot isolate the specific amount.
Q. They've already been paid a portion of their costs?
A. They've been paid a portion.
Q. How much have they been paid?
A. It's a matter of record. This says $62,047.
MR. WILLIAMS: Just for your information, the record exhibit doesn't have -- it's missing several pages that you're talking to him about, including 0308. I don't know why it's missing from this copy.
MR. GROAT: Tell us the pages that are missing. Obviously, the copy firm had a problem.



MR. WILLIAMS: Looks like it goes from 0282 to 0331.
MR. GROAT: Okay. We can make another copy.
BY MR. GROAT:
Q. Now, in the wood framing section, you indicate that Roxco budgeted $1,981,452. This is at page 12 of 19 in your Section F.
What, if any, analysis did Pearson make regarding that estimated cost?
A. I don't see that number.
Q. Page 12 of 19. We're in wood framing under the "Claim Pricing," Section L. I'm sorry. The small book, I should have said.
A. What is your question?
Q. What, if any, analysis did Pearson perform regarding that budgeted amount?
A. We determined that Roxco had sufficient materials to build the project for that amount and that they had subcontracted all of the labor required to do the framing for Cheneyworth, and the combination of those two things was a million -- roughly a little less than $2 million.
Q. Where is that analysis that you performed?
A. It's not an analysis. It's in their



estimate. You go through their estimate records and you can count boards and you can go through Cheneyworth's subcontract and find out that Cheneyworth was signed up to install all of the framing members. So you need two documents, both of which have been made available to you: Cheneyworth subcontract and the detailed Roxco estimate.
Q. What analysis did you perform of the Roxco estimate?
A. We reviewed the Roxco estimate and determined that they had sufficient materials in that estimate to build the job.
Q. Did you review the costs that Roxco estimated for the materials?
A. Yes. And they issued purchase orders for that material for the prices that were listed in their estimate, sometimes less than was in the estimate.
Q. Was the estimate based upon the use of grade No. 3 lumber?
A. I believe -- I have a fuzzy recollection about that, but I can tell you that the first purchase order for materials is based on No. 3 material. I've seen that one.
Q. So it's your contention that the use of No. 3 lumber was not reasonable because of the